Honorable Richard A. Jones
February 26, 2021

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| JENNIFER DOLD, personal representative of the estate of Alexander Dold; and KATHY DUNCAN,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>SNOHOMISH COUNTY, a political subdivision of the State of Washington; BRYSON McGEE; and CODY McCOY;<br><br>　　　　　　　　Defendants. | NO. 2:20-cv-00383-RAJ<br><br>DECLARATION OF JAMES E. LOBSENZ IN SUPPORT OF OBJECTION TO JOINT REPRESENTATION OF DEFENDANTS |

I, JAMES E. LOBSENZ, do hereby declare under penalty of perjury under the laws of the United States, that the following facts are true and correct:

1. I am counsel for the plaintiffs and I have personal knowledge of the facts set forth here.

2. Attached to this declaration as Exhibit A is a true and correct copy of Page No. 000214 of the typed Statement of Defendant Bryson McGee.

3. Attached to this declaration as Exhibit B is a true and correct copy of Page No. 269 of the typed Statement of Defendant Cody McCoy.

---

DECLARATION OF JAMES E. LOBSENZ IN SUPPORT OF OBJECTION TO JOINT REPRESENTATION OF DEFENDANTS – 1
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6496203.docx

4. Attached to this declaration as Exhibit C are true and correct copies of Page Nos. 000587 and 000590 from the Statement of Jason Padvorac, given under the penalty of perjury.

5. Attached to this declaration as Exhibit D is a true and correct copy of Page No. 000597 from the Statement of Meggan Padvorac, given under the penalty of perjury.

DATED this 22nd day of January, 2021.

             *s/ James E. Lobsenz*
             James E. Lobsenz WSBA #8787
             Attorney for Plaintiffs

DECLARATION OF JAMES E. LOBSENZ IN SUPPORT OF OBJECTION TO JOINT REPRESENTATION OF DEFENDANTS – 2
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6496203.docx

# CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of February, 2021, I electronically filed the foregoing **DECLARATION OF JAMES E. LOBSENZ** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Attorneys for Defendants Snohomish County and Bryson McGee**
Geoffrey A. Enns       geoffrey.enns@co.snohomish.wa.us
Margaret A. Duncan     margaret.duncan@co.snohomish.wa.us
Katherine H. Bosch     kbosch@snoco.org

**Attorneys for Defendant Cody McCoy**
Shannon M. Ragonesi    sragonesi@kbmlawyers.com

DATED this 22nd day of February, 2021.

　　　　　　　　　　　　　　　　　　　*s/ Deborah A. Groth*
　　　　　　　　　　　　　　　　　　　Legal Assistant

DECLARATION OF JAMES E. LOBSENZ IN SUPPORT OF OBJECTION TO JOINT REPRESENTATION OF DEFENDANTS – 3
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6496203.docx

# EXHIBIT C

As I reached the top of the porch, the door swung violently open. A male appeared and stopped the door, placing himself between the door jam and the open door. He was standing in the opening and bracing the open door against his left shoulder. With his head poked out, he stated "what do you want."

I again advised him that I was the 'POLICE' and advised him that I was there because his mother called 911. He stated "she's fine." I asked him where she was and he repeated "she's fine, now leave." I could hear a female voice from somewhere behind him saying "I'm here." The way she said it, made me feel as though she was older and not ok. I asked the male what happened and he stated "my mom owes me $20 and I wanted my money, she didn't give it to me, so I shoved her onto the couch and told her she wasn't leaving until I got my $20."

I asked the male if we could come in and check on the female and he stated "no, she's fine" and started to close the door. Based on the initial 911 call about a male being physical with the female caller, his demeanor and what I heard in the female's voice, and then the male admitting to physically assaulting his mother to me at the front door, I made the decision that the male needed to be detained to further investigate the DV and check on the mother. I put my foot against the door to prevent the male from closing it further. The male became upset and started to try and close the door on me. Fearing for the safety of the mother and how upset the male was, I started to push back on the door and eventually got it to start opening. The male stepped back as I made entry, towards the female that I could now see. As I stepped into the house, the male punched me right in the face. His punch connected with the left side of my face and it knocked me back.

I yelled at the male that he was under arrest as he started to turn and run towards a back bedroom. Deputy McCoy had also made entry and fell in behind me. I had no idea who this male was and feared that he was retreating to a bedroom to obtain a weapon. The male had already shown violent aggression by feloniously assaulting me, and I feared that his intent was to continue with his assault on me. As we got into the bedroom, the male squared off again, I pushed him onto the bed and lost my footing, falling to my right. I put out "Code 2" on my portable radio, to get addition help to the scene. Deputy McCoy made entry and advised "taser," deploying his taser with probes into the male. The taser appeared to have a desired effect and the male locked up, rolling on the bed. The male started kicking me and striking me several times in the legs/thighs and it became clear to me that the male was continuing his assault on me. At this point, I had a fear for the mother's safety, Deputy McCoy's safety and mine as well. The male was large and muscular. Deputy McCoy put out on his radio that he had deployed his taser, and I stepped onto the bed and delivered several closed fist punches to the male's body. The male was putting his hands/arms up and swatting my hands/arms away to thwart my being able to control him.

I then produced my taser and advised "taser" and deployed my taser with probes in the area of his abdomen. My placement was difficult as he was violently moving around, flailing his arms, squirming his body and thrashing his legs around during his continued assault and focus on me. The male displayed signs of neuromuscular incapacitation and rolled off of the bed. In that process, I could see that one of my probes had pierced one of his forearms. The male got to the floor and as soon as the evolution ended, started punching and kicking at me and Deputy McCoy. I was hit and kicked several times as he escalated his assault on us.

# EXHIBIT B

and talking with us?' and the suspect replied 'no I will talk to you from here'. Deputy McGee then asked the suspect if we could come inside and he replied something like 'no, I said I'd talk to you from here'. The male yelled these statements at Deputy McGee and me which I found odd and concerning.

The male was very aggressive and obviously not happy we were there. Deputy McGee asked the male if he knew why we were there and the suspect replied something to the effect of 'me and my mom got into a fight, this is my house! And she was supposed to give me twenty dollars; she got into my face so I pushed her!' In my mind the male suspect had just admitted to assaulting his mother and I believed I had reasonable suspicion to detain him until I could gather more information from the reporting party (his mother). Deputy McGee asked where the suspect's mom was and if she was safe, he replied that she was right there gesturing to his right. I observed an elderly woman move the curtains back from the window to my left. The elderly woman waved at me, appeared to be frightened, and was talking to someone on the phone. The fact that the victim was now inside with the suspect along with his action made me fear for her safety.

Deputy McGee then told the suspect that we needed to come inside the home to speak with his mother and to ensure her safety, this angered the suspect based on him gritting his teeth and shaking his head no. As Deputy McGee started to enter, the suspect tried to shut the door but Deputy McGee's foot was in the way. Deputy McGee pressed against the door. The suspect using his whole body tried closing it on Deputy McGee, this went back and forth a couple of times until Deputy McGee successfully moved the suspect out of the way, using the door and made entry into the home.

The suspect was pushed back away from and to the left side of the door. I was directly behind Deputy McGee when I saw the suspect with clinched fists, hands up, and leaning forward in what I believed to be a fighting stance. Suddenly the suspect with a closed fist struck Deputy McGee in the face stunning him (Deputy McGee). I immediately drew my Taser (Conductive Electrical Weapon) removed it from safe and aimed it at the center mass of the suspect and fired it to protect Deputy McGee from any further attacks in an effort to subdue the suspect. This whole exchange from the time we told the suspect we needed to come inside to Deputy McGee being punched in the face was about seven seconds. I immediately notified dispatch that I had deployed my Taser and they closed the air for us.

I could see what appeared to be both of the prongs from my Taser cartridge in the suspect but it did not achieve the expected neuromuscular interference. The suspect yelled in pain,

# EXHIBIT C

SMART Investigation                                                                                    Case No. SM 17-6

Det. Mehl: Absolutely.

Jason Padvorac: So we were inside our house and I heard all of it, we, I hadn't heard anything before then that I noticed at least. Then all of a sudden I heard really loud yelling and screaming and some kind of thumping or thudding. I wasn't sure what that was. I was concerned that it might've been a gun. It didn't have the crack that a gun has but it had a thump that was, you know, like a, like a handgun or something.

Det. Mehl: Um-hmm.

Jason Padvorac: It was over in a few seconds. The thing, the really loud screaming, yelling and thumping, it was 5 seconds, 10, 20 seconds, something like that.

Det. Mehl: Okay.

Jason Padvorac: I've, I've heard people have fights before in different places and I've, in different places I've been kind of by the door with my phone ready to call 911 and ready to run over there but I've never done that before. But this, the sounds were bad enough that I, I put on my boots and I ran out the door because I knew something was, something was going on that wasn't good.

Det. Mehl: Um-hmm.

Jason Padvorac: By, by the time I was out the door, the, the, that, the just constant yelling and screaming, thumping had ended. But it was, it was clear that there was something happening on the porch next door.

Det. Mehl: Okay.

Jason Padvorac: As, as I was going up my driveway, then over and then around, I heard, I heard a male voice or voices, I couldn't tell if it was one person or multiple people but there was a voice that said, that said multiple times, stop fighting, I'm gonna break your fingers, I'll shoot you. And periodically intermixed with that Alex would let out a yell and periodically mixed in with that Alex would yell, I submit.

Det. Mehl: Okay.

Jason Padvorac: When I, when I got over there, as I was coming around the corner of their house to where I could see them and they could see me...

Det. Mehl: Um-hmm.

Jason Padvorac: ...I think it was before, when, when I was walking down the driveway, I, I yelled, hey, a few times cause I was just trying to distract whoever was doing all that from whatever they were doing and get 'em to stop.

Det. Mehl: Okay.

SMART Investigation                                                                                    Case No. SM 17-6

came back over here and watched. Eventually they stopped doing CPR and the sometime after that, we went inside because, yeah.

Det. Mehl: Okay. Okay. Could you, so just a few follow-up questions.

Jason Padvorac: Yeah.

Det. Mehl: When you first heard all the yelling, could you, was it a, could you tell who it was? Was it...

Jason Padvorac: I...

Det. Mehl: ...guy, girl, was it Alex yelling? Do you?

Jason Padvorac: They were, they were all male voices.

Det. Mehl: Okay.

Jason Padvorac: It was, I couldn't say how many voices there were. And I only ever saw, when I was over there, I only saw one officer.

Det. Mehl: Okay.

Jason Padvorac: But when, when the yelling was happening, I'm pretty sure I could hear Alex's voice just kind of, I'm pretty sure I could hear Alex's voice and I heard at least one other male voice. And everyone sounded incredibly upset and angry.

Det. Mehl: Okay.

Jason Padvorac: It was the worst yelling, shouting I've ever heard.

Det. Mehl: Okay. Do you remember anything, you talked about the stop fighting, I'll break your fingers and then you heard Alex say, I'll submit. Do you remember anything else that may have been said during all that?

Jason Padvorac: The, I heard a male voice that wasn't Alex say I'll shoot you.

Det. Mehl: Okay.

Jason Padvorac: Alex, the only things Alex said were I submit and he'd periodically let out a yell that sounded like, I don't know, he'd just say ahhhhhh, like that.

Det. Mehl: Okay.

Jason Padvorac: And his mother, I remember hearing his mother say, Alex, we need to take you to hospital.

# EXHIBIT D

SMART Investigation                                                                 Case No. SM 17-6

Det. Mehl:  Okay.

Meggan Padvorac:  There were sounds of people fighting otherwise. I didn't know who the combatants were.

Det. Mehl:  Okay.

Meggan Padvorac:  I just knew that one person was getting beat up by the other people.

Det. Mehl:  Okay.

Meggan Padvorac:  That's all I knew. Okay, and I was pretty afraid because I heard the guy say I'm gonna break your fingers, man. And then, and this is before Jason got there. And then he said, I could shoot ya. And that made me very afraid.

Det. Mehl:  Right.

Meggan Padvorac:  Because at that point I wanted to call Jason back but I didn't because I didn't want to startle the person with the gun into just shooting something randomly.

Det. Mehl:  Sure.

Meggan Padvorac:  You know, I didn't know who it was.

Det. Mehl:  Sure.

Meggan Padvorac:  He could have been drunk, he could have been anything.

Det. Mehl:  And at that point did you know that it was the police?

Meggan Padvorac:  No.

Det. Mehl:  Okay.

Meggan Padvorac:  I did not.

Det. Mehl:  Yeah.

Meggan Padvorac:  I didn't know the police until the point in the story where Jason comes back and tells me it's the police.

Det. Mehl:  Okay.

Meggan Padvorac:  So there was nothing like that. It could have been somebody's older brother or drunk uncle or whatever.