UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| JENNIFER DOLD, personal representative of the estate of Alexander Dold; and KATHY DUNCAN,<br><br>Plaintiffs,<br><br>v.<br><br>SNOHOMISH COUNTY, a political subdivision of the State of Washington; BRYSON McGEE; and CODY McCOY,<br><br>Defendants. | NO. 2:20-cv-00383-RAJ<br><br>DECLARATION OF JAMES E. LOBSENZ IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON FOURTH AMENDMENT EXCESSIVE FORCE CLAIM |

I, James E. Lobsenz, do hereby declare under penalty of perjury under the laws of the United State of America that the following facts are true and correct:

1.  I am counsel for the Plaintiffs. I have personal knowledge of the facts set forth here.

2.  Attached to this declaration as **Appendix A** is a true and correct copy of Page 3 of the Autopsy Report of Alexander Dold.

3.  Attached to this declaration as **Appendix B** is a true and correct copy of the Statement of Sergeant Daniel Johnson.

4.  Attached to this declaration as **Appendix C** are true and correct copies of excerpts from the deposition of Donald Dawes, MD.

5.  Attached to this declaration as **Appendix D** are true and correct copies of excerpts from the deposition of Theodore Chan, MD.

DECLARATION OF JAMES E. LOBSENZ IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON FOURTH AMENDMENT EXCESSIVE FORCE CLAIM – 1 (2:20-cv-00383-RAJ)

DOL013-0001 6873154

6. Attached to this declaration as **Appendix E** are true and correct copies of excerpts from the deposition of Stanley Adams, MD.

7. Attached to this declaration as **Appendix F** are true and correct copies of excerpts from the deposition of Kris Sperry, MD.

8. Attached to this declaration as **Appendix G** are true and correct copies of excerpts from the deposition of Chad Daugherty.

9. Attached to this declaration as **Appendix H** are true and correct copies of excerpts from the deposition of Gary Vilke, MD.

10. Attached to this declaration as **Appendix I** are true and correct copies of excerpts from the deposition of Jennifer Dold.

11. Attached to this declaration as **Appendix J** are true and correct copies of excerpts from the deposition of Vanessa Dold.

12. Attached to this declaration as **Appendix K** are true and correct copies of excerpts from the deposition of Kathy Duncan.

DATED this 23rd day of March, 2022.

        _s/ James E. Lobsenz_
James E. Lobsenz WSBA #8787
Attorneys for Plaintiffs
CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104
Phone: (206) 622-8020

DECLARATION OF JAMES E. LOBSENZ IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT EXCESSIVE FORCE CLAIM – 2
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6873154

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of March, 2022, I electronically filed the foregoing **DECLARATION OF JAMES E. LOBSENZ IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON FOURTH AMENDMENT EXCESSIVE FORCE CLAIM** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Attorneys for Defendant Snohomish County**
Ted Buck                    tbuck@freybuck.com
Delaney DiGiovanni          ddigiovanni@freybuck.com
Nick Gross                  ngross@freybuck.com

**Attorneys for Defendants Cody McCoy and Bryson McGee**
Shannon M. Ragonesi         sragonesi@kbmlawyers.com
Richard B. Jolley           rjolley@kbmlawyers.com
Sean M. Dwyer               sdwyer@kbmlawyers.com


DATED this 23rd day of March, 2022.


_s/ Deborah A. Groth_
Legal Assistant

DECLARATION OF JAMES E. LOBSENZ IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT EXCESSIVE FORCE CLAIM – 3
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6873154

# APPENDIX A


An examination for postmortem interval is performed. At 0603 hours, the ambient temperature is measured at 48.3 degrees Fahrenheit. A body core temperature is measured at 0604 hours and measures 86.4 degrees Fahrenheit. Rigor is moderately well-developed in the bilateral upper extremities and is well-developed in lower extremities and jaw. Lividity is purple and dorsal and is unfixed at this time.

The right ankle is tagged with Snohomish County Medical Examiner Office tag number "17SN0482". The body is placed in clean, new, white sheet and new body bag and is sealed with Snohomish County Medical Examiner Office integrity tag number "0004435". We departed the scene at 0642 hours.

## OPINION

Postmortem examination reveals numerous scattered and focally patterned cutaneous abrasions and contusions involving head, trunk, and extremities. Internal examination shows a single focus of left anterior chest muscle contusion, as well as focal contusion of the left sternohyoid muscle of the anterior neck. There are right and left tongue tip bite injuries. There is concentric left ventricular hypertrophy of the heart. There is pulmonary edema. Postmortem toxicology shows no ethanol or drugs detected.

This 29-year-old Caucasian male, Alexander William Dold, based on investigative information, external and internal examination, radiology examination, and postmortem toxicology tests, *died of cardiac arrhythmia due to cardiac left ventricular hypertrophy. Other significant conditions contributory to death were schizophrenia and physical altercation with law enforcement officers that included use of conducted electrical weapon.*

The manner of death is classified as *accident,* because death was the unintentional outcome of a physical altercation that occurred while taking Mr. Dold into custody, using a level of force that is generally not considered to be life-threatening.

Daniel Selove M.D.
Chief Medical Examiner

april 26 2017

Date Signed        SA/NCTSMS0001/DS

DOLD-BL-000739

# APPENDIX B

# Statement of Sergeant Daniel Johnson #1441

**This is a true and involuntary statement given at the direct order of Undersheriff Rob Beidler of the Snohomish County Sheriff's Office under the threat of termination.**

I have been working in law enforcement since 1991. I have served as a limited commissioned police officer and reserve police officer. I have been a fully commissioned Police Officer in Washington since 2003. I became a full-time deputy for the Snohomish County Sheriff's Office in 2005. I was promoted to Master Patrol Deputy in 2013 and was promoted to Sergeant in August of 2016.

On March 21, 2017 I was assigned to the Snohomish County Sheriffs Office South Precinct as the South Swing-shift Sergeant (noon to midnight). I was wearing a department approved jumpsuit and driving a fully marked patrol vehicle equipped with emergency lights and sirens.

I was in the Sergeant's Office at the South Precinct when I heard screaming over the radio. A few seconds later I heard Master Patrol Deputy Bryson McGee advised he had deployed his Taser.

Dispatch immediately closed the air for emergency radio traffic. Not knowing what call he was on, I asked dispatch for his location but she did not respond so I asked again. She broadcasted the location and I proceeded out of the South Precinct and responded with my emergency lights and sirens activated.

While in route, the radio keyed back up again and they asked if somebody was coming. At that time I had dispatch advise East County Units and Monroe PD as they may be closer given the location.

As I continued, I asked dispatch on a tactical channel if he (MPD McGee) had anybody with him. Dispatch informed me that 1C2 (Deputy Cody McCoy) was with him.

As I got closer, I heard one of deputies on scene say, send help! At that point in time, another unit in route to the location told dispatch to put out a code 3 call or help the officer.

I then got on the tactical channel again not to tie up the emergency traffic and advised dispatch to put South County at level two operations and to have aid stage for the incident.

While continuing to the call, both MPD McGee and Deputy McCoy spoke on the radio asking us to hurry up and provided a description on the location they were at.

MPD McGee was breathing heavy on the radio as he spoke. He did not sound like his normal self, indicating to me that he was exhausted from the altercation.

I then heard a Monroe PD unit arrive on scene. At that time, I looked at the map and estimated I was within a mile of the location so, I put on gloves and grabbed a spit mask and a hobble restraint and put them in my pocket.

Upon arrival, I observed two marked SCSO cars parked across the street a couple driveways before the residence. I also noticed a Monroe PD patrol car parked in the driveway of the residence. I parked on the street just past the driveway and ran in on foot just as another Officer/Deputy was coming in right behind me.

As I approached the front of the residence I could hear a commotion. As I rounded the corner to the residence, I observed three officers struggling with a male on the front steps to the residence. I also observed an older lady talking on a phone in the front window to the left of the closed front door.

As I got closer, I saw MPD McGee and Deputy McCoy literally crawling off of the male looking disheveled and exhausted as I arrived.

At that point, the male was face down on the front steps with his head facing the bottom step. His hands were concealed underneath his waist area and he was still preventing us (Officers/Deputies) from placing him into custody by actively keeping his hands underneath him pulling away. Not knowing if he had any weapons or not, I ran up the stairs and proceeded to kick him in his left upper thigh area two to three times as I yelled, "Let's see your hands" as the other officers/deputies who arrived attempted to gain control of him by of his upper torso and legs.

I then dropped to my knee. I tried to grab his left hand from under him but he was still giving static resistance preventing me from placing his left hand behind his back. I then delivered several closed hand strikes to his lower left torso area and yelled, "Give me your hand" and "Stop resisting." That had little to no effect on him so, I pulled out my Taser, said, "Taser" and proceeded to drive stun him above his butt crack to left side of his upper buttock.

After several seconds I thought my Taser was not working because I was not getting any reaction or response from the Taser application. Nor was I hearing any sounds emitting from the Taser itself. I removed the Taser and verified it was still properly cycling. Since it was not having any affect I re-holstered the Taser and proceeded to grab his left wrist as it was now out from under him.

I assisted the other Officers/Deputies secure his hands in handcuffs. I then instructed the others to move him off the stairs and onto the flat ground.

Once he was on flat ground, I used my hobble restraint to secure his legs as he was still being held down to further prevent him from injuring himself or us. After I

DOLD-BL-000333

secured his legs, I looped it around the handcuffs to further prevent any injury from him kicking or fighting with us.

At that time, I advised dispatch that we had one in custody and that no other units were needed at this time. As I was saying those things, I noticed that the subject was barely moving. I said, "Is he still breathing?" I then told the others to, "Roll him over onto his side and check." He was immediately rolled over onto his right side. That's when we noticed that his breathing was labored. Deputy Miner told aid to respond in. I told them the spot was secure since I was not aware of how many other occupants were involved on the original domestic or what else we were dealing with from the originally call.

As I went out to the street to direct the aid car in, someone yelled that the suspect had stopped breathing and that they were starting CPR. I then got on the radio and instructed the units to move their cars out of the driveway before the aid crew arrived so that they could pull right up to the patient.

Once they arrived, I informed them to hurry up that the suspect had stopped breathing and that officers were now performing CPR. They asked me what was wrong with him and I stated, "I don't know, he fought with officers for 10 minutes and got Tased" (Guestimate on time based on driving). The aid crew then ran in and started life saving measures.

Sgt. Crandall arrived on scene and asked me what I needed. I told him to stay with the patient while I went out to the street to speak with MPD McGee and Deputy McCoy to see if they needed aid.

Both of them were out of breath and exhausted. MPD McGee stated his right hand was hurting and he was sore but he didn't think anything was broken. I asked them if they needed water and MPD McGee said yes. I then got him water from my car. I then told both of them to stay out here in the street away from the scene. I also told them, I would have another unit handle the primary call since they were now victims of an assault.

I instructed Deputy Marino to go inside the residence and investigate the original incident as MPD McGee and Deputy McCoy were now done with the call.

I also tasked a WSP Trooper whom arrived on scene to block off the road at the top of the hill to restrict traffic into the neighborhood.

I then notified LT. Rogers via telephone of the incident and that aid was performing CPR. He informed me that he was in route to the location.

I then went back to speak to Deputy McCoy to check up on him. He was sitting on the front bumper of a patrol car catching his breath. He said he was doing okay with the exception of the shit he had on him. I asked him, "What do you mean?" He then

pointed down to his uniform and showed me the feces on his uniform. I asked him, "Where did that come from?" He told me that during the altercation the suspect, "shit his pants." I stated that, I noticed that his pants had been down from the altercation but I didn't realize he "shit himself."

At that time I looked over my uniform and noticed that I had some feces on my right leg below the knee and down towards my shin and on the toe area of my right boot.

About that time, the graveyard Sergeant (MPD McGee and Deputy McCoy direct supervisor) Sergeant Fortney arrived on scene. I quickly briefed him on the situation and informed him that this may turn into a SMART call. I asked him if he knew if I could clean my uniform or if I had to wait for SMART to photograph me? He stated if it was a biohazard I could wash it off.

I then went to my patrol car cleaned up using Lysol wipes and paper towels. I then disposed of the waste in a garbage bag along with the gloves I wore to clean up. I tied the bag off and placed it in the rear cargo area of my patrol car.

I then went and spoke to the officers and deputies involved and informed them not to discuss the incident with others and to stay separated as this was most likely going to be a SMART call given that medics were still performing CPR.

LT. Rogers arrived on scene and assigned Deputy Poteet to me since the patient had passed away. I remained on scene by my patrol car until I was instructed to go to the South Precinct to be interviewed at which time I did.

I then drove to the South Precinct and sat in the Sergeant's Office with Deputy Poteet and a peer support member until I met with my union attorney.

After my meeting, I met with Detectives from the SMART Team. At that time, I provided them with my Taser and informed them that I had cleaned my uniform due to the biohazard concern and had removed my gloves. I fully cooperated with their investigation and even provided them with my uniform, boots and the garbage bag I used to store the waste.

This ended my involvement in this incident.

# 1441

# APPENDIX C

1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8          WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9   JENNIFER DOLD, personal          )
    representative of the estate     )
10  of Alexander Dold; and           )
    KATHY DUNCAN,                     )
11                                    )
             Plaintiffs,             )
12                                    )
                 vs.                  )        NO. 2-20-cv-00383-RAJ
13                                    )
    SNOHOMISH COUNTY, a political )
14  subdivision of the State of      )
    Washington; BRYSON McGEE; and )
15  CODY McCOY,                       )
                                      )
16           Defendants.             )

17  ─────────────────────────────────────────────────────

18   REMOTE VIDEO RECORDED DEPOSITION UPON ORAL EXAMINATION OF

18                      DONALD DAWES, MD

19  ─────────────────────────────────────────────────────

20

21

22

23

24             TUESDAY, JANUARY 18, 2022

25                  DEHUFFDEPO.COM

                            1

1    you remember who your co-authors were in the second one?

2  A  I don't.  And, and just to be clear on this, both those

3     papers stem from work on that committee.  I didn't have

4     any significant hand at writing those.  I was -- I had a

5     hand, a large hand in writing the committee

6     recommendations.  And so I think Dr. Vilke took from

7     that and made it into a paper.  So, who he included in

8     the author list, I don't know; I wasn't involved enough

9     to know.  I just remember he put me on the list because

10    of my work with him on the committee and for him asking

11    me to maybe provide some edits during the writing.

12 Q  Okay.  I'm gonna ask you an awful lot of questions,

13    among other things, about acidosis now.

14                            (Discussion off the record.)

15 Q  Okay.  First of all, I'd like you to just explain what

16    is acidosis or metabolic acidosis.

17 A  Metabol-- So, acidosis is a pH less than -- The normal

18    body pH is 7.4.

19 Q  And acidosis is a body pH less than 7.4?

20 A  Correct.

21 Q  Okay.  And does that have -- As, as the pH gets lower

22    and lower, does that have health consequences?

23 A  Yes.

24 Q  What are they?

25 A  Well, there could be a whole host of consequences.  It

```
 1       can affect the, the performance of the heart, you know,

 2       myocardial contractility, can affect the strength of the

 3       muscles of respiration, like the diaphragm.  It can

 4       affect brain functioning.  I mean, acidosis can have a

 5       whole wide range of organ effects, but the ones usually

 6       of interest are the heart and lung effects.

 7   Q   Okay.  And as acidosis gets more and more severe can it

 8       cause death?

 9   A   Yes.

10   Q   Okay.  Can it cause death because of its affect on the

11       performance of the heart?

12   A   Yes.

13   Q   Can it cause death because of its affect of the strength

14       of the diaphragm?

15   A   Yes.

16   Q   Can it cause death because of its affect on brain

17       function?

18   A   Probably a little harder to make that connection, but

19       certainly it's a consideration.  It can potentially

20       affect brain stem function, which controls a lot of the

21       basic cardiorespiratory functions.

22   Q   Why is it a consideration?  Why is the brain function a

23       consideration as a cause of death from acidosis?

24   A   Well, because I'm not, I'm not aware that there's been a

25       hundred percent link to the brain stem function.
```

1    Dysfunction occurs because of acidosis before the other

2    things occur, but it's certainly possible that if, if

3    the brain is affected, that can then have neurologic

4    impacts on the heart and lung.  But I think it's

5    primarily direct effects on heart and lung.

6  Q  Okay.  Let me see if my understanding is correct.  The

7    brain stem has the part of the brain that controls the

8    autonomic nervous system; is that right?

9  A  Correct.

10  Q  So, it's in the brain stem that -- That's the part of

11    the brain that controls whether your heart is beating

12    without your having to think about it; right?

13  A  Right.

14  Q  And that's the part of your brain that generally when

15    you're asleep controls your breathing without your

16    having to think about it; right?

17  A  Correct.

18  Q  All right.  I don't know, I had -- My Godmother was one

19    of the last people in the United States to have polio,

20    and she survived it and lived, like, fifty more years or

21    something.  But it affected her brain stem, her

22    autonomic nervous system, so she had to think every

23    breath she took for, like, fifty years.  She had to sort

24    of think, "I want to breathe in; I want to breathe out;

25    I want to breathe in; I want to breathe out."  Now, am I

1    right, acidosis can affect that function of the brain

2    stem?

3  A  Yes.

4  Q  So, if it gets bad that part of the brain stem doesn't

5    work, your heart just doesn't automatically beat

6    anymore; right?

7  A  Right.

8  Q  And if it's affected you don't just automatically

9    breathe anymore; right?

10             MR. GROSS:  Object to form.

11 A  Yes.

12 Q  So, as I understand it, you tell me if this is right, if

13   you agree with this:  If acidosis gets too high and the

14   brain stem gets affected it can indirectly cause death

15   because either your breathing stops or your heart stops?

16 A  Yes.

17 Q  Okay.  Now, you used the term called hypercarbia.  What

18   does that mean?

19 A  Well, part, part of the way you get rid of acid is

20   you're' blowing off carbon dioxide.  It's part of, part

21   of the breathing pro-- respiratory process for animals.

22   So, if you're not breathing either at a high enough rate

23   or volume, then you retain too much carbon dioxide into

24   the blood stream, and that shifts the acid-based balance

25   and becomes more acidic.  So, when you mentioned

```
1      acid and we're using the buffering system, the Co2
2      buffering system and the respiratory system to then
3      adjust to that increased acid in the blood.  So, you
4      would increase your respiratory rate to blow off the
5      acid.
6   Q  Okay.  But the increase in lactic acid comes from
7      increase in carbon dioxide; correct?
8   A  No, it comes from the increased anaerobic work inside
9      the muscles.
10  Q  Okay.  Is it related to the an increase in carbon
11     dioxide?
12  A  No.
13  Q  No?
14  A  It's, it's a way cellular respiration takes place.  It
15     can occur aerobically and anaerobically.  And when you
16     exceed the ability of the cells to pull oxygen from the
17     environment, then it shifts to an anaerobic metabolic
18     pathway.  And then you start pro-- The biproduct of that
19     ancient kind of in the evolution scale metabolic pathway
20     is that you start forming acidosis and your body
21     responds to that acidosis by increasing minute
22     ventilation to blow off that acid.
23  Q  I'm badly trying to ask you questions about exercise and
24     things like lactic acid.  So, let me use a stupid
25     example, for me.  I go home, I lift weights.  I pick up
```

1   my, my -- What do we call it? -- longer than the
2   dumbbell thing, and I start lifting the weights.  And I
3   lift and I lift and I lift until I really can't lift
4   anymore.  Somewhere around the 40th or 50th rep' I can't
5   do it anymore.  Am I right, the more that exercise I'm
6   doing the more I'm generating lactic acid?
7  A  Yes.
8  Q  Okay.  And the more I generate lactic acid at some point
9      this other mechanism kicks in to get rid of it, to lower
10     it, is this respiratory function of blowing off; is that
11     right?
12 A  Well, not exactly.  As you're -- It's a continuous
13     process.  So, as you're exercising your, your cells are
14     using the available oxygen locally to use the aerobic
15     metabolic pathway to use energy in the cells.  As you're
16     exercising and depending upon the rate of exercise you
17     exceed the capacity of those cells.  You exceed the
18     capacity of the oxygen locally in the environment for
19     those cells to use, so the cells convert to an anaerobic
20     metabolic pathway, which is sort of an ancient before
21     they evolved to aerobic, it's kind of a backup system
22     pathway, because the negative of it is it's inefficient
23     and produces lactic acid which then increases the acid
24     in the body.  And as your body responds to that
25     increased acid starts using several buffering

1    mechanisms, the quickest of which is to start breathing

2    faster or having increased volume of ventilation so you

3    can blow off $CO_2$ which has the effect -- because that's

4    the buffering system -- to lower the acid.  So, that's

5    how the body maintains a -- tries to maintain a normal

6    pH in the context of exercising.

7  Q  Okay.  Maybe it would help if we -- if I go now to the

8    general situation of where a police officer is

9    struggling with somebody to put handcuffs on them.  The

10   more the person struggles and the longer the person

11   struggles and fights with the police officer, what's the

12   effect on these systems for these, these ways aerobic

13   and anaerobic that the body has for dealing with the

14   problem?

15 A  It's just the same as when you're exerting yourself

16   heavily, you can't continue to use the aerobic pathway,

17   you have to convert to the inefficient anaerobic pathway

18   and you form lactic acidosis and you have to use the $CO_2$

19   buffering system to drop the lac-- to drop the acidosis.

20   Oh, I'm sorry.  "Correct the acidosis."  I shouldn't say

21   "drop" because that's confusing.

22 Q  So, what's happening is the longer it goes on the

23   further and further it sort of -- I don't know if the

24   word is "behind," but the respiratory way of blowing it

25   off doesn't work anymore, it doesn't keep up?  Is that a

```
 1        fair way of saying?

 2   A    For sure there's a point at which -- There's certain

 3        capacities for everything; right?  And you can exceed

 4        that capacity and eventually not be able to keep your

 5        C-- your pH balance.  That occurs in lots of different

 6        things.

 7   Q    Okay.  And then from the -- And it can happen, anyway,

 8        that higher and higher -- Well, actually, it's lower and

 9        lower the pH gets -- right -- the higher and higher acid

10        gets, you can eventually die of that?

11   A    Yes.

12   Q    Because both -- Normally first the breathing stops?

13   A    Well, I don't,  I don't know that that's known, but

14        that's a contributor, is that the respiratory muscles in

15        the environment where acidosis can get weaker.  And if

16        you're using that as one of your primary means to blow

17        off acid you could start to go into, you know, sort of a

18        -- You know, you can't keep up.  You get more acidotic.

19        It makes the respiratory muscles weaker, which means you

20        can't keep up, which means they get weaker.  So, you can

21        kind of get into a spin.

22   Q    That was my next question.  I was going to ask you to

23        explain what you meant by downward spiral.  And I, I

24        think you sort of just did.  But can you explain why the

25        situation gets worse and worse and worse as a person
```

1    keeps resisting?

2  A  Well, because it -- because if you -- As, as you become

3     more acidotic and you're using this, what we, you know,

4     consider the immediate buffering system, the breathing

5     system -- There's obviously kidneys filtering systems

6     and other things that occur later.  But the more you're

7     using that, there's -- the muscle the faster -- the

8     respiratory muscles get tired themselves, just like any

9     muscle.  And the more that these muscles are in this

10    kind of skew or milieu of acidosis that negatively

11    impacts their contractility.  And so, but they are not

12    only getting tired, but now they can't contract as

13    efficiently, which means you can't keep up, which means

14    you get more acidic.  If you get more acidic and you

15    continue to fight they get tired, they get less

16    contractility and eventually go to respiratory failure.

17    We see that in diabetic ketoacidosis.  That's a pretty

18    common pathway to death.

19  Q  When you say respiratory muscles are you referring to

20    the diagram?

21  A  Diaphragm controls most of it.  I can't remember, 60,

22    70, somewhere percent of it.  But you have also, you

23    know, intercostal muscles; you have, scalenes.  You have

24    all kind of muscles of the thorax that help your

25    breathing as well.

1    aware of the fact that there was a moment when

2    apparently Mr. Dold lost control of his bowels and

3    evacuated his bowel?

4  A  I don't, I don't specifically remember that.  But that

5     -- Yeah, I don't specifically remember reading that.

6  Q  Does that surprise you?

7  A  No, that happens often at -- you know, a lot of people

8     that occurs when someone dies.  It can happen when

9     someone dies.  We see that in the emergency department

10    with cardiac arrest.

11 Q  Isn't that because the autonomic system that maintains

12    muscle tension in the bowel is suddenly gone and nothing

13    is keeping it in?

14 A  Yeah, I think that makes sense.  I'm not -- Again,

15    that's kind of pushing my -- I haven't really given much

16    thought to that, the rationale for it.

17 Q  Okay.  In what you read did you not read that it was

18    first detected by police officers that he seemed to stop

19    breathing and second it was detected that he didn't seem

20    to have a pulse?

21 A  I just -- Yeah, I just don't remember that.  I -- From

22    the purpose of my analysis of the case that didn't

23    matter.

24 Q  Okay.  There's some comments in your report about the

25    general situation of a police officer fighting with the

| | | |
|---|---|---|
| 1 | | subject to restrain him, and you say, "The subject |
| 2 | | usually fights attempts to restrain him." And my |
| 3 | | question is, you certainly saw the effect of that in |
| 4 | | this case; correct? |
| 5 | A | Correct. |
| 6 | Q | Okay. And you said in your report that, "This kind of |
| 7 | | fighting leads to a metabolic tailspin;" correct? |
| 8 | A | It can, yes. |
| 9 | Q | Well, in this case was it not your opinion that it did? |
| 10 | A | Yes. |
| 11 | Q | Okay. And then you describe -- You said that this -- I |
| 12 | | don't know if the word was "create" -- but "causes or |
| 13 | | creates a significant challenge in policing." Do you |
| 14 | | remember that, what you were discussing there? |
| 15 | A | Yes. |
| 16 | Q | Or -- Okay. And let me ask you if my understanding of |
| 17 | | it is correct. The challenge is that there's a conflict |
| 18 | | between what the police have to do and what kinds of |
| 19 | | things exacerbate the metabolic tailspin. |
| 20 | A | Correct. |
| 21 | Q | And you're saying if the police have to restrain him |
| 22 | | he's gonna fight more, he's going fight more, that's |
| 23 | | gonna increase the metabolic tailspin; correct? |
| 24 | A | Right. Yeah, well, in a general sense the more someone |
| 25 | | fights the more they're going to get more metabolic |

```
 1   A   Or a respiratory arrest.
 2   Q   Well, eventually he also had a cardiac arrest no matter
 3       what; right?
 4   A   Eventually his heart stopped.
 5   Q   Okay.  Why, why in your opinion did his heart eventually
 6       stop?
 7   A   I'm not opining on the cause of death in this case.
 8   Q   Okay.  Somewhere in your report do you recall
 9       calculating that he was fighting strenuously for about
10       twelve minutes?
11   A   Yes, I agreed with your Medical Examiner expert who
12       concluded the same.
13   Q   Tell me if you agree with this statement:  "If he had
14       not been in a strenuous physical fight, there had not
15       been any fight at all physically for twelve minutes, he
16       would not have died."
17   A   Sorry.  Can you say it again?  I'm not trying to be
18       obtuse here.
19   Q   If he hadn't been in a fight for twelve minutes, if he
20       hadn't been in a strenuous physical fight, if he hadn't
21       been in any physical fight at all, he wouldn't have
22       died?
23           MR. GROSS:  Object to form.
24   A   Again, I'm try-- My struggle is I'm not going to opine
25       on the cause of death but I...  So, I'm trying -- I
```

```
1        would -- Sorry.  I'm trying to -- Can you ask it again?
2        I'm not being obtuse.  I want to be sure I'm answering
3        the question.  I don't want to opine on something that
4        I'm not prepared to opine on.  But I don't want to be
5        intentionally evasive.  I want to be sure I provide a
6        reasonable answer.
7     Q  Well, maybe this will help you.  Let's go back one step.
8        Why don't you assume that the officers never went to the
9        house, never contacted Mr. Dold and so there was never
10       any confrontation between the police and Alexander Dold
11       at all.  If nobody went to the house that night, you
12       agree with me, do you not, that he would not have died?
13    A  I would say that's probably the case.
14    Q  Okay.  Now, let's assume that they went to the house,
15       these officers went to the house, but there was never
16       any physical fight.  Let's assume that they said, "We'd
17       like to take you to the mental hospital in the next
18       town," and they did and there was never any physical
19       fight.  You assume that he probably wouldn't have died;
20       right?
21    A  I would agree with that.
22              (Comments off the record.)
23              (Recess in proceedings 11:57 a.m. to 12:30 p.m.)
24    Q  Dr. Dawes, at one point in your life were you
25       considering a career in law enforcement?
```

| | | |
|---|---|---|
| 1 | | conducted electrical weapon. Am I correct you disagree |
| 2 | | with the opinion of the Medical Examiner on that point? |
| 3 | A | I do disagree with him, and I think this harkens back to |
| 4 | | the laziness issue where they don't make any attempt to |
| 5 | | hone down on the physiology in the case. |
| 6 | Q | Okay. |
| 7 | A | I think this is what I described as some of the laziness |
| 8 | | diagnosis before. This is where they just kind of throw |
| 9 | | everything into the soup and don't make any attempt to |
| 10 | | separate out things and can't give weight or attribute |
| 11 | | real contribution to. So, this is seen unfortunately a |
| 12 | | lot. This is seen unfortunately as just kind of the |
| 13 | | all-encompassing catch phrase that Medical Examiners |
| 14 | | often use. |
| 15 | Q | So, you don't agree that use of conducted electrical |
| 16 | | weapon was a contributory condition; correct? |
| 17 | A | Correct. |
| 18 | Q | Okay. Now, he also says that schizophrenia was a |
| 19 | | significant condition contributory to death; do you |
| 20 | | agree with him? |
| 21 | A | I don't have an opinion on it. |
| 22 | Q | One way or the other? |
| 23 | A | One way or the other. |
| 24 | Q | He also said that the physical altercations between the |
| 25 | | law enforcement officer was a contributory condition, |

| | | |
|---|---|---|
| 1 | | significant contributory condition.  Do you agree with |
| 2 | | him on that? |
| 3 | A | I do. |
| 4 | Q | Okay.  So, explain to me why you think the physical |
| 5 | | altercation was a contributory condition. |
| 6 | A | Well, because the physical altercation assuredly at that |
| 7 | | level for that duration led to metabolic acidosis. |
| 8 | Q | And when you say "physical altercation," when you say |
| 9 | | that that contributed, what are you including in the |
| 10 | | term "physical altercation"? |
| 11 | A | That basically is the struggle, his, his fighting |
| 12 | | exertion that he's going through.  So, I don't know that |
| 13 | | that would necessarily include, like, getting punched in |
| 14 | | the -- being punched somewhere in the body.  It's more |
| 15 | | talking about the exertion that he's incurring. |
| 16 | Q | Okay.  But you don't think that that includes uses of |
| 17 | | the weapon, the taser? |
| 18 | A | I don't -- I think if you take this case and you take |
| 19 | | out the taser, he dies anyway.  If you take out |
| 20 | | everything, the exertion, the struggle and leave the |
| 21 | | taser, he doesn't die.  That is my opinion. |
| 22 | Q | You take out the taser, do you think there might have |
| 23 | | been less struggle? |
| 24 | A | No. |
| 25 | Q | No?  How do you know that? |

# APPENDIX D

1

2

3

4

5

6

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | | |
|---|---|---|
| JENNIFER DOLD, personal representative of the estate of Alexander Dold; and KATHY DUNCAN, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | NO. 2-20-cv-00383-RAJ |
| SNOHOMISH COUNTY, a political subdivision of the State of Washington; BRYSON McGEE; and CODY McCOY, | ) ) ) ) | |
| Defendants. | ) | |

REMOTE VIDEO RECORDED DEPOSITION UPON ORAL EXAMINATION OF

THEODORE C. CHAN, MD

WEDNESDAY, FEBRUARY 16, 2022

```
1    records, I think he had an enlarged heart which put him
2    at risk for a sudden cardiac arrest, cardiac
3    dysrhythmia, and I think his most likely cause of death
4    was, in fact, that, the sudden cardiac arrest.
5  Q  Well, then is that another opinion that you're gonna
6    offer in this case, that you think Alexander Dold died
7    because his enlarged heart was subjected to cardiac
8    arrest and that's why he died?
9         MR. JOLLEY:  Object to the form.
10 A  Well, what I would say is that I, I agree with the
11   Coroner's opinion as to the cause of death.
12 Q  Well, the Coroner said that was only one cause of death;
13   right?
14        MR. JOLLEY:  Object to the form.
15 A  Well, I think -- I mean, we can take a look at it.  I
16   think, you know, he mentions a number of factors.  And
17   whether they're contributory or the cause, I think, you
18   know, we can take -- we can dissect that if you'd like.
19   But I agreed with the Coroner's finding or cause of
20   death.
21 Q  Including his finding that his struggle with the police
22   was a significant contributory cause?
23        MR. JOLLEY:  Object to the form.
24 A  So, any time you're in a physical struggle that can
25   increase your endogenous catecholamine production, and
```

9

# APPENDIX E

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

JENNIFER DOLD, personal          )
representative of the            )
estate of Alexander Dold;        )
and KATHY DUNCAN, mother         )
of Alexander Dold,               )   No. 2:20-cv-00383-RAJ
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )
                                 )
SNOHOMISH COUNTY, a              )
political subdivision of         )
the State of Washington;         )
BRYSON MCGEE; and CODY           )
MCCOY,                           )
                                 )
          Defendants.            )

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

STANLEY D. ADAMS, M.D.

WEDNESDAY, FEBRUARY 23, 2022
REMOTELY VIA ZOOM
DEHUFFDEPO.COM

```
 1        Somebody might have deleted the rest of that sentence

 2        or I might not have finished it, you know.  There's

 3        no way to go back to that.

 4   Q    What about the final section, Opinion?  Is that

 5        something you started drafting?

 6   A    I would have written the preliminary opinion, but

 7        this one has been all changed around.

 8             Normally, I would start out -- well, first of

 9        all, my scene investigations, which he has up in the

10        front of this report, are normally my very last

11        page of my autopsy report.  So, you know, if it was a

12        ten-page autopsy report, they would be page 10.  So

13        he moved these all the way up to the front of the

14        report.

15             And then the opinion would be on its own page.

16        And I would start out with the paragraph -- this is

17        Bates 739.  I would start out with:  "This

18        29-year-old Caucasian male."  That would be my first

19        sentence.  And then the postmortem examination would

20        be the second paragraph.

21             And then the thing that he changed was, in

22        particular, was the manner of death.  And that's -- I

23        have a -- I have a little bit of heartburn with that

24        because he took my correct answer and he changed it

25        to an incorrect answer.  He put "accident" and this
```

1    is a homicide.

2  Q    Why do you say it's a homicide?

3  A    Because when one human being does an action or

4       neglects to do an action that caused the death of

5       another, it really doesn't matter about the intent,

6       you know.

7           You know, if somebody aims a gun at somebody

8       and it accidentally goes off, it's not an accident;

9       it's a homicide.  Is it a murder?  Not necessarily.

10      Sometimes things are justifiable homicides.  The

11      combat deaths I used to do in the military, those

12      were all homicides.

13          If you go to any major medical examiner office

14      in the United States, anywhere, I guaranty you they

15      would call this a homicide and not an accident.  A

16      beginning medical student might accidentally call

17      this an accident, but that's not a -- that's not a

18      mistake I would expect of a practicing medical

19      examiner.  So this is not an accident.  It's a

20      homicide.

21 Q    I am assuming -- tell me if I'm right -- that you are

22      very familiar with the legal definition of

23      manslaughter; is that right?

24 A    I'm familiar with the legal definitions of

25      manslaughter and first degree.  You know, I don't use

1    not be material in a person's death, but then when

2    you go and examine them and they have an enlarged

3    heart, and with thickening of the left ventricle,

4    that is well known to cause sudden cardiac death.

5    Those people kind of are living on borrowed time.

6         And so in someone like him, even if he got into

7    a struggle, you know, just the physical altercation

8    could push a heart like that into an arrhythmia,

9    because what happens during a struggle is your system

10   is getting flooded with hormones like adrenaline, and

11   the adrenaline can make the heart more susceptible,

12   you know, to that, that type of electrical

13   abnormality.

14        So just the fight with the deputies could have

15   caused his existing heart disease to manifest as a

16   sudden cardiac death.

17  Q   And isn't that what you concluded was his, at least,

18       primary cause of death?

19  A   Well, I -- yeah, I -- you know, to put -- to complete

20       this death certificate properly, it would be remiss

21       of me -- and I didn't do it, but I would also put the

22       conducted electrical.  I would put there is a history

23       of use of conducted electrical weapon because I know

24       that to be a fact, you know, but I don't -- and it

25       would be kind of remiss not to mention it at all in

# APPENDIX F

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

-----------------------------------------------------------

JENNIFER DOLD, personal )
representative of the )
estate of Alexander Dold; )
and KATHY DUNCAN, mother )
of Alexander Dold, )   No. 2:20-cv-00383-RAJ
)
        Plaintiffs, )
)
    vs. )
)
SNOHOMISH COUNTY, a )
political subdivision of )
the State of Washington; )
BRYSON MCGEE; and CODY )
MCCOY, )
)
        Defendants. )

-----------------------------------------------------------

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

KRIS SPERRY, M.D.

-----------------------------------------------------------

9:02 a.m. - 12:45 p.m.

Wednesday, January 19, 2022

Remote Video Teleconference

REPORTED BY:
JOLENE C. HANECA, RPR, CCR 2741

1      Q.    Assuming that's true, if Deputy McCoy was

2    actually on Mr. Dold's legs, it would be fair to say it

3    would be impossible for him to actually contribute to

4    causing Mr. Dold's asphyxia; correct?

5      A.    Yes.  Based on how you asked the question, then

6    yes, that would -- being on Mr. Dold's legs alone would

7    not contribute to asphyxia.

8      Q.    How much weight would be needed on Mr. Dold's

9    torso for that to be a contributing factor in causing

10   asphyxia that led to his death?

11     A.    Sure.  That's a harder question to answer only

12   because -- well, not only because, but, first of all,

13   Mr. Dold is on the stairs, and it's not a -- you know,

14   it's not a flat surface.  He's on the stairs, and so it's

15   irregular, and weight on his back will be distributed in

16   a very -- in a different way depending on where his body

17   is laying on the stairs.

18          And, secondly, this -- of course, these are

19   experiments that can't ever be performed on human beings,

20   you know, to reach, to see how they can reach their

21   limits as far as tolerating weight.

22          And, thirdly, Mr. Dold certainly had been in a

23   fairly extensive physical struggle since the point where

24   the officers came into the house, some approximately

25   what, ten minutes or so earlier, something like that,

1    eight to ten minutes.

2           And so with all, with all of that, I mean being

3    in the struggle would produce an oxygen debt and $CO_2$

4    retention and some acidosis.  So he would be more

5    sensitized to asphyxia than someone who had not undergone

6    all that physical stress.

7           So having said all that, I don't know that

8    that's really an answerable question, because this is --

9    well, with the element of the stairs being under

10   Mr. Dold's body, that's a very different physical

11   substrate than what is present in most situations where

12   the weight of officers causes compression asphyxia.

13   Q.    Assume for purposes of this question that

14   Deputy McCoy is on Mr. Dold's legs and Deputy McGee is on

15   the side of his body while Officer Block is pressing down

16   on the back of his head with the flashlight.

17          Would Deputy McCoy and Deputy McGee's actions,

18   where they're not on Mr. Dold's torso, actually

19   contribute to asphyxia as Deputy, or Officer Block is

20   pressing down on the back of Mr. Dold's head?

21   A.    With that assumption, then no.  Weight, that

22   is, weight on Mr. Dold's chest, on his back, really would

23   not be a contributing factor.

24          Now, just to really kind of complete that out,

25   and I know that's a hypothetical question, I understand

1    then he wouldn't have effects of a discharge.

2          And, I mean, so that's -- that's really what it

3    is.  That's what I'm trying to say here, that the

4    descriptions that were given by the officers that the

5    Tasers had little to no effect probably related to

6    incomplete penetration of one dart or another into the

7    skin, thus again, as I've been trying to say, completing

8    the circuit and allowing the discharge to go into his

9    body.

10   Q.    Is it your opinion that the Taser applications

11   played any role in Mr. Dold ultimately dying of, I think

12   your opinion is, of asphyxia?

13   A.    Okay.  I don't think that the Taser

14   discharge -- you know, any electrical can -- any

15   electrically conducted current that may have gone into

16   his body, that would not have caused, say, you know, any

17   heart damage or anything that was deleterious to his body

18   that is somehow cumulative or in some way that would

19   result in his death from the Taser discharge.

20         The only thing that really the Taser would do,

21   again assuming, excuse me, that he actually did have the

22   effects of the Taser discharge current in his body, would

23   increase his oxygen utilization and enhance the acidosis,

24   that all of which is being produced by the intense

25   struggle that is going on between Mr. Dold and the

1    officers.

2          So the Taser, really except in vanishingly rare

3    cases, doesn't directly cause someone's death, nor result

4    in any tissue damage or heart damage that contributes to

5    the death, but, as I said, the only real effect is if it

6    is the -- is on the underlying physiology, if there are

7    cumulative discharges.

8          Does that make sense to you?

9      Q.    Yes.  And the cumulative effect of the

10   discharges would be that that would contribute to stress

11   that ultimately creates acidosis?

12     A.    Basically, yes.  Yeah, I mean increased

13   adrenalin production that, of course, is involuntary, and

14   then, you know, as I said, oxygen utilization and

15   impairment of exhaling enough carbon dioxide such that

16   the blood pH becomes more and more acidotic and then, you

17   know, can reach critical, critical point, critical levels

18   if indeed everything is all continued.

19     Q.    Just based on what you saw from the autopsy, is

20   it your opinion that the Tasers, or Taser applications

21   contributed in any way to Mr. Dold's death?

22     A.    Well, the problem is, and this is one of the

23   difficulties about these deaths, the fact that the Taser

24   was used and there were apparently multiple attempts at

25   applying the Taser current, I can't tell you that the

1    patterned abrasions and contusions on the left side of

2    his head, along with Officer Block's statements that he

3    used his flashlight to push against Mr. Dold's head, and

4    that I think it was inevitable that Mr. Dold's head was

5    pushed up against the underlying stairway.

6           And then the -- well, the overall effects of

7    the struggle, we've talked about, about that, I think,

8    but that ultimately Mr. Dold was in an oxygen deficit and

9    had an excess of carbon dioxide and was acidotic --

10   excuse me -- and that this would render him much more

11   sensitive to a sudden death with any type of asphyxia

12   that his body sustained.

13       Q.    What is the evidence from the autopsy that

14   tells you that Mr. Dold was acidotic?

15       A.    Well, there, there isn't anything from the

16   autopsy.  You can't tell -- we can't tell acidosis at an

17   autopsy examination.  But it's the -- well, the nature of

18   human physiology and the struggle, the physical struggle

19   that Mr. Dold had been in that was very intense with

20   other officers, and it's -- that is some fairly basic

21   physiology.

22       Q.    Would that same acidosis be a contributing

23   factor if Mr. Dold died of a cardiac arrhythmia rather

24   than asphyxia?

25       A.    I'm not -- I don't quite understand your

1  combined weight that caused compressional asphyxia is a

2  conclusion you are reaching based on the physical

3  evidence that you saw in the autopsy; is that right?

4         MR. LOBSENZ:  Objection; argumentative,

5  repetitive.  Objection as to form.  Go ahead.

6     A.    All right.  I mean, I think that's, that's a

7  reasonably fair assimilation of what I have been trying

8  to say, and that the -- I mean, the weight of one officer

9  alone should not be enough to cause an adult male of

10  Mr. Dold's size to have compression, to have chest

11  compression, but it would require more weight than just

12  one officer.

13         And both officers were working to try to get

14  him handcuffed and yet hold his body still while they

15  were doing that.  And, of course, Mr. Dold was struggling

16  during the course of this, making it more difficult.

17  BY MR. GROSS:

18     Q.    And can you state again what the relationship

19  is between acidosis and Mr. Dold's death?

20     A.    Okay.  Well, it's the element of an intense

21  struggle of any sort.  I mean, I don't -- I'm not a

22  runner.  If you're a runner, you go out and run, if you

23  check your blood pH and lactic acid level when you

24  finish, you'll find that you are slightly acidotic and

25  your lactic acid is elevated, because that's the normal

1  physiology, but people who are adapted to that recover

2  just fine and certainly don't have any problems, but with

3  a very intense struggle like this, with Mr. Dold and the

4  two officers, this is going to generate lactic acid and

5  generate, well, reduce in -- excuse me, result in an

6  oxygen debt and an accumulation of carbon dioxide in the

7  blood, and that produces acidosis.

8          In fact, we talked about this a couple hours

9  ago with the Taser discharges.  Tasers are painful, and

10  pain produces adrenalin, which then accentuates the

11  production of lactic acid and enhances the oxygen debt

12  that is present.

13          So you don't kill someone directly with a

14  Taser, but factored into everything else, the acidosis

15  increases.  So -- excuse me -- ultimately there is a

16  breaking point that is reached that will cause sudden

17  death just from the restraint and the intense physical

18  action, as well as the Taser application, all combined

19  together, without asphyxia.

20          Now, when some type of asphyxial mechanism, say

21  compression of the neck is factored in, an individual

22  such as Mr. Dold is much more sensitive to interruptions

23  in blood flow going to the brain, and a sudden cardiac

24  death can result from an asphyxial mechanism that is not

25  as intense, or not as severe in the absence of any

1    acidosis.

2        Q.    And are you able to rule out that acidosis

3    alone didn't kill Mr. Dold?

4        A.    Well, the problem is the presence of the, of

5    the petechial hemorrhages, the evidence of asphyxia, as

6    well as there is also pulmonary edema from the lungs,

7    which is another element that is associated with -- at

8    least found in asphyxial mechanisms, such as what

9    Mr. Dold has, other evidence that we've been describing

10   over and over again.

11            So I would say, because of the totality of what

12   Mr. Dold underwent, I think it's inevitable that he had

13   some acidosis going on, but the finding of petechiae, the

14   pulmonary edema, those are the markers of asphyxia.

15            And we know that he had a lateral vascular neck

16   restraint.  We know certainly his head was pushed

17   downward against the stairs with really pressure against

18   his neck, and some degree, some element of force was

19   applied to his back.

20            Everything all combined result in oxygen

21   deprivation and carbon dioxide accumulation, which

22   enhances the acidosis.

23            So I'm sorry to give you a long dissertation,

24   but your questions are deceptively simple.

25        Q.    Are you able to tease out what effect acidosis

1          THE VIDEOGRAPHER:  Apologies.

2          MR. LOBSENZ:  That's all right.

3                        EXAMINATION

4    BY MR. LOBSENZ:

5      Q.    Dr. Sperry, you said that pulmonary edema is a

6    typical marker of acidosis.

7            Could you explain why?

8      A.    You mean of acidosis or asphyxia?  Well, or

9    both?  Okay.  I mean, it could occur --

10     Q.    Let's start with acidosis first.

11     A.    Okay.  I mean, it could be seen in acidosis as

12   the consequence of progressive heart failure, you know,

13   weakening of the heart, the weakening of the pumping

14   ability of the heart over the course of time, and thus --

15   because the acidosis affects the heart, and thus, as the

16   heart pumping ability weakens, then blood essentially

17   backs up into the lungs -- there's a pressure gradient --

18   and edema fluid leaks out from the billions of

19   capillaries in the lungs into the air sacs, and that's

20   pulmonary edema related to acidosis alone.

21     Q.    And before we get to the other part of it,

22   would you just explain why acidosis weakens the heart?

23     A.    Well, sure.  All of our body organs function

24   within a very narrow range of the acid-based balance.  I

25   mean, that's what we're talking about.

1          The acidosis means that there is more acid

2    chemicals in the blood than base chemicals.  And so

3    the -- you know, the blood, if you measure the pH or the

4    balance of the acid in the base in the blood, the

5    abnormality causes the pH to become more acid.

6          And because all of our organs, especially the

7    heart being an electrical organ -- it functions on

8    electricity in a very narrow blood pH -- when the blood

9    becomes more acidotic, this disrupts the ability at a

10   cellular level of the heart muscle fibers to contract and

11   do their job normally.  So the heart muscle starts to

12   weaken and lose its ability to pump effectively because

13   the chemical nature of the blood that is nourishing the

14   heart changes more towards the acid side.

15         Does that make sense?

16   Q.    Yes.

17   A.    Okay.

18   Q.    When you say --

19   A.    It's complicated, and I can try, you know, to

20   make it more easier, but that's -- well, I tried, but I

21   could do better.

22   Q.    That should be all of our mottos, but.

23   A.    I'm going to have to write that down.  I may

24   use that again.

25   Q.    But let's go back to what you said about it

1    changes the -- I think you said something about it

2    changes the chemical something of the blood.

3        A.    Well, the -- okay.

4        Q.    Let me ask the question.  Okay?

5        A.    Sure.  Yeah, I'm waiting for it.

6        Q.    As the blood becomes more acidotic, does this

7    chemical change of the nature of the blood and the

8    acidity of the blood have any effect on the level of

9    carbon dioxide in the blood?

10       A.    Okay.  The level of carbon dioxide actually

11   increases with someone who is at an intense struggle.

12   They are not able to breathe in as much oxygen as they

13   really need.

14             That's why I was using the term oxygen debt.

15   In other words, their reserve of the oxygen is depleted,

16   and when that happens, the ability to blow off or breathe

17   out carbon dioxide that accumulates in our blood is also

18   impaired.

19             As the carbon dioxide accumulates in the blood,

20   this shifts the chemical consistency of the blood more

21   towards acid, and that's where the -- that's where

22   acidosis comes from.

23             So yes, it is related to accumulation of carbon

24   dioxide and the inability to exhale or blow it off

25   sufficiently to prevent the heart muscles from

1    functioning poorly, from weakening.

2        Q.    Does the increase in carbon dioxide level in

3    the blood have any effect on the brain?

4        A.    Oh, yes.  Yeah, it produces -- oh, I'm sorry.

5        Q.    Go ahead.

6        A.    Okay.  Yes, the carbon dioxide is actually very

7    toxic to brain cells, and it -- there is an entity

8    actually called carbon dioxide narcosis, where as the

9    carbon dioxide in the blood accumulates, it actually

10   poisons the brain cells and will cause them to die very

11   rapidly, yes.

12       Q.    How rapidly?

13       A.    Over the course of seconds.  I mean, this could

14   progress very rapidly.

15       Q.    And does that include the brain cells that

16   govern the autonomic nervous system?

17       A.    Yes.

18       Q.    So as carbon dioxide increases and destroys

19   brain cells in the autonomic nervous system, does that

20   have an effect on the heart?

21       A.    Yes, it does.  The autonomic nervous system

22   controls the beating of the heart.  It initiates the

23   electrical impulse that travels down to the heart and

24   goes through the heart, causing the heart to pump and

25   beat, and the carbon dioxide accumulation affecting the

1   autonomic nervous system then affects the ability of that

2   part of the nervous system to effectively cause the heart

3   to beat.

4       Q.   And what about the effect, if any, of carbon

5   dioxide on the brain cells in the autonomic nervous

6   system that control breathing?

7       A.   It's the same thing, that the breathing is

8   affected -- well, breathing is controlled also by the

9   autonomic nervous system, meaning that we, we as human

10  beings, cannot like make ourselves stop breathing

11  completely, but the accumulation of carbon dioxide

12  poisons those brain cells as well and thus damages the

13  brain's ability to make the human being breathe

14  adequately.  It poisons that part.  It poisons

15  everything.

16      Q.   Now, a couple of questions back you used both

17  the phrase edema as a marker of acidosis and edema as a

18  marker of -- I forget whether you said asphyxia, I think.

19      A.   Yes.

20      Q.   Would you explain why edema is a typical marker

21  of asphyxia?

22      A.   Yes.  Asphyxia, I mean, the little translation

23  from the Greek, Greek means without oxygen, or without

24  breathing literally, and with -- when someone is not

25  breathing or not getting enough oxygen into their body,

1   this is toxic.

2          It actually relates back to what you and I were

3   just, or at least I was chatting about a few minutes ago

4   regarding the accumulation of carbon dioxide.  If someone

5   is not breathing for whatever reason, or their ability to

6   breathe is impaired, or the ability of the blood to get

7   oxygen is impaired, carbon dioxide rises and this is what

8   damages the heart, just as we -- like we were talking

9   about a minute ago.

10          The endpoint of the production of acid --

11   excuse me -- in the blood is really the same for asphyxia

12   as it is for just chemical acidosis.

13          In other words, if you are not breathing and

14   you are not getting oxygen in your body, you are not

15   getting rid of all the carbon dioxide that you have to

16   get rid of, that then becomes toxic to the heart and

17   weaken, weakens the heart, causing its function to

18   gradually get weaker and weaker, and the blood backs up

19   into the lungs, and the lung -- at a microscopic level,

20   the lung cell, the lung tissues, excuse me, get leaky and

21   fluid leaks out into the air spaces, and that is

22   pulmonary edema, fluid in the air sacs because of a

23   failing heart.

24      Q.   Among the materials that you reviewed, did you

25   review a transcript of an interview of Mr. Dold's mother,

1    Kathy Duncan?

2        A.    Yes, I did.

3        Q.    Within -- during your review of that, did you

4    find anything to corroborate the notion that there was

5    pulmonary edema?

6        A.    Yes.  She saw that there was a foam in his

7    mouth, that he was -- he appeared to be -- have foaming

8    that was, you know, that was in his mouth during the

9    course of this.  And that is an external manifestation of

10   pulmonary edema.  As the fluid comes up from the lungs

11   and mixes with air, it produces foam, yes.

12       Q.    The autonomic nervous system, does it also play

13   a role in maintaining -- I don't know what the right term

14   is -- sort of normal muscle tone and tension?  Do you

15   know what I mean?

16       A.    Yes.  Yeah, no, I know exactly what you mean.

17       Q.    What is the right term for that?

18       A.    Well, it's exactly what you said, really.

19   Normal muscle tone is affected or controlled by the

20   autonomic nervous system.

21             In other words, if there is a derangement and

22   the autonomic nervous system is not working right, the

23   skeletal muscles get soft and flabby.  They don't work

24   right.  They become weak and, you know, will not, will

25   not function.

1      Q.      And isn't -- is that true of all muscles, like,

2  for example, facial muscles?

3      A.      It is, yes, you know, to varying degrees.  Most

4  of the voluntary muscles are not.  I mean, we can -- we

5  can control those unless the autonomic nervous system

6  that empowers the muscles, you know, at rest, unless that

7  is damaged or not working right.  Then the face may

8  appear to go slack and the person can, you know, become

9  abnormally weak and not able to physically do, physically

10  do what they could normally.

11      Q.      What about the bowel muscles, the muscles that

12  control whether or not you do or don't defecate?

13      A.      Oh, yeah, that's a very good one.  The

14  autonomic nervous system controls involuntary defecation.

15  I mean, it's a very complex relationship, because we all,

16  every human being, normally has bowel movements, but you

17  have to have the autonomic nervous system intact in order

18  for that to work, and if there is a dysfunction, if the

19  autonomic nervous system is not working correctly, this

20  can result in involuntary defecation.

21      Q.      So let's go in the reverse order now.  Instead

22  of going from the brain to the bowel for a moment,

23  assume, hypothetically, that -- you may have read this,

24  but assume, hypothetically, that at some point while they

25  were struggling Mr. Dold's body released all of the fecal

1   matter and he defecated and much of it got on Deputy

2   McCoy.

3        A.     Yes.  I remember that.

4        Q.     What, if anything, does that signify to you

5   about what was going on with the autonomic nervous

6   system?

7        A.     No, I understand.  That indicates to me that he

8   was already, at that point in time, suffering from, you

9   know, increased carbon dioxide retention and poisoning,

10  you know, acidosis development, and the toxic effects

11  then that those chemicals have on the autonomic nervous

12  system.  And so involuntary defecation is a marker of a

13  damaged or a poisoned autonomic nervous system.

14       Q.     Is involuntary defecation a marker of brain

15  death?

16       A.     It can be, yes.  And certainly asphyxia.

17  That's -- I won't say oddly, but it's an element that in

18  the -- in looking at victims of strangulation, actually,

19  involuntary defecation is found somewhere between a third

20  and a half of all individuals who are strangled and who

21  survive and actually may not even remember the

22  strangulation because of the damaged brain cells that

23  occur from lack of oxygen, but the defecation is a marker

24  of the nervous system not functioning right and then

25  there's involuntary defecation.

# APPENDIX G

5          UNITED STATES DISTRICT COURT

6     WESTERN DISTRICT OF WASHINGTON AT SEATTLE

7

8

9   JENNIFER DOLD, personal        )
    representative of the          )
    estate of Alexander Dold;      )
10  and KATHY DUNCAN, mother       )
    of Alexander Dold,             )   No. 2:20-cv-00383-RAJ
11                                 )
                                   )
             Plaintiffs,           )
12                                 )
        vs.                        )
13                                 )
    SNOHOMISH COUNTY, a            )
14  political subdivision of       )
    the State of Washington;       )
15  BRYSON MCGEE; and CODY         )
    MCCOY,                         )
16                                 )
             Defendants.           )
17

18

19   VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

20                  CHAD DAUGHERTY

21

22           TUESDAY, FEBRUARY 22, 2022
                REMOTELY VIA ZOOM
23               DEHUFFDEPO.COM

24

25

1    that it was something other than dirt?

2  A  Later on -- well, when I talked to Deputy McCoy,

3     there was -- he had told somebody that, in his words,

4     "The guy shit on me" or "Shit all over me."

5         And I didn't really pay any attention to that,

6     kind of the chaos at the scene at the time.  And then

7     later on, when I had taken an ice pack to Deputy

8     McCoy, after he had been removed from the scene to a

9     patrol car, he had told me again pretty much the same

10    statement.

11        And I couldn't tell if it was fecal matter or

12    if it was dirt.  I don't remember there being any

13    smell like fecal matter, but I can't say whether it

14    was or wasn't.

15 Q  And so McCoy said that twice; is that correct?

16 A  Yes.  That's what I heard twice.

17 Q  Can you describe for me the tone of voice in which he

18    made that remark, that "The guy shit all over me"?

19 A  It was basically a statement, just a -- kind of a

20    disgust.  Like if somebody would have, you know,

21    gotten fecal matter all over themselves, it would be

22    that, "I don't want it on me."

23        So it was kind of disgust.  It wasn't in jest

24    or a joke or anything like that.  It was just one of

25    those, one of those statements of disgust.

# APPENDIX H

1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8            WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9   JENNIFER DOLD, personal      )
    representative of the estate )
10  of Alexander Dold; and       )
    KATHY DUNCAN,                 )
11                                )
            Plaintiffs,           )
12                                )
                vs.               )        NO. 2-20-cv-00383-RAJ
13                                )
    SNOHOMISH COUNTY, a political )
14  subdivision of the State of   )
    Washington; BRYSON McGEE; and )
15  CODY McCOY,                   )
                                  )
16          Defendants.           )

17  _____

    REMOTE VIDEO RECORDED DEPOSITION UPON ORAL EXAMINATION OF
18
                       GARY VILKE, MD
19  _____

20

21

22

23

24            WEDNESDAY, MARCH 2, 2022

25                 DEHUFFDEPO.COM

| | | |
|---|---|---|
| 1 | | hold those opinions with a confidence level of 50 de-- |
| 2 | | of greater than 50 percent; correct? |
| 3 | A | Correct. |
| 4 | Q | In your opinion, what was the cause of Mr. Dold's death? |
| 5 | A | Sudden cardiac event or sudden cardiac arrest due to |
| 6 | | exertion causing a lot of increased acidosis, lactic |
| 7 | | acid production and its effect on his abnormally |
| 8 | | enlarged hypertrophied heart causing a sudden |
| 9 | | dysrhythmia and sudden death. |
| 10 | Q | So, in your opinion, one of the reasons his heart |
| 11 | | stopped was the acidosis; correct? |
| 12 | A | Yes, his -- The acidosis produced by his very long, |
| 13 | | extreme exertion, yes. |
| 14 | Q | And if I understand right, you were also of the opinion |
| 15 | | that he was, hmm, more vulnerable to this type of sudden |
| 16 | | cardiac arrest because he had an enlarged heart? |
| 17 | A | Correct. |
| 18 | Q | So, can you put it into less scientific terms if |
| 19 | | possible? Why did his heart stop? |
| 20 | A | The heart itself was working very hard obviously because |
| 21 | | the exertion and the fighting and the struggle that was |
| 22 | | going on and his resistance. That created -- that is a |
| 23 | | stressor on the heart. The heart is working hard as it |
| 24 | | is, and then he had a lot of muscle activity, a lot of |
| 25 | | resistance creating this acidosis, the lactic acid |

1    build-up in the blood that lowers the pH. And the lower
2    pH and exertion is -- used the term earlier -- irritable
3    to the heart. It can cause a sudden cardiac arrest; it
4    can cause an irregular heartbeat. Somebody with an
5    enlarged heart, hypertrophied tissue, is at risk to
6    going into cardiac event without acidosis. It can
7    happen suddenly without adding anything. But you're
8    adding the additional exertion acidosis and prolonged
9    struggle to this already abnormal heart and neck, at
10   some point created the sudden cardiac arrest.
11 Q So, would you agree with this statement: It was not
12   just a pure coincidence that his heart stopped and he
13   died on the night of March 21st as opposed to the
14   previous night or the night before that?
15        MR. JOLLEY: Object to the form.
16 A Yeah, it was his resistance and struggle that caused
17   this. I don't consider that -- if you consider that a
18   coincidence or not... That was more of an involvement.
19   But had that happened the night before, it could have
20   happened -- if this had happened the night before, it
21   could have happened then, too, I guess. I'm not sure
22   I'm following your question.
23 Q I think you are. If he'd had -- If he'd engaged in a
24   twelve-to-fifteen-minute struggle with police the night
25   before he might have died the night before. But he

1    didn't do that the night before, so it's not a

2    coincidence that it happened on March 21st, the night

3    that he did have that kind of a struggle; right?

4         MR. GROSS:  Object to form.

5  A  I guess it was the struggle that led to this cascade

6    that occurred.  So, I guess that -- It's not a

7    coincidence that that happened.

8  Q  Okay.  So, you can say, can you not, with reasonable

9    medical certainty that he would not have died on

10   March 21st, 2017 if he had not engaged in this struggle

11   with the police?

12        MR. GROSS:  Object to the form.

13 A  I guess more, more likely than not had he not been

14   involved in any struggle or anything going on that night

15   -- you know, because I can't predict what would have

16   happened had, you know, mom not called 9-1-1 at that

17   time, maybe she would have called an hour later, two

18   hours later.  You know, that's -- Now we're getting into

19   hypotheticals -- that his behavior was escalating.  It

20   still could have occurred on that date, but maybe a

21   different time, but if nothing -- if he just sat down

22   and watched T.V. the rest of the night, he probably

23   wouldn't have died.

24 Q  That's exactly what my next hypothetical was going to

25   be.  If he had just sat there that night and watched TV

# APPENDIX I

1          UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF WASHINGTON AT SEATTLE
2
─────────────────────────────────────────────
3   JENNIFER DOLD, personal      )
    representative of the        )
4   estate of Alexander Dold;    )
    and KATHY DUNCAN, mother     )
5   of Alexander Dold,           )
                                 )
6                Plaintiffs,     )
                                 )
7       vs.                      )   NO. 2:20-cv-00383-RAJ
                                 )
8   SNOHOMISH COUNTY, a          )
    political subdivision of     )
9   the State of Washington;     )
    BRYSON McGEE; and CODY       )
10  McCOY,                       )
                                 )
11               Defendants.     )
─────────────────────────────────────────────
12

13    Video-Recorded Deposition Upon Oral Examination

14                         of

15                  JENNIFER DOLD

16  ─────────────────────────────────────────────

17

18                  Taken Via Zoom

19

20

21

22

23

24  DATE:  February 2, 2022

25  REPORTED BY:  Lori K. Haworth, RPR
                  License No.:  2958

1    can't remember her name.

2        Q.   So Jen, we talked about some interactions that

3    Alex had with the police.  One that we didn't talk about

4    was, apparently Alex was -- soon after a friend was

5    involved in a deadly application of force with law

6    enforcement, Alex actually arrived at his house.  And

7    that was back in the 2011 time frame, if I remember

8    correctly.  Does that sound about right?

9        A.   That sounds right.

10       Q.   So Alex didn't have any personal interaction

11   with police that day.  But he did have some personal

12   interaction with police after the broken car window

13   incident that you described earlier with his friend; is

14   that right?

15       A.   Yes.

16       Q.   And was he actually arrested on that occasion

17   or was he simply brought back to -- brought home by the

18   law enforcement officers?

19       A.   No, he was taken in.

20       Q.   And we talked about the altercation with Frank.

21   But your recollection is, the police didn't actually

22   have contact with him that night; is that correct?

23       A.   No.  Yeah, there was no contact.  There was a

24   court date.  And my cousin didn't go.  So it was thrown

25   out, I believe.  I don't know the technical term.

1     Q.   And of course there were the two interactions

2 around New Year's Eve where he went through a

3 checkpoint.  Did Alex ever talk about those interactions

4 with police being negative or causing him to have any

5 lingering concerns about law enforcement?

6     A.   No.  Those were good interactions.

7     Q.   So I want to follow-up on some information that

8 was in the interrogatories.  Then you indicated that

9 Alex had developed a strong fear for law enforcement,

10 and I am trying to figure out what caused that and why

11 you believe that.  So can you flesh that out for us a

12 bit.

13     A.   So I believe with the Thanksgiving arrest, he

14 did not punch the window.  And he offered up the guy's

15 name who did; told them where he lived.  They didn't

16 listen to him, threw him in the back of the car, and

17 arrested him.  So I think he felt like even if he was

18 talking to them and giving them information, he was

19 always scared that things were going to go the wrong

20 way.  So.  And his -- like I said, his cognition wasn't

21 very good.  So I think his flat affect and not showing

22 what people would deem appropriate emotions to

23 situations I think made people, officers maybe, you

24 know, think he was guilty when he wasn't.  He did his

25 best.  But I think that definitely -- that definitely

1   scared him because he felt like he didn't get a fair

2   chance and have someone listen to his side.  They just

3   took him and threw him in jail.

4       Q.   Does Alex actually talk to you about having

5   that reaction, or are you kind of --

6       A.   Yeah.

7       Q.   -- surmising that that's what happened?

8       A.   No, he did, he did.  And he -- yeah, he

9   definitely did.

10      Q.   Were there any other interactions with law

11  enforcement where Alex reported that he felt he had been

12  ill-treated?

13      A.   Yes.

14      Q.   What were the others?

15      A.   He was put in the back of a police car when he

16  walked up from the house on Elm Way to get cigarettes at

17  QFC.  It's a couple miles.  It's uphill.  And they

18  pulled in the parking lot; said there had been a robbery

19  by two guys in the area; he fit the description.  He

20  said, "It wasn't me.  I just walked up here for

21  cigarettes."  Anyways, they -- after awhile, he was

22  afraid they were going to take him to jail.  And they

23  brought him home, and he was crying and was afraid

24  that -- he said, "Please don't let them take me to

25  jail."

1          So he was afraid of them because he never felt

2    like they listened, or he could communicate with them

3    the right way to get them to listen, I guess.

4          Q.    Yet in that incident, the police didn't

5    actually arrest him, they is simply brought him home; is

6    that right?

7          A.    Yeah.  They said they were going to go and

8    review evidence and would more than likely be back

9    and -- to arrest him.

10         Q.    There were some other incidents, it sounds

11   like, including the one at the Hollywood Casino, in

12   which Alex had communication with law enforcement

13   officers that was very calm and --

14         A.    Yes.

15         Q.    -- actually perhaps interactive in a fashion

16   that allowed him to make some good decisions about what

17   ought to happen.  Is that --

18         A.    Yeah.

19         Q.    -- correct?

20         A.    Yes.

21         Q.    So is it fair for me to surmise from this that

22   there were circumstances in which Alex was fine with

23   police being around, and perhaps other times would be

24   adversely affected by it?

25         A.    I think it's the immediate interaction with

# APPENDIX J

1              UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON AT SEATTLE
2    _____

3    JENNIFER DOLD, personal        )
     representative of the          )
4    estate of Alexander Dold;      )
     and KATHY DUNCAN, mother       )
5    of Alexander Dold,             )
                                    )
6                 Plaintiffs,       )
                                    )
7          vs.                      )   NO. 2:20-cv-00383-RAJ
                                    )
8    SNOHOMISH COUNTY, a            )
     political subdivision of       )
9    the State of Washington;       )
     BRYSON McGEE; and CODY         )
10   McCOY,                         )
                                    )
11                Defendants.       )

12   _____

13      Video-Recorded Deposition Upon Oral Examination

14                          of

15                     VANESSA DOLD

16   _____

17

18                    Taken Via Zoom

19

20

21

22

23

24   DATE:   February 2, 2022

25   REPORTED BY:  Lori K. Haworth, RPR
                   License No.:  2958

1    Q.   Sure.  What about having friends over or any

2  company?

3    A.   I don't think he had company out there that I

4  remember.

5    Q.   Okay.  I read that Alex's -- one of his good

6  friends had an altercation with the Shoreline Police

7  Department, and his friend passed away.

8    A.   Yes.

9    Q.   Can you tell me anything you know about that

10  incident.

11    A.   So I believe Alex and my sister, Jen, were

12  going over to pick up -- his name was David.  To go

13  hang-out.  And before they got there, David and his

14  girlfriend had gotten in some sort of argument, and I --

15  I believe he tried to hurt himself, and his parents

16  called 911.  And that's the bulk of what I know, other

17  than what ended up happening.

18    Q.   And do you know if -- when Jen and Alex got

19  over there, was -- was it hours after or was it --

20    A.   It was -- it was pretty -- pretty soon after,

21  after it happened, after he died.

22    Q.   And do you know if David -- David's body was

23  still there?

24    A.   I don't know, no.

25    Q.   Did Alex ever confide in you about this

1    incident and how it impacted him?

2      A.    He was upset.   David was one of his best

3    friends.   Yeah.

4      Q.    Did he go to therapy?

5      A.    I don't think so.   I am not sure.

6      Q.    Did his behavior change after this?

7      A.    I am -- I am sure -- I am sure it did just

8    because that's a pretty significant event, to lose your

9    best friend in that way, but I -- I can't think of

10    anything specific.

11      Q.    Did he -- do you know if he used any -- used

12    any drugs or alcohol after this incident more or less?

13      A.    I don't know, no.   He wasn't really a big

14    drinker, and he wasn't into drugs, so I -- I don't think

15    so, but I am not sure.

16      Q.    Okay.   Did you ever feel scared for your

17    brother after the few incidents I have gone over with

18    the Shoreline Police Department, his altercation with

19    Frank, and the -- his friend smashing the car door -- or

20    the car window?

21      A.    I am not sure what -- what you mean by feel

22    scared for him?

23      Q.    Did you ever feel scared that these incidents

24    would im- -- how they would impact him?

25      A.    I think it made him a bit more afraid and a bit

1          Shannon, do you have any questions?

2              MS. RAGONESI:  Yes.  I just have a couple,

3    so.

4          You are almost done, Vanessa.  Just quickly.

5

6              E X A M I N A T I O N

7    BY MS. RAGONESI:

8      Q.   Did Alex ever tell you that he was afraid of

9    police?

10     A.   I think he had a distrust, and he was a little

11   afraid of them, just after what happened to David, his

12   friend.

13     Q.   Specifically, though, did he ever tell you that

14   he was afraid of police?

15     A.   I don't know if he stated those exact words.

16     Q.   Did he ever tell you that he disliked police?

17     A.   No.

18     Q.   Did he ever specifically say anything to you

19   about police?

20     A.   I am sure he may have at some point in time.

21   Yeah.

22     Q.   But as you sit here today, you don't recall?

23     A.   I don't -- I can't recall anything specific.

24   No.

25              MS. RAGONESI:  Okay.  Thank you.  Those

# APPENDIX K

UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE


------------------------------------------------------------

JENNIFER DOLD, personal representative )
of the estate of Alexander Dold; and   )
KATHY DUNCAN, mother of Alexander Dold,)
                                       )
                Plaintiffs,            )
                                       )
        vs.                            )
                                       ) NO. 2:20-CV-00383
SNOHOMISH COUNTY, a political          )
subdivision of the State of            )
Washington; BRYSON MCGEE; and          )
CODY MCCOY,                            )
                                       )
                Defendants.            )


------------------------------------------------------------

REMOTE

VIDEO DEPOSITION UPON ORAL EXAMINATION OF

KATHY DUNCAN

------------------------------------------------------------

9:39 a.m.

January 26, 2022

Seattle, Washington


STENOGRAPHICALLY REPORTED BY:

JANE L. WORDEN, RPR, CCR No. 2726

1    A.  Well, I think Mike was giving him a bad time about

2  not working.  And he didn't really understand the

3  schizophrenia.  And it might have been before the official

4  diagnosis.

5    Q.  So what did Alex do during that argument?

6    A.  Well, I wasn't there.  But I just know they were

7  arguing.

8    Q.  Did anyone tell you what Alex did during the

9  argument?

10    A.  No.

11    Q.  You testified earlier that Alex had at least one

12  instance of being charged with being a minor in possession

13  and one instance of being charged with a DUI.

14         So is it correct to say that he had had some

15  prior interactions with police officers before the night

16  in question?

17    A.  Yes.

18    Q.  Was there anything that Alex told you about his

19  prior interactions with police?

20    A.  No.

21    Q.  When you called 911 the night of the incident, you

22  mentioned that Alex had had a friend who died in an

23  interaction with police; is that correct?

24    A.  Correct.

25    Q.  Can you explain to me what that interaction was,

1   what you know about that.

2       A.   I wasn't there, but from what I was told, the

3   young man, David, was threatening to hurt himself.  And

4   his dad called 911 to get help.  And I guess he had a

5   weapon and he was bloody.

6             He was standing on the front porch, and his

7   arms were down.  And he didn't put his weapon down, and

8   they shot and killed him.

9       Q.   Do you know David's last name?

10      A.   Albrecht.

11      Q.   Albright?

12      A.   No, A-l-b-r-e-c-h-t, I believe.

13            And my daughter -- well.

14      Q.   No, please go ahead.

15      MR. LOBSENZ:  The question's been answered; so ask

16  another --

17      THE WITNESS:  It's not relevant to that, no.

18      Q.   BY MS. RAGONESI:  What were you about to say about

19  your daughter?

20      A.   She was told by an officer at the scene that it

21  doesn't matter if he raised his weapon.  If he didn't put

22  it down, they had a right to kill him.

23      Q.   So your daughter was at the scene of the incident?

24      A.   Yes.

25      Q.   Was Alex at the scene of the incident?

1    A.   They were both there afterwards.  It was taped off

2  before they got there.

3    Q.   Did Alex tell you how he felt about what happened

4  with David and the police?

5    A.   How I found out?

6    Q.   No, no, I'm sorry.  Did Alex tell you how he felt

7  about what happened with David and the police?

8    A.   Not in so many words.  But he was a pallbearer.

9  And I remember him going up to his coffin and putting his

10  hand on his hand.  So he knew what could happen with

11  police.

12    Q.   When did that incident with David happen?

13    A.   It was on David's 21st birthday I think 2010.

14         But it was on David's 21st birthday.

15    Q.   Did Alex ever tell you that he was afraid of

16  police?

17    A.   Not in those words, no.

18    Q.   What words did Alex use?

19    A.   He just knew, he knew what could happen.

20    Q.   How do you know what Alex knew could happen?

21         Did he tell you something about that?

22    MR. LOBSENZ:  Object, I think it misstates her

23  testimony.  But I think she was -- you asked him what he

24  said, and she answered you he knew that it could happen.

25    Q.   BY MS. RAGONESI:  Let me reask a question.