1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| JENNIFER DOLD, personal representative of the estate of Alexander Dold; and KATHY DUNCAN, <br><br>             Plaintiffs, <br><br>      v. <br><br> SNOHOMISH COUNTY, a political subdivision of the State of Washington; BRYSON McGEE; and CODY McCOY, <br><br>             Defendants. | NO. 2:20-cv-00383-RAJ <br><br> MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK KROLL, Ph.D. <br><br> **NOTE ON MOTION CALENDAR: April 8, 2022** |

MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK
KROLL, Ph.D.
(2:20-cv-00383-RAJ)

DOL013-0001 6877769

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1

## I.      INTRODUCTION

2

The Defendants have identified Mark Kroll as an expert witness.  They assert that Kroll

3 is expected to testify that the use of "conducted electrical weapons" (tasers) was not a factor in

4 Alexander Dold's death.[1]  Kroll opines that "electrocution" was not a cause of death but he says

5 he will not be offering any opinion as to what *did* cause his death.[2]  Kroll is not a medical

6 doctor.[3] But he is a member of the board of directors of Axon Enterprise Inc., (formerly Taser

7 International, Inc.), [4] a Delaware corporation[5] that makes and sells Tasers.  Thus, Kroll has a

8 fiduciary duty to Axon that precludes him doing anything which would harm Axon's financial

9 interests.  Kroll is familiar with his fiduciary duty since he was once sued for breaching it.

10

Fed. R. Evid. 702(a) and (c) permit a witness qualified as an expert to testify in the form

11 of an opinion if he has "scientific, technical, or other specialized knowledge that will help the

12 trier of fact to understand the evidence or to determine a fact in issue" and if his "testimony is

13 the product of reliable principles and methods."   Plaintiffs do not dispute the fact that Kroll has

14 scientific knowledge about electricity, electrocution and tasers.  But he is precluded by his

15 fiduciary duty from taking any action that would harm Axon.  Any opinion or admission that

16 acknowledges that the use of a Taser can cause death would be harmful to Axon.  Kroll is

17 prohibited by law by his fiduciary duty as an Axon board member from expressing any opinion,

18 or from informing the jury of any fact, that would support the contention that the repeated police

19 use of tasers caused Dold's death.  Kroll knows that if he were to give any such  testimony, he

20 would likely be sued for violating his fiduciary duties.  Any jury that knows that Kroll has such

21 a legal duty, and that he has previously been sued for violating it, will know that Kroll's

22

23 [1] *Snohomish County and Bryon McGee's Supplement Disclosure of Possible Expert Witnesses*, at 2:19-22. Lobsenz Decl., Appendix A

24 [2] Kroll, at 82-83.

[3] Kroll, at 75.

25 [4] Kroll has been a director continuously for the past 16 or 17 years.  Years ago Taser changed its name to Axon Enterprises, but it is the same corporate entity.  Kroll, at 66-67, 71, 85.

26 [5] *See, e.g., Axon Enter., Inc., v. FTC*, 986 F.3d 1173 (9th Cir. 2021), *cert. granted,* 142 S.Ct. 895 (2022).

MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK KROLL, Ph.D. – 1
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6877769

opinions are worthless.  The jurors will know that his opinions cannot "help them . . . determine an issue in the case" because Kroll's opinions are limited by his fiduciary duty to Axon.  Since he cannot meet the requirements of Rule 702, he should be precluded from testifying.

## II.   EVIDENCE RELIED UPON

Plaintiffs rely upon Kroll's deposition testimony and Kroll's report, attached to the declaration of their counsel, James E. Lobsenz.

## III.   ARGUMENT

**A.   The County's own Medical Examiner concluded that taser use *did* constitute a significant contributory condition to Alexander Dold's death. Kroll disagrees.**

Deputy McCoy and Deputy McGee each tased Dold three times.[6] Following a physical struggle that lasted approximately 12 minutes,[7] after Dold was handcuffed and hobbled, officers noticed that he was not breathing and were unable to detect a pulse.[8]  Dold died at the scene.[9] The autopsy showed that he had no alcohol or drugs in his system.[10]  Dr. Selove, the Snohomish County Medical Examiner, concluded that one of the "significant conditions contributory to death" was a "physical altercation with law enforcement officers *that included use of [a] conducted electrical weapon*."[11] Not surprisingly Kroll, a board member of the corporation that manufactures tasers, disagrees with the Medical Examiner.

**B.   Board members have a fiduciary duty to protect their company from any harm.**

Directors of a Delaware corporation owe fiduciary duties of care and loyalty to the

---

[6] Detective M. Stone, Follow Up Report, pages 48-49, showing six taser applications within 14 minutes (Lobsenz Decl., Appendix B).

[7] Kroll, at 14 (Lobsenz Decl., Appendix C).

[8] Van Eaton, at 54-55 (Lobsenz Decl., Appendix D); Block, at 26 (Appendix E); and Daugherty, at 20 & 24. (Appendix F)

[9] Daugherty, at 31.

[10] Kroll, at 54.

[11] Autopsy Report, at p. 1, (attached to Declaration of Lobsenz as Appendix G.

MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK KROLL, Ph.D. – 2
(2:20-cv-00383-RAJ)

DOL013-0001 6877769

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

corporation and its shareholders.[12] These duties apply at all times.[13] The duty of loyalty includes an affirmative duty to protect the interests of the corporation as well as an obligation to refrain from conduct that would harm the corporation.[14]

Given his position on the board, Kroll owes Axon a duty of loyalty. He cannot do anything that would harm the corporation without violating that duty. If he were not a board member, and thus if he had no such duty, he would be free to provide testimony that would support the contention that the repeated use of tasers was a contributory cause of Dold's death. But Kroll is precluded by law – by his fiduciary duty to Axon – from expressing any agreement with Dr. Selove's conclusion that use of tasers was a contributory cause of Alexander Dold's death. Even if he personally believes that the Medical Examiner is correct, the existence of his fiduciary duty requires him to disagree with it. He must opine that the sheriff's deputies' use of tasers did *not* play a causal role in Dold's death. No matter how clear it is that taser use *did* contribute to Dold's death, Kroll cannot legally express such an opinion without breaching his legal duty to Axon and without exposing himself to personal liability for such a breach.

**C.    Kroll was sued before for breach of fiduciary duty, fraud, and misrepresentation.**

Kroll has been on Axon's board of directors for over eighteen years.[15] Kroll is quite familiar with his fiduciary duties as a director because he has been sued for breaching them.

In *In re Taser International Shareholder Derivative Litigation,* No. CV-05-123-PHX-SRB, 2006 WL 687033, *1 (D. Ariz. Mar. 17, 2006), shareholders brought a derivative action against the nominal defendant TASER International, and against four members of TASER's board of directors (the "Individual Defendants"), including Kroll. After TASER offered its stock to the public, the company's stock price rose dramatically. The shareholders claimed that

---

[12] *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989); *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006).

[13] *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001).

[14] *See generally* 1 R. Balotti & J.F. Finkelstein, *The Delaware Law of Corporations and Business Organizations*, § 4.16 (2022).

[15] Kroll, at 66-67.

MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK KROLL, Ph.D. – 3
(2:20-cv-00383-RAJ)

DOL013-0001 6877769

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

this rise was the result of the directors' assurances that its tasers were safe. *Id.* at 2. The "rocket-like stock performance" caught the attention of the *New York Times* which published an article that questioned Taser's safety record and asserted that nationally renowned engineers had concluded that "TASER has significantly overstated the weapons [sic] safety.'" *Id.* at *2-3.

The defendant directors responded by issuing a press release in which they denounced the *New York Times*, the article's author and the credibility of its reporting. *Id.* at *2. Then, in another press release, TASER discussed an independent study on the health effects of TASER use conducted by the Air Force Research Laboratory and the Department of Defense. *Id.* at 3. The study was not publicly available at that time. The shareholder plaintiffs alleged that this put the director defendants in a position to characterize the study's findings in a way that best suited them. *Id.* The second press release stated that the DOD study "validated the safety" of tasers and went on to say that the government's summary of its study "concludes that TASER technology is not likely the primary factor in the cause of in-custody fatalities." *Id.*

The stock market reacted favorably to TASER's press release characterization of the DOD study's results. TASER's stock price rose to an all-time high and TASER announced a two-for-one stock split. *Id.* at *4. After that announcement, "Kroll sold 100% of his TASER holdings, or 25,001 shares, on November 9 and December 1, 2004, for a total of $1,137,286.92." *Id*. On November 26, the *New York Times* published another article stating that the Air Force Laboratory and the Defense Department "disagreed with TASER's characterization" of its study. *Id.* TASER's press release stated that "the federal study endorses the safety of its [taser] guns." *Id.* But the *Times* reported that the study "actually found that the guns could be dangerous, and that more data was needed to evaluate their risks." *Id.* Four days later Amnesty International issued a report critical of TASER and claimed that "74 people had died in TASER-related incidents" in the preceding three years. *Id.*

Based on these events, the plaintiff shareholders brought five separate claims of breach

MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK
KROLL, Ph.D. – 4
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6877769

of fiduciary duty against Kroll and three other directors.  *In re Taser International*, at *6.[16] They also sought a court order of disgorgement, requiring Kroll and the other director defendants to disgorge all profits and benefits that they received as a result of their actions.

Pursuant to FRCP 23.1, before filing a shareholder derivative suit the shareholders must make a demand to the board of directors to take the action that they desire.  However, a demand need not be made if the plaintiffs show that a demand would be futile.  Futility is shown where there is either a showing that the directors are incapable of making an impartial decision *either* because they have a financial interest in the challenged action, or because they lack independence.  The director defendants moved to dismiss on the grounds that the plaintiffs had not made a demand before filing suit.  The district court ruled that the Plaintiffs had proved *both* grounds for finding that a demand would have been futile because they had shown that Kroll and the other directors could not be said to be disinterested, and that they lacked independence. Thus, the district court denied the defendants' motion to dismiss.  *Id.* at *9-12.

The director defendants also moved to dismiss the Plaintiffs' breach of fiduciary duty claims on the ground that the breach was based on an allegation of fraud and fraud had not been pleaded with sufficient particularity. *Id.* at *13.  The district court denied that motion to dismiss as well, finding that the Plaintiffs had sufficiently plead facts which supported the inference that the directors "had misrepresented the central finding" in the Department of Defense's study; that contrary to their representations "the studies conducted on the Company's TASER weapons were inconclusive as to their safety"; that they knew that "the Company revenues and earnings would be negatively impacted once the truth of these studies became known"; and that the plaintiffs had adequately plead "a unified course of fraudulent conduct to deceive the

---

[16] The five counts for breach of fiduciary duties alleged breaches committed by (1) insider selling, (2) the dissemination of misleading and inaccurate information, (3) breach of the duty to act in good faith in the management of the company, (4) waste of corporate assets, and unjust enrichment.

MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK
KROLL, Ph.D. – 5
(2:20-cv-00383-RAJ)

DOL013-0001 6877769

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

public." *Id.* at *15-16.[17]   At his deposition in this case, Kroll said that the shareholder suit alleged ""nothing against me personally,"[18] but the district court in *In re Taser* focused on Kroll repeatedly in its decision.[19] Immediately after the district court denied the defendants' motion to dismiss, TASER International paid the plaintiffs over $1 million to settle the case.[20]

**D.    Like a juror who is closely related to one of the parties, Kroll should be disqualified because his status as an Axon director makes it impossible for him to give an independent expert opinion.  Axon has a strong interest in ensuring that no jury verdict contradicts its position that tasers are safe and they do not kill people.**

While Axon is not a party to this lawsuit, it clearly has an interest in the outcome of the case.  Any verdict based on a finding that Alexander Dold was killed by Axon's product – a "conducted electrical weapon" as the Medical Examiner put it – is harmful to Axon's position that tasers do not kill people and that their use is safe.  If people come to believe that tasers can and do kill people, then the sale of tasers to police departments will suffer.  Since Kroll is a member of Axon's board of directors, he has an inescapable legal duty not to harm Axon by expressing any opinion that contradicts Axon's mantra that its product does not kill people.

Kroll's fiduciary duties require him to limit his opinions to those that favor, or at least do not harm, Axon.  It would be a waste of everyone's time and of court resources to allow Kroll to testify since the jury would learn that because of his legal duties as an Axon director

---

[17] Even applying the heightened pleading standard for fraud, the court concluded that it was reasonable to infer that the Defendants engaged in insider trading as part of a scheme to artificially inflate TASER's stock price so that Defendants could sell material portions of their holdings for a profit; that the Board was aware of taser's safety issues; and that Plaintiffs had stated a claim for breach of the duty of good faith. *Id.* at *16-17.

[18] Kroll, at 68. Kroll claimed to be "unaware" of the fact that the complaint accused him of making false statements. *Id.* at 69. He said that he never read the complaint and that he didn't "recall that anyone accused [him] of doing anything wrong except for being on the board of a company whose stock had gone down." *Id.* at 68.

[19] The district court noted that he sold all of his holdings before adverse safety data went public, and that Kroll was a member of the Audit Committee, "which approved the various company statements and transactions during the Relevant Period, as well as 'the improper and misleading press releases concerning the safety and projected demand for the Company's weapons.'" *Id.* at *5. The court also noted Kroll was one of two directors on the compensation committee and that "even after the numerous issues surrounding the Company began to receive public attention, and even though the Company did not meet its target revenue growth goals for FY 2004, Culver and Kroll awarded the Officer Defendants compensation worth tens of millions of dollars…." *Id.* at *6.

[20] At his deposition, Kroll said "there was some ransom paid" to settle the case." Kroll, at 67.

---

MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK
KROLL, Ph.D. – 6
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6877769

Kroll's opinions were preordained by a legal duty that precludes him expressing any opinion that police use of his company's "electrical weapon" caused Dold's death. The jurors would know that Kroll's opinions were worthless because Kroll cannot function as an independent expert.  An expert who is precluded by law from saying anything that favors the plaintiff or harms the defendants, is of no assistance whatsoever to the jury. Such an expert cannot "help the trier of fact to understand the evidence or to determine a fact in issue."

Some relationships are simply too close to permit one of them to serve in a role where one must judge the conduct of the other.   Like a juror subject to a challenge for cause because, for example, he is the brother of one of the parties to the case, Kroll is subject to disqualification because he is inescapably biased as a matter of law. Most states have statutes which recognize that a potential juror is removable for cause if,  because of a close relationship with a party, the juror has a bias that he cannot escape or disavow.  In Washington, for example, a juror is removable for cause if he "is within the fourth degree of consanguinity or affinity" of a party; if he is the landlord or a tenant of a party; if he is "a partner in business with, or in the employment for wages, of a party."  RCW 4.44.180(2).  In addition, a juror is impliedly biased and may be removed for cause if there is an "[i]nterest on the part of the juror in the event of the action, or the principal question involved therein . . . ."  RCW 4.44.180(4).  While Axon is not a party to this case, Axon clearly does have an "interest . . . in the event" of Dold's death, and an "interest" in one of "the principal question[s] involved."  Defendants propose to call Kroll as an expert to address the question of whether taser use was one of the causes of Dold's death. As a member of Axon's board, Kroll is legally obligated to help Axon to avoid financial misfortunes which flow if potential customers learn from adverse jury verdicts that tasers are dangerous and sometimes can and do kill people.[21]

---

[21] In addition, although Kroll is not Axon's "brother" or "landlord," he is "employ[ed] for wages" by Axon. Thus, Kroll has his own huge financial self-interest in seeing to it that Axon's revenues from the sale of tasers continue to grow.  If Axon does well financially, then Kroll also does well financially because he is employed by Axon in two capacities.  First, Axon pays him an annual cash compensation of either $60,000 or $80,000 to serve

*(Footnote continued next page)*

MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK
KROLL, Ph.D. – 7
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6877769

Naturally, Kroll's anticipated expert opinion testimony is favorable to Axon.  Thus it is no surprise, since Kroll is necessarily compelled by the existence of his legal fiduciary duty not to say anything that would harm Axon's sales, or to increase the chances that Axon would be held legally liable in civil suits where it is alleged that use of a taser – Axon's product – caused the Plaintiff's decedent to die.  Therefore, Kroll's testimony cannot be viewed as "the product of reliable principles and methods," nor can he provide opinions or information "that will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Kroll's opinions are dictated by his fiduciary duty no matter what the evidence is. Consequently, the Court should preclude Kroll from serving as an expert witness in this case because he cannot meet the qualifications of Rule 702.

**E.**     **If the Court allows Kroll to testify, it should preclude testimony about the effects that a taser can have on intoxicated people or people under the influence of drugs.**

In his Rule 26 expert report, Kroll discloses that he intends to opine that tasers frequently do not have the desired effect of paralyzing a person's muscles if the targeted person is intoxicated or under the influence of drugs. But at his deposition, Kroll conceded that there was no evidence in this case that Dold fell into either one of those categories.[22]  As part of the autopsy a drug and alcohol scan was performed and no such substances were found in Dold's blood.[23]  Since there is no such evidence, Kroll's opinions on this subject are completely irrelevant.  Allowing him to testify to them would simply run the risk of confusing the jury, or of making them speculate that maybe Dold was using drugs which the toxicology screen somehow missed. Kroll actually encourages just such rank speculation when he asserts that he

---

on the board of directors. Kroll, at 85-86.  Second, Axon pays him another "$120,000 per year as a "consultant fee." *Id.* at 88. Axon also pays Kroll additional compensation in the form of stock options. *Id.* at 87. Currently, Kroll owns Axon stock which he thinks is "probably" worth "around a million" dollars. *Id.* at 84. Thus, Kroll is effectively "in business with" Axon because if Axon does well and its stock appreciates, then Kroll gets richer too.

[22] Kroll, at 54.

[23] Autopsy Toxicology Report, attached to Declaration of Lobsenz as Appendix H.

MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK KROLL, Ph.D. – 8
(2:20-cv-00383-RAJ)

DOL013-0001 6877769

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1    "is not sure he [Dold] was tested for synthetic cannabinoid, which is an increasing problem

2    these days."[24]  While he concedes that he has no reason to think so, Kroll speculates that maybe

3    the toxicology lab did not screen for such drugs, and thus "maybe" Dold "really" was under the

4    influence of drugs, at the same time Kroll admits that there is no evidence of that.[25]  Since it is

5    undisputed that Dold is *not* within *either* of the classes of people whom Kroll believes have a

6    limited response to taser applications, this Court should preclude Kroll from opining on the

7    subject of the "limited" effect of taser stuns on such people.

8    **F.**      **Kroll is not a doctor. He lacks the medical training to opine about pain tolerance.**

9          Each opinion from an expert must be grounded in scientific, technical or other

10   specialized knowledge that the expert possesses from education or experience. *Daubert*, 509

11   U.S. 579 (1993). The complexity of the subject matter affects the degree of knowledge and

12   experience required of the proffered expert. *See, e.g., Jones v. Lincoln Elec. Co.*, 188 F.3d 709,

13   723–24 (7th Cir. 1999) (court should have barred scientist from testifying about conclusions

14   that 'were rooted in medical knowledge and training which [he] did not have' and that were

15   'derived primarily, if not completely' from a physiologist). Courts are particularly wary of

16   strained credentials where medical testimony is at issue.[26] In sum, testimony about complex

17   medical issues needs to come from experts with credentials in the relevant field. *Dura Auto.*

18   *Sys. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir.2002) ("A scientist, however well credentialed

19   he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

20         Kroll is not a medical doctor and lacks sufficient medical training for several of his

21

22   ――――――――――

       [24] Kroll, at 54.

       [25] Kroll, at 54 ("Q. . . But you agree . . . there's no evidence in this case that Mr. Dold fell into one of those
23     categories of intoxicated or under the influence of drugs?  A. I agree.") When asked why he would opine about
       factors that are not present in this case, Kroll replied, "that comment [was] just meant to set the stage broadly for
24     a class of people that have limited response to a drive stun." *Id.*

       [26] *See, e.g., Carlson v. Bioremedi Therapeutic Systems, Inc.*, 822 F.3d 194, 200 (5th Cir. 2016) (reversable
25     error to admit testimony from a chiropractor who was not a medical doctor and who lacked a degree in a field
       ancillary to the medical fields he wished to testify); *Dura Auto. Sys. of Ind., Inc.*, 285 F.3d at 613(surgeon "would
26     be competent to testify that the cancer was too advanced for surgery," but was not qualified to opine that "the
       radiologist should have discovered the cancer sooner").

MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK
KROLL, Ph.D. – 9
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6877769

proffered opinions.   His degrees are limited to mathematics, electrical engineering, and business. [27] And yet he believes that he is qualified to give his opinion that Dold had a high pain threshold.[28]   The Plaintiffs disagree.   Kroll bases his opinion on the fact that "Dold's only response" to being tased "was a brief yell which demonstrates an extremely high pain threshold."[29]  Even if one assumes that this actually was Dold's "only response" to being tased, the dubious inference that this shows he had a high pain threshold is not one that Kroll bases on any "scientific, technical, or other specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  Every lay person is aware of the fact that a "yell" *can* indicate that a person is in pain, and that the absence of a yell *might* indicate that the person was not experiencing much pain.  In this case, it might simply indicate that Dold could not speak or yell any more than once because he was being choked by deputy McGee who had his arm pressing against Dold's neck for several minutes.  In any event, Kroll has no "expertise" that assists the jury in determining whether being tased caused Dold to experience pain or increased his fear that the deputies were killing him.

The defendants' identified two medical doctors, Theodore Chan and Donald Dawes, as witnesses who will offer expert opinions in this case.  Unlike Drs. Chan and Dawes, Kroll does not have any experience, education, or expertise, that qualifies him to offer opinions which will assist the jury in determining either Dold's level of pain tolerance or the cause of his death.

**G.    Mr. Kroll is not a law enforcement expert.  He has no training, education, or expertise, in either mental illnesses or in the police use of force to make arrests.**

Kroll is similarly lacking in expertise for his opinions about "the realities of law enforcement" and mental illness. In his report, Kroll lumps together the behavior of people who are *either* "intoxicated" "or mentally ill," and asserts that since "they" "tend to be involved in forceful arrests" it would be wrong to ignore "the realities of law enforcement" by concluding

---

[27] Kroll, at 75, 71-72.

[28] Kroll, at 31-32.

[29] Expert Report of Mark Kroll, at 17, attached to Declaration of Lobsenz as Appendix I.

that tasers should not be used against them. [30] Further, he opines that the suggestion that tasers "should not be used on the mentally ill, (including those in excited delirium), *or* those intoxicated by drugs or alcohol" would "exclude *the very people that most often resist being placed in custody.* . . ."[31] Thus, Kroll impliedly opines that like drunks and people on drugs, mentally ill people "often resist" arrest, and that they are often experiencing something called "excited delirium."   Finally, Kroll offers his "expert" opinion that

> Sober and *rational people generally do not resist law enforcement officers. Regardless, it is often impossible for officers to tell which individuals are mentally ill*, high on drugs, or intoxicated (or any combination of these), especially in chaotic situations.[32]

But Kroll is not qualified to opine on the behavior that mentally ill people engage in when they are subjected to "forceful arrests."   Kroll has no law enforcement training or expertise.  He has never tried to make a "forceful arrest" of a mentally ill person, or of anyone else.[33]  According to Kroll, "rational people generally do not resist law enforcement officers."[34] But rational people *do* resist law enforcement officers if they reasonably believe that the officers are going to seriously injure them or kill them if they do not resist.  In this case, the officers *did* kill Dold.  Moreover, a jury could easily conclude that it was "rational" for Dold to "resist" deputy McGee's maintenance of a chokehold for roughly four or five minutes.  It is up to the jury – not Kroll – to decide whether the deputies' "forceful arrest", accomplished by means of

---

[30] Kroll cites a Canadian study of people who were "involved in forceful arrests, combines these two classes of people, and then asserts that 79% of these "recipients of force" "have a history of mental illness *or* substance abuse." Kroll Expert Report, at 21. What proportion of these recipients are drug abusers and what portion are mentally ill Kroll does not say. Moreover, in this case there is no evidence that Dold was a drug abuser. *Id.* at 21.

[31] *Id.*

[32] Kroll Expert Report, at 21.

[33] Moreover, the study that Kroll cites regarding "recipients of force" says *nothing* about (1) whether the "force" used by police in those cases involved the use of tasers; (2) whether the use of force was found to be objectively reasonable; (3) whether *any* of the "recipients" resisted arrest; and even assuming that some of them did, (4) whether they merely engaged in passive resistance. Finally, for all we know, police use excessive force more often against mentally ill people precisely because the police felt they could get away with it since a mentally ill person will be less likely to be believed.

[34] Kroll Expert Report, at 21.

six taser applications, punches, blows to the head, and a chokehold, was objectively reasonable. As he conceded at his deposition, Kroll has no "training or special expertise" in the fields of psychiatry, psychology, or schizophrenia[35] and thus he has no specialized knowledge that will assist the jury in making this determination.[36]

Finally, Kroll seeks to opine that "it is often impossible for officers to tell" whether the arrestee is mentally ill.[37] But in this case, from the moment deputies McGee and McCoy were dispatched they *knew* that Dold had a mental illness because SNOPAC police radio informed them that Dold was schizophrenic who was "off his meds," and that his mother had called to ask that he be taken to a psychiatric hospital.[38] Since both deputies knew that Dold had a mental illness, Kroll should not be permitted to testify about a completely irrelevant point.

## IV.   CONCLUSION

Plaintiffs ask the Court to prohibit Kroll from offering any expert testimony whatsoever. If, however, the Court concludes that his fiduciary duties as an Axon director do not require his complete disqualification, Plaintiffs request that the Court enter an order precluding him from testifying about irrelevant facts and circumstances such as (1) the use of force against drug abusers; (2)intoxicated people; (2) and people that the officers have no way of knowing are mentally ill.  Plaintiffs also ask the Court to preclude Kroll from opining about the behavior of law enforcement officers, on the behavior of the mentally ill, and on the question of whether and when it is "rational" for a person to resist when police are making a "forceful arrest."

---

[35] Kroll, at 14.

[36] Kroll also lacks the qualifications to opine about "excited delirium."  He assumes that Dold was experiencing "excited delirium."  Whether someone is in a state of "excited delirium" is not a question of electrical engineering. It is a medical question, and the medical profession itself does not even agree that there is such a thing as "excited delirium." Neither the American Medical Association, nor the American Psychiatric Association, recognize its existence.  *See New AMA policy opposes "excited delirium" diagnosis*, (June 14, 2021), available at https://www.ama.org/press-center/press-releases/new-ama-policy and *Position Statement on Concerns About Use of the Term 'Excited Delirium,'* APA Board of Trustees, Approved November 2020 ("The term 'excited delirium' . . . should not be used until a clear set of diagnostic criteria are validated.").

[37] Kroll Expert Report, at 21.

[38] McGee, at 39, 74-75, 93 (attached to the Declaration of Lobsenz as Appendix J).

MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK KROLL, Ph.D. – 12
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6877769

1    DATED this 24th day of March, 2022.

2

3
                                            __s/ James E. Lobsenz_____
4                                           James E. Lobsenz WSBA #8787
                                            Attorneys for Plaintiffs
5                                           CARNEY BADLEY SPELLMAN, P.S.
                                            701 Fifth Avenue, Suite 3600
6                                           Seattle, WA 98104
                                            Phone: (206) 622-8020
7                                           lobsenz@carneylaw.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK                **CARNEY BADLEY SPELLMAN, P.S.**
KROLL, Ph.D. – 13                                          701 Fifth Avenue, Suite 3600
(2:20-cv-00383-RAJ)                                        Seattle, WA 98104-7010
                                                           (206) 622-8020
DOL013-0001 6877769

1

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2022, I electronically filed the foregoing **MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK KROLL** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Attorneys for Defendant Snohomish County**

Ted Buck                    tbuck@freybuck.com
Delaney DiGiovanni          ddigiovanni@freybuck.com
Nick Gross                  ngross@freybuck.com

**Attorneys for Defendants Cody McCoy and Bryson McGee**

Shannon M. Ragonesi         sragonesi@kbmlawyers.com
Richard B. Jolley           rjolley@kbmlawyers.com
Sean M. Dwyer               sdwyer@kbmlawyers.com

DATED this 24th day of March, 2022.

_s/ Deborah A. Groth_
Legal Assistant

.

MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK
KROLL, Ph.D. – 14
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6877769