1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

JENNIFER DOLD, personal representative of the estate of Alexander Dold; and KATHY DUNCAN,

          Plaintiffs,

       v.

SNOHOMISH COUNTY, a political subdivision of the State of Washington; BRYSON McGEE; and CODY McCOY,

          Defendants.

NO. 2:20-cv-00383-RAJ

DECLARATION OF JAMES E. LOBSENZ IN SUPPPORT OF PLAINTIFFS' MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK KROLL

     I, JAMES E. LOBSENZ, do hereby declare under penalty of perjury under the laws of the United States of America that the following facts are true and correct:

1. I am counsel for the Plaintiffs. I have personal knowledge of the facts set forth here.

2. Attached to this declaration as Appendix A is a true and correct copy of the Defendants' Supplemental Disclosure of Expert Witnesses.

3. Attached to this declaration as Appendix B are true and correct copies of pages 48-49 of Detective M. Stone's Follow Up Report of the Snohomish Multi-Agency Response Team which investigated the death of Alexander Dold.

4. Attached to this declaration as Appendix C are true and correct copies of excerpts from the deposition of Mark Kroll.

DECLARATION OF JAMES E. LOBSENZ IN SUPPPORT OF
PLAINTIFFS' MOTION TO DISQUALIFY DEFENDANTS'
EXPERT MARK KROLL – 1
(2:20-cv-00383-RAJ)

DOL013-0001 6877819

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

5. Attached to this declaration as Appendix D are true and correct copies of excerpts from the deposition of Officer Van Eaton.

6. Attached to this declaration as Appendix E are true and correct copies of excerpts from deposition of Officer Travis Block.

7. Attached to this declaration as Appendix F are true and correct copies of excerpts taken from the deposition of Deputy Sheriff Chad Daugherty.

8. Attached to this declaration as Appendix G is a true and correct copy of page 1 from the Autopsy Report of Dr. Selove, the former Snohomish County Medical Examiner.

9. Attached to this declaration as Appendix H is a true and correct copy of the Toxicology Report which was part of the Snohomish County Medical Examiner's autopsy of Alexander Dold.

10. Attached to this declaration as Appendix I is a true and correct copy of the expert report authored by Defendants' proffered expert Mark Kroll.

11. Attached to this declaration as Appendix J are true and correct copies of excerpts taken from the deposition of Defendant Bryson McGee.

DATED this 24th day of March, 2022.

_s/ James E. Lobsenz_
James E. Lobsenz WSBA #8787
Attorneys for Plaintiffs
CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104
Phone: (206) 622-8020
lobsenz@carneylaw.com

DECLARATION OF JAMES E. LOBSENZ IN SUPPPORT OF
PLAINTIFFS' MOTION TO DISQUALIFY DEFENDANTS'
EXPERT MARK KROLL – 2
(2:20-cv-00383-RAJ)

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6877819

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2022, I electronically filed the foregoing **DECLARATION OF JAMES E. LOBSENZ IN SUPPORT OF PLAINTIFFS' MOTION TO DISQUALIFY DEFENDANTS' EXPERT MARK KROLL** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Attorneys for Defendant Snohomish County**
Ted Buck                          tbuck@freybuck.com
Delaney DiGiovanni                ddigiovanni@freybuck.com
Nick Gross                        ngross@freybuck.com

**Attorneys for Defendants Cody McCoy and Bryson McGee**
Shannon M. Ragonesi               sragonesi@kbmlawyers.com
Richard B. Jolley                 rjolley@kbmlawyers.com
Sean M. Dwyer                     sdwyer@kbmlawyers.com

DATED this 24th day of March, 2022.

_s/ Deborah A. Groth_
Legal Assistant

DECLARATION OF JAMES E. LOBSENZ IN SUPPPORT OF
PLAINTIFFS' MOTION TO DISQUALIFY DEFENDANTS'
EXPERT MARK KROLL – 3
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6877819

# **APPENDIX A**

1

2

3

4

5

6

7

8

The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9  JENNIFER DOLD, personal representative
   of the estate of Alexander Dold; and

10 KATHY DUNCAN, mother of Alexander
   Dold,

11                          Plaintiffs,

12 v.

13 SNOHOMISH COUNTY, a political
   subdivision of the State of Washington;

14 BRYSON MCGEE; and CODY MCCOY,

15                          Defendants.

16

No. 2:20-cv-00383-RAJ

DEFENDANT MCGEE AND
MCCOY'S SUPPLEMENT
DISCLOSURE OF EXPERT
WITNESSES

17

18       Pursuant to FRCP 26(a)(2), Defendants McCoy and McGee hereby adopt defendant

19 Snohomish County's experts and disclose the following already disclosed expert witnesses

   whom Defendants may call to testify at trial in this matter:

20

21       **1.**      Russ Hicks
                     Hicks Consulting, LLC

22                   P.O. Box 7917
                     Bonney Lake, WA  98391

23       Mr. Hicks is the Assistant Commander of the Washington State Criminal Justice

24 Training Commission Basic Law Enforcement Academy and has 30 years' experience as a

25 law enforcement officer, with expertise in police tactics and training regarding domestic

26 violence response, crisis intervention, patrol, and de-escalation. He is expected to opine that

27 Defendants McGee and McCoy engaged in appropriate de-escalation, crisis intervention,

DEFS. MCGEE AND MCCOY'S SUPPL. DISCLOSURE
OF EXPERT WITNESSES- 1
2:20-cv-00383-RAJ

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

and patrol tactics in contacting and responding to Mr. Dold.  He is also expected to opine that Plaintiff Duncan's 911 call regarding a physical and verbal domestic violence incident presented a mandatory arrest situation for the deputies that required them to respond to the residence and investigate, and that they had exigent circumstances to enter the residence. He may also testify in rebuttal to testimony presented by Plaintiffs' experts, if any, on police tactics and training.

2.    Donald M. Dawes, MD
        5347 Pasco Cameo
        Santa Barbara, CA  93111

Dr. Dawes is an emergency room and urgent care physician with familiarity with the operation of and expertise in the physiological effects of conducted electrical weapons.  He is expected to opine that Mr. Dold's death was not the result of the effects of the conducted electrical weapons used by the deputies.  He is also expected to opine on how the effects of conducted electrical weapons compare to other physiological stressors on the human body. He may also testify in rebuttal to testimony presented by Plaintiffs' experts, if any, on the physiological effects of conducted electronical weapons.

3.    Mark Kroll, PhD, FACC, FHRS, FAIMBE
        Mark Kroll Associates
        P.O. Box. 23
        Crystal Bay, MN  55323

Dr. Kroll is a biomedical scientist with a primary specialty in bioelectricity and the effect of electrical shocks on the human body.  He is expected to opine on the electrical details of conducted electrical weapons in general and the Taser applications by Defendants McGee and McCoy specifically.  He is also expected to opine that the heart electrical rhythms of Mr. Dold were not consistent with electrocution and that the use of conducted electrical weapons was not a factor in Mr. Dold's death.  He may also testify in rebuttal to testimony presented by Plaintiff's experts, if any, on any relationship between the Taser applications and Mr. Dold's death.

DEFS. MCGEE AND MCCOY'S SUPPL. DISCLOSURE
OF EXPERT WITNESSES- 2
2:20-cv-00383-RAJ

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

4.      Ryan Spurling
        E. 240 North Cove Road
        Shelton, WA  98584

Chief Spurling is the Chief Criminal Deputy of the Patrol for the Mason County Sheriff's Office and a retired Washington State Patrol Trooper with extensive experience in teaching and performing patrol, weapons, and control tactics and procedures. He is expected to opine that all uses of force by the deputies against Mr. Dold were justified and not excessive based on the facts of the physical altercation between Mr. Dold and the deputies and the totality of the circumstances known to the deputies at the time of the incident, as well as his experience in reviewing law enforcement uses of force.  He may also testify in rebuttal to testimony presented by Plaintiffs' experts, if any, on police tactics and training.

5.      Gary Vilke, MD, FACEP, FAAEM
        Department of Emergency Medicine
        UCSD Medical Center
        200 W. Arbor Drive
        San Diego, CA 92103-8676

Dr. Vilke is a Professor of Clinical Emergency Medicine for the University of California, San Diego, (UCSD) School of Medicine and Vice-Chair of Clinical Operations, UCSD Department of Emergency Medicine, and is board certified in Emergency Medicine. He is expected to opine that Mr. Dold's cause of death was directly related to his enlarged heart and the prolonged altercation with the deputies.  He is also expected to opine that the lateral vascular neck restraint and physical restraint of Mr. Dold did not cause the death and that Mr. Dold was not experiencing excited delirium syndrome.  He may also testify in rebuttal to testimony presented by Plaintiffs' experts, if any, on the medical causes of Mr. Dold's death.

Discovery is ongoing, and Defendants reserve the right to name additional experts in response to experts named by Plaintiffs or any other party.  Defendants reserve the right to call any of their facts witnesses as expert witnesses under ER 702,

DEFS. MCGEE AND MCCOY'S SUPPL. DISCLOSURE
OF EXPERT WITNESSES- 3
2:20-cv-00383-RAJ

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

DATED:  January 27, 2022

1

2                                                    KEATING, BUCKLIN & McCORMACK, INC., P.S.

3

4                                                    By:  /s/ Shannon M. Ragonesi
                                                          Shannon M. Ragonesi, WSBA #31951
5                                                    *Attorney for Defendants Cody McCoy and Bryson*
                                                     *McGee*
6
                                                     801 Second Avenue, Suite 1210
7                                                    Seattle, WA  98104
                                                     Phone: (206) 623-8861
8                                                    Fax:    (206) 223-9423
                                                     Email: sragonesi@kbmlawyers.com
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DEFS. MCGEE AND MCCOY'S SUPPL. DISCLOSURE
OF EXPERT WITNESSES- 4
2:20-cv-00383-RAJ

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

1

## CERTIFICATE OF SERVICE

2       I hereby certify that on January 27, 2022, I electronically served the foregoing

3   document on the below parties via email:

4   **Attorneys for Plaintiffs**

5   James E. Lobsenz, WSBA #8787
    CARNEY BADLEY SPELLMAN PS

6   701 Fifth Avenue, Suite 3600
    Seattle, WA  98104

7   Phone: 206-622-8020
    Email:  lobsenz@carneylaw.com; groth@carneylaw.com

8   E-SERVICE AGREEMENT

9

    **Attorneys for Defendant Snohomish County**

10  Ted Buck, WSBA #22029
    Delaney DiGiovanni, WSBA #56851

11  Nick Gross, WSBA #48236

12  FREY BUCK P.S.
    1200 5th Avenue, Suite 19

13  Seattle, WA  98101
    Email:  tbuck@freybuck.com; ngross@freybuck.com; ddigiovanni@freybuck.com;

14  dfalkowski@freybuck.com

15

16  DATED:  January 27, 2022

17

18

19  *s/Sarah Damianick*_____
    Sarah Damianick, Legal Assistant

20  sdamianick@kbmlawyers.com

21

22

23

24

25

26

27

DEFS. MCGEE AND MCCOY'S SUPPL. DISCLOSURE
OF EXPERT WITNESSES- 5
2:20-cv-00383-RAJ

KEATING, BUCKLIN & McCORMACK, INC., P.S.
ATTORNEYS AT LAW
801 SECOND AVENUE, SUITE 1210
SEATTLE, WASHINGTON 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423

# **APPENDIX B**

# FOLLOW-UP

| GENCY NAME: SNOHOMISH COUNTY MULTIPLE AGENCY RESPONSE TEAM | INCIDENT CLASSIFICATION | INCIDENT NUMBER **2017-06** |
|---|---|---|
| VENUE AGENCY Snohomish County Sheriff's Department | | REPORT DATE 03-21-17 |
| TYPE OF ORIGINAL REPORT | VENUE AGENCY REPORT NUMBER | |

McGee's recorded interviews. Schuler downloaded the each of the two audio interviews onto three separate CD's. Schuler provided me with the set of the three CD's of both Deputy McCoy's and MPD McGee's interviews. I placed one CD of MPD McCoy's and one CD of MPD McGee's recorded interviews into separate evidence envelopes, sealed and marked each envelope. I contacted SMART Evidence Technician Richardson and provided her with the two sealed evidence envelopes containing the CD's of the two interviews, two working case copy CD's of the two interviews, the two original signed Interview Forms, the two Garitty Warning memos, the two signed typed written statements and the two signed sketches by Deputy McCoy and MPD McGee.   Everett Police Department (Major Crimes) Administrative Secretary Johnson transcribed Deputy McCoy's and MPD McGee's audio statements.

On 07-07-17, I received from Evidence Technician Richardson the four transcriptions of Officer Block's, Deputy Miner's, Deputy McCoy's and MPD McGee's statements.  I reviewed each transcription in comparison to the audio recording of each interview.  I made minor corrections to several entries of the four statements to accurately reflect the recorded statement.  All four of the transcriptions of Officer Block's, Deputy Miner's, Deputy McCoy's and MPD McGee's statements were consistent with the audio recordings. I signed each of the transcriptions and returned them to Evidence Technician Richardson.

Taser reports

Five of the six involved officers Taser were collected as evidence at the time of the processing by SMART detectives. Deputy Miner did not have did not carry his Taser during the incident. SMART Property Technician Richardson coordinated downloading the five involved officers Tasers and generated into individual reports identified by each Taser's model and serial number. Richardson provided me with the five reports. The reports were formatted based on the model number of the Taser. There were three different model types which resulted in different data logs. The following are the activity of each Taser during the date and time of the contact with Alexander Dold:

I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

| OFFICER NAME/NUMBER **Det. M. Stone #0087** | | | | | | APPROVED BY | |
|---|---|---|---|---|---|---|---|
| IBR CLEARANCE: ( ) ARR/A ( ) EXC/A———— ( ) ARR/J ( ) EXC/J———— | ( ) INSUFF/ CLO ( ) OTHER/ CLO ( ) UNF | COPIES MADE FOR: ( ) PA ( ) PAT | ( ) CPS· ( ) DSHB | ( ) JUV ( ) MH | ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SIU ( ) OTHER: | | DATA ENTRY |

DOLD-BL-000055

# FOLLOW-UP

| AGENCY NAME | INCIDENT CLASSIFICATION | | INCIDENT NUMBER |
|---|---|---|---|
| SNOHOMISH COUNTY MULTIPLE AGENCY RESPONSE TEAM | | | 2017-06 |
| VENUE AGENCY Snohomish County Sheriff's Department | | REPORT DATE 03-21-17 | |
| TYPE OF ORIGINAL REPORT | VENUE AGENCY REPORT NUMBER | | |

| Officer | Mod. | Taser S/N | Result |
|---|---|---|---|
| Dep. McCoy | X26P | X1200466W | At 1744 hours, test |
| | | | At 2152:21 hours, 5 second discharge |
| | | | At 2153:48 hours, 5 second discharge |
| | | | At 2153:54 hours, 5 second discharge |
| Dep. McGee | X26 | X00-328989 | At 2205:40 hours, 5 second discharge |
| | | | At 2205: 52 hours, 5 second discharge |
| | | | At 2206: 11 hours, 5 second discharge |
| Sgt. Johnson | X26 | X00-328987 | At 2208 hours, 12 second discharge |
| Ofc. Van Eaton | X2 | X290049XN | No Taser discharge / device was off safe |
| Ofc. Block | X2 | X29004AHX | No Taser discharge |

I was unable to confirm the data on each Taser report actually indicated the Tasers were or were not deployed during the time of the incident.

<u>Medical Examiner Doctor Selove's report</u>

On 04-26-17, Snohomish County Medical Examiner Selove completed the autopsy report. On 04-27-17, at 1100 hours Detective Chissus and I met Doctor Selove at the Snohomish County Medical Examiner's Office in Everett. Doctor Selove provided me with a signed copy of the autopsy report. Doctor Adams had conducted the autopsy and completed his examination report. Doctor Selove completed the autopsy report. Doctor Selove briefed Detective Chissus and me on the report. Doctor Selove said Alexander Dold died of cardiac arrhythmia (irregular heartbeat) due to heart's left ventricular hypertrophy (The enlargement and thickening (hypertrophy) of the walls of the heart's main pumping chamber). Doctor Selove further mentioned and noted in the report, "Other significant conditions contributory to death were schizophrenia and physical altercation with law enforcement officers that included use of conducted electrical weapon

I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

| OFFICER NAME/NUMBER **Det. M. Stone #0087** | | | | APPROVED BY AW | |
|---|---|---|---|---|---|
| IBR CLEARANCE : ( ) ARR/A ( ) EXC/A ( ) ARR/J ( ) EXC/J | ( ) INSUFF/ CLO ( ) OTHER/ CLO ( ) UNF | COPIES MADE FOR: ( ) PA ( ) CPS ( ) JUV ( ) PAT ( ) DSHS ( ) MH | ( ) COURT: CAS / EVG / EVD ( ) DET: PREC / OTH / SXU ( ) OTHER: | SOUTH / EVT | DATA ENTRY |

# **APPENDIX C**



1

2

3

4

5

6

7                UNITED STATES DISTRICT COURT

8          WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9   JENNIFER DOLD, personal         )
    representative of the estate    )
10  of Alexander Dold; and          )
    KATHY DUNCAN,                    )
11                                   )
            Plaintiffs,              )
12                                   )
                vs.                  )        NO. 2-20-cv-00383-RAJ
13                                   )
    SNOHOMISH COUNTY, a political )
14  subdivision of the State of     )
    Washington; BRYSON McGEE; and )
15  CODY McCOY,                      )
                                     )
16          Defendants.              )

17  _____

    REMOTE VIDEO RECORDED DEPOSITION UPON ORAL EXAMINATION OF
18
                    MARK WILLIAM KROLL, PhD
19  _____

20

21

22

23

24            WEDNESDAY, JANUARY 27, 2022

25                 DEHUFFDEPO.COM

                           1

| | | |
|---|---|---|
| 1 | | the officers broadcast the phrase "1015;" correct? |
| 2 | A | I did. |
| 3 | Q | And what does the phrase 1015 mean to you? |
| 4 | A | I'm not sure.  It varies from agency to agency. |
| 5 | Q | In this case didn't you treat it as meaning "suspect in |
| 6 | | custody"? |
| 7 | A | Apparently. |
| 8 | Q | So, we know that the time duration from the time of the |
| 9 | | first trigger pull to the time that they broadcast |
| 10 | | "1015" was almost thirteen minutes; right? |
| 11 | A | The first trigger pull to 1015. |
| 12 | Q | From 9:52:25 to 10:05:08 would be about twelve minutes |
| 13 | | and 43 seconds if my math is right. |
| 14 | A | That sounds about right. |
| 15 | Q | I'd like to ask you some questions about your areas of |
| 16 | | expertise and training.  Do you have any training or |
| 17 | | special expertise in the field of psychiatry? |
| 18 | A | No. |
| 19 | Q | Psychology? |
| 20 | A | No. |
| 21 | Q | Do you have any expertise in the area of schizophrenia? |
| 22 | A | No. |
| 23 | Q | So, you wouldn't consider yourself competent to diagnose |
| 24 | | schizophrenia; would you? |
| 25 | A | No. |

| | | |
|---|---|---|
| 1 | | whether he was or wasn't experiencing a schizophrenic |
| 2 | | break that night? |
| 3 | A | Let's see, if we got rid of the medical records and his |
| 4 | | history of schizophrenia and all we saw was irrational |
| 5 | | behavior, then there could be a lot of other things. |
| 6 | | For example, hypoglycemia.  Knowing that the medical |
| 7 | | records say he's got a history of schizophrenia, I don't |
| 8 | | think it's a big leap for anyone to say that he was in a |
| 9 | | schizophrenic or psychotic break. |
| 10 | Q | So, are you saying you're qualified to opine as to |
| 11 | | whether Alexander Dold was or wasn't in a schizophrenic |
| 12 | | break? |
| 13 | A | That's clearly not an area that I offer formal opinions |
| 14 | | on.  And if this is -- And I'm not offering this as a |
| 15 | | clinical diagnosis.  I'm obviously not a psychiatrist or |
| 16 | | emergency physician that deals with these people.  What |
| 17 | | I can tell you is he had a very high pain threshold, he |
| 18 | | was not communicating rationally with the officers.  And |
| 19 | | you can put any label on it you want.  That's not -- |
| 20 | | doesn't really go to the core of my opinion. |
| 21 | Q | Did you just say that you do feel qualified to say that |
| 22 | | Alexander Dold had a high pain threshold? |
| 23 | A | Yes. |
| 24 | Q | Okay.  Okay, you actually did say that in your report; |
| 25 | | right?  You said Alexander Dold had a highly elevated -- |

1      not highly -- had a clearly elevated pain threshold;
2      correct?
3   A  Something like that.
4   Q  If you wanted to determine what an individual's pain
5      threshold was, how would you go about it?
6   A  Common -- Most common studies used involve electric
7      shock, and so here we have --
8   Q  -- How --
9   A  Go ahead.
10  Q  Sorry.
11  A  Anyway, that's how it's commonly done.  You don't burn
12     people with cigarettes to see how different pain
13     relievers work.  Electric shock is the most common
14     technique for determining pain threshold.
15  Q  Okay.  Well, tease that out for me.  If I'm -- you're
16     measuring me, my pain threshold, what do you do with me?
17     You hook me up to something and give me a shock.  How
18     does that tell you whether or not I have a high, medium,
19     low pain threshold?
20  A  Vary the amount of charge and note when you are -- can
21     sense the stimulation, when you complain that it's
22     uncomfortable and then when you tear the electrodes off
23     and get up and drop out of the study; that's what's
24     commonly done.
25  Q  Okay.  So, let's suppose you are doing that with me and

```
 1   A    In the larger sense, yes; it's relevant just pointing
 2        out conditions where -- which a drive stun has limited
 3        effectiveness.
 4   Q    It's pointing out a situation that doesn't exist in this
 5        case; correct?
 6   A    Well, I think you're being a little harsh there.  I
 7        think we can agree that toxicology did not find alcohol
 8        or recreational drugs, though I'm not sure he was tested
 9        for synthetic cannabinoid, which is an increasing
10        problem these days.  So, that comment is just meant to
11        set the stage broadly for a class of people that have
12        limited response to a drive stun.
13   Q    Set the stage broadly.  But you agree with me there's no
14        evidence in this case that Mr. Dold fell into one of
15        those categories of intoxicated or under the influence
16        of drugs?
17   A    I agree.
18   Q    You also indicate in your report, I think, that officers
19        often cannot tell when a person is mentally ill;
20        correct?
21   A    Could you direct me to that statement in my report,
22        please?
23   Q    You can look on Page 21, and I think you'll see there,
24        "It is often impossible for officers to tell which
25        individuals are mentally ill."  Do you see that?
```

1   A   Yes.

2   Q   Okay.  And was this a photograph of this dart, was it

3       inside the Dold house or outside the Dold house?

4   A   I believe that one was inside, all four probes were

5       found inside, well, except the one lodged in his shirt.

6   Q   You're familiar, very familiar, are you not, with the

7       various types of wounds and marks that a taser can

8       cause?

9   A   Yes.

10  Q   Or create on a person's body?

11  A   Yes.

12  Q   You wrote and published An Atlas of Taser Wounds;

13      correct?

14  A   I was a co-editor on that book, yes.

15  Q   And what's the purpose of that book?

16  A   To help investigators, Medical Examiners identify wounds

17      on, on the body that -- caused by an electrical weapon.

18  Q   You reviewed the autopsy photos in this case?

19  A   I did.

20  Q   Do you have a general idea of how many autopsy photos

21      you looked at, a general idea?  I don't mean, you

22      know --

23  A   -- Well over, well over a hundred.  And I asked that the

24      original photo supplied be replaced by native resolution

25      photos so I could blow them up and look for these

```
 1        depending upon the model -- say, 20, 25 millimeters.
 2        So, about an inch total.  So, you're allowed a half inch
 3        for each separation.
 4   Q    I got to shift to some different topics now.  I forget.
 5        Are you currently located in Minnesota?
 6   A    I am.
 7   Q    And my understanding is you, most of your post-high
 8        school education is at the University of Minnesota;
 9        correct?
10   A    That and a local private university, yes.
11   Q    Is that St. Thomas?
12   A    Correct.
13   Q    Okay.  Have you ever been sued?
14   A    I think, I think I was once fifteen years ago.  The, the
15        stock of TASER went down, and I was a director, and they
16        sued every director.  Other than that I don't think I've
17        ever been sued.
18   Q    Okay.  You say that was about fifteen years ago?
19   A    Yes.  Maybe more.  Sixteen, maybe seventeen.
20   Q    Okay.  And you say they sued every director in the
21        company?
22   A    Correct.
23   Q    At that time you were a director?
24   A    Yes.
25   Q    And you're a director today?
```

1    A    Correct.

2    Q    And have you been a director continuously from then to

3         now?

4    A    Yes.

5    Q    And my understanding is that at some point Text -- TASER

6         changed its name; correct?

7    A    Correct.

8    Q    And this is a distinction, that perhaps you're familiar

9         with, but did it remain the same corporate entity and

10        changed its name or did it become -- dissolve and a

11        separate entity came into being?

12   A    Just, it was just a name change.

13   Q    Just a name change.  And where was that suit brought?

14   A    Oh, heaven.  Probably some, some friendly court for

15        so-called shareholder derivative lawsuits.  I don't

16        remember it.

17   Q    You don't remember where the case was brought?

18   A    No.  I understand these are typically brought in

19        California and New York.  But I never heard anything

20        after that.

21   Q    You never heard anything after the suit was brought?

22   A    Correct.

23   Q    So, you don't know what happened to the lawsuit?

24   A    Oh, there was some ransom paid, and it went away.

25   Q    What do you mean there was some ransom paid?

| | | |
|---|---|---|
| 1 | A | Back then there was an industry that would sue smaller |
| 2 | | companies when their stock went down, and I think the |
| 3 | | law has changed, so it's much harder to do that.  And |
| 4 | | then these people get, get your directors and officers |
| 5 | | insurance, and then they go away. |
| 6 | Q | Sounds like you're saying there was a settlement; is |
| 7 | | that right? |
| 8 | A | Presumably.  I mean, there's no trial, and I was never |
| 9 | | deposed, so I don't know much of the details. |
| 10 | Q | What were the accusations made against you in that case? |
| 11 | A | Nothing against me personally.  I think the, the general |
| 12 | | theme of the so-called derivative lawsuit is that |
| 13 | | someone felt that they could have appointed a better |
| 14 | | slate of directors.  And after they got their check they |
| 15 | | appeared to have lost interest in doing that. |
| 16 | Q | What do you mean there was nothing against you |
| 17 | | personally? |
| 18 | A | The...  There was a firm that specialized in suing small |
| 19 | | public companies whose stock went down.  And my |
| 20 | | understanding is that they would first sue the |
| 21 | | corporation and then make a settlement for that, and |
| 22 | | then they would sue the directors and get a settlement |
| 23 | | for that.  And so I don't, don't recall that anyone |
| 24 | | accused me of doing anything wrong except for being on |
| 25 | | the board of a company whose stock had gone down. |

1   A   I have no idea.

2   Q   How much did they pay?

3   A   I have no idea.

4   Q   Were any changes made to the governance of the company

5       as a result of the lawsuit?

6   A   Of course not.

7   Q   Were there any changes made to the composition of the

8       Board of Directors as a result of the lawsuit?

9   A   No.

10  Q   Was the change of company name from TASER to Axon after

11      this lawsuit was over?

12  A   Yes, about ten years after.

13  Q   You would agree with me that your primary area of

14      expertise is within the subject of electricity on the

15      heart?

16  A   No.

17  Q   Would you agree with me that you have published your

18      research on the effects of electric shocks on the heart?

19  A   Yes.

20  Q   Okay.  You hold several college and graduate degrees;

21      correct?

22  A   Say again.

23  Q   You hold several college and graduate degrees; right?

24  A   Yes.

25  Q   Okay.  You have a bachelors degree in math; correct?

1   A   Yes.

2   Q   And a masters degree in electrical engineering; correct?

3   A   Correct.

4   Q   And a PhD in electrical engineering; correct?

5   A   Yes.

6   Q   And a business degree, a MBA; is that right?

7   A   Yes.

8   Q   Now, am I right that the business degree was sort of

9      many years after the other degrees?

10  A   Three or four years, it was three or four years after my

11     PhD I think.

12  Q   What were you doing at the time you were studying for

13     your MBA?

14  A   I was running research.  Well, it covered two jobs.

15     One, I was working electrocardiography research running

16     a start-up, and then later I was running research for an

17     implantable defibrillator start-up.

18  Q   What's the name of the start-up you were doing?

19  A   It was called Angemed, A-N-G-E-M-E-D.

20  Q   Did you say you were running one start-up and doing

21     something with another start-up?

22  A   That was in sequence.  And the MBA study covered an

23     overlap.

24  Q   Could you explain what you mean to me?  I don't -- I'm

25     lost.

1       practitioner that diagnoses and treats neurological

2       disorders.

3  Q  You have a degree in anatomy?

4  A  No.

5  Q  Okay.  And you don't have a degree in physiology; do

6       you?

7  A  Correct.

8  Q  And you don't have a degree in pathology; do you?

9  A  Correct.

10  Q  So, is there any -- You don't have a medical degree; do

11      you?

12  A  Correct, I do not.

13  Q  Okay.  Let me ask you some questions about the term

14      "physiological" or "physiological effects" because you

15      used that term a couple times in your report.  To you,

16      what is the science of physiology?

17  A  Study of the engineering of the human body.  A function

18      as opposed to the construction which would be anatomy.

19  Q  Let me read you a definition that comes out of a -- I'll

20      represent to you that this definition comes from the

21      Guytan and Hall Textbook of Medical Physiology.

22  A  I have it on my bookshelf.  It's a wonderful text.

23  Q  Okay.  Then here's how that textbook defines it.

24      "Physiology is a subdiscipline of biology which focuses

25      on how organisms, organ systems and individual organs

1  A   Correct.

2  Q   So, then I'm correct, you don't intend to offer any

3      opinions regarding the accuracy of Dr. Sperry's findings

4      or conclusions; correct?

5  A   Well, that's basically true.  I, I would note that he

6      also did not find any electrical weapon wounds from his

7      study of the autopsy photos.  But the other things he

8      opined on such as asphyxial death, I'm not intending to

9      offer any opinions in that area.

10                            (Exhibit Number 2 marked.)

11 Q   I heard your comment about you think something in

12     Dr. Sperry's report is accurate.  But early in your

13     answer I asked you do you intend to offer any opinions

14     -- and maybe I didn't ask it very well.  Do you intend

15     to offer any opinions in this case that anything in

16     Dr. Sperry's report is not accurate?  Earlier you just

17     said that's basically true.

18 A   I do not, I do not intend to offer any opinions that I

19     disagree with anything in Dr. Sperry's report, but I

20     have to -- just to clarify that, I'm not saying I agree

21     with it.  I was not asked to opine on, for example, the

22     restrained asphyxia.

23 Q   And you have no intent of opining on that; do you?

24 A   Correct, I do not.

25 Q   What do you think was the cause of death in this case?

1    A    I do not have an opinion outside of exclusion of

2        electrocution.

3    Q    So, as I understand it, tell me if I'm wrong, you have

4        an opinion that says "I can exclude electricity as a

5        cause of death," and other than that, you don't have any

6        more opinions about cause of death?

7    A    That's correct.

8    Q    Okay.  You own stock in Axon or TASER today?

9    A    I do.

10    Q    And when did you first own stock in TASER?

11    A    Well, I'm not calling options, which are potential

12        ownership -- Probably first shares I owned were, I don't

13        know, ten, twelve years ago.

14    Q    And when I said -- Did I just say TASER or Axon?

15    A    That's a -- I was -- That's fine, I -- The company was

16        called TASER up until five years ago when the cameras

17        and evidence became a bigger part of the business and

18        they changed it to Axon, but I know what you meant.

19    Q    Okay.  So, the first time you owned stock, regardless of

20        whether we call it TASER or Axon, excluding options, the

21        first time you owned stock in one of those was around,

22        somewhere between 2010 and 2012; is that right?

23    A    That sounds about right.  I can't remember the exact

24        year because they -- They switched from paying directors

25        with options to paying directors with outright stock

1          grants around that time.
2     Q    Okay.  Now -- You have excluded options.  When is the
3          first time that you were given options to buy stock in
4          either TASER or Axon?
5     A    March 2003.
6     Q    So, you didn't exercise any of those options until at
7          the earliest somewhere around 2010?
8     A    No, that's not correct.
9     Q    Okay.  Then I don't understand.
10    A    The options had the option of being exercised in a
11         same-day sale, so I never really owned them, or maybe
12         legally for a millisecond or something like that.
13    Q    I see.  So, are you saying that for a millisecond or so
14         you sold some stock options as early as March of 2003?
15    A    No.
16    Q    Well, when is the first time that you exercised any
17         options, roughly?
18    A    Either 2004, 2005.  Probably '04.
19    Q    How much TASER or Axon stock do you own today?
20    A    I don't know.
21    Q    What's your best estimate?
22    A    Well, stock market has been very volatile lately, so
23         it's even harder.  Probably around a million dollars.
24    Q    Any time in your life have you made capital gains from
25         the sales of TASER stock?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Roughly when do you think you first did that? |
| 3 | A | Probably ten years ago. |
| 4 | Q | Okay.  Have you ever sold, say, more than a hundred |
| 5 | | thousand dollars worth of TASER stock? |
| 6 | A | I have. |
| 7 | Q | What's the largest, roughly the largest sale of TASER |
| 8 | | stock you've ever made? |
| 9 | A | I just don't recall. |
| 10 | Q | Do you think you've made a sale of TASER stock sometime |
| 11 | | in your life larger than half a million dollars? |
| 12 | A | Yes. |
| 13 | Q | Do you think you've made a sale of TASER stock sometime |
| 14 | | in your life of larger than a million dollars? |
| 15 | A | Probably. |
| 16 | Q | On the -- You're currently on the Board of Directors of |
| 17 | | now it's called Axon; right? |
| 18 | A | Correct. |
| 19 | Q | Maybe I asked you this already, but have you |
| 20 | | continuously served on the Board of TASER, slash, Axon |
| 21 | | all the way back to -- what is it -- 2003? |
| 22 | A | I have. |
| 23 | Q | Do you draw a salary today for being on the TASER Board? |
| 24 | A | Yes.  Well, it's not -- It's called a retainer, but, |
| 25 | | yes, there is an annual compensation, cash compensation. |

1  Q  How much is it?

2  A  I, I always get these confused because I sit on a number

3     of boards.  I think it's 60K.

4  Q  Do you think you might be wrong, and it might be larger

5     than a hundred thousand?

6  A  Well, I get 80K from one board, so it's either 80K or

7     60.

8  Q  What's the other board?

9  A  Haemonetics.

10 Q  Can you spell that for the court reporter and me?

11 A  H-A-E-M-O-N-E-T-I-C-S.  We make cardiology equipment and

12    plasma extraction equipment.

13 Q  Have you ever made a salary from a position as a

14    director of any corporation in the neighborhood of

15    300,000 a year?

16 A  I'm going to interpret your question as salary meaning a

17    cash retainer, and the answer is no.

18 Q  If you -- besides Haemonetics and TASER are there any

19    other boards where you draw a salary or what you call

20    retainer?

21 A  Yes.

22 Q  What are those corporations?

23 A  prostaCare out of Sydney, Australia, which is doing

24    electrical therapies for cancer.  And that's it for cash

25    compensation.  Other boards compensate with stocks and

# **APPENDIX D**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

JENNIFER DOLD, personal          )
representative of the estate     )
of Alexander Dold; and           )
KATHY DUNCAN,                     )
                                 )
          Plaintiffs,            )
                                 )
          vs.                    )          NO. 2-20-cv-00383-RAJ
                                 )
SNOHOMISH COUNTY, a political    )
subdivision of the State of      )
Washington; BRYSON McGEE; and    )
CODY McCOY,                       )
                                 )
          Defendants.            )

REMOTE DEPOSITION UPON ORAL EXAMINATION OF

OFFICER SHAUN VAN EATON

TUESDAY, OCTOBER 5, 2021

DEHUFFDEPO.COM

1

| | | |
|---|---|---|
| 1 | | fighting or, or the placement of the landscape or |
| 2 | | whatever.  But as soon as the handcuffs are applied, at |
| 3 | | that point on those positions and the scene is safe, we |
| 4 | | roll them over into a recovery position and continue |
| 5 | | your investigation, per se.  So... |
| 6 | Q | So, I didn't quite hear what you said about as soon as |
| 7 | | what?  You roll him over? |
| 8 | A | As soon as they're handcuffed and the position is safe |
| 9 | | to roll them into a recovery position or sitting up or |
| 10 | | depending on the scene or the totality of the |
| 11 | | circumstances. |
| 12 | Q | So, and the recovery position is what position? |
| 13 | A | On the side, left arm, right arm. |
| 14 | Q | Were you ever taught anything about the disadvantages or |
| 15 | | dangers of putting weight on a person after he had been |
| 16 | | handcuffed and was not resisting? |
| 17 | A | I had been trained on positional asphyxia where if |
| 18 | | somebody's placed on their stomach for a lengthy period |
| 19 | | of time, stomach area, chest area, to where a person |
| 20 | | could have difficulty breathing. |
| 21 | Q | And what were you taught about placing weight on a |
| 22 | | person who was on their stomach and not resisting? |
| 23 | | MS. RAGONESI:  Object to the form. |
| 24 | A | I've been told that it can provide difficulty breathing. |
| 25 | Q | In this case did you see at some point yourself that |

1      Mr. Dold had stopped breathing?

2   A  When he was in the recovery position.

3   Q  You're saying that you saw him stopped breathing when he

4      was on his side?

5   A  I'm saying that I did not see him breathing when he was

6      on his side.

7   Q  So, who moved him from the position on his belly to the

8      position on his side?

9   A  I can't remember exactly who it was.  I...

10  Q  Before he was moved from his belly to his side, were you

11     concerned that he was in any kind of medical distress?

12  A  No.

13  Q  After he was moved from his belly to his side, did there

14     come a point where you were concerned that he was in

15     some kind of medical distress?

16  A  Yes.

17  Q  What caused that?

18  A  When we were assessing him and observations of him not

19     having any type of verbal interaction or facial

20     movements that I could see we started assessing to see

21     if he was okay.

22  Q  What kind of verbal interaction are you talking about?

23     You said no verbal interaction.

24  A  You -- Usually when you handcuff somebody you roll them

25     off to the side or whichever, there's, you know, verbal

# **APPENDIX E**



UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| JENNIFER DOLD, personal representative of the estate of Alexander Dold; and KATHY DUNCAN,<br><br>          Plaintiffs,<br><br>          vs.<br><br>SNOHOMISH COUNTY, a political subdivision of the State of Washington; BRYSON McGEE; and CODY McCOY,<br><br>          Defendants. | NO. 2-20-cv-00383-RAJ |

REMOTE DEPOSITION UPON ORAL EXAMINATION OF

OFFICER TRAVIS BLOCK

TUESDAY, NOVEMBER 9, 2021

DEHUFFDEPO.COM

1

1   Q   Can you describe that sound?

2   A   Somebody breathing.  I'm not sure how to elaborate on

3       that.

4   Q   Well, was it -- In volume, can you say it was

5       particularly loud breathing, particularly soft

6       breathing?

7   A   I don't recall.

8   Q   You don't know?

9   A   No.

10  Q   Do you recall a little bit back you said that the tone

11      of voice of some officer was to you a tone of distress.

12      What about this breathing, did it seem to you breathing

13      of a man in distress or not?

14              MS. RAGONESI:  Object to form.

15              MR. GROSS:  Join.

16  A   I don't recall specifically, again.

17  Q   Did you see anything to you to indicate Mr. Dold was in

18      distress?

19  A   At a certain point, yes.

20  Q   What did you see?

21  A   When he was in handcuffs and was removed from the stairs

22      I noticed that he wasn't thrashing about like he had

23      been, and I didn't hear any noises or breathing, and I

24      checked his pulse, and -- at that point, yeah.

25  Q   So, let's go back.  You just mentioned earlier when he

# **APPENDIX F**

1

2

3

4

5                    UNITED STATES DISTRICT COURT

6         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

7

8    ─────────────────────────────────────────────

9    JENNIFER DOLD, personal      )
     representative of the        )
     estate of Alexander Dold;    )
10   and KATHY DUNCAN, mother     )
     of Alexander Dold,           )    No. 2:20-cv-00383-RAJ
11                                )
                                  )
12           Plaintiffs,          )
                                  )
13       vs.                      )
                                  )
14   SNOHOMISH COUNTY, a          )
     political subdivision of     )
     the State of Washington;     )
15   BRYSON MCGEE; and CODY       )
     MCCOY,                       )
16                                )
             Defendants.          )
17   ─────────────────────────────────────────────

18

19      VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

20                     CHAD DAUGHERTY

21   ─────────────────────────────────────────────

22            TUESDAY, FEBRUARY 22, 2022
                 REMOTELY VIA ZOOM
23                DEHUFFDEPO.COM

24

25

1

```
1    Q   Did you ever go on those stairs?

2    A   I don't remember going on those stairs.

3    Q   Did you ever see any dirt or fecal matter or anything

4        on those stairs?

5    A   Not that I remember.

6    Q   The area where Mr. Dold was laying facedown, what was

7        the surface that he was lying on?

8    A   It had gravel, dirt.

9    Q   So after you have checked on McGee and then McCoy,

10       then what do you do?

11   A   There was people tending to Mr. Dold on the ground.

12       And they had rolled him up onto his side, and I could

13       see that his stomach was rising and falling as if he

14       was breathing.  And there was already other officers

15       and deputies there, tried to start medical treatment,

16       verifying if he had a pulse.

17           And then he was on his side.  So I helped roll

18       him onto his back and -- because he was a bigger guy.

19       And once he was on his back, we made the determination

20       that -- they were checking for pulse.  I didn't have

21       any -- I didn't check, but I know there was one

22       person at the neck, one person checking wrist pulse

23       while he was on his side.  Couldn't get a pulse

24       and -- on either one, and so I basically said we need

25       to start CPR.
```

1  Q   Did he move any part of his body when they rolled
2      him?
3  A   Not that I saw.
4  Q   Now, by this second position, after you went back,
5      could you tell whether he was still breathing?
6  A   I could see the rise and fall of his stomach, and it
7      appeared to me he was breathing.  His stomach was
8      exposed, so I could see it fairly well.
9  Q   What did you see in terms of other officers checking
10     on his medical condition?
11 A   I just saw them checking -- I don't know who it was,
12     but I just saw hands at the neck, feeling for a
13     pulse, and then somebody feeling at the wrist for a
14     pulse.  Kind of simultaneously they were talking to
15     each other.
16 Q   So those are different officers, one is feeling on
17     his neck and one is feeling his wrist?
18 A   Yes.
19 Q   And did you hear them verbalize what they could
20     detect?
21 A   Yeah.  Nobody could feel a pulse.
22 Q   And I don't know if you said this or not.  Did you
23     say that you decided that people needed to do CPR?
24 A   Yes.  When there was no pulse being found, I told
25     them we need to start CPR.

# **APPENDIX G**



# Snohomish County Medical Examiner's Office
*Autopsy Report*

| Decedent:   Alexander William Dold | Case #:   17SN0482 |

## PATHOLOGIC DIAGNOSES

I. **Cardiac arrhythmia due to cardiac left ventricular hypertrophy. Other significant conditions contributory to death were schizophrenia and physical altercation with law enforcement officers that included use of conducted electrical weapon:**

   A. Cardiac hypertrophy (490 grams), with concentric left ventricular hypertrophy.

   B. History of schizoaffective disorder.

   C. Numerous abrasions and contusions of head and trunk and extremities, left anterior chest muscle contusion, left sternohyoid anterior neck muscle contusion, and intramuscular tongue bite bruises scantly mark hemorrhage, consistent with reported history of physical altercation/struggle with law enforcement.

   D. Petechial hemorrhages on lower eyelids, conjunctival surfaces.

   E. Taser embedded in clothing of upper back.

II. Pulmonary edema.

III. <u>Toxicology:</u> No drugs or alcohol detected.

## CASE SYNOPSIS

The Snohomish Multi-Agency Response Team (SMART) reported the death of a 29-year-old Caucasian male with a history of schizophrenia who was involved in a domestic violence incident in the Echo Lake area of Snohomish County during the late evening hours of March 21, 2017. Snohomish County Sheriff's Office deputies responded and an altercation ensued, including a physical struggle that included TASER deployment; during the struggle, the subject suddenly became unresponsive. Resuscitation efforts were attempted by the deputies and by responding medics without success.

## SCENE NOTE

I was notified at 0425 hours on March 22, 2017 by Investigator Robert Karinen of a Snohomish County Multi-Agency Response Team (SMART) investigation of a police-related death of a 29-year-old male with a medical history of schizophrenic who died while being taken into custody. We arrived at 12014 - 221st Street Southeast in the vicinity of Echo Lake near Snohomish, Washington, at 0545 hours and were met by members of SMART, who told us that the decedent had a history of schizophrenia and was involved in a domestic violence incident with his mother late the previous

DOLD-BL-000737

# **APPENDIX H**



**TOXICOLOGY LABORATORY**
**WASHINGTON STATE PATROL**
2203 Airport Way South Suite 360 Seattle, WA 98134
(206) 262-6100  FAX No. (206) 262-6145

**TOXICOLOGY TEST REPORT**

**Attention:** Dr. Stanley Adams

**Agency:** Snohomish Co Medical Examiner

**Address:** 9509 29th Ave W
Everett, WA 98204

**Tox Case #:** ST-17-03739    **Case Type:** Death Investigation    **Report Date:** 4/17/2017

| | |
|---|---|
| **Agency Case #:** 17SN0482 | **Subject Name:** Alexander W. Dold |

**Evidence:** The following evidence was submitted to the Laboratory by Danielle Renshaw of the Snohomish Co Medical Examiner on 3/29/2017 via USPS-Certified Mail:
(1)  ST-17-03739-A; VGray, Blood - Peripheral

**Volatile Analysis Results:**

ST-17-03739-A: Blood - Peripheral

ST-17-03739-A was tested by Headspace - Gas Chromatography for the presence of acetone, ethanol, isopropanol, and methanol on 04/10/2017. The following result was obtained:

**None Detected**

**Drug Analysis Results:**

ST-17-03739-A: Blood - Peripheral

ST-17-03739-A was tested by Enzyme Multiplied Immunoassay Technique (EMIT) for the presence of amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine metabolite, and opiates on 04/10/2017. The following result(s) was obtained:

**None Detected**

ST-17-03739-A was tested by Gas Chromatography/Mass Spectrometry for the presence of basic drugs and metabolites on 04/10/2017. The following result(s) was obtained:

**None Detected**

**COMMENTS**

*All testing was performed by the Forensic Scientist listed below except as otherwise indicated. The Forensic Scientist has technically reviewed all relevant pages of testing documentation in the case record.*



DOLD-BL-000747



Request ID: ST-17-03739-0001

Examined by:                                    Reviewed by:

Asa Louis, BSc                                  Reviewer
Forensic Scientist 3                            Date: 4, 19, 17
Date: 2017 0417

# **APPENDIX I**

# United States District Court
## Western District of Washington

| | |
|---|---|
| Jennifer Dold<br><br>　　　　　Plaintiff,<br><br>　　　　v.<br><br>Snohomish County, et al,<br>　　　　　　Defendants. | No. 2:20-cv-00383-RAJ |

### EXPERT REPORT OF MARK KROLL, PhD, FACC, FHRS, FIEEE, FAIMBE

This report summarizes my analysis and findings and includes a statement of my opinions. The report also includes data and other information considered by me in forming my opinions and sets out my qualifications (including my CV which is an integral part of this report).

Mark Kroll, PhD, FACC, FHRS, FAIMBE                    4 Nov 2021

# Details of Trigger Pulls

## Trigger Pull #1

Dep. McCoy deployed his X26P probes towards Mr. Dold and the pulse logs show 4.5 seconds of current delivered. It is likely that the probes landed very close together as there was no electronic control. Mr. Dold's only response was a brief yell which demonstrates an extremely high pain threshold.

Dep. McCoy then removed the cartridge in preparation for possible later drive stuns.

## Trigger Pull #2

After a 17 second delay (from the end of the trigger pull #1), Dep. McGee deployed his X26E probes towards Mr. Dold. The older X26E does not have pulse logs so we do not know how many seconds of current was delivered. A conservative estimate would be the maximum 5 seconds in the recorded trigger pull.

There was some electronic control and the deputies were able to get Mr. Dold off the bed onto the ground. This level of movement will typically break the delicate wires of the probes.

## Trigger Pull #3

After a 7 second delay (from the end of the trigger pull #2), Dep. McGee pulled the X26E trigger again but there was no response. That would be consistent with a wire breaking or a probe dislodging.

Dep. McGee recalled that a probe had fallen out of Mr. Dold's forearm. Detective Barrows later found loose TASER CEW probes inside the bedroom of this part of the struggle.

## Trigger Pull #4

Dep. McGee attempted a drive-stun 14 seconds after the end of TP #3. While the X26E does not have pulse logs we know from experience that current is delivered for ~30% of a drive-stun duration and that would give 1.5 seconds of current.

## Trigger Pull #5

Dep. McCoy attempted a drive-stun 26 seconds after the end of TP #4. The pulse logs show a 3-second trigger pull with only 0.8 seconds of contact.

## Trigger Pull #6

Dep. McCoy attempted a final drive-stun 10 seconds after the end of TP #5. The pulse logs show a 5-second trigger pull with only 1.5 seconds of contact.

Ofc. Block noted that Mr. Dold was nonresponsive to a sternal rub and had a faint or "weak" pulse consistent with PEA as reported at 22:08:34. It is important to note that many physician experts inappropriately confuse or conflate the faster-deterioration rate of ischemically-induced VF to the demonstrated longer duration for electrically-induced VF. The 2 are not synonymous as ischemically-induced VF tends to deteriorate more rapidly.[46]

Asystole and PEA are the most common cardiac arrest rhythms in deaths associated with drug and alcohol abuse.[47-52 53-55] Asystole and PEA are the most common cardiac arrest rhythms in deaths associated with excited delirium syndrome.[56-66] They are also very common with sudden death due to heart disease.[67]

*Mr. Dold had the cardiac arrest rhythms of asystole (flat-line) and PEA which, with the limited time line, eliminates the possibility that he was electrocuted.*

## 5. Electronic Control is not More Dangerous with the Mentally Ill and Intoxicated

The occasional opinion — that electronic control should not be used with the intoxicated (or mentally ill) — does not comport with the realities of law enforcement. That reality is that well-adjusted and sober members of society do not tend to be involved in forceful arrests as 79% of recipients of force have a history of mental illness or substance abuse and 66% have a documented history of mental illness.[68] More specifically to drug abuse, a large study found that 71% of electronic control subjects had drugs in their urine and 73% had a substance abuse history.[69] A large Canadian forceful-arrest study found that 82% of the subjects were being affected by alcohol, drugs, or emotional disturbance.[70]

The suggestion that CEWs not be used on the mentally ill (including those in excited delirium) or those intoxicated by drugs or alcohol would exclude the very people that most often resist being placed in custody. A landmark study gave 22 intoxicated volunteers (average BAC of 0.12%) exposures of 15 seconds.[71] Blood samples we're taking before drinking, after drinking, after the CW exposure, and 24 hours later. There was no clinically significant effect on any biomarkers.

Electricity is not more dangerous with the mentally ill or those in a state of excited delirium. Electrocution involves the heart (outside of lightning strikes which can damage the brain) but mental illness and excited delirium live in the brain. There is no connection between the two nor is there any increased sensitivity to electrocution with the chronically or acutely mentally ill.

*Sober and rational people generally do not resist law enforcement officers. Regardless, it is often impossible for officers to tell which individuals are mentally ill, high on drugs, or intoxicated (or any combination of these), especially in chaotic situations.*

21

# APPENDIX J

1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8              WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9  JENNIFER DOLD, personal          )
   representative of the estate     )
10 of Alexander Dold; and           )
   KATHY DUNCAN,                     )
11                                   )
            Plaintiffs,              )
12                                   )
                vs.                  )        NO. 2-20-cv-00383-RAJ
13                                   )
   SNOHOMISH COUNTY, a political )
14 subdivision of the State of      )
   Washington; BRYSON McGEE; and )
15 CODY McCOY,                       )
                                     )
16          Defendants.              )

17 ─────────────────────────────────────────────────────────

   REMOTE VIDEO RECORDED DEPOSITION UPON ORAL EXAMINATION OF
18
                       BRYSON MCGEE
19 ─────────────────────────────────────────────────────────

20

21

22

23

24              TUESDAY, DECEMBER 7, 2021

25                    DEHUFFDEPO.COM

                           1

```
 1   Q   Okay.  Was anyone else in the precinct, if you recall,
 2       besides you?
 3   A   The only ones that I recall being there were
 4       Cody McCoy and Dep. Chris Marino.
 5   Q   Dep. Chris Marino was also there?
 6   A   Yes.
 7   Q   Okay.  And did you get information from police radio
 8       around 9 o'clock?
 9   A   Did I?
10   Q   Yeah.
11   A   I, at some point after 9 I believe I did, yes.
12   Q   What was the information you got initially?
13   A   Exactly what it was -- I'm not sure what was said, but
14       it was dispatching myself and Dep. McCoy to a physical
15       domestic.
16   Q   Okay.  Anything else you remember besides getting
17       information that you were to go to a physical domestic?
18   A   The, the address was off -- it was quite a distance
19       away.  It was in the Charles 4 beat.  And the
20       information was something to the effect of a male and a
21       female were physical, there was an altercation, and it
22       may not have been in this order, but the male was
23       schizophrenic or something and off his medication and
24       the mom -- the reporting party had requested that he go
25       for a psych' eval'.
```

1      or hypotheticals.

2    Q  That's not the question, and it's not a hypothetical.

3      The question is did you consider it while you were

4      driving there or walking up the driveway.

5    A  Did I consider what?

6    Q  What type of medicines he was on or not on.

7    A  The only, the only information I had about medicines was

8      that he had been off his medicine for a period of time.

9      I don't recall what it was.

10            MR. LOBSENZ:  I move to strike as

11     non-responsive.

12   Q  Did you consider?

13   A  Did I consider what?

14            MS. RAGONESI:  Sorry, I was waiting for the

15     rest of the question.  Just for the record, we object to

16     the motion to strike.  Go ahead.

17            Jim, it wasn't clear to me that you had asked

18     the whole question, so maybe you can repeat it.

19   Q  Did you consider what type of medications he was on or

20     not on?

21   A  No.

22   Q  That was a "no;" right?  Hard to hear.

23   A  No.  Correct.

24   Q  Okay.  Did you ask -- You heard at some point police

25     radio tell you the mother said he's off his med's;

| | | |
|---|---|---|
| 1 | | correct? |
| 2 | A | Something to that effect, yes. |
| 3 | Q | Did you ask police radio for more information about |
| 4 | | that? |
| 5 | A | Did I ask?  No, like I said, the radio traffic is pretty |
| 6 | | valuable and we don't ask those kinds of things. |
| 7 | Q | Did you ask radio dispatch what type of mental illness |
| 8 | | he had? |
| 9 | A | No. |
| 10 | Q | Did you ask radio dispatch what type of criminal history |
| 11 | | this son had? |
| 12 | A | Did I ask?  No. |
| 13 | Q | Did they tell you whether he had any criminal history, |
| 14 | | police radio? |
| 15 | A | I don't know. |
| 16 | Q | Did you ask police radio to tell you anything about how |
| 17 | | best to approach the house? |
| 18 | A | I don't know what that would serve, but, no. |
| 19 | Q | Did police radio tell you that the mother thought he |
| 20 | | would take off if he knew the police were called? |
| 21 | A | I recall something, something to that effect being |
| 22 | | either in the call or broadcast. |
| 23 | Q | As you approached the house, were you concerned that he |
| 24 | | would try to run out of the house and away? |
| 25 | A | Was I concerned that he would run away? |

```
 1    A    I don't know if he was or not.  That was what was --
 2         that he had some kind of mental item going on.  What it
 3         was, I don't know.
 4    Q    Okay.  And you recall that the mom wanted him taken to a
 5         hospital?
 6    A    I recall something to that effect.
 7    Q    And you recall knowing that the mom thought he would
 8         flee if he knew police were coming?
 9              MS. RAGONESI:  Object to form.
10    A    Again, something to that effect.  What, exactly what was
11         said, I don't, I don't know.
12    Q    Okay.  And you recall knowing that the mom left the
13         house to make a call, said she going to return, and you
14         knew she had returned?
15    A    Now, what now?  Sorry.
16    Q    You knew at that moment -- right -- you'd been informed
17         that the mom had left the house to make the call, had
18         said she was going back to the house after the call, and
19         you knew that she was back at the house from the car?
20              MS. RAGONESI:  Object to form.
21    A    I, I didn't know if she was back at the house or not.
22         The last -- One of the updates that I got was that she
23         was going back.
24    Q    Okay.  Am I wrong?  I thought you told me that you knew
25         by the time you got there she was back.
```