UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

JENNIFER DOLD, personal representative
of the estate of Alexander Dold; and KATHY
DUNCAN,

               Plaintiffs,

     v.

SNOHOMISH COUNTY, a political
subdivision of the State of Washington;
BRYSON McGEE; and CODY McCOY,

               Defendants.

NO. 2:20-cv-00383-RAJ

PLAINTIFFS' BRIEF IN OPPOSITION
TO DEPUTY DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

## I.  INTRODUCTION

Defendants McGee and McCoy killed an unarmed, mentally ill man.[1]  Together they tased him six times in less than four minutes, subjected him to a carotid artery restraint (an "LVNR") for another four minutes, punched him in the head, hit him in the head with a police baton, broke his fingers, threatened to shoot him, applied weight to his back while he was in a prone position, and after he had lost consciousness and handcuffed, they carried him down the stairs that led to his front door and dumped his body face down on the gravel.

While they pretend to adhere to the principles which govern summary judgment in excessive force cases, they ignore the rule that summary judgment is granted "sparingly" in

---

[1] This was not the first time McGee had killed a man.  Seven years earlier he killed Adam Colliers who was actively psychotic because he was under the influence of speed.  Here, Alexander Dold, a diagnosed schizophrenic, was chronically mentally ill and was "off his meds" at the time.

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 1
(2:20-cv-00383-RAJ)

DOL013-0001 6895230

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

such cases. They also ignore the rule that when officers have killed a man, thus eliminating the key witness who might dispute their version of the events, juries are not required to accept the officers' self-serving statements as to what happened. The also ignore strong circumstantial evidence that the deputies, who were given days to think of a good cover story, told several lies. They ignore the fact that their statements as to what happened are impossible to square with what Dold's neighbors heard. They ignore the fact that the absence of any physical injury to deputy McGee's face, as well as his failure to mention any facial injury on the night of the incident, belies their claim that Alexander Dold punched Deputy McGee in the eye.

They also repeatedly ignore the substantive law governing exigent circumstances; the right to refuse warrantless entry into a home over the objection of a present co-occupant; the fact that both the use of an LVNR and the placement of weight on a suspect's back have been recognized as serious types of force which can be deadly; and the fact that it has been clearly established for almost half a century "that an officer [cannot] use deadly force on an unarmed, nonthreatening suspect and any belief to the contrary [is] not reasonable." *Lam v. City of Los Banos,* 976 F.3d 986, 1000 (9th Cir. 2020), citing *Tennessee v. Garner,* 471 U.S. 1, 11-12 (1985). Of course the Defendants contend that Alexander Dold was *not* nonthreatening and that he threatened them with death. But that's their story and it conflicts with the testimony of their neighbors.

Duncan's next-door neighbors Jason and Meggan Padvorac both report that they heard Alexander Dold yelling, "I submit." They report that the only voice they heard threatening to use deadly force was a male voice that was *not* Alexander Dold. Thus, a jury could easily find that it was the Deputy Defendants who threatened to use deadly force, not Alexander Dold; that Alexander Dold was never armed; that he never resisted arrest; and that the deputies had no objectively reasonable basis for killing him.

The courts have repeatedly said that the existence of a material factual dispute precludes a district court from entering summary judgment on claims of excessive force and warrantless

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 2
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

entry for violation of the Fourth Amendment. For the same reason, courts routinely hold that genuine factual disputes preclude a summary judgment dismissal on qualified immunity grounds. There are such genuine material issues of disputed fact here and therefore the Defendants' motion for summary judgment must be denied.

## II. SUMMARY JUDGMENT ON EXCESSIVE FORCE CLAIMS: GENERAL PRINCIPLES.

**A. Summary judgment is seldom appropriate in excessive force cases because jury determination of disputed facts is nearly always required. In police misconduct cases summary judgment almost always turns on a jury's determination of who is telling the truth.**

It has long been settled that the summary judgment dismissal of § 1983 excessive force claims is almost never appropriate. Because the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit] ha[s] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith v. Hemet*, 394 F.3d 689, 701 (9th Cir. 2005), quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).[2] *Thomas v. Seattle,* 395 F. Supp.2d 992, 997-98 (W.D. Wash. 2005);[3] *Liston v. County of Riverside*, 120 F.3d 965, 976, n.10 (9th Cir. 1997) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury.")[4]

Summary judgment is almost never appropriate "because [police misconduct cases] almost always turn on a jury's credibility determinations." *Hemet*, at 701; *Santos*, at 853; *Glenn*, 673 F.3d at 871 (same); *cf. LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir.

---

[2] *Accord Estate of Aguirre v. County of Riverside,* 29 F.4th 624, (9th Cir. 2022) (same); *Gonzalez v. Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc) (same); *Davis v. Las Vegas,* 478 F.3d 1048, 1055 (9th Cir. 2007) (same); *Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011) (same).

[3] "Viewing the facts in the light most favorable to Ms. Thomas and keeping in mind the Ninth Circuit's caveat that summary judgment in excessive force cases should be 'granted sparingly,' the court reluctantly denies Officer Martin's motion for summary judgment on Ms. Thomas' claim of excessive force."

[4] In *Liston* even though police had reason to believe the plaintiff was a violent methamphetamine drug manufacturer, the Court held that it could *not* say as a matter of law that the officer's use of force was objectively reasonable, so the officer was *not* entitled to summary judgment. *Liston*, at 977.

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 3
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

2000) (error for trial judge to resolve credibility and grant JMOL).  In several other cases the Ninth Circuit has invoked the same rule while affirming the denial of summary judgment motions brought by defendant officers.  *See, e.g., Espinosa v. San Francisco*, 598 F.3d 528, 537-38 (9th Cir. 2010) (firing multiple gunshots).

Summary judgment is not proper unless the evidence permits only one reasonable conclusion.  *Munger v. Glasgow*, 227 F.3d 1082, 1087 (9th Cir. 2000); *LaLonde*, 204 F.3d at 959; *Lawson v. Umatilla County*, 139 F.3d 690, 692 (9th Cir. 1998); *Gonzalez*, 747 F.3d at 797.

**B.      When an officer has killed someone, courts may not lightly accept the officer's self-serving account of the incident. Direct evidence of the unreasonable use of force is not required. A plaintiff may establish excessive force solely on the basis of circumstantial evidence.**

As the Supreme Court recognized in *Garner*, "[t]he intrusiveness of a seizure by means of deadly force is unmatched."  471 U.S. at 9.  "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'"  *AKH v. Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016), citing *Garner*, at 9.

Consequently, in the context of a case where the use of deadly force has resulted in a death, courts "may not simply accept what may be a self-serving account by the police officer."  *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).  *Accord Zion v. County of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) (holding jury need not accept officer's testimony that the victim was still moving after he was shot and thus officer needed to shoot him some more).  "Because the person most likely to rebut the officers' version of events – the one killed – can't testify, '[t]he judge must carefully examine all the evidence in the record … to determine whether the officer's story is internally consistent and consistent with other known facts.'"  *Cruz v. Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014).  *Accord Gonzalez*, 747 F.3d at 794-95).  This includes "circumstantial evidence that, if believed, would tend to discredit the police officer's

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 4 (2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

story." *Scott*, 39 F.3d at 915. *Accord Santos*, 287 F.3d at 852.[5]

## C. Dismissal on qualified immunity grounds is also precluded when there are material issues of disputed fact.

Disputed issues of material fact also preclude summary judgment on qualified immunity grounds. *Drummond v. City of Anaheim*, 343 F.3d 1052, 1053 (9th Cir. 2003).[6] "Critical disputes of fact render summary judgment premature." *Estate of Aguirre v. County of Riverside,* 29 F.4th 624, 630 (9th Cir. 2022).[7] *Accord George v. Morris,* 736 F.3d 829, 832-33, 835 (9th Cir. 2013) (factual dispute as to whether potentially suicidal man had his gun pointed towards the officer when officer shot and killed him precludes summary judgment on qualified immunity grounds);[8] *Torres v. City of Madera,* 648 F.3d 1119, 1129-30 (9th Cir. 2011) (reversing summary judgment for defendants on qualified immunity grounds and remanding for trial).

In several respects, the facts of *Drummond* are similar to the facts of this case. There, three police officers determined that Drummond, "who was unarmed and mentally ill, should be taken to a medical facility for his own safety, but the manner in which they attempted to subdue and restrain him resulted in his falling into a coma from which he has never recovered." *Id.* at 1053-54. Drummond, "who had a history of . . . (bipolar disorder and schizophrenia), had run out of medication and was hallucinating and paranoid." *Id*. at 1054. Drummond's fiancée called the Anaheim police and asked them "to help her take Drummond to the hospital to receive medical assistance." *Id.* Four officers responded and took him to the hospital, but because he

---

[5] "Nowhere in our cases have we held that police misconduct may be proved only through direct evidence. To the contrary, a jury's finding for a plaintiff in an excessive force case may unquestionably rest on inferences drawn from circumstantial evidence."

[6] "We again confront the interplay of excessive force and qualified immunity in a case in which a mentally disturbed individual suffers serious injuries as a result of an encounter with police officers. Once again, we reverse the grant of summary judgment in favor of the officers and remand for a trial on the merits."

[7] "We cannot assume the jury's role to resolve the disputed question whether [the decedent] presented an immediate threat. Accepting [decedent's] version of the facts – as we must at this stage . . . we affirm the district court's denial of qualified immunity." *Id.* at 630.

[8] "There were genuine disputes of fact such that a reasonable jury could 'disbelieve the officers' testimony' and rely on record evidence to conclude that Donald had not ignored commands to drop the gun, or taken other threatening measures such as pointing the weapon at deputies."

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 5
(2:20-cv-00383-RAJ)

DOL013-0001 6895230

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

did not have the money, he was unable to get his medicine that night.  The next night police were called again, this time by a neighbor, who was afraid Drummond, who was darting into traffic, was going to get hurt.  The officers who responded recognized Drummond from the night before.  *Id.*  They called for an ambulance to take him to the hospital, but before the ambulance arrived they "decided to take him into custody, 'for his own safety.'"  *Id.*  They knocked him to the ground and one officer put his knee into Mr. Drummond's back and placed the weight of his body on him and another officer[9] put his knee on Drummond's neck.  *Id.*  Drummond told the officers that he could not breathe and that they were choking him, but they continued to put weight on him. *Id.* at 1055.  The officers put him in a hobble restraint face down and Drummond then lost consciousness and the officers could not detect a pulse.  CPR was performed and Drummond was briefly revived, but he sustained brain damage, fell into a coma and lived on in a permanent vegetive state.  *Id.*

The officers argued they were entitled to qualified immunity.  The district court agreed but the Ninth Circuit reversed, holding that taking the evidence in the light most favorable to the plaintiff "it would have been clear to a reasonable officer at the time of the encounter that the force alleged was constitutionally excessive."  *Id.* at 1054.  The Court noted that it had previously "held that a detainee's mental illness must be reflected in any assessment" of the reasonableness of an officer's use of force, *id.* at 1058 and that the risk of death by compression asphyxia was well known.  *Id.* at 1056-59.  The Court further held that Drummond's right to be free from this type of force was clearly established.  *Id.* at 1060-62.

In the present case, as in *Drummond*, the man being arrested was a schizophrenic off his meds; his family had requested police assistance in getting him to a hospital; he was unarmed; and the force that was used against him resulted in his death from compression asphyxia, the same cause of death identified by Plaintiffs' expert in this case.  Moreover, the force used in

---

[9] This officer weighed 175 pounds.  *Id.* In this case, deputy McGee testified that he weighed about 200 or 235 pounds. McGee, at 161. (Lobsenz Decl. Appendix A)

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 6
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

this case was much greater than the force used in *Drummond*, since here police applied a chokehold for roughly four minutes, tased Dold six times, and struck and punched him in the head.

The deputies claim that all of their force was justified because Dold allegedly threatened them and punched McGee in the face when he pushed his way into the home. But all of these facts are disputed. In this respect, this case is similar to *McCue v. City of Bangor*, 838 F.3d 55 (1st Cir. 2016) where police encountered McCue, an apparently mentally ill man, after a neighbor called the police and reported that McCue was ranting, raving and screaming. The responding officers decided they needed to take McCue into custody and to a hospital for a professional evaluation. As in *Drummond* and this case, the officers placed weight on McCue's back and neck. McCue eventually went limp and died. The cause of death identified by one of McCue's expert witnesses was identical to the cause of death identified by Plaintiffs' expert witness (Dr. Sperry) in this case:

> One of [McCue's] expert witnesses attributed the likely cause of death to 'prolonged prone restraint under the weight of multiple officers, in the face of a hypermetabolic state of excited delirium." The witness elaborated that "McCue's inability to hyperventilate and compensate for metabolic acidosis in his state of excited delirium led to his cardiopulmonary arrest."

838 F.3d at 60.[10]

Even though it was *not* disputed that McCue "swore at the officers and threatened to kill them" (*id.* at 58), the First Circuit held that the district court correctly denied the officers' motion for dismissal on qualified immunity grounds because factual disputes needed to be resolved by a jury.[11] *Cf. Lam v. City of Los Banos*, 976 F.3d 986, 997 (9th Cir. 2020) (affirming

---

[10] The same cause of death was identified by the Medical Examiner in this case. Dr. Selove said that Dold died of "cardiac arrythmia" and that "[o]ther significant conditions contributory to death were schizophrenia and physical altercation with law enforcement officers." Dkt. #69-10 at 5.

[11] "The only issue before us is the pretrial denial of qualified immunity . . ." *Id.* at 61. "[W]e hold that there remains a genuine dispute of fact that precludes appellate jurisdiction over the denial of summary judgment." *Id.* at 63. The First Circuit also held that "it was clearly established in September of 2012 that exerting significant, continued force on a person's back while that [person] is in a face-down prone position after being subdued and/or
*(Footnote continued next page)*

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 7
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

district court denial of officer's Rule 50(b) motion challenging jury verdict in favor of decedent's successor where jury found that officer fired his second gunshot after decedent had stabbed officer with scissors and that decedent did not have scissors when he approached officer before the second shot).[12]

Here, as in *McCue*, "in light of the material disputed facts yet to be resolved," a dismissal on qualified immunity grounds would be erroneous. *McCue*, at 65. As in *Drummond* "because the law was clearly established, any reasonable officer would have known that the force used amounted to a constitutional violation," this Court must deny the officers' motion for summary judgment and the case must proceed to trial on the excessive force claim. *Drummond*, at 1062.

## III.    EVIDENCE OF LYING BY THE DEPUTIES

**A.    Defendants make factual assertions that they know are disputed in hopes that this Court will overlook the fact that they cannot be considered in support of their motion for summary judgment because the evidence must be considered in the light most favorable to the Plaintiffs.**

While the Deputy Defendants assert that they are viewing all of the evidence in the light most favorable to the Plaintiffs, this is simply not true. In their brief in support of their motion for summary judgment, they repeatedly assert that Dold physically attacked and threatened them. They assert that (1)"Alexander Dold punched Deputy McGee in the face";[13] (2) that in the bedroom "Dold was still able to kick and punch Deputy McGee and Deputy McCoy multiple times as they struggled on the bedroom floor";[14] (3) that even after tasing Dold for a fourth time the taser deployments "had no effect and Dold continued punching and kicking at the

---

incapacitated constitutes excessive force." *Id.* at 64-65 (noting that the Ninth Circuit's decision in *Drummond* had established this in 2003 and Seventh and Tenth Circuit cases had established the same principle in 2005 and 2008).

[12] "[Officer's] second shot was not an objectively reasonable use of force. When [the officer] fired the second shot, [decedent] no longer posed an immediate threat." *Id.* at 999. "The district court did not err in concluding that Acosta was not entitled to qualified immunity regarding the second shot he fired because the law was clearly established that an officer may not shoot a previously armed person who no longer posed a threat." *Id.* at 999-1000.

[13] Dkt. #67 at 5:18-19

[14] Dkt. #67 at 6:5-6

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 8
(2:20-cv-00383-RAJ)

DOL013-0001 6895230

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

deputies";[15] (4) that Dold then threw the deputies off him, got to his feet and "charged Deputy McGee and punched him several more times";[16] (5) that as Dold was dragging McGee towards the front door "McGee could feel Dold grabbing his holstered gun and Dold was punching Deputy McGee in the body";[17] and (6) that after Dold had fallen on the front porch stairs and after the deputies had managed to get one handcuff on him, "Dold continued to grab for Deputy McGee's gun, punch Deputy McGee and gouge deputy McGee's eyes as McGee applied the LVNR to little effect".[18] The *only* evidentiary sources that is offered for these assertions are statements that Deputy McGee made during his deposition.[19] [20] In a footnote, Defendants contend that they are "not relying" on McGee's deposition testimony and that they are only providing them to the Court "to give a contextual background" to *their* motion for summary judgment.[21] If the Defendants had cited these statements by McGee in *opposition* to one of the *Plaintiffs'* summary judgment motions, then these statements might be relevant because in *that* context the evidence would have to be viewed in the light most favorable *to them*. But when cited "in the context" of their *own* motion for summary judgment, they have no relevance at all because in that context the evidence must be considered in the light most favorable *to the Plaintiffs*. The Deputy Defendants know full well that all these statements by McGee are disputed by the Plaintiffs, and yet they cite them anyway for "context." Since these factual statements *cannot* be considered as evidentiary support for their own motion, the only possible

---

[15] Dkt. #67 at 6:8-10.

[16] Dkt. #67 at 6:11-12.

[17] Dkt. #67 at 6:17-20.

[18] Dkt. #67 at 7:2-3.

[19] On pages 5 through 7 of their brief (Dkt. #67), Defendants cite to McGee's deposition testimony 18 times.

[20] Moreover, on page 4 of their brief, as record support for nine factual statements they repeatedly cite to the 911 CAD transcript attached to their counsel's declaration as Exhibit C. But that transcript contains *nothing* to support any of these assertions. See Dkt. #67 at 4:5-18. Presumably, defendants meant to cite some other source, most likely McGee's deposition testimony again.

[21] Dkt. #67 at 5, fn. 1.

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 9 (2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

reason the defendants can have for making them is to hope that this Court will consider them anyway, even though they are irrelevant because they are all disputed.

**B.** **Contrary to the Deputy Defendants' representation, the "fact" that Alexander Dold punched Deputy McGee is hotly disputed. Plaintiff Duncan denies this accusation and strong circumstantial evidence demonstrates that this punch is simply a lie that McGee made up. Photos taken of McGee on the night of the incident show no eye injury as well as the photos taken eight days later show no eye injury, and McGee did not mention any eye injury on the night of the incident, even though he told many officers that his arm was injured.**

On March 17, 2021 – the night that Dold was killed – except to list their injuries, neither McGee nor McCoy made any statement to the detectives who arrived to investigate the in-custody death. They did not say *anything* about what happened when they knocked on the Plaintiffs' door; Dold's response; the physical fight that erupted; their use of tasers; McGee's use of an LVNR; the position that Dold was in when they handcuffed him; or any physical force that they used against Dold. The *only* questions they answered that night were in response to inquiries as to whether they were injured and whether they needed any medical aid. On that night, McGee told several other deputies that his arm was injured, but he never mentioned any injury to his eye and never mentioned being punched in the eye.[22]

Both deputies then had time to consult with their attorneys and on March 29, eight days after the incident, for the first time ever, in a prepared written statement, McGee asserted that Dold punched him in the face after McGee pushed his way into the house.[23] In this statement

---

[22] Reports of Sgt. D. Crandall ("I asked MPD McGee if he was okay. He indicated to me that he thought he was okay, but had possibly injured his right arm in the incident.") (000175); Deputy J. Kunard ("'My arm (right arm) is smoked.' He was not requesting aid at that time.") (000178); Detective Andrew Williams, at 2 (McGee said he had an injury to his arm) (000097); Detective Tedd Betts, at 2 (McGee said he had an injury to his forearm) (000109); Detective Mike Sergeant (McGee had an injury to his right arm)(000143). These reports are attached to the Declaration of Lobsenz in Support of Opposition to Deputies' Motion for Summary Judgment. (Lobsenz Decl. Appendix B)

[23] McGee's involuntary written statement of March 29, 2017, at page 2, attached to the Decl. of Lobsenz as Appendix C. On this date McGee also claimed that on the night of the incident (March 17) he went to Swedish Hospital "where I was treated for a lumbar strain and a contusion of my right forearm." But McGee refused to sign a waiver allowing investigators to get copies of his medical treatment records and no records showing such a hospital visit have ever been produced. Report of Detective Andrew Williams, at 2 (00097).

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 10 (2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

McGee said the punch "connected with the left side of my face and it knocked me back."[24] McGee's attorney arranged for McGee to come to the police station so that photos could be taken of McGee's injuries.[25] Detective Hughes took "close-up photos of Deputy McGee['s] injuries that he pointed out to" Hughes, but Detective Hughes noted that he didn't see any such bruise and the photos Hughes took do not show one:

> During the photography, I observed an approximate 1.5 inch X 1 inch yellow bruise near Deputy McGee's left tricep, an approximate 1.5 inch X 1 inch yellow bruise on his left torso, and an approximate 3 inch X 2 inch very faint yellow bruise on his right shin. ***I did not observe any bruising around Deputy McGee's left eye.[26]***

Similarly, the defendants' own expert witness, Thomas Ovens, acknowledged that he looked at every single photo that was taken of McGee and he "didn't see" "even the slightest visual sign that McGee got punched in the face."[27]

On April 10, 2017, twenty-four days after the incident, McGee was questioned about the incident for the first time and that interview was recorded. In that interview he asserted that when Dold punched him just under his left eye, the punch "kinda knocked me back for a second."[28]

When Plaintiff Duncan was interviewed in the early morning hours of March 18, 2017, the interviewing detective never asked her if she saw her son punch McGee. This is not terribly surprising since as of that time McGee had never made this assertion and he did not assert it until March 29th. But after March 29, no one ever went back to interview Duncan again. As

---

[24] *Id.* at page 2.

[25] Detective Chissus Follow Up, (DOLD-BL-000075), entry for March 28, 2017 at 1240 hours, attached to Decl. of Lobsenz as Appendix D.

[26] Detective Hughes Follow Up, (DOLD-BL-000134) (emphasis added), attached to the Decl. of Lobsenz as Appendix E.

[27] Ovens, at 98. Ovens also conceded that whereas McGee told detectives that he got punched in his left eye, when he was deposed and asked to mark one of the photos taken that night to show where the punch landed, McGee circled his right eye. *Id.* at 100-101. (Lobsenz Decl. Appendix F)

[28] Tape Recorded Statement of McGee of April 10, 2017 at Page 10 (Lobsenz Decl. Appendix G)

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 11 (2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

Defendants' own expert admits, this was shoddy investigation, and he believes someone should have gone back and asked her if she ever saw such a punch.[29]

But when Duncan, the only living non-police witness to the deputies' forcible entry into her home, was asked about the supposed punch she flatly denied that it ever happened:

Q. Did Alex punch one of the deputies after they pushed their way in?

A. No.

Q. Is it possible that he did and you didn't see it?

A. No.[30]

McGee's assertion that Dold punched him immediately after McGee pushed his way into the house is also in conflict with what he said to Deputy James Kunard on the night of the incident. Kunard's report from that evening states:

> The only thing that McGee told me was that when he went to contact Dold **in the back bedroom** of the residence 'He [Dold] looked at me **and the fight was on**", I fought him **from that back bedroom** into the front yard", . . . .[31]

But those statements cannot be squared with McGee's assertion, first made eight days later, that Dold punched him right after he pushed his way in through the front door. If such a punch truly was thrown, then the "fight was on" from the moment McGee forced his way into the home. And if such a punch was actually delivered, then McGee fought Dold "from" the moment of entry through the front door, *not* "from" the moment that McGee "*went to contact* Dold in the back bedroom." (Italics added).

---

[29] Ovens, at 93-94 ("A. . . . They could have gone back and interviewed I guess Kathy Duncan if they felt it was relevant. . . . Q. . . . If you had been in charge would you have gone back and interviewed Kathy Duncan? A. Potentially. Q. Okay. Potentially she would have said to you, "that never happened." That's a possibility, right? A. Sure."). (Lobsenz Decl. Appendix F)

[30] Duncan, at 135. (Lobsenz Decl. Appendix H)

[31] Report of Deputy James Kunard (emphasis added) (000178) (Lobsenz Decl. Appendix B).

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 12 (2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

**C. Jason and Meggan Padvorac, the next-door neighbors, heard Dold yelling "I submit" and they heard a male voice threatening to shoot Dold.**

The Deputies simply ignore the most powerful evidence of all. The sworn statements given by Alexander Dold's neighbors, Jason and Meggan Padvorac, completely contradict everything the deputies have to say about Alexander fighting them and resisting arrest.

Jason Padvorac: So we were inside our house and I heard all of it, we, I hadn't heard anything before then that I noticed at least. I mean all of a sudden I heard really loud yelling and screaming and some kind of thumping or thudding.[32]

———————

Jason Padvorac: So came back around, and then we, I sat on my front porch where we can see kind of under the tree branches up to what's going on there. The, Alex, there continued to be the periodic yelling of the, the, the, the male voice saying stop fighting; *I'm gonna break your fingers,* and periodically Alex yelling and then like just kinda like letting out a roar, like ahhhh, something like that.

Det. Mehl: Okay.

Jason Padvorac: *And periodically him saying, I submit.* I went, when I was over there by the, by the door when I had gone over there, Alex asked for his mom a couple times, just saying, mom. He sounded kinda like he was confused. And then she told him that they needed to take him to the hospital.[33]

———————

Det Mehl: Okay. Do you remember anything, you talked about the stop fighting, I'll break your fingers *and then you heard Alex say, I'll submit.* Do you remember *anything else* that may have been said during all that?

Jason Padvorac: The, *I heard a male voice that wasn't Alex say I'll shoot you*.

Det. Mehl: Okay.

Jason Padvorac: Alex, *the only things Alex said were I submit* and he'd periodically let out a yell that sounded like, I don't know, he'd just say ahhhh, like that.[34]

---

[32] Transcript of interview of Jason Padvorac, at 2, attached to Declaration of James Lobsenz as Appendix I.

[33] *Id.* at 3.

[34] *Id.* at 5.

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 13 (2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

Megan Padvorac's statements are much the same:

> Meggan Padvorac: . . . The first thing I remember hearing distinctly was Kathy's voice saying, will you please call mental health or something to that effect.[35]

———————

> Meggan Padvorac: I Just knew that one person was getting beat up by the other people.
>
> Det. Mehl: Okay.
>
> Meggan Padvorac: That's all I knew. Okay. and I was pretty afraid because *I heard the guy say I'm gonna break your fingers, man*. And then, and this is before Jason got there. *And then he said, I could shoot ya.* And that made me very afraid.[36]

———————

> Meggan Padvorac: Yeah. I just knew that there was *one person over there getting beat up pretty bad. By the voices* and Alex calling for his mom and her responding, I, *I figured out* before Jason got back *that it was Alex getting beaten up and somebody else doing the beating.*
>
> Det. Mehl: Okay.
>
> Meggan Padvorac: So, anyway, so I heard the two threats of the policemen. I heard Jason intervene and I heard him be told to go back to his house.[37]

She said Alex sounded "confused and afraid," "like he wasn't able to tell what was real and wasn't," and like he "wasn't in a clear mental state."[38]

**D.** **McGee told a similar lie when the Sheriff's Office investigated the death of Adam Colliers seven years earlier.**

Not surprisingly, when a police officer has to explain why a person died when the officer was trying to take him into custody, the officer often resorts to the tactic of blaming the dead guy. As noted in the Plaintiff's prior briefing on bifurcation, Deputy McGee has tried that tactic twice. In the present case, he blames Dold for starting a fight by punching him in the face. In the Colliers' case, the story he first told (to Deputy Zelaya) was that when he arrived at the

---

[35] Transcript of interview of Meggan Padvorac, at 2, attached to Decl. of James Lobsenz as Appendix J.

[36] *Id.* at 3.

[37] *Id.* at 4.

[38] *Id.* at 4-5.

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 14 (2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

scene, Adam Colliers was already fighting with deputy Ian Whipple and so McGee simply went to Whipple's assistance.[39] But then McGee ran into a problem: Whipple didn't back him up on that story. Whipple told the truth and said that Colliers was not fighting with him before Deputy McGee arrived. When confronted with Whipple's refusal to corroborate what McGee had told Zelaya, McGee resorted to lamely stating that he could not recall ever saying that to Zelaya.[40]

**E.  Deputy McCoy's deposition testimony that he has no idea where the human excrement on his uniform came from is irreconcilable with his statement made on the night of the incident that Dold shit all over him.**

On the night of March 17, 2017 after Dold had been handcuffed and had died, McCoy told Deputy Daugherty that "Dold shit all over me." Dkt. #62 at 57. He said the same thing to Sgt Johnson. Dkt. #62, at 9-10. But at his deposition four years later, McCoy testified that he was "not exactly sure" how the excrement on his uniform got there and suggested that he was not even sure it was human excrement and it "could have been animal as well.[41] The fact that it was Dold's is damning because loss of bowel control can be "a marker of brain death" and "certainly" is a marker of asphyxia."[42] Thus, the presence of Dold's excrement on McCoy's uniform tends to show that Dold died while McCoy was still struggling to get him handcuffed and while Dold was lying prone on the front porch stairs.

**F.  A jury could easily find that the officers' acts caused Alexander Dold's death. Dr. Sperry's opinion is supported by the record. The existence of an enlarged heart is irrelevant. The deputies themselves have admitted that they placed their weight on his back and his head.**

The Deputy Defendants argue that there is no evidence that they placed any weight on Dold's back. This is clearly erroneous. In other briefing, Plaintiffs have already cited deputy McGee's testimony that he weighed 235 pounds and that for a portion of the time that he was

---

[39] Dkt #59 at 11.
[40] *See* Dkt. #59, at 86.
[41] McCoy, at 171. (Lobsenz Decl. Appendix K)
[42] Sperry, at 117. (Lobsenz Decl. Appendix L)

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 15
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

attempting to apply an LVNR he did not have either foot on the ground and thus had his entire weight on Dold's neck and back. In his recorded interview conducted on April 10, 2017, McGee stated that he "immediately dropped all my weight down on [Dold's] lower back and chest area" Dold started struggling with him on the stairs leading to the front door.[43] McCoy testified that he put his knee on Dold's face in order to pin his head to the ground.[44] McCoy acknowledged that he was putting "some" of his body weight on the knee that he had on Dold's head and that he put enough weight on so that Dold would not be able to throw McCoy off him.[45] One of the Monroe police officers who arrived while McGee and McCoy were struggling with Dold on the stairs said that while it did not appear that either deputy had his "entire body weight on top of Dold," both appeared to have part of their body weight on him.[46]

The Defendants have reprised their argument that Dold died because he had an enlarged heart and not because of anything they did to him. Plaintiffs have already extensively addressed the evidence in their prior briefing. They have already pointed out that (1) the Snohomish County Medical Examiner himself opined that while Dold died of a cardiac arrest and had an enlarged heart, the physical altercation that Dold had with the officers was a significant contributory condition that caused his death; and (2) that the defendants' own experts agreed that if the officers had not physically struggled with Dold that evening, Dold would not have had a sudden cardiac arrest and would not have died.[47] Plaintiffs have also addressed the legal issue regarding injured plaintiffs who are especially vulnerable to severe injuries in prior briefing which explains that the eggshell plaintiff doctrine applies in civil rights actions just as

---

[43] Transcript of McGee's taped statement of April 10, 2017, at p. 18 (attached to Decl. James Lobsenz as Appendix G). See also McGee at 222-24 where he states that he "couldn't venture to say that I had all my weight on him" and when asked if that statement was true replied, "I don't know."

[44] McCoy, at 126

[45] McCoy, at 128-29.

[46] Block, at 108. Lobsenz Decl. Appendix M)

[47] Dkt. #62 at 4-8 and the supporting evidentiary materials in Dkt. #62.

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 16
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

it does in common law tort actions.[48]

## IV.  WARRANTLESS ENTRY CLAIM

**A.  The Deputy defendants ignore the established legal principle that they may only rely on facts known to them at the time they acted.  They attempt to rely on facts that were learned by other law enforcement officers which were not communicated to them before they encountered Dold.  Defendants also seek to rely on facts that other officers learned hours after Defendants had entered the house, and after Alexander Dold had died.**

The Deputy Defendants seek to justify their warrantless entry into the Dold/Duncan home by asserting the existence of exigent circumstances.  In support of this argument they point to facts that they did not know about at the time they entered the home.  In Plaintiffs' reply brief in support of Plaintiffs' motion for summary judgment on their warrantless entry claim, Plaintiffs noted that the law does not permit this.  *See* Dkt. #107 at pp. 6-11 and the cases cited there, in particular *Cuevas v. De Roco*, 531 F.3d 726 (9th Cir. 2008).  Plaintiffs have previously briefed this legal issue as well.  Plaintiffs will again point out, however, that the photographs of Duncan's "fat lip" were not taken until *after* the Deputies entered the home without a warrant, *after* they had struggled with Dold in the bedroom and on the front porch stairs, *after* Dold had died, and *after* the Deputies had left the scene and gone to the police station.  In fact, the information that can be gleaned from those photos was not known to *any* police officer until hours after Dold's death.

In addition, Plaintiffs will again also note that (1) the police radio dispatcher and the 911 call operator are different individuals; and (2) even if the 911 operator had imparted information that she received from Duncan to the police dispatcher and (3) even if the Deputies had asked the dispatcher to give all that information to them; then (4) the deputies would have learned that during the 911 Duncan stated that "he's calm now."[49]  Roughly 40 minutes later

---

[48] See Dkt. #61 at 10-13.
[49] Dkt. #64 at 23.

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 17
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

when the deputies got to the front door of the Duncan home, they noted that so far as they could tell things were still calm since they heard absolutely no noise coming from inside the house.[50]

**B.** **For purposes of the Defendants' summary judgment motion on the warrantless entry, this court must take the evidence in the light most favorable to Plaintiffs. Moreover, even if the prior domestic violence incident occurred three hours and 35 minutes earlier, things were calm and quiet by the time the deputies arrived and there was no evidence to support an objectively reasonable belief that Duncan was in "immediate" danger of being assaulted.**

Defendants point to Duncan's statement in an answer to an interrogatory where she said the incident with her son happened three hours ago.[51]  Were that statement to be accepted as true, then the incident occurred at 6:18 p.m., three hours before the 911 call was made at 9:18 p.m.  The deputies arrived at the Duncan home at 9:53 p.m., which was 3 hours and 35 minutes later.  Thus, defendants argue that the mandatory four-hour arrest statute applied.

However, Duncan testified that the incident was over by 5:30 p.m.,[52] in which case the deputies arrived 4 hours and 23 minutes later and the statute did not apply.  For purposes of Defendants' summary judgment motion, the Court must assume that the jury could find 5:30 to be correct, in which case the incident did *not* occur within the four hours of the time the deputies arrived at the home and therefore the mandatory four-hour arrest statute is *not* applicable.

More importantly, even if the statute *was* applicable because the incident between Duncan and Dold *did* occur within the four-hour period of time, defendants simply ignore the point that the deputies *still* needed exigent circumstances in order to justify a warrantless entry. The defendants actually concede that the statute cannot and does not overrise the constitutional warrant requirement.[53]  They argue, however, that because this case involved a domestic violence complaint that automatically means that there were exigent circumstances which

---

[50] Dkt. #64 at 46-69.

[51] Dkt. #86 at 10.

[52] Duncan, at 62.

[53] Dkt. #86 at 9 ("Defendant Deputies acknowledge that Washington Law does not control the Court's interpretation of the Fourth Amendment . . . ").

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 18 (2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

justified their warrantless entry. But at the same time they simply ignore the fact that the Ninth Circuit has rejected this contention. *Bonivert v. City of Clarkston,* 883 F.3d 865, 877 (9th Cir. 2018) ("[W]e have refused to hold that 'domestic abuse cases create a per se' emergency justifying warrantless entry"); *United States v. Black*, 482 F.3d 1035, 1040 (9th Cir. 2007) ("[W]e have stopped short of holding that 'domestic abuse cases create a per se exigent need for warrantless entry'"); *United States v. Brooks,* 367 F.3d 1128, 1136 (9th Cir. 2004) ("We do not suggest that domestic abuse cases create a per se exigent need for warrantless entry"). *See also George v. Morris*, 736 F.3d at 839 (wife of decedent was "not in jeopardy when deputies arrived"). A case-by-case examination of the facts must be made to discern whether there was an objectively reasonable basis to conclude that a person inside the house was in "immediate" danger. In this case, there clearly was not.

**C.     The Fourth Amendment requires that the determination of probable cause be made by a neutral magistrate.**

Defendants argue that there was probable cause to believe that Dold had committed a crime since he admitted he shoved his mother. But defendants miss the point of the Fourth Amendment. Unless an exception to the warrant requirement applies (and none does here), the determination of whether probable cause exists must be made by a neutral magistrate, and *not* by a law enforcement officer. *Johnson v. United States,* 333 U.S. 10, 14 (1948). *Accord Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972).

**D.     Plaintiff's expert William Harmening's legal conclusion that sticking one's foot in the door is not an entry which requires a warrant is a legal conclusion that no expert can give because it usurps the judge's role of determining the law. Harmening is not an attorney, and he was clearly wrong. And in any event, McGee did not stop with just a foot.**

Defendants note that Plaintiffs' expert said he did not think that just blocking the closing of a door with a foot constitutes a warrantless entry. Harmening was wrong. *See, e.g., Cuevas v. de Roco*, 531 F.3d 726, 731-32 (9th Cir. 2008) (unlawful entry "commenced when de Roco put his foot in the door opening and, together with Deputy Starr began pushing against the door

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 19
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

in an attempt to open it."). This is a good illustration of why police practices experts are not allowed to give opinions which are legal conclusions.

But this is a non-issue. Things didn't stop with the mere warrantless entry of McGee's foot. He pushed against the door, overcame Dold's opposing push, and then both McGee and McCoy entered the residence – without a warrant – in violation of the Fourth Amendment.

## V.    STATUTORY IMMUNITY FOR STATE LAW CLAIMS

**A.    In *Roy v. City of Everett* the Washington Supreme Court refused to construe RCW 10.99.070 broadly since that could lead to "absurd results."**

RCW 10.99.070 confers immunity from civil liability upon police officers for any action or omission "arising from" an alleged incident of domestic violence which is taken "in good faith." They contend that law enforcement officers have complete immunity for any conduct occurring "in the course of an arrest or other on-the-scene action such as entering the home to break up a fight." Dkt. #67 at 22, citing to *Roy v. City of Everett*, 118 Wn.2d 352, 357-58, 823 P.2d 1084 (1992).

Defendants ignore the statutory language that requires that the officers act "in good faith." They also ignore the language that the conduct be taken in the course of action "such as entering the home to break up a fight." They ignore the Washington Supreme Court's refusal to give this statute a broad construction. And they ignore the undisputed evidence that the officers did not enter the Dold/Duncan home "to break up a fight" or take any action to prevent an ongoing assault on Duncan.

In *Roy* the Court refused to give the statute a broad instruction stating that it "was not enacted in a vacuum" and that it was "less than a model of clarity." *Id.* at 355, 357. The court held that enactment of a statute that provided "a blanket grant of immunity for peace officers as to any action or inaction relating to a domestic violence situation, as defendants assert the Legislature did, would be absurd in every sense of the term," *Id.* at 358. In the present case, the deputies contend that since the statute immunizes any good faith action "arising from" an

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 20 (2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

alleged incident of domestic violence, that the officers' conduct in this case was covered by the statute and therefore they have complete immunity from civil liability. But this contention would also cover the case of officers who came to investigate a domestic violence report that was made three or four *days* earlier and the scene was calm when they arrived. In such a case, what if the officers shot and killed a man because he was within five or six feet of the alleged victim, even if they were both asleep at the time? Literally a case can be made that such a killing "arose from" an alleged domestic violence incident. But such an interpretation of the statute would be precisely the kind of "absurd result" that the Washington Supreme Court refused to countenance. "If the legislature had intended to create blanket immunity for *all* injuries arising out of interaction between police and parties to domestic violence, the statute could have been written so explicitly." *Id.* at 359.

**B.      In *Roy* there was no evidence of "bad faith." In this case there is a plethora of such evidence. Given this factual dispute, this issue cannot be resolved on summary judgment.**

Defendants also ignore the plethora of evidence indicating that they acted in *bad* faith such as (1) the testimony of the Padvoracs that they both heard a male voice – one of the deputies since there were no other males present – twice telling Dold "I could shoot you"; (2) the testimony of Duncan that when she asked if the deputies could give her son a shot of medicine deputy McCoy responded sarcastically that he would give him a "shot" meaning that he would shoot him with his gun; (3) McCoy's admission that he intentionally broke Dold's fingers; and (4) the Padvoracs' testimony that the deputies were beating Dold even though Dold was yelling "I submit" and acting confused and afraid. This is to be contrasted with the state supreme court's statement in *Roy* that the plaintiff (Sheila Roy) "does not allege that the peace officers acted in bad faith, nor is there evidence that they did so." 118 Wn.2d at 381. *See also Roy*, at 354 (Roy alleged that the police had not protected her from Milton Glenn who

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 21
(2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

"relentlessly and violently pursued and abused her," without saying how and without alleging any physical injury).

Plaintiff Duncan asked the police to come and take her son to a hospital where he could get medicine for his schizophrenia. Instead they came and killed him with a combination of force including punches, tasers, an LVNR (or an attempted LVNR anyway), and the placement of over 200 pounds of weight on the neck of an unarmed, mentally ill man who was confused and afraid. In sum, in this case, *at the very least* there is a genuine material issue of fact as to whether the deputies acted in good faith in this case which precludes entry of summary judgment. *Accord Roy*, 118 Wn.2d at 360 (Anderson, J., concurring).[54]

## VI.   CONCLUSION

For these reasons, Plaintiffs ask this Court to deny the Deputy Defendants' motion for summary judgment dismissal of any of their claims.

DATED this 18th day of April, 2022.

    *s/ James E. Lobsenz*
James E. Lobsenz WSBA #8787
Randy J. Johnson WSBA #50129
Attorneys for Plaintiffs
CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104
Phone: (206) 622-8020
lobsenz@carneylaw.com
johnson@carneylaw.com

---

[54] "Upon reviewing the record before us, it cannot fairly be said that there is 'no genuine issue as to any material fact' as required before a summary judgment may be entered. Accordingly, the trial court did not err in denying the motions for summary judgment."

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 22 (2:20-cv-00383-RAJ)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DOL013-0001 6895230

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of April, 2022, I electronically filed the foregoing **PLAINTIFFS' BREIF IN OPPOSITION TO DEPUTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Attorneys for Defendant Snohomish County**
Ted Buck                        tbuck@freybuck.com
Delaney DiGiovanni              ddigiovanni@freybuck.com
Nick Gross                      ngross@freybuck.com
Evan Bariault                   ebariault@freybuck.com

**Attorneys for Defendants Cody McCoy and Bryson McGee**
Shannon M. Ragonesi            sragonesi@kbmlawyers.com
Richard B. Jolley              rjolley@kbmlawyers.com
Sean M. Dwyer                  sdwyer@kbmlawyers.com

DATED this 18th day of April, 2022.

_s/ Deborah A. Groth_
Legal Assistant

PLAINTIFFS' BRIEF IN OPPOSITION TO DEPUTY
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – 23
(2:20-cv-00383-RAJ)

DOL013-0001 6895230

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020