Honorable John H. Chun

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

JENNIFER DOLD, personal representative
of the estate of Alexander Dold; and KATHY
DUNCAN,

               Plaintiffs,

      v.

SNOHOMISH COUNTY, a political
subdivision of the State of Washington;
BRYSON McGEE; and CODY McCOY,

               Defendants.

NO. 2:20-cv-00383-JHC

DECLARATION OF JAMES E.
LOBSENZ IN SUPPPORT OF
PLAINTIFFS' OPPOSITION TO
DEPUTY DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

     I, JAMES E. LOBSENZ, do hereby declare under penalty of perjury under the laws of the United States of America that the following facts are true and correct:

1. I am counsel for the Plaintiffs. I have personal knowledge of the facts set forth here.

2. Attached to this declaration as **Appendix A** are true and correct copies of excerpts from the deposition of Bryson McGee.

3. Attached to this declaration as **Appendix B** are true and correct copies of reports of Sgt. D. Crandall, Deputy J. Kunard, Detective Andrew Williams, Detective Tedd Betts and Detective Mike Sargent.

4. Attached to this declaration as **Appendix C** is a true and correct copy of Bryson McGee's involuntary written statement of March 29, 2017.

DECLARATION OF JAMES E. LOBSENZ IN SUPPPORT OF
PLAINTIFFS' OPPOSITION TO DEPUTY DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT – 1
(2:20-cv-00383-JHC)

DOL013-0001 6895907

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

5.  Attached to this declaration as **Appendix D** is a true and correct copy of Detective Chissus Follow-Up entry for March 28, 2017.

6.  Attached to this declaration as **Appendix E** is a true and correct copy of Detective Hughes Follow Up dated March 29, 2017.

7.  Attached to this declaration as **Appendix F** are true and correct copies of excerpts from the deposition of Thomas Ovens.

8.  Attached to this declaration as **Appendix G** are true and correct copies of pages from the Recorded Statement of Bryson McGee dated April 10, 2017.

9.  Attached to this declaration as **Appendix H** are true and correct copies of excerpts from the deposition of Kathy Duncan.

10.  Attached to this declaration as **Appendix I** are true and correct copies of transcript pages from the interview of Jason Padvorac

11.  Attached to this declaration as **Appendix J** are true and correct copies of transcript pages from the interview of Meggan Padvorac.

12.  Attached to this declaration as **Appendix K** are true and correct copies of excerpts from the deposition of Cody McCoy.

13.  Attached to this declaration as **Appendix L** are true and correct copies of excerpts from the deposition of Kris Sperry, MD.

14.  Attached to this declaration as **Appendix M** are true and correct copies of excerpts from the deposition of Officer Travis Block.

DECLARATION OF JAMES E. LOBSENZ IN SUPPPORT OF
PLAINTIFFS' OPPOSITION TO DEPUTY DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT – 2
(2:20-cv-00383-JHC)

DOL013-0001 6895907

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1    DATED this 18th day of April, 2022.

2

3                                           _s/ James E. Lobsenz_
                                            James E. Lobsenz WSBA #8787
4                                           Attorneys for Plaintiffs
                                            CARNEY BADLEY SPELLMAN, P.S.
5                                           701 Fifth Avenue, Suite 3600
                                            Seattle, WA 98104
6                                           Phone: (206) 622-8020
                                            lobsenz@carneylaw.com
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF JAMES E. LOBSENZ IN SUPPPORT OF
PLAINTIFFS' OPPOSITION TO DEPUTY DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT – 3
(2:20-cv-00383-JHC)

DOL013-0001 6895907

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of April, 2022, I electronically filed the foregoing **DECLARATION OF JAMES E. LOBSENZ IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEPUTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Attorneys for Defendant Snohomish County**
Ted Buck                     tbuck@freybuck.com
Delaney DiGiovanni          ddigiovanni@freybuck.com
Nick Gross                   ngross@freybuck.com
Evan Bariault                ebariault@freybuck.com

**Attorneys for Defendants Cody McCoy and Bryson McGee**
Shannon M. Ragonesi          sragonesi@kbmlawyers.com
Richard B. Jolley            rjolley@kbmlawyers.com
Sean M. Dwyer                sdwyer@kbmlawyers.com

DATED this 18th day of April, 2022.

_s/ Deborah A. Groth_
Legal Assistant

DECLARATION OF JAMES E. LOBSENZ IN SUPPPORT OF
PLAINTIFFS' OPPOSITION TO DEPUTY DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT – 4
(2:20-cv-00383-JHC)

DOL013-0001 6895907

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

# APPENDIX A



UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

JENNIFER DOLD, personal              )
representative of the estate         )
of Alexander Dold; and               )
KATHY DUNCAN,                        )
                                     )
          Plaintiffs,                )
                                     )
          vs.                        )          NO. 2-20-cv-00383-RAJ
                                     )
SNOHOMISH COUNTY, a political        )
subdivision of the State of          )
Washington; BRYSON McGEE; and        )
CODY McCOY,                          )
                                     )
          Defendants.                )

REMOTE VIDEO RECORDED DEPOSITION UPON ORAL EXAMINATION OF

BRYSON MCGEE

TUESDAY, DECEMBER 7, 2021

DEHUFFDEPO.COM

1

| | | |
|---|---|---|
| 1 | | backwards after being punched? |
| 2 | A | I believe I did, yeah, kind of knocked -- knocked my |
| 3 | | balance off a little bit. |
| 4 | Q | And you weigh roughly the same today as you did on the |
| 5 | | date of the incident? |
| 6 | A | I wish. |
| 7 | Q | Okay.  Why don't you tell me what you think you weighed |
| 8 | | roughly at the time. |
| 9 | A | Probably 230, maybe. |
| 10 | Q | Okay. |
| 11 | A | 235. |
| 12 | Q | And when you were going through the door getting punched |
| 13 | | you were wearing the gun on your hip? |
| 14 | A | I was wearing all of the equipment that I was issued. |
| 15 | Q | So, you were wearing a gun on your hip? |
| 16 | A | It included a gun, yes, and amongst other things. |
| 17 | Q | And which hip was that on; left or right? |
| 18 | A | My, my handgun? |
| 19 | Q | Yeah. |
| 20 | A | Right. |
| 21 | Q | And was it in a holster? |
| 22 | A | Yeah. |
| 23 | Q | And was there anything hiding it from plain sight? |
| 24 | A | Is there anything hiding it? |
| 25 | Q | Would it be clearly visible to a person standing in |

```
 1        LVNR?
 2   A    As I previously stated, I had slipped on the, on the,
 3        the porch.
 4   Q    So, there was some period of time when you released it?
 5        Is that related, the slip and the releasing?
 6   A    Yeah, I just answered, yeah.  That when I slipped I
 7        wasn't, wasn't holding onto him directly.
 8   Q    Directly, what does that mean?  Were you holding onto
 9        him some other way?
10   A    No.  Like I said, I slipped and I wasn't -- I didn't
11        have contact with him.  I don't recall having contact
12        with him.
13   Q    Okay.  So, there's no contact with him, and then you put
14        the neck restraint back on?  Is that right?
15   A    When he came -- When he started fighting again and we
16        were working -- we weren't able to further restrain him
17        in the second handcuff, yeah, I reapplied the lateral --
18        the LVNR.
19   Q    Okay.  And when he started struggling again, did you put
20        all your weight on top of his back?
21   A    How much weight was put where, I don't know.  The, the
22        porch was very, very slippery, and I -- my lower half of
23        the body was, of my body was pointed down the stairs.
24        So, if -- I couldn't venture to say that I had all my
25        weight on him, no.
```

```
1   Q    What part of your body did you put on his back?

2             MS. RAGONESI:  Object to the form.

3   A    Again, my, my, my body, the majority of it was, was

4        down, facing down the stairs, and the, the slipperiness

5        I guess -- it's not really a word -- but just the

6        slippery nature of the porch made it difficult to, to

7        remain in one, in one place.

8   Q    Is this a true statement:  "I immediately dropped all my

9        weight down onto his lower back and chest area"?

10            MS. RAGONESI:  Object to form.

11  A    I, I don't know what you're reading.

12  Q    I know you don't.  Is that a true statement, though?

13            MS. RAGONESI:  Object to form.

14  A    How, how would I answer that if I don't know what you're

15       reading.

16  Q    You would answer whether it was true because you know it

17       was true or you would answer it was not true if it was

18       not true.  So, I'll read it again.  "I immediately

19       dropped all my weight down onto his lower back and

20       chest," period.  Is that true?

21            MS. RAGONESI:  Object to form.

22  A    Again, I don't know what you're reading, so I can't give

23       an accurate depiction of whether or not whatever it is

24       that you're reading is true or not true or what it is or

25       what it isn't.
```

```
 1   Q   Why do you need to know what I'm reading from in order
 2       to know it's true?
 3   A   Because it sounds like you're putting words in that I
 4       don't know what it is that you're putting in.
 5   Q   Well, so then if it doesn't sound true to you why can't
 6       you answer "that doesn't sound true to me"?
 7           MS. RAGONESI:  Object to the form of the
 8       question.
 9   Q   Why do you need to know what I'm reading from in order
10       to know if it's true?
11           MS. RAGONESI:  Object to the form of the
12       question.  Counsel, it's getting argumentative.
13   A   I mean, we could go back and forth all day long.  You
14       can tell me what it is you're reading.  I can probably
15       give you an accurate answer from that.  But, again, if,
16       if you want to keep going back and forth with this my
17       answer is the same as it previously was.
18   Q   And I'll tell you I'm reading from Page 18 of your tape
19       recorded statement word for word.  Now, could you tell
20       me if it's true?
21           MS. RAGONESI:  Object to the form.
22   A   I don't know.
23   Q   Why don't you know if that's true or not?
24           MS. RAGONESI:  Object to the form of the
25       question.  It's been asked and answered.  Counsel, are
```

# APPENDIX B

ORIGINAL

## FOLLOW-UP

Page 1 of 3

| SNOHOMISH COUNTY SHERIFF'S OFFICE | INCIDENT CLASSIFICATION SMART Investigation | REPORT NUMBER SMART 17-06 |
|---|---|---|
| NAME OF VICTIM(S) | | DATE OF REPORT 03/23/2017 |
| TYPE OF ORIGINAL REPORT Assault 4 DV | FIU DATE | RECLASSIFY TO | CONNECTING REPORT NUMBERS NWS 2017-42162 |

## Snohomish County Sheriff's Office: SMART 17-06

On 03/21/2017, I was on duty and assigned to the Violent Offender Task Force as Unit 20080. At approximately 2150 I was enroute to my residence to secure from my shift for the evening. Around 2150 hours, I heard on the radio what sounded to be a scuffle and someone stating something about a "Taser". SNOPAC immediately closed the air for radio traffic. Moments later, I heard of the units on scene of the same call yell into the radio "send us some help". I switched to the south TAC frequency and put myself enroute to the call. SNOPAC upgraded the call to a TYPE – CODE 3 (HELP).

The SNOPAC dispatched advised me the location of the call as 12014 221st Street SE (off of Echo Lake Road) in the unincorporated portion of Snohomish County. As I was proceeding to the scene, I saw on the computer screen that the call was originally coded as a Domestic Violence call.

As I was enroute to the scene, I heard one of the Deputies on scene, yell into the radio "hurry". The background noise indicated that a scuffle was taking place between the Deputies and someone else. Moments later, I heard another one of the Deputies yell into the radio "we some units here now". Based on my 27 years of Law Enforcement experience, I could tell that the Deputies on scene were in a potential life threating situation.

SNOPAC had dispatched multiple outside agencies to the scene from county wide agencies to include Bothell PD and the King County Sheriff's Office. I arrived on scene at approximately 22:07 hours. (Note: I was unable to get on the radio for officer safety purposes to put myself enroute to the scene, however my arrival time was 22:07 hours)

As I arrived on scene, I contacted Master Patrol Deputy B. McGee in front of a patrol car in front of the residence location at 12014 221st Street SE. I asked MPD McGee if he was okay. He indicated to me that he thought that he was okay, but had possibly injured his right arm in the incident. I noticed that MPD McGee was severely out of breath and the front of his jumpsuit (tan and green approved SCSO jumpsuit) had blood on it. I was unable to ascertain if the blood was his or someone else's. Deputy McCoy was sitting on the front push bar of a patrol car next to MPD McGee. I left MPD McGee and proceeded down the driveway towards the residence to check on the other Deputies on scene.

As I approached the residence, I saw a group of deputies around a downed subject and front of the residence on the ground approximately 5 feet from a set of stairs which led up to a porch area of the residence. SCSO Deputy Marino was performing CPR (Chest Compressions) on the downed subject. A Monroe Police Officer (unknown name) and a Mill Creek Police Officer

*I certify or declare under the penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.*

| OFFICER NAME/NUMBER Sgt. D. Crandall #1348 | | | | APPROVED BY | | |
|---|---|---|---|---|---|---|
| IBR CLEARANCE (ONE) ( ) ARR/A ( ) EXC/A ( ) ARR/J ( ) EXC/J | ( ) INSUFF / CLO ( ) OTHER / CLO ( ) UNF | COPIES MADE FOR: ( ) PA ( ) PAT | ( ) CPS ( ) DSHS | ( ) JUV ( ) MH | ( ) COURT: CAS / EVD / SOUTH / EVT ( ) DET: PREC / CTH / SPEC ( ) OTHER: | DATA ENTRY |

**FOLLOW-UP**     ORIGINAL                              Page 1 of 2

| Agency Name:<br>Snohomish County Sheriff's Office | INCIDENT CLASSIFICATION<br>Domestic Violence Physical | INCIDENT NUMBER<br>SM17-06 |
|---|---|---|
| NAME OF ORIGINAL VICTIM(S) | | REPORT DATE |

| TYPE OF ORIGINAL REPORT | DATE | RECLASSIFY TO | CONNECTING REPORTING NUMBERS | |
|---|---|---|---|---|
| PROPERTY CHANGES: | ACTION | ADDITIONAL LOSS.<br>$ | ACTION | ADDITIONAL RECOVERED<br>$ |

| TOTAL RECOVERED<br>☐ YES ☐ NO | ☐ Computer used<br>☐ Drug related<br>☐ Alcohol related |
|---|---|

Deputy J. Kinard #C1489

Domestic Violence Physical

Suspect: Dold, Alexander W. ▓▓▓▓1987

Incident Location: 12014 221st St. SE, Snohomish WA

On March 21, 2017 around 2147 hours a Domestic Violence Physical (DVP) was dispatched. (1C9) Deputy McGee and (1C2) Deputy McCoy responded. Around 2153 hours Deputy McGee transmitted "Tazer Deployed", at 2154 hours Deputy McCoy transmitted "send us some help". Both of those transmissions were washed out with the sounds of a fight in the background.

I responded to the incident location from the South Precinct. By the time that I had arrived, Deputy Jim Miner, Deputy Sgt. Dan Johnson and two Monroe Police Officer's where already on scene. I went to the incident location and ran down the long dirt/gravel driveway, and outside of the main entrance to the manufactured home (the South side of the residence).

I observed a white male face down on the ground, and he was handcuffed. Seeing that they did not need any assistance with the suspect, I started to look for Deputy McGee and Deputy McCoy. They both were just beyond where the suspect was lying on the ground and I could see that they were exhausted, hunched over trying to catch their breath. I grabbed Deputy McGee and walked him out to the street.

I remained out on the street to stay with the involved LE personnel. The only thing that Deputy McGee told me was that when he went to contact Dold in the back bedroom of the residence "He looked at me and the fight was on", "I fought him from that back bedroom into the front yard", "My arm (right arm) is smoked". He was not requesting aid at that time.

Eventually it appeared that the suspect, Dold was undergoing some serious medical issues, and the decision was made to separate all of the involved persons. I was assigned to stay with Deputy Miner until told what to do.

We eventually were told that all of the involved Deputy's / Officers were to drive to the Snohomish County South precinct and wait for peer support and the DSA. I followed Deputy Miner to the precinct. I stayed with him until peer support arrived. While I was with Deputy Miner we did not discuss his involvement, specifically pertaining to his contact with Dold.

SMART investigators arrived and I provided them with the initial briefing.

At no time did I come in contact with Dold, or interview any of the witnesses/victims.

This completed my involvement in this incident.

END OF REPORT

*Deputy Kinard added that two of the Deputies were injured during the altercation. Deputy McGee had an injury to his arm and Deputy Miner had an injury to his elbow. Deputy Kinard did not know who deployed their Taser.*

At that point we began processing the involved officers. Det. Bartl (Marysville) and I processed Deputy McGee, Deputy Miner, and Officer VanEaton.

### 3/21/2017 @ 0128 hours-Deputy McGee (SCSO)

Deputy McGee was in pain. When he initially walked in he was stiff and his right arm was bent at the elbow. I observed grass, dirt, and a little blood on his lower legs. He also had a small amount of blood on his upper shoulder. He was accompanied by his attorney, Derek Jackson. Before we began processing Deputy McGee we asked him several questions that Derek had already vetted. Below are the questions I asked Deputy McGee and his answers:

| | |
|---|---|
| • Was a Taser deployed? | Yes |
| • Was any other piece of equipment used? | No |
| • Have you changed your appearance since the incident? | Yes, he washed his face |
| • Do you have any injuries from the incident? | Yes |
| • Was a firearm displayed? | No |
| • Do you wish to make a statement? | No |

After I finished with the questions Derek stepped out and we began photographing the deputy. Even though Deputy McGee never displayed his firearm, we conducted a round count of both of his issued and backup handguns.

We recovered the following items from Deputy McGee:
- Taser (item #1)
- Jumpsuit (item #2)
- Gloves (item #3)

Deputy McGee indicated that he was going to go to the hospital after we were finished to be examined. We discussed having each of the officers sign a medical waiver. Derek reviewed the counties waiver and decided it was too broad. As a result, none of the officers signed waivers.

### 3/21/2017 @ 0216 hours-Deputy Miner (SCSO)

Deputy Miner arrived towards the end of the incident so he was not as involved as Deputy McGee. As a result, his only injury was an elbow strain. He did not appear to have any evidence on his jumpsuit. We asked Deputy Miner the same questions. Here are his responses:

| | |
|---|---|
| • Was a Taser deployed? | No |
| • Was any other piece of equipment used? | No |
| • Have you changed your appearance since the incident? | No |
| • Do you have any injuries as a result of the incident? | Yes. A bump on my elbow |

*I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. (RCW 9A.72.085.)*

| OFFICER SIGNATURE | AT EVERETT WASHINGTON | DATE 7/19/2017 | FORCE USED NO | FLEEING NO |
|---|---|---|---|---|
| OFFICER NAME/NUMBER Det. Andrew Williams #1183 | | UNIT 724 | APPROVED BY/PERS.NO. | 1158 |
| ISR CLEARANCE ( ) UNFOUNDED ( ) ARR / A    ( ) EXC / A ( ) ARR / J    ( ) EXC / J | DISTRIBUTION:    ( ) JUV    ( ) TRAF    OTHER: ( ) PA    ( ) OPS    ( ) ISD    ( ) DET ( ) ADMIN ( ) DSHS ( ) MH    ( ) PAT | | LOGGED: DATE    INITIALS | |
| ☐ ENTERED RMS ___/___ DATE    INITIALS | ☐ ENTERED WACIC / NCIC ___/___ DATE    INITIALS | ☐ CLEARED WACIC / NCIC ___/___ DATE    INITIALS | | |

Rev. 2/2007

FOLLOW-UP  PAGE 2 OF 21

| AGENCY NAME | INCIDENT CLASSIFICATION | INCIDENT NUMBER |
|---|---|---|
| SNOHOMISH COUNTY MULTIPLE AGENCY RESPONSE TEAM | Officer Involved Death | SM2017-0006 |
| VENUE AGENCY | | REPORT DATE |
| Snohomish County Sheriff's Office | | March 27, 2017 |
| TYPE OF ORIGINAL REPORT | VENUE AGENCY REPORT NUMBER | |

0127 hrs: Sgt. Erickson briefed the team members with the following information:

- 2118 hrs: Deputies were dispatched to this address for a male who was verbal and physical with family members.
- 2119 hrs: A dispatch update stated the male had mental issues and was off his medication. The male was in and out of the house.
- 2147 hrs: MPD McGee and Deputy McCoy arrived.
- 2153 hrs: The dispatch frequency was closed to routine radio traffic and an announcement was made that a Taser had been deployed.
- 2154 hrs: One of the responding deputies announced, "Send us some help."
- 2157 hrs: One of the responding deputies announced, "Hurry up."
- 2200 hrs: One of the responding deputies announced, "Need units now."
- Unknown time: Sgt. Johnson arrived and then Deputy Miner arrived. Monroe officers Van Eaton and Block also arrived.
- 2205 hrs: The combative male had been taken into custody.
- Deputy Marino, Officer Block and Mill Creek Officer Lerma performed CPR on the male, who'd gone unresponsive. Medics, who'd been staged in the area, arrived and attempted life-saving measures until 2302 hrs.
- The male was identified as Alexander W. Dold (05/15/87). He was lying in the driveway near the front door.

Deputy Daugherty said Dold was in custody and wearing handcuffs when he arrived. He said Dold was limp, but was breathing and had a pulse. However, Dold faded quickly and went unresponsive, with no pulse or respirations. Officer Block had been checking Dold's pulse and he started compressions when Dold went unresponsive. Officer Lerma and Deputy Marino also gave compressions. No breaths were given. Deputy Daugherty said Deputy McCoy and MPD were exhausted and MPD McGee had an injury to his forearm.

Sgt. Crandall said deputies announced over the air that the Taser had been deployed and when he arrived, CPR was in progress. One of the Monroe P.D. officers saw a Taser under the front steps.

Sgt. Erickson tasked me with photographing the interior of the residence. Det. Hughes would photograph the exterior and Det. Barrows would video the scene. We were told that Dold's mother signed a Permission to Search document to allow us into the scene to conduct our search. I waited for Detectives Hughes and Barrows and then I entered the scene at about 0255 hrs so I could survey the scene and plan how I was going to photograph it. I noted the residence is a double-wide 3 bedroom, 2 bathroom mobile home. The master bedroom and living room held most of the evidence concerning this incident.

| :ertify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. | | | | | |
|---|---|---|---|---|---|
| OFFICER NAME/NUMBER | | | | APPROVED BY | |
| Det. Tedd Betts #1429 | | | | | |
| IBR CLEARANCE: ( ) ARR/A ( ) EXC/A ———— ( ) ARR/J ( ) EXC/J ———— | ( ) INSUFF/CLO ( ) OTHER/CLO ( ) UNF | COPIES MADE FOR: ( ) PA ( ) CPS ( ) JUV ( ) PAT ( ) DSHS ( ) MH | | ( ) COURT: CAS / EVG / SOUTH / EVT ( ) DET: PREC / CTH / SIU ( ) OTHER: | DATA ENTRY |

DOLD-BL-000109



| SNOHOMISH COUNTY SMART TEAM | Case Supplement Report |
| --- | --- |
| 3002 Wetmore Ave Everett, WA 98021 | Case Report # 2017-00000006 |

### NARRATIVE (continuation)

Creek Officer Lerma conducted CPR on Dold. It was reported that the medics arrived on scene at approximately 2302 hours. It was reported that Dold is deceased and still laying outside in front of the residence near the front door. It was also reported that SCSO Deputies Daugherty, Smith, and Smarr arrived on scene. SCSO Sergeants Fortney and Crandle arrived on scene and took over as scene managers. It was reported that all involved Deputies and Officers were separated from each other. It was also reported that Deputies McGee and McCoy were both exhausted and that McGee had an injury to his right arm.

After the briefing duties were assigned in which Detective Mehl and I were paired together to interview SCSO Deputy Daugherty. We escorted Deputy Daugherty to Detective Mehl's vehicle where a recorded interview was conducted.

03-22-17 / 0149 hours
    Detective Mehl and I informed Deputy Daugherty that the recording had started, and then Detective Mehl read a recorded interview form. The following is a summary of Deputy Daugherty's interview: Deputy Daugherty provided his work information per questions from the recorded interview form.

    Deputy Daugherty stated that he was at the South SCSO Precinct typing reports when he heard over the radio, "We need help." Deputy Daugherty stated that he recognized the voices and knew where the scene was because there was only one incident happening at that time. Deputy Daugherty stated that he knew that Deputies McCoy and McGee were at a physical domestic violence incident, so he drove as fast as he could to the scene. Deputy Daugherty stated that he arrived behind a Mill Creek Officer and SCSO Deputy Marino.

    Deputy Daugherty stated that he exited his vehicle and ran towards the Deputies and then heard the Deputies say that they had one in custody. Deputy Daugherty stated that when he came around the corner of the driveway to the house he saw a larger male subject who was naked from the waist down laying at the base of the stairs that lead to the front door. Deputy Daugherty stated that he saw that the male was handcuffed. Deputy Daugherty stated that his attention now turned to Deputies McGee and McCoy.

Deputy Daugherty stated that he saw that Deputy McGee was located between the deck and a boat in the driveway. Deputy Daugherty stated that Deputy McGee was bent over at the waist, breathing heavily, and clenching his right arm. Deputy Daugherty stated that he contacted Deputy McGee and asked him if he was all right. Deputy Daugherty stated that Deputy McGee told him that he could not feel his right arm. Deputy Daugherty stated that he asked Deputy McGee if he had other injuries in which Deputy McGee stated that he did not. Deputy Daugherty stated that because Deputy McGee did not require immediate medical attention, he then checked on Deputy McCoy. Deputy Daugherty stated that Deputy McCoy was ok but out of breath as well. Deputy Daugherty stated that it was obvious that Deputies McGee and McCoy had been fighting because both of their uniforms were covered in dirt and they were wet. Deputy Daugherty stated that one of the Deputies stated, "The guy shit all over me." Daugherty stated that because there were other Deputies on scene and Deputies McGee and McCoy were ok, his attention now moved to the male in custody. Deputy Daugherty stated that Deputies McGee and McCoy were escorted away from the scene by other Deputies. Deputy Daugherty stated that he later heard Deputy McCoy state, "The guy shit all over me."

This report was submitted from an electronic device owned, issued, or maintained by a law enforcement agency using my user ID and password. I certify or declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

| REPORTING OFFICER / ID# | | APPROVING SUPERVISOR |
| --- | --- | --- |
| Sargent, Mike | 1146 | Erickson, Philip |
| LOCATION SIGNED  Snohomish County, WA | | DATE SIGNED   03/22/2017 |

This officer's narrative is complete when an approving supervisor's name is attached. Complete report details do not print in this format.

DOLD-BL-000143

# APPENDIX C

Statement of Master Patrol Deputy Bryson McGee #1500

This is a true and involuntary statement given at the direct order of Undersheriff Rob Beidler of the Snohomish County Sheriff's Office under the threat of termination.

This statement is in conjunction with Snohomish Multiple Agency Response Team (SMART) incident number SM17-06.

I have been in Law Enforcement since 2006. I was hired by the King County Sheriff's Office and put through the Washington State Criminal Justice Training Commission's – Basic Law Enforcement Academy. In 2007 I was hired as a Lateral Deputy with the Snohomish County Sheriff's Office. During my career, I have been through hundreds/thousands of hours of various trainings. My current position is a Master Patrol Deputy. In this role I am a patrol Deputy and Supervisor. In WA State, I am a certified First Level Supervisor (Sergeant). I have also served as a Field Training Officer and have trained dozens of Deputies.

On 03/21/2017 I was working as a fully commissioned Master Patrol Deputy (MPD) with the Snohomish County Sheriff's Office. I have full arrest powers and am charged with enforcing laws. During this incident I was wearing a tan/green jumpsuit with a metal badge and shoulder patches that are bright yellow and say 'SNOHOMISH COUNTY SHERIFF." I also had a duty belt with the following issued equipment; handcuffs, OC spray, police radio, ASP baton, flashlight, three magazines, taser and pistol. It would be clear to anyone that I was a Police Officer.

On 03/21/2017 at about 2100 hours I was at the South Precinct in Mill Creek. At about 2118 hours I was dispatched to a DVP (Domestic Violence PHYSICAL) at 12014 221st ST SE, Snohomish – with Deputy McCoy. I was the 1C9 car and McCoy was the 1C2 car.

While at the Precinct, the call was dispatched as "CC, Male verbal and Physical" supplements stated that "sus is mental and off meds, RP req silent approach" – "sus -F/Alexander, L/Dold, 29 YO." – "sus is in house, RP left the house in order to call, RP thinks he will take off if he knows RP called."

Less than two minutes later a supplement was given that the "RP is going back to the house" – "sus veh- whi Plymouth neon, RP veh-blu yaris." The final supplement given was "RP wants him taken for phych eval, sus-WMA tall, shaved head, tee, sweats."

Deputy McCoy and I arrived together at about 2147 hours. We located the house after a short time and walked up to the front door. As we stood at the front, I noted that the porch was very slippery. I looked through the window on the door and could not see anyone. I then knocked on the front door and announced it was the "POLICE." As soon as I said that, I could see a male that fit the description of the suspect in the reported DVP approach the door. The male, peered out the window and quickly ducked down out of sight. I could hear a male voice yell "who is it?" I again announced it was the "POLICE" and to "COME TO THE DOOR." I could see that the male was continuing to duck and move around near the front door. There was a larger window off to the right, so I stepped down the porch and tried to look through the window to see if I could get a better visual. I could not see into the house through that window, so I started to step back up to the porch.

DOLD-BL-000213

As I reached the top of the porch, the door swung violently open. A male appeared and stopped the door, placing himself between the door jam and the open door. He was standing in the opening and bracing the open door against his left shoulder. With his head poked out, he stated "what do you want."

I again advised him that I was the 'POLICE' and advised him that I was there because his mother called 911. He stated "she's fine." I asked him where she was and he repeated "she's fine, now leave." I could hear a female voice from somewhere behind him saying "I'm here." The way she said it, made me feel as though she was older and not ok. I asked the male what happened and he stated "my mom owes me $20 and I wanted my money, she didn't give it to me, so I shoved her onto the couch and told her she wasn't leaving until I got my $20."

I asked the male if we could come in and check on the female and he stated "no, she's fine" and started to close the door. Based on the initial 911 call about a male being physical with the female caller, his demeanor and what I heard in the female's voice, and then the male admitting to physically assaulting his mother to me at the front door, I made the decision that the male needed to be detained to further investigate the DV and check on the mother. I put my foot against the door to prevent the male from closing it further. The male became upset and started to try and close the door on me. Fearing for the safety of the mother and how upset the male was, I started to push back on the door and eventually got it to start opening. The male stepped back as I made entry, towards the female that I could now see. As I stepped into the house, the male punched me right in the face. His punch connected with the left side of my face and it knocked me back.

I yelled at the male that he was under arrest as he started to turn and run towards a back bedroom. Deputy McCoy had also made entry and fell in behind me. I had no idea who this male was and feared that he was retreating to a bedroom to obtain a weapon. The male had already shown violent aggression by feloniously assaulting me, and I feared that his intent was to continue with his assault on me. As we got into the bedroom, the male squared off again, I pushed him onto the bed and lost my footing, falling to my right. I put out "Code 2" on my portable radio, to get addition help to the scene. Deputy McCoy made entry and advised "taser," deploying his taser with probes into the male. The taser appeared to have a desired effect and the male locked up, rolling on the bed. The male started kicking me and striking me several times in the legs/thighs and it became clear to me that the male was continuing his assault on me. At this point, I had a fear for the mother's safety, Deputy McCoy's safety and mine as well. The male was large and muscular. Deputy McCoy put out on his radio that he had deployed his taser, and I stepped onto the bed and delivered several closed fist punches to the male's body. The male was putting his hands/arms up and swatting my hands/arms away to thwart my being able to control him.

I then produced my taser and advised "taser" and deployed my taser with probes in the area of his abdomen. My placement was difficult as he was violently moving around, flailing his arms, squirming his body and thrashing his legs around during his continued assault and focus on me. The male displayed signs of neuromuscular incapacitation and rolled off of the bed. In that process, I could see that one of my probes had pierced one of his forearms. The male got to the floor and as soon as the evolution ended, started punching and kicking at me and Deputy McCoy. I was hit and kicked several times as he escalated his assault on us.

DOLD-BL-000214

I advised I was going to activate the taser again and did. Deputy McCoy was on the male's upper half as the male DID NOT display any neuromuscular incapacitation in this cycle. It was my thought that the probe in his forearm had dislodged in the male's violent movement to the floor.

I then removed the cartridge from the taser as Deputy McCoy was delivering some punches to the male's upper chest/facial area. The male continued to physically assault Deputy McCoy and kick me. It was becoming clear to me that the male was displaying great physical strength. I deployed the taser in a drive-stun scenario to the males lower back/abdomen and advised Deputy McCoy I was activating drive-stun. With the amount of movement and physical assaulting the male was doing, it was hard to keep the taser in contact with his body. He displayed little to no neuromuscular incapacitation.

I holstered my taser as the male threw Deputy McCoy off of him and rolled from his back up to his feet. At this point, his continued violent assault put me in fear that he was going to kill me. I then put my hand on my gun and felt that I was going to be forced to shoot the male. I looked out and saw that the female was now standing near where the male was headed and that I did not have a clear shot.

I instead charged the male as he punched me several more times. At 21:54 hours, some two+ minutes into this violent encounter, I was able to key my mic and yell "send us some help." I needed responding Deputies to understand the urgency in which we needed back up and I knew that they would put out a 'Code 3' and additional, maybe closer agencies would respond.

The male had either lost his footing or ducked down, displaying his upper head/neck area. I immediately went into a Lateral Vascular Neck Restraint (LVNR) and applied pressure. My intent was to render him unconscious, so that we could take him into custody. The male, with me in tow (I was in LVNR and he was literally pulling me as he walked) on a LVNR, walked towards the front door. The male was displaying abnormal strength and continued to connect body punches to my abdominal area, which was protected by my body armor. Several times as we made our way to the front door, I could feel the male grabbing my holstered gun. This put more fear in me that his intent was to kill me.

I continued to apply the LVNR and further restrict the male's neck and as we exited the house, he went unconscious. I let go as we both went through the door and he fell to the ground just outside the door. Deputy McCoy was able to get onto his lower half and started to cuff the male. As I was getting to his upper body, the male came back conscious and immediately started fighting. I think that Deputy McCoy had been able to cuff one hand and was trying to hold onto it. The male was violently fighting, trying to roll. I dropped my body on his and immediately went back into LVNR. The male had one arm free and started to punch me several times in the head/face as I dropped my head to the back of his. I could feel the male grabbing at my equipment to include my gun with the hand Deputy McCoy was trying to control.

I advised Deputy McCoy that I was going to remain in LVNR to control him until backup arrived. I knew that additional Deputies/Officers were responding and it would still be several minutes. This position allowed me to control his upper body. I continued to yell "SHOW ME YOUR HAND" and "STOP FIGHTING." I could hear the mother yelling at Deputy McCoy and he yelling for her to move back. I heard the female scream over and over "Alex, stop fighting them!" As my head and right ear were on the back of the male, he continued to scream and yell. As my right arm was now going numb, I grabbed onto my right wrist with my left hand and applied more pressure to try and render him unconscious.

As I did this, the male sputtered "IM GUNNA KILL YOU." The male also continued to punch the top of my head and poke his fingers in my face, I believe this was an attempt to 'eye-gouge' me to try and incapacitate me.

At some point during the above struggle an unknown male appeared the driveway and was yelling "what's going on!?" I yelled back that we were the 'POLICE' and he needed to stay back. I did not know who this person was and did not want anyone else on the porch during this violent encounter.

The actions the male was taking and the fact that he stated he was "gunna kill" me made me fear that if he was able to get free, he had every intention of killing me, Deputy McCoy and likely the mother.

I felt very tired and exhausted and was able to key my mic as I was holding my LVNR. I put out "center we need some units here now!" I knew that fighting a male of this strength while we were all severely exhausted was dangerous and could prove to be fatal for any of us.

I was trying to at this point use the remaining strength I had to render the male unconscious. I now could not feel my right arm and was pulling my right arm with my left hand. I continued to yell at the male to "STOP FIGHTING." I could now feel that the male had stopped hitting me and his arm was resting extended out in front of him. The male was still breathing (I could hear him still breathing and his chest was still moving, I figured that he had gone unconscious at this point) but ceasing his efforts to assault/kill us. I started to release my hold in LVNR, maintaining a minimal amount of pressure, to control him. As I could hear backup units' sirens approaching, I keyed my mic and advised dispatch to "have an ambulance stage, we need them close by."

After several straight minutes of a constant, violent, physical attack, additional Officers/Deputies arrived on scene. As they got onto the porch, I slipped and slid face first down the flight of stairs to the ground. I could hear them taking the male into custody and I stood up, noticing my right arm was still numb and my back was hurt, walked to the other end of the stairs and asked Deputy McCoy if he was ok. Additional Deputies arrived and escorted us away to the street. As additional AID units arrived, they could see that I was in pain and stopped to address my injuries. I instructed them to continue to assist with the male and I would wait for other AID units.

I advised Deputies that this was likely going to be a SMART call and told Deputies to stay with myself and Deputy McCoy and to keep us separated. I said this based on Deputies advising they were starting CPR, them requesting AID expedite to the scene and the sheer violence of the encounter. I returned to my car and stayed there with Deputies Marino and Whipple. AID arrived several minutes later and evaluated me in the ambulance. AID wiped blood off of both of my arms. After being looked at, I returned to my car and tried to bring some feeling back into my right arm.

Several minutes later I heard Deputies advise that AID was stopping life-saving efforts and dispatch noted the TOD.

Deputy Marino drove me back to the South PCT as I could not drive. Once there, everyone who was involved stayed in separate offices. Deputy Malsalsky from Peer Support arrived and was assigned as my Peer Support person.

I was processed by SMART Detectives at the South PCT and they kept my jumpsuit and taser as evidence. They asked me if I deployed my taser and I responded "yes." They asked me if I deployed my firearm and I responded "no."

Once I was processed, I was transported to Swedish Hospital where I was treated for my injuries. I was treated for a lumbar strain and a contusion of my right forearm. Deputy Binkley transported me there and out of service once I was released.

This incident was a tense, uncertain and rapidly evolving prolonged physical altercation that was started when the male physically assaulted his mother. It continued when we arrived and he physically assaulted me and Deputy McCoy. This was the most intense fight I have ever been in and felt as though this was a fight for my life. I believe that the male had every intention of killing me and Deputy McCoy.

# APPENDIX D

# FOLLOW-UP

| AGENCY NAME | INCIDENT CLASSIFICATION | INCIDENT NUMBER |
|---|---|---|
| SNOHOMISH COUNTY MULTIPLE AGENCY RESPONSE TEAM | SMART Investigation | SMART 2017-06 |
| VENUE AGENCY | | REPORT DATE |
| Snohomish County Sheriff | | 3/22/2017 |
| TYPE OF ORIGINAL REPORT | VENUE AGENCY REPORT NUMBER | |
| SMART-17-6 | | |

3/25/2017 at 1015 hours, P/C to Involved Officers Attorney Derrick Isackson and left a VM inquiring about obtaining photos of injuries of any of the officers.

3/28/2017 0800 hours, I attended a SMART briefing at Everett PD on this case. Follow-up assignments were issued out and a synopsis of the initial investigation was provided.

1240 hours, P/C to Attorney Isackson and spoke to him regarding photos of involved officer injuries. Isackson said that Deputy McGee still had injuries from the incident and Deputy Miner has an injured elbow. Bothe Deputies were willing to have their injuries photographed. Dep. McGee had already been treated at a hospital and Dep. Miner plans to get treatment for the elbow in the future. Isackson id he would be willing to review a Medical Waiver that was specific to this incident.

3/28/2017 1350 hours, P/C to Jennifer Dold to ask for her friend, Mollie's, contact information (Jennifer mentioned she was listening to her Mom on speakerphone with Mollie present). Call went to VM and mail box was full.

1330 hours, P/C to Dep. McGee and asked about taking the photographs. Dep. McGee agreed to meet me at SCSO South Precinct at 1615 hours. He also said he would contact Dep. Miner to see if he could make it at the same time.

1620 hours, Detectives Stone, Hughes and I contacted Deputy McGee at the South Precinct. He was unable to get ahold of Dep. Miner. Dep. McGee allowed his person to be photographed by Det. Hughes. I noticed McGee had slight bruising above his left elbow, left side and right shin. McGee advised he had bruising under his left eye, which I was unable to notice on this date. We did not ask McGee any questions related to this incident, see photos taken by Det. Hughes.

rtify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

| OFFICER NAME/NUMBER | | | | APPROVED BY | | |
|---|---|---|---|---|---|---|
| Det. G. Chissus #0249 | | | | | | |
| IBR CLEARANCE: | ( ) INSUFF/ CLO | COPIES MADE FOR: | | ( )  COURT: CAS  /  EVG  /  SOUTH  /  EVT | | DATA ENTRY |
| ( ) ARR/A     ( )EXC/A——— | ( ) OTHER/ CLO | ( ) PA        ( ) CPS      ( ) JUV | | ( )  DET: PREC  /  CTH  /  SIU | | |
| ( ) ARR/J     ( )EXC/J——— | ( ) UNF | ( ) PAT      ( ) DSHS    ( ) MH | | ( )  OTHER: | | |

DOLD-BL-000075

# APPENDIX E

PAGE 1 OF 1

# FOLLOW-UP

| AGENCY NAME | INCIDENT CLASSIFICATION | | INCIDENT NUMBER |
|---|---|---|---|
| SNOHOMISH COUNTY MULTIPLE AGENCY RESPONSE TEAM | | | 2017-00000006 |
| VENUE AGENCY | | | REPORT DATE 03/29/2017 |
| TYPE OF ORIGINAL REPORT | | VENUE AGENCY REPORT NUMBER | |

On 03/28/2017, at approximately 1620 hours, I assisted Bothell PD Detective Stone and Bothell PD Detective Chissus by documenting Deputy B McGee's injuries via photographs at the Snohomish County Sheriff's Office South Precinct. Using my department issued Nikon D610 and Nikon Speedlight SB-910 flash; I formatted the memory card in slot A and confirmed the internal date/time stamp was accurate within +/- 1 minute.

We advised Deputy McGee that we would not be asking him any questions and that I was only there to document the injuries he received from the night of the altercation with Alexander Dold. I took multiple overall photos; mid-range photos, and close-up photos of Deputy McGee injuries that he pointed out to me. Deputy McGee advised he had bruising under his left arm, his left side, his right shin, and near his left eye. Since the photographs were taken approximately 7 days (161 Hours) after the altercation, Deputy McGee's bruising was faint.

During the photography, I observed an approximate 1.5 inch X 1 inch yellow bruise near Deputy McGee's left tricep, an approximate 1.5 inch X 1 inch yellow bruise on his left torso, and an approximate 3 inch X 2 inch very faint yellow bruise on his right shin. I did not observe any bruising around Deputy McGee's left eye.

Overall, I took a total of 21 photographs in JPEG/NEF (RAW). I returned to the Mill Creek Police Department and made four DVD copies of the photographs which I later submitted to the SMART team.

**End of Report.**



I certify (or declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

| OFFICER NAME/NUMBER | | | | | APPROVED BY | |
|---|---|---|---|---|---|---|
| Det. T Hughes 040 / SMART49 | | 040 | 3/29/17 | | 1158 | |
| IBR CLEARANCE : | ( ) INSUFF/ CLO | COPIES MADE FOR: | | COURT: CAS / EVG / SOUTH / EVT | DATA ENTRY |
| ( ) ARR/A  ( ) EXC/A | ( ) OTHER/ CLO | ( ) PA  ( ) CPS  ( ) JUV | | DET: PREC / CTH / SIU | |
| ( ) ARR/J  ( ) EXC/J | ( ) UNF | ( ) PAT  ( ) DSHS  ( ) MH | | ( ) OTHER: | |

DOLD-BL-000134

# APPENDIX F

1

2

3

4

5

6

7               UNITED STATES DISTRICT COURT

8          WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9   JENNIFER DOLD, personal      )
    representative of the estate  )
10  of Alexander Dold; and        )
    KATHY DUNCAN,                 )
11                                )
            Plaintiffs,           )
12                                )
                vs.               )        NO. 2-20-cv-00383-RAJ
13                                )
    SNOHOMISH COUNTY, a political )
14  subdivision of the State of   )
    Washington; BRYSON McGEE; and )
15  CODY McCOY,                   )
                                  )
16          Defendants.           )

17  _____

    REMOTE VIDEO RECORDED DEPOSITION UPON ORAL EXAMINATION OF
18
                       THOMAS F. OVENS
19  _____

20

21

22

23

24            THURSDAY, JANUARY 13, 2022

25               DEHUFFDEPO.COM

1   A   Yes.

2   Q   Okay.  And were any other photographs taken at any other

3       time?

4   A   I don't know the answer to that question.

5   Q   Didn't you read a report indicating that other photos

6       were taken later?

7   A   That, that could be true.

8   Q   Okay.  So, far as you know, once they learned that he

9       was claiming he was punched, nobody ever went back to

10      look at those pictures; did they?

11  A   I can't answer that.

12              MR. JOLLEY:  Object to the form.

13  Q   You can answer what you know.  And so far has you know,

14      nobody ever did that; right?

15  A   As far as I know, that's correct.

16  Q   Okay.  What else could they have done to investigate the

17      possibility that McGee was simply lying through his

18      teeth when he claimed to be punched in the eye?

19              MR. BUCK:  Object to the form.

20  A   They could have gone back and interviewed him again if

21      they wanted to do so.  They could have gone back and

22      interviewed I guess Kathy Duncan if they felt it was

23      relevant.

24  Q   Okay.  They could have gone back and interviewed

25      Kathy Duncan.  If you had been in charge would you have

1      gone back and interviewed Kathy Duncan?

2  A  Potentially.

3  Q  Okay.  Potentially she would have said to you "that

4      never happened."  That's a possibility; right?

5  A  Sure.

6  Q  And if she'd said that, then you really would have been

7      interested in looking at those photographs; wouldn't

8      you?

9  A  Well, no, if she said that and she's -- so, essentially

10     making an allegation that he's committing a serious

11     misconduct, he'd be referred to Internal Affairs for

12     investigation.

13  Q  My question was about what you would have done.

14  A  I'm telling you what I would have done.

15  Q  Wouldn't you --

16  A  If I developed --

17  Q  -- My question was wouldn't you have then gone back and

18     look at the photos to see if they corroborated what he

19     said or she said.

20  A  Well, that's not how it works at Seattle PD where my

21     experience is from.  Is that if I as an administrative

22     force investigator develop or receive an allegation or

23     develop an allegation that an officer, in this

24     particular case, is lying to me in the performance of

25     official duties I can't continue that investigation.  It

1   A   I'd have to refer back to my report.

2   Q   Okay.  Do you ever remember hearing McGee say "I could

3       shoot you"?

4   A   I don't recall.

5   Q   Do you remember any other officer at any point saying to

6       Dold, "I could shoot you"?

7   A   No.

8   Q   Okay.  Do you remember threatening to break any of his

9       bones?

10   A   Yeah, I threatened to break two of his fingers.

11   Q   And did he respond to that?

12   A   No.

13   Q   Okay.  And did you try to break his fingers?

14   A   I did.

15   Q   And as I understand it, you believe that you probably

16       did break his fingers; right?

17   A   I, I believe I did.  I tried my best to.

18   Q   At any point while the -- did -- at any point while

19       during the entire incident did you ever hear Kathy the

20       mother saying to Alex, "Alex, you need to go to the

21       hospital," or anything along those lines?

22   A   No.

23   Q   At any point during the incident do you remember her

24       saying to you or McGee, "He has a mental illness"?

25   A   No.

1  Q  Okay.  Well, --

2  A  -- Or McCoy's.  I...

3  Q  I think we're talking about the same thing.  During his

4     deposition you read that he stopped and he drew a little

5     circle on a photo of his own face; do you remember

6     reading that?

7  A  Yes.

8  Q  Is that the photo you're talking about?

9  A  Yes.

10 Q  You looked at it; right?

11 A  Yes.

12 Q  And you would agree with me that there's absolutely --

13    this is years later, but there's nothing to show a

14    bruise at that point -- right -- he's just marking a

15    spot; right?

16 A  Correct.

17 Q  Okay.  Which eye did he mark?

18 A  I believe it would have been his -- Well, okay, that's

19    weird because it was a photo that was taken on his phone

20    and held on a camera, but I believe it was his left eye.

21 Q  If it was his right eye it wouldn't be consistent with

22    what he said; would it?

23 A  I don't recall.  He was punched in the face.

24 Q  I'm asking you for the moment to assume that the eye

25    that he circled in his photo was the right eye.

1    A    Okay.

2    Q    If you set that assumption then you would have to agree

3         with me that contradicts what he said in his deposition,

4         which is that "I got hit in my left eye"?

5    A    My impression was he was punched in the left eye, so

6         that would contradict that.

7    Q    Okay.  Now, so far as you know, nobody has ever asked

8         Kathy Duncan if she saw him -- her son punch McGee;

9         right?  So far as you know, nobody's ever asked her

10        that; right?

11   A    That's correct.

12   Q    Okay.  So, now I want you to assume that -- I don't know

13        -- you're in a room with Kathy Duncan and you say, "Gee,

14        Ms. Duncan nobody ever asked you this.  I'm gonna ask

15        you.  Did you see Alexander Dold get punched -- punch

16        McGee in the eye?"  And she says "I did not."  And you

17        say, "Did that happen?"  And she says, "It did not."

18        And you say, "Are you sure?"  And she says, "I'm sure.

19        It never happened."  You assume all that.  Would that

20        change any of your opinions in this case?

21   A    It would, it would be a factor considering the totality

22        of the circumstances, yes.

23   Q    Wouldn't you have considered, then, the possibility that

24        excessive force was used by McGee?

25   A    On McGee or Dold?

# APPENDIX G

Um, so at that point, um, obviously we got dispatched to a physical domestic, right?  Um, at that point at the doorway he's admitting to me that he assaulted his mother, um, and um, that uh, so the senses that I kinda had where she maybe wasn't okay kind of confirmed that when he uh, admitted the uh, the assaulting her.  Um, I then asked him if…if we could come in, um, and uh, and check on his mom and he stated, "No," that "she's fine" and he started to close the door again.  Um, at that point, based on everything that we had in the call, um, what we initially saw or what I initially saw when I was there, um, I did not feel comfortable leaving without investigating this further and obviously, um, at that point he's already admitted to assaulting his mother, um, so um, I (inaudible) at…at that point my intention was to detain him to further investigate the um, the incident or the assault on his mother.  Um, so I put my foot, uh, on the door or in front of the door to stop him from shutting it, um, and uh, he kinda started shoving the door, trying to get it…trying to really get it closed.  Um, so again at that point I didn't…I didn't know what…what kind of condition the mother was in, um, what kind of condition, uh, anybody else in the house was in; all I know is that a) why I'm there b) what I've observed and c) that he's already ad…uh, admitted to me that he's assaulted his mother.  Um, so I started to push back on the door, uh, told him that…that he was um, uh, that he was under arrest until we figure out what's…what's going on, um, based on what…everything…the…the totality of the circumstances that I had at that point.  Um, he uh, he kinda started…it was kind of a tug-of-war, uh, back and forth at the door there for a quick minute, um, and uh, I eventually shoved it open, he kinda stepped back and uh, I walked in and started walkin' towards him, uh, he uh, reached back, socked me, came back, punched me square in the face on the left side of my face just under my eye, uh, which kinda knocked me back for a second.  Um, I told him again that he was under arrest and he turned and ran towards the back bedroom.

MS          Alright.  Can you uh, can you…for the diagram, can you just show…let's refer you…to you as "Deputy 1, D1", and McCoy as "D2".

BMG         So I was here and McCoy was roughly somewhere over here.

DOLD-BL-000227



<u>Recorded Statement-MPD Bryson McGee-SMART Case #SM17-6, Det. Mike Stone-04/10/17</u>

half and the male's fighting, uh, pretty intensely to get free.  Um, as soon as I saw that, I immediately dropped all my weight down onto his um, lower back and chest area or excuse me, lower back, as his chest was on the porch, um, and I went back into an LVNR and...and uh, again, started um, applying pressure on the LVNR again to render him unconscious so we could get him back into custody.  Um, as um, so as...as I'm on...on his back, he's kind of...his...his le...I believe it was his left arm was out front, I'm behind him with my head back against his head delivering the LVNR, I could feel him several times punching the top of my head and he started eye gouging, I...I think he was eye gou...trying to eye gouge my...my eyes to render me uh, or to incapacitate me and to...to thwart his, um, my attempt to...to get him uh, under control and...and under...under arrest.  Um, uh, at that point, again my...um, my right side, I...I kind of cozied my body up with him as McCoy's kind of straddling his...his lower half, um, and um, basically my um, my duty belt and my gun was up on his back half where my McCoy had the one, I believe it was cuffed or...or somewhat in...in some form of...of control.

Um, I could feel him, the suspect, several times grab my gun again, um, and uh, I had basically advised Dep...uh, Deputy McCoy that I was gonna remain in...in LVNR until our backup arrived because I knew it was still gonna be several more minutes.  Um, uh, McCoy, I think, got on the radio and said somethin' to the extent of "Hurry up!"  Um, I got um, I got on again, um, with...with my left arm, uh, keyed up again on my radio and advised that we needed some units there now.  Um, and at...at that point, um, uh, again, my head was on his...the...basically he was king of turned off like this so my...my ear was pretty close to his...his ear and his mouth and I'm kinda um, delivering more pressure with my head onto his and again, trying, in an LVNR, trying to render him unconscious to get him under somewhat of control. Um, I kept yellin' at him to show me his hand because at that point I couldn't see the hand, I just could keep feeling it extended and...and hittin' me, um, and I told him to...to stop fighting and show me his hand repeatedly, um, while we were on the porch.

DOLD-BL-000235

# APPENDIX H

UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---------------------------------------------------------------

JENNIFER DOLD, personal representative )
of the estate of Alexander Dold; and   )
KATHY DUNCAN, mother of Alexander Dold,)
                                )
              Plaintiffs,     )
                                )
     vs.                    )
                                ) NO. 2:20-CV-00383
SNOHOMISH COUNTY, a political      )
subdivision of the State of       )
Washington; BRYSON MCGEE; and    )
CODY MCCOY,                )
                                )
              Defendants.    )

---------------------------------------------------------------

REMOTE

VIDEO DEPOSITION UPON ORAL EXAMINATION OF

KATHY DUNCAN

---------------------------------------------------------------

9:39 a.m.

January 26, 2022

Seattle, Washington

STENOGRAPHICALLY REPORTED BY:

JANE L. WORDEN, RPR, CCR No. 2726

Kathy Duncan - January 26, 2022

Page 62

1    A.   Not that I recall.

2    Q.   What happened next?

3    A.   Pardon?

4    Q.   What happened next?

5    A.   I sat and waited for Alex to come home.  I figured

6  the police would come in, talk to him.  So I cleaned off

7  his coffee table that had a bunch of his stuff on it,

8  cups, ashtrays, that type of thing, cleaned that up.  Just

9  sat and waited.

10        And the girls, you know, called back and

11  forth.  Is he home yet?  No.  You know, I just waited.  I

12  didn't know if he was going to come back, but I wanted to

13  be there when he did.

14   Q.   And eventually Alex did come back; correct?

15   A.   Yes.

16   Q.   How long had he been gone?

17   A.   Over three hours.

18   Q.   And why do you say it was over three hours?

19   A.   Well, from when he left to when he came back.

20   Q.   So what time did he leave?

21   A.   When did he leave?

22   Q.   Yes.

23   A.   5:30?

24   Q.   And how do you know it was 5:30?

25   A.   Just from when I got home and when he was upset.

Kathy Duncan – January 26, 2022

Page 135

1    Just I could have reached out and grabbed either one; they

2    were that close.  The area's very small.

3        Q.  Did you ever lose sight of Alex in those first few

4    moments when the officers came in the door?

5        A.  Well, they pushed in, and I stepped over, and then

6    I turned around.  And then I saw McGee wrestling with

7    Alex.

8        Q.  I think there's a description of -- I can't

9    necessarily picture it.

10            So the question I'm asking is was there a

11   point in those first few seconds where you lost sight of

12   Alex, where you couldn't see him, maybe by the direction

13   you were facing or by the angle of the house?

14       A.  No.

15       Q.  Did Alex punch one of the deputies after they

16   pushed their way in?

17       A.  No.

18       Q.  Is it possible that he did and you didn't see it?

19       A.  No.

20           MR. LOBSENZ:  Object, calls for speculation.

21               It's a guess.

22           THE WITNESS:  No.

23       Q.  BY MR. GROSS:  When Alex went into the bedroom and

24   Deputy McGee tased him you said, where on Alex's body was

25   the Taser?

# APPENDIX I

SMART Investigation                                              Case No. SM 17-6

Det. Mehl:  Absolutely.

Jason Padvorac:  So we were inside our house and I heard all of it, we, I hadn't heard anything before then that I noticed at least. Then all of a sudden I heard really loud yelling and screaming and some kind of thumping or thudding. I wasn't sure what that was. I was concerned that it might've been a gun. It didn't have the crack that a gun has but it had a thump that was, you know, like a, like a handgun or something.

Det. Mehl:  Um-hmm.

Jason Padvorac:  It was over in a few seconds. The thing, the really loud screaming, yelling and thumping, it was 5 seconds, 10, 20 seconds, something like that.

Det. Mehl:  Okay.

Jason Padvorac:  I've, I've heard people have fights before in different places and I've, in different places I've been kind of by the door with my phone ready to call 911 and ready to run over there but I've never done that before. But this, the sounds were bad enough that I, I put on my boots and I ran out the door because I knew something was, something was going on that wasn't good.

Det. Mehl:  Um-hmm.

Jason Padvorac:  By, by the time I was out the door, the, the, that, the just constant yelling and screaming, thumping had ended. But it was, it was clear that there was something happening on the porch next door.

Det. Mehl:  Okay.

Jason Padvorac:  As, as I was going up my driveway, then over and then around, I heard, I heard a male voice or voices, I couldn't tell if it was one person or multiple people but there was a voice that said, that said multiple times, stop fighting, I'm gonna break your fingers, I'll shoot you. And periodically intermixed with that Alex would let out a yell and periodically mixed in with that Alex would yell, I submit.

Det. Mehl:  Okay.

Jason Padvorac:  When I, when I got over there, as I was coming around the corner of their house to where I could see them and they could see me…

Det. Mehl:  Um-hmm.

Jason Padvorac:  …I think it was before, when, when I was walking down the driveway, I, I yelled, hey, a few times cause I was just trying to distract whoever was doing all that from whatever they were doing and get 'em to stop.

Det. Mehl:  Okay.

DOLD-BL-000587

SMART Investigation                                                    Case No. SM 17-6

Jason Padvorac:   When I came around the corner, I saw a man half in, half out of the door, holding Alex's arms behind his back and Alex was on the, on the porch steps. And then the man yelled, okay, I wasn't sure if it was who are you or go back to your house first. I know he yelled who are you at me and I know he yelled go back to your house.

Det. Mehl:   Okay.

Jason Padvorac:   I don't remember which was first.

Det. Mehl:   Okay.

Jason Padvorac:   It doesn't matter.

Det. Mehl:   No, it doesn't.

Jason Padvorac:   As I put my hands up and said hey, I'm just a neighbor. And then I noticed that the, the person had a patch on their sleeve and so I asked if it was an officer and he said yes, go back to your house.

Det. Mehl:   Okay.

Jason Padvorac:   And at that point I did because I figured that there was nothing for me to do there...

Det. Mehl:   Right.

Jason Padvorac:   ...if the police had the situation.

Det. Mehl:   Right. Okay.

Jason Padvorac:   So came back around, and then we, I sat on my front porch where we can see kind of under the tree branches up to what's going on there. The, Alex, there continued to be the periodic yelling of the, the, the, the male voice saying stop fighting, I'm gonna break your fingers, and periodically Alex yelling and then like just kinda like letting out a roar, like ahhhh, something like that.

Det. Mehl:   Okay.

Jason Padvorac:   And periodically him saying I submit. I went, when I was over there by the, by the door when I had gone over there, Alex asked for his mom a couple times, just saying, mom. He sounded kinda like he was confused. And then she told him that they needed to take him to the hospital.

Det. Mehl:   Okay.

DOLD-BL-000588

SMART Investigation                                          Case No. SM 17-6

came back over here and watched. Eventually they stopped doing CPR and the sometime after that, we went inside because, yeah.

Det. Mehl:  Okay. Okay. Could you, so just a few follow-up questions.

Jason Padvorac:  Yeah.

Det. Mehl:  When you first heard all the yelling, could you, was it a, could you tell who it was? Was it...

Jason Padvorac:  I...

Det. Mehl:  ...guy, girl, was it Alex yelling? Do you?

Jason Padvorac:  They were, they were all male voices.

Det. Mehl:  Okay.

Jason Padvorac:  It was, I couldn't say how many voices there were. And I only ever saw, when I was over there, I only saw one officer.

Det. Mehl:  Okay.

Jason Padvorac:  But when, when the yelling was happening, I'm pretty sure I could hear Alex's voice just kind of, I'm pretty sure I could hear Alex's voice and I heard at least one other male voice. And everyone sounded incredibly upset and angry.

Det. Mehl:  Okay.

Jason Padvorac:  It was the worst yelling, shouting I've ever heard.

Det. Mehl:  Okay. Do you remember anything, you talked about the stop fighting, I'll break your fingers and then you heard Alex say, I'll submit. Do you remember anything else that may have been said during all that?

Jason Padvorac:  The, I heard a male voice that wasn't Alex say I'll shoot you.

Det. Mehl:  Okay.

Jason Padvorac:  Alex, the only things Alex said were I submit and he'd periodically let out a yell that sounded like, I don't know, he'd just say ahhhhhh, like that.

Det. Mehl:  Okay.

Jason Padvorac:  And his mother, I remember hearing his mother say, Alex, we need to take you to hospital.

DOLD-BL-000590

# APPENDIX J

SMART Investigation                                        Case No. SM 17-6

Det. Mehl: 1256.

Meggan Padvorac: Yeah.

Det. Mehl: Okay. Do you have a home or a work phone?

Meggan Padvorac: No.

Det. Mehl: Okay. Alright. So like I was saying with your husband, just, you know, you guys have probably talked about what you saw, and that's fine.

Meggan Padvorac: To some extent.

Det. Mehl: Yeah, and that's fine. Just try and keep it to what you actually saw or heard.

Meggan Padvorac: Saw myself, right, okay.

Det. Mehl: And because everybody's perceptive is a little bit different, so.

Meggan Padvorac: Right.

Det. Mehl: Okay.

Meggan Padvorac: Okay. Well, we had been up talking in this main room here. And Jason brought the noise outside to my attention. We had a, we had a little baby staying overnight with us so I was a little concerned about the fact that there was a scuffle of some sort going on over there. We went to the door and listened. We were both thinking, do we need to call the police, you know, cause it sounded like it was an angry brawl to me.

Det. Mehl: Um-hmm.

Meggan Padvorac: So Jason said he was gonna go over there to find out what was going on. And I wasn't real thrilled about that but he, he does that kind of thing so he did. And I stayed at the door with the door open and listened while he went. The first thing I remember hearing distinctly was Kathy's voice saying, will you please call mental health or something to that effect. Most of the things I hear, I repeat having heard I can't swear to the exact language.

Det. Mehl: Okay.

Meggan Padvorac: But I can, I can pretty much swear to the content.

Det. Mehl: Okay.

Meggan Padvorac: So she asked them to call mental health. There was no response. But Alex was making noise. I mean at this point the only person that I could put a person on was Kathy because she was the only woman involved.

DOLD-BL-000596

SMART Investigation                                              Case No. SM 17-6

Det. Mehl:  Okay.

Meggan Padvorac:  There were sounds of people fighting otherwise. I didn't know who the combatants were.

Det. Mehl:  Okay.

Meggan Padvorac:  I just knew that one person was getting beat up by the other people.

Det. Mehl:  Okay.

Meggan Padvorac:  That's all I knew. Okay, and I was pretty afraid because I heard the guy say I'm gonna break your fingers, man. And then, and this is before Jason got there. And then he said, I could shoot ya. And that made me very afraid.

Det. Mehl:  Right.

Meggan Padvorac:  Because at that point I wanted to call Jason back but I didn't because I didn't want to startle the person with the gun into just shooting something randomly.

Det. Mehl:  Sure.

Meggan Padvorac:  You know, I didn't know who it was.

Det. Mehl:  Sure.

Meggan Padvorac:  He could have been drunk, he could have been anything.

Det. Mehl:  And at that point did you know that it was the police?

Meggan Padvorac:  No.

Det. Mehl:  Okay.

Meggan Padvorac:  I did not.

Det. Mehl:  Yeah.

Meggan Padvorac:  I didn't know the police until the point in the story where Jason comes back and tells me it's the police.

Det. Mehl:  Okay.

Meggan Padvorac:  So there was nothing like that. It could have been somebody's older brother or drunk uncle or whatever.

SMART Investigation

Case No. SM 17-6

Det. Mehl: Right.

Meggan Padvorac: Yeah. I just knew that there was one person over there getting beat up pretty bad. By the voices and Alex calling for his mom and her responding, I, I figured out before Jason got back that it was Alex getting beaten up and somebody else doing the beating.

Det. Mehl: Okay.

Meggan Padvorac: So, anyway, so I heard the two threats of the policemen. I heard Jason intervene and I heard him be told to go back to his house.

Det. Mehl: Okay.

Meggan Padvorac: And then I was standing right there with the door open.

Det. Mehl: Okay.

Meggan Padvorac: So I could hear it pretty well. Jason came back. I heard, and he told me that it was a police officer there. So we were like oh well I guess it would be redundant to call the police then. So we just kind of were gonna let it go cause they had it under control somehow. So I heard, well Jason, when Jason had come back, I heard Kathy ask again for mental health to be called. Then Alex called for her and, and she said yes? And he seemed to me to be very dis, very much disassociating. I've worked with people with mental illness before.

Det. Mehl: Okay.

Meggan Padvorac: So he seemed to me to be disassociating, straight up disassociating, because he, he called for her and she answered and there was a pause and then he called for her again and she answered again. At that point she said Alex, you need to go with these people so they can take you to the hospital.

Det. Mehl: Okay.

Meggan Padvorac: Okay.

Det. Mehl: So when you say, when you say disassociating...

Meggan Padvorac: Yes.

Det. Mehl: ...you mean, do you mean like he wasn't associating that she was there or?

Meggan Padvorac: He seemed to be very confused about where he, he seemed to be confused and afraid.

Det. Mehl: Okay.

DOLD-BL-000598

SMART Investigation                                                    Case No. SM 17-6

Meggan Padvorac:  Like he was unable to tell what was real and wasn't.

Det. Mehl:  Oh, okay, I see.

Meggan Padvorac:  Sort of thing, okay?

Det. Mehl:  Okay.

Meggan Padvorac:  So he wasn't in a clear mental state.

Det. Mehl:  Okay.

Meggan Padvorac:  For whatever reason, okay? So, right, cause she answered and then he called for her again.

Det. Mehl:  Right.

Meggan Padvorac:  Right. So Jason came back, I'm not sure exactly that exchange between Kathy and Alex had happened before or right after Jason came back, I don't think that's particularly relevant though. So he told me that it was a police officer so I came inside. I didn't sit and watch the whole thing.

Det. Mehl:  Um-hmm.

Meggan Padvorac:  Because frankly I was just glad that our neighbor kid and my own kids would, weren't going to get shot by a drunk.

Det. Mehl:  Right.

Meggan Padvorac:  Right. So anyway, Jason came back to where I was a few minutes later, could have been 10, 20 minutes, something like that. I don't think it was particularly long. He said...

Det. Mehl:  And you were inside the house somewhere?

Meggan Padvorac:  I was, I was, I was working...

Det. Mehl:  Okay.

Meggan Padvorac:  ...on the computer in the office.

Det. Mehl:  Okay.

DOLD-BL-000599

# APPENDIX K



1

2

3

4

5

6

7               UNITED STATES DISTRICT COURT

8          WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9   JENNIFER DOLD, personal      )
    representative of the estate )
10  of Alexander Dold; and       )
    KATHY DUNCAN,                 )
11                                )
          Plaintiffs,            )
12                                )
              vs.                )        NO. 2-20-cv-00383-RAJ
13                                )
    SNOHOMISH COUNTY, a political )
14  subdivision of the State of   )
    Washington; BRYSON McGEE; and )
15  CODY McCOY,                   )
                                  )
16        Defendants.            )

17  _____

18   REMOTE VIDEO RECORDED DEPOSITION UPON ORAL EXAMINATION OF

19                         CODY MCCOY
    _____

20

21

22

23

24            MONDAY, NOVEMBER 22, 2021

25                 DEHUFFDEPO.COM

1

1   Q   Okay.  All right.  What happens when he falls on the

2       ground, the two of them fall on the ground?

3   A   I believe Bryson is on top of him and I placed my knee

4       into his cheek to hold his head to the ground.

5   Q   When they fell to the ground did McGee speak to Dold?

6   A   Not that I recall.

7   Q   Did you speak to Dold?

8   A   Probably "stop resisting," but nothing that I can

9       distinctly remember without referencing my report.

10   Q   Did Dold say anything?

11   A   No.

12   Q   Do you remember Dold saying the word "no, no, no, no,

13       no"?

14   A   Yes.

15   Q   Is that here in the bedroom on the ground that he's

16       saying "no, no, no"?

17   A   I don't recall.

18   Q   You just recall he said it sometime that evening?

19   A   Yes.

20   Q   Okay.  When you're giving these commands, are you able

21       to look at Mr. Dold's face?

22   A   Sometimes.

23   Q   What's the expression on his face?

24   A   Ready to escape.  He's angry, non-compliant.

25   Q   Do you remember describing his expression as a blank

1   Q   And I gather at some point he was successful; right?

2   A   Yes.

3   Q   Okay.  So, I think you might have said in your report --

4       I don't remember -- but if you're -- I'm wondering -- It

5       doesn't make much difference.  But I'm wondering if his

6       head is turned to the right and your knee is on his

7       right cheek or his head is turned to the left and your

8       knee is on his left cheek.  Do you remember?

9   A   No.

10  Q   Okay.  But whichever it is, there's -- am I right, his

11      head was turned to one side or the other?

12  A   Correct.

13  Q   Okay.  And...  Let's just use your right cheek -- I'm

14      not suggesting that we know whether it was the right

15      cheek or the left cheek without your looking -- but just

16      for the moment, would you point to your right cheek to

17      where you put your knee?

18              Okay.  And when you put your knee there, am I

19      right, you're putting weight of your body on your knee?

20  A   Yeah, some level of weight, yeah.

21  Q   Okay.  Well, are you trying to put all your body weight

22      on your knee?

23  A   No.

24  Q   Can you tell me how much of your body weight you're

25      putting on your knee?

1    A    No.

2    Q    I take it you're putting enough weight on that you think

3         he won't be able to throw you off?

4    A    Correct.

5    Q    But he was able to throw you off; is that right?

6    A    Yes.

7    Q    Okay.  If you put your knee on his cheek could you see

8         whether or not he could breathe through his nose?

9    A    I don't recall.

10   Q    Wasn't at least half of his nose smashed into the

11        ground?

12   A    I don't recall.

13   Q    Was any part of your knee covering his mouth?

14   A    No.

15   Q    Could you hear whether he was breathing?

16   A    Not -- No.

17   Q    I'm sorry?  That's you don't -- you couldn't hear so you

18        don't know whether he was or wasn't?

19   A    I couldn't hear his breathing.

20   Q    Does that mean you're telling me he wasn't breathing?

21   A    No.

22   Q    Okay.  So, you're telling me you don't know?

23   A    I don't know.

24   Q    Okay.  All right.  Do you remember whether Kathy his

25        mother was ever in that bedroom?

1   Q   Code black.  Okay.  Do you...  I know this might sound

2        like a funny question.  But at some point that night did

3        some fecal matter, defecation, shit get placed on you?

4   A   Yes, sir.

5   Q   Tell me how that happened.

6   A   I'm not exactly sure.  Probably just from the struggle.

7        Mr. Dold's pants became around his ankles while he was

8        fighting with us on the landing.  Could have been animal

9        as well.

10   Q   Mr. Dold's pants, sweat pants they were; right?

11   A   Correct.

12   Q   At some point you remember seeing them down around his

13       ankles?

14   A   Correct, from him struggling with us so -- for so long

15       and so hard, just the movement of him fighting us his

16       pants naturally came down.

17   Q   Okay.  And he wasn't wearing underpants -- is that right

18       -- so you saw his naked buttocks?

19   A   Couldn't recall that he was wearing underwear or not,

20       but I did see his naked buttocks.

21   Q   Okay.  When you saw his naked butt you were struggling

22       with him?

23   A   Yes.

24   Q   And when you saw his naked butt it didn't have any fecal

25       matter or shit on it; did it?

# APPENDIX L

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

---------------------------------------------------------

| | |
|---|---|
| JENNIFER DOLD, personal representative of the estate of Alexander Dold; and KATHY DUNCAN, mother of Alexander Dold, ) ) ) ) ) | |
| ) | No. 2:20-cv-00383-RAJ |
| Plaintiffs, ) ) | |
| vs. ) ) | |
| SNOHOMISH COUNTY, a political subdivision of the State of Washington; BRYSON MCGEE; and CODY MCCOY, ) ) ) ) ) ) | |
| Defendants. ) | |

---------------------------------------------------------

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

KRIS SPERRY, M.D.

---------------------------------------------------------

9:02 a.m. - 12:45 p.m.

Wednesday, January 19, 2022

Remote Video Teleconference

REPORTED BY:
JOLENE C. HANECA, RPR, CCR 2741

Verb8M Reporting, Inc.
206.467.0800 - info@verb8m.net

1   matter and he defecated and much of it got on Deputy

2   McCoy.

3       A.    Yes.  I remember that.

4       Q.    What, if anything, does that signify to you

5   about what was going on with the autonomic nervous

6   system?

7       A.    No, I understand.  That indicates to me that he

8   was already, at that point in time, suffering from, you

9   know, increased carbon dioxide retention and poisoning,

10  you know, acidosis development, and the toxic effects

11  then that those chemicals have on the autonomic nervous

12  system.  And so involuntary defecation is a marker of a

13  damaged or a poisoned autonomic nervous system.

14      Q.    Is involuntary defecation a marker of brain

15  death?

16      A.    It can be, yes.  And certainly asphyxia.

17  That's -- I won't say oddly, but it's an element that in

18  the -- in looking at victims of strangulation, actually,

19  involuntary defecation is found somewhere between a third

20  and a half of all individuals who are strangled and who

21  survive and actually may not even remember the

22  strangulation because of the damaged brain cells that

23  occur from lack of oxygen, but the defecation is a marker

24  of the nervous system not functioning right and then

25  there's involuntary defecation.

# APPENDIX M

1

2

3

4

5

6

7              UNITED STATES DISTRICT COURT

8         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9   JENNIFER DOLD, personal      )
    representative of the estate )
10  of Alexander Dold; and       )
    KATHY DUNCAN,                 )
11                                )
            Plaintiffs,           )
12                                )
                 vs.              )        NO. 2-20-cv-00383-RAJ
13                                )
    SNOHOMISH COUNTY, a political )
14  subdivision of the State of  )
    Washington; BRYSON McGEE; and )
15  CODY McCOY,                   )
                                  )
16          Defendants.           )

17  _____

         REMOTE DEPOSITION UPON ORAL EXAMINATION OF
18
                  OFFICER TRAVIS BLOCK
19  _____

20

21

22

23

24          TUESDAY, NOVEMBER 9, 2021

25              DEHUFFDEPO.COM

```
 1        specifically what I told him.  But I believe I commanded
 2        him to, to give up his hand and put his hand behind his
 3        back.
 4    Q   And did Mr. Dold do that?
 5    A   No.
 6    Q   Did you hear anyone else give Mr. Dold commands?
 7    A   At -- I can't recall specifically hearing a specific
 8        person say a command.  I wouldn't say that I did not.  I
 9        just can't specifically remember one right now.
10    Q   Did you ever see anyone directly on top of Mr. Dold?
11    A   I, I saw...  I guess I would need clarification on
12        "directly," but I saw both deputies partially on his --
13        on him when we approached.
14    Q   Yeah, that might be a better way to get to the answer.
15        You saw deputies on either side of him.  Did it appear
16        to you that at least part of each officer's body weight
17        was on the stairs?
18    A   Yeah, yes.  It did appear that, that part of their body
19        weight was on the stairs and that definitely not all of
20        their body weight was on Mr. Dold, of either deputy.
21    Q   Did you ever perceive that anyone on scene had their
22        entire body weight on top of Mr. Dold?
23    A   No.
24    Q   Sorry?
25    A   No.
```