1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JENNIFER DOLD, ET AL.,

                    Plaintiffs,

        v.

SNOHOMISH COUNTY, ET AL.,

                    Defendants.

CASE NO. 2:20-cv-00383-JHC

MEMORANDUM OPINION RE: CROSS
MOTIONS FOR SUMMARY JUDGMENT

# I

## INTRODUCTION

This case arises from a tragic and fatal interaction between two Snohomish County Sheriff deputies, deputy Cody McCoy and deputy Bryson McGee, and Alexander Dold. Following a struggle between the deputies and Mr. Dold—during which the deputies tased Mr. Dold, applied a chokehold, and used other means of force—Mr. Dold died. Plaintiffs Jennifer Dold (Mr. Dold's sister, acting in her capacity as the representative of Mr. Dold's estate) and Kathy Duncan (Mr. Dold's mother, acting in her personal capacity) sued deputy McGee, deputy McCoy, and Snohomish County. Plaintiffs assert causes of action under 42 U.S.C. § 1983 and under Washington state law. *See* Dkt. # 50 (operative complaint).

The parties filed five motions for summary judgment or partial summary judgment.  Dkt. ## 58, 61, 63, 67, 75.  On December 9, 2022, the Court issued an order stating its conclusions on each of those five motions.  Dkt. # 134.  The Court:

(1)  Denied Plaintiffs' Motion for Partial Summary Judgment on the Negligent Retention Claim.  Dkt. # 58.

(2)  Granted in part and denied in part Plaintiffs' Motion for Partial Summary Judgment on Causation and Color of Law Elements of the Excessive Force Claim.  Dkt. # 61.  The Court granted the motion as to the "color of law" element of the claim but denied it as to the "causation" element of the claim.

(3)  Denied Plaintiffs' Motion for Partial Summary Judgment on the Warrantless Entry Claim.  Dkt. # 63.

(4)  Granted in part and denied in part the deputies' Motion for Summary Judgment.  Dkt. # 67.  The Court granted the motion as to the warrantless entry claim but denied the motion as moot as to the wrongful death claim and the state law qualified immunity argument.

(5)  Granted in part and denied in part the County's Motion for Summary Judgment.  Dkt. # 75.  The Court granted the motion as to the failure to train claims (both the *Monell* claim and the right to companionship claim).  The Court denied the motion as to the negligent retention claim.

*Id.*  In that order, the Court said that it would issue a separate memorandum opinion explaining the reasoning behind its conclusions.  This is the Court's memorandum opinion.

## II

### BACKGROUND

On March 21, 2017, Alexander Dold was living with his mother, Kathy Duncan, at their home in Snohomish, Washington.  Dkt. # 63 at 2.  Mr. Dold was 29 years old and had twice been hospitalized for schizophrenia.  *Id.* at 2–3.  That evening, Mr. Dold and Ms. Duncan got into an argument when he insisted that she owed him money.  *Id.*  As detailed below, Mr. Dold became angry, hitting Ms. Duncan in the face and shoving her on the couch.  Mr. Dold then left for

1  several hours.  During that period, Ms. Duncan concluded that Mr. Dold needed to be admitted to

2  a hospital in order to get back on his medications.  *Id.* at 3.

3         Mr. Dold then returned to the house, left again to get a snack from a local gas station, and

4  then returned to the house a second time around 9 p.m.  *Id.*  Ms. Duncan called the Snohomish

5  County Department of Mental Health and asked them to send a mental health professional to

6  evaluate Mr. Dold, but the Department refused to do so.  *Id.*  They told her to call 911 instead.

7  Ms. Dold went to a nearby store, where she called 911.  *Id.*

8         Ms. Duncan told the 911 operator about the nature of the situation.  She told the operator:

9  that her son had not taken his medication, that he was "tossing around the house tonight," that he

10 "just went over the line," that he gave Ms. Duncan "a fat lip," that he "hit [her]," and that he

11 could have "done more damage than he did."  Dkt. # 76 at 19–20, 25 (911 transcript); *see also id.*

12 at 27 ("[Y]ou don't throw your mom around the house and hit her.").  But Ms. Duncan also

13 explained that she wanted the officers to take Mr. Dold to the hospital, explained that Mr. Dold

14 "was calm now," that she wanted the deputies to approach without sirens, and that nobody

15 needed emergency aid.  *Id.* at 20–22.  She told the 911 operator that she was returning to the

16 home.  *Id.* at 23.  However, it appears undisputed that many of the details provided by Ms.

17 Duncan during the 911 call were not conveyed to the deputies.

18        Deputies Bryson McGee and Cody McCoy received information a little after 9 p.m. from

19 police radio dispatching them to a "physical domestic" altercation.  Dkt. # 64 at 32.  The

20 dispatcher told the deputies that there was a "male verbal and physical" at the house.  Dkt. # 76

21 at 29.  The dispatcher added that "RP [reporting person] is advising source is mental and off

22 meds, requests a silent approach."  *Id.*  The dispatcher told the deputies that the "[s]uspect will be

23 Alexander Dold, last seen in the house.  RP left the house to call and thinks suspect will take off

24 if he knows RP called."  *Id.*  The deputies also recall being told that "a male and a female were

MEMORANDUM OPINION RE: CROSS
MOTIONS FOR SUMMARY JUDGMENT - 3

physical" and that "the male was schizophrenic or something and off his medication and the

mom . . . had requested that he go for a psych eval." Dkt. # 64 at 32.  Deputy McGee testified

that he was told that Ms. Duncan was returning to the home.  *Id.* at 43–44.  Deputy McGee also

stated that he knew that Mr. Dold "assaulted his mother," that he "hadn't been on his

medication," that he had "some kind of mental item going on," and that Ms. Duncan wanted Mr.

Dold to be taken to the hospital.  *Id.* at 50–51.  But the deputies could not recall whether they

knew if Mr. Dold was armed or if there was an ongoing fight inside the home.  *Id.* at 54.

About 30 minutes after the 911 call, the deputies arrived at the home and approached the

front door.  Dkt. # 63 at 4.  Neither deputy recalls hearing any noise (aside from ambient

background noise) coming from the house.  Dkt. # 64 at 49, 123.  The deputies knocked on the

door.  The deputies said "[s]omething to the effect of 'police.'"  *Id.* at 55.  Mr. Dold then opened

the door.  According to deputy McGee, Mr. Dold opened the door "only a couple of feet . . . it

wasn't wide open and it wasn't closed," and stood inside the house "by the threshold" of the

door.  *Id.* at 59.

Deputy McGee explained to Mr. Dold that they had been dispatched because Ms. Duncan

had called about him.  Dkt. # 63 at 6.  Deputy McGee asked if he could "come in and talk to [Ms.

Duncan]."  Dkt. # 64 at 69.  Mr. Dold declined, responding "something to the effect of 'she's

fine.'"  *Id.*  Deputy McGee says that he could not see Ms. Duncan, nor could he confirm whether

she was hurt or needing help.  But he says that he heard Ms. Duncan say, "I'm here" in a

"fearful, afraid, [and] scared" manner.  *Id.* at 67; *see also* Dkt. # 76 at 88–89 (deputy McCoy

observing that Ms. Duncan "looked scared").  During the interaction, deputy McGee asked Mr.

Dold to step outside the home.  Dkt. # 64 at 75.  Mr. Dold declined: "No, I'll talk to you from

here."  *Id.* at 127.  Both deputies testified that Mr. Dold admitted to having shoved Ms. Duncan

on the couch earlier that day.  *Id.* at 71.  Unlike deputy McGee, deputy McCoy testified that he

could see Ms. Duncan through the window and that he observed her talking on the phone. *Id.* at 126. Deputy McCoy added that deputy McGee asked if Ms. Duncan could "come out," but Mr. Dold told the officers "no, she's not coming out." Dkt. # 76 at 85.

At some point, Mr. Dold "started to kind of shut the door." Dkt. # 64 at 72. As Mr. Dold tried to close the door, deputy McGee put his foot "on the doorjamb" to prevent it from closing. *Id.* at 74. The deputies applied additional pressure to force the door open. The deputies then entered the home and declared that Mr. Dold was under arrest. *Id.*

At this point in the encounter, the parties' descriptions of events begin to diverge. The deputies testified that Mr. Dold punched deputy McGee in the face "right as [he] was stepping in or at that point in the threshold of the door." *Id.* at 83. Deputy McGee also testified that Mr. Dold tried to grab the deputy's gun "a few times." *Id.* at 86. Plaintiffs dispute this, suggesting that Mr. Dold did not punch the deputies or try to grab their guns (and more generally, Plaintiffs assert that Mr. Dold's resistance to arrest was far less than the deputies claim). Deputy McCoy fired a taser dart (which hit Mr. Dold in the chest), and a fight between the deputies and Mr. Dold ensued. Dkt. # 63 at 10.

Mr. Dold then "turned around and made a run for a back bedroom," and both deputies followed him. Dkt. # 64 at 87. Once in the bedroom, the deputies found Mr. Dold on the bed (the parties dispute Mr. Dold's exact positioning on the bed, and whether that positioning was threatening or in preparation of a fight). *Id.* at 89. The deputies contend that Mr. Dold began thrashing and flailing, "swinging his arms and kicking his feet" in a manner that made contact with deputy McGee "a few times." *Id.* at 92–93. Deputy McGee fired his taser. Deputy McGee placed his knee on Dold's cheek to pin his head to the ground and applied "closed fist strikes to his face." Dkt. # 63 at 11.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Sometime during the struggle, Mr. Dold made it to his feet, and the parties moved back toward the porch.  *Id.*  Deputy McGee then tried to apply a chokehold called a "lateral vascular neck restraint" (LVNR) in order to render him unconscious.  *Id.*  Though Mr. Dold did lose consciousness, he began to regain consciousness as deputy McCoy tried to apply restraints to Mr. Dold.  At that point, the deputies began to apply additional physical pressure to Mr. Dold.  They placed their body weight on him, maintained some form of a chokehold, hit Mr. Dold with a baton, and bent his fingers back.  *Id.* at 11–12.  (The parties strenuously dispute the nature of the physical force applied, including the duration of the chokehold and the way the deputies applied their body weight).  Taser logs show that deputies McGee and McCoy each deployed their tasers three separate times during the incident.  Dkt. ## 63 at 12; 64 at 148–85.

Backup officers eventually arrived at the scene.  Mr. Dold required immediate medical assistance.  Mr. Dold was pronounced dead later that night.

The parties strenuously dispute the "cause" of Mr. Dold's death.  *See generally* Dkt. ## 61, 88, 99, 101.  Different experts opined that some combination of factors—including a preexisting heart condition (resulting in an "enlarged heart"), the strenuous physical nature of the altercation, and the various forms of force applied to Mr. Dold—led to severe "metabolic acidosis."  *See, e.g.*, Dkt. # 61 at 2–9.  This metabolic acidosis, in turn, led to sudden cardiac arrest and death.

### III

#### DISCUSSION

A.     Summary Judgment Standard

A court may grant summary judgment if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The evidence must be viewed in the light most favorable to the nonmoving

party, and all reasonable inferences should be drawn in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Nelson v. City of Davis*, 571 F.3d 924, 927 (9th Cir. 2009) ("All justifiable inferences must be drawn in Nelson's favor, and we must deny summary judgment if any rational trier of fact could resolve an issue in his favor."). A court does not weigh evidence, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

B.      Excessive Force Claims

Plaintiffs assert two causes of action under 42 U.S.C. § 1983 based on the deputies' alleged use of excessive force against Mr. Dold. *See* Dkt. # 50 at 12–13. First, Plaintiffs assert an excessive force claim under the Fourth Amendment. Second, Ms. Duncan asserts a due process claim for her loss of companionship as a product of the deputies' use of excessive force. For purposes of this order, there is no distinction between the two, so the Court considers them the claims together.

Plaintiffs move for partial summary judgment as to two elements of their excessive force claims: (1) that the deputies "caused" Mr. Dold's injury (satisfying the causation element of a section 1983 excessive force claims) and (2) that the deputies acted under the "color of law." *See* Dkt. # 61. The Court denies the motion as to the causation element of the excessive force claims but grants the motion as to the "color of law" element.

1.      Causation

Plaintiffs seek partial summary judgment as to the "causation" element of their excessive force claims. Dkt. ## 61, 101. In response, the deputies argue that it was Dold's alleged

resistance during the arrest process that "caused" his death, not the deputies' actions.[1]  *See* Dkt. # 88 (deputies' response); Dkt. # 99 (County's response).  This is so, the deputies say, because Mr. Dold's resistance led to physical exertion, which in turn produced the "metabolic acidosis" that caused his heart failure.  *See* Dkt. # 88 at 3–4.  Because this is a motion brought by Plaintiffs, the Court construes all facts in favor of the non-moving deputies.  *Anderson*, 477 U.S. at 255.  The Court denies the motion as to the causation element.

"In a § 1983 action, the plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury."  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008).  "To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation."  *Id.*; *see also Arnold v. IBM Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981); *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996).  "The proximate cause question asks whether the unlawful conduct is closely enough tied to the injury that it makes sense to hold the defendant legally responsible for the injury."  *Mendez v. Cty. of Los Angeles*, 897 F.3d 1067, 1076 (9th Cir. 2018) (citing Prosser and Keeton on Torts § 42 (5th ed. 1984)).  And "the touchstone of proximate cause in a § 1983 action is foreseeability."  *Id.*  "A requirement of proximate cause thus serves, inter alia, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity."  *Paroline v. United States*, 572 U.S. 434, 445 (2014).

The Court concludes that in this case, causation is a factual question that is properly left to the jury.  *See Soremekun*, 509 F.3d at 984 ("Where the moving party [as here] will have the

---

[1] While Plaintiffs' motion anticipated that the deputies would respond to the motion by arguing that Mr. Dold's preexisting heart condition "caused" his death, *see* Dkt. # 61, the deputies did not rely on this argument in their response brief.

burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.").

The causation inquiry asks whether the alleged constitutional violation (here, excessive force) was both a cause-in-fact (but-for cause) and a proximate cause of a plaintiff's injury. But answering the causation inquiry now would put the cart before the horse. The causation element asks only if an officer's *unlawful* conduct caused a plaintiff's injury. Before addressing the causation inquiry, then, a jury must determine which aspects of the deputies' conduct, if any, were unlawful. This presents a factual question for the jury. The struggle between Mr. Dold and the deputies lasted several minutes, and the deputies employed varying (and disputed) amounts of force throughout the encounter. For example, the deputies tased Mr. Dold several times, but also applied a chokehold, struck him with their hands and batons, and used different forms of restraints. It is difficult to determine whether the deputies' alleged wrongful conduct "caused" Mr. Dold's death without knowing which act or acts, if any, the jury finds to be excessive in the first place. To be sure, a reasonable jury could conclude that the interaction as a *whole* (or in aggregate) led to Mr. Dold's death. But that must be decided by the factfinder. The causation question is inextricably linked to the excessive force question.[2]

Even if Plaintiffs could show as a matter of law that the deputies' alleged unlawful conduct was a cause-in-fact of Mr. Dold's injuries, Plaintiffs would still need to satisfy the proximate cause requirement. Proximate cause is almost always a question of fact left for a jury. *See, e.g.*, *Tahoe Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 34 F.3d 753, 756 (9th Cir. 1994) (noting in the context of a § 1983 claim that "a question of causation is preeminently a question of fact, to be decided after trial"); *Beard v. Mighty Lift, Inc.*, 224 F. Supp. 3d 1131,

---

[2] The Court also believes that a jury may be confused if told that it must find causation as a matter of law before it has determined what conduct, if any, was excessive.

1136 (W.D. Wash. 2016) ("[P]roximate cause is ordinarily a jury question."); *Terpin v. AT&T Mobility, LLC*, 399 F. Supp. 3d 1035, 1043 (C.D. Cal. 2019) (same); *King v. United States*, 756 F. Supp. 1357, 1360 (E.D. Cal. 1990) (same). While "the court may determine proximate cause on summary judgment if reasonable minds could reach only one conclusion," *see Beard*, 224 F. Supp. 3d at 1136, courts tend to do so only when holding that proximate cause *is not* satisfied as a matter of law. The parties cite no case in which a court granted a *plaintiff's* motion for summary judgment as to causation in a Section 1983 case. A jury is best equipped to evaluate whether any alleged resistance by Mr. Dold severed the causal chain between the deputies' actions and Mr. Dold's injury.

While the Court is denying Plaintiffs' motion, the Court emphasizes that it will carefully instruct the jury about the law of causation and damages as necessary. Defendants' arguments inaccurately suggest that if Mr. Dold's resistance was a cause-in-fact of Mr. Dold's death, then the deputies' conduct cannot also be a cause-in-fact of his death. But an injury can have multiple but-for causes and multiple proximate causes. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020) ("[O]ften events have multiple but-for causes."); Dan B. Dobbs et al., *The Law of Torts* § 196, p. 625 (2d ed. 2011) ("It is by no means true that the but-for test reduces everything to a single cause. In fact, there are always many causes that meet the but-for test."); *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011) ("[I]t is common for injuries to have multiple proximate causes."). If appropriate, the Court will instruct the jury as such. And the Court will instruct the jury about the law of damages, as appropriate. *See, e.g.*, *Caruso v. Solorio*, No. 115CV780AWIEPGPC, 2021 WL 22498, at *26 (E.D. Cal. Jan. 4, 2021) ("[T]he eggshell skull doctrine, i.e. the defendant takes his victim as he finds him, is a recognized theory in § 1983 cases."); *Richman v. Sheahan*, 512 F.3d 876, 884 (7th Cir. 2008).

    2.     Color of Law

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Plaintiffs seek summary judgment on the "under color of law" element of their excessive force claims. Dkt. # 61. A plaintiff in a § 1983 action must prove that "a person acting under color of state law committed the conduct at issue." *Leer v. Murphy*, 844 F.2d 628, 632 (9th Cir. 1988); *see also* 42 U.S.C. § 1983. The parties agree that the deputies were acting under the color of state law when they responded to the 911 call—in their capacity as sheriff deputies—and engaged in a struggle with Mr. Dold. The deputies agree. *See* Dkt. # 88 at 1 ("Defendants' [sic] do not deny they acted under color of law."). Accordingly, the Court grants Plaintiffs' motion for partial summary judgment as to the "color of state law" element of their 1983 claims.

3.      Excessive Force

The Court emphasizes that Plaintiffs' excessive force-related claims are all still in play; a jury will need to decide whether the deputies used excessive force under the circumstances. Portions of the County's brief (and to a lesser extent, the deputies' brief) could be read to suggest that Defendants seek a determination that the deputies' conduct was permissible as a matter of law. *See, e.g.*, Dkt. # 75 at 14–17. But there are numerous disputes of material fact that preclude such a judgment. Most notably, the parties strenuously debate the nature and severity of the deputies' use of force. Accordingly, if Defendants are seeking an order as to the excessive force element of Plaintiffs' § 1983 claim, that request is denied.

C.      Warrantless Entry Claim

The parties cross-move for summary judgment on Plaintiffs' warrantless entry claim. Dkt. # 63 (Plaintiffs' Motion); Dkt. # 67 at 9–18 (deputies' motion). Plaintiffs assert that the deputies' entry violated the Fourth Amendment and that the deputies are not entitled to qualified immunity. The deputies respond that exceptions to the Fourth Amendment's warrant requirement justify their entry. And even if not, the deputies say, they are entitled to qualified immunity.

It is a close question whether the deputies violated the Fourth Amendment through their warrantless entry, particularly when the facts are viewed in the light most favorable to Plaintiffs (as they must for purposes of the deputies' motion). But the Court need not resolve that question because, even viewing the facts in the light most favorable to Plaintiffs, the deputies are entitled to qualified immunity: No case law "clearly establishes" that warrantless entry in these circumstances would be unconstitutional. Accordingly, the Court grants the deputies' motion and denies Plaintiffs' motion.

1.      Qualified Immunity Legal Framework

When resolving a motion for summary judgment based on qualified immunity, courts "engage in a two-step inquiry." *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022) (citing *Tolan v. Cotton*, 572 U.S. 650, 655 (2014) (per curiam)). First, courts ask "whether the facts, viewed in the light most favorable to the plaintiff, demonstrate that the deputies violated a constitutional right." *Id.* Second, courts ask "whether that right was 'clearly established' at the time of the alleged constitutional violation." *Id.* While the Supreme Court had once required courts to evaluate these questions sequentially, *see generally Saucier v. Katz*, 533 U.S. 194 (2001), it has since clarified that courts may answer the questions in either order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Thus, a court may grant an officer qualified immunity on the "clearly established" prong without directly deciding whether a constitutional violation occurred.

2.      Constitutional Violation Prong

The first prong of the qualified immunity analysis asks whether, viewing the facts in the light most favorable to the nonmoving party, the state actor violated a constitutional right. *Peck*, 51 F.4th at 887. The constitutional right at issue is the Fourth Amendment's protection from unreasonable searches and seizures.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. U.S. Dist. Court*, 407 U.S. 297, 313 (1972)). "It is 'a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). "A warrantless entry into a home violates the Fourth Amendment unless an exception to the Fourth Amendment warrant requirement applies, such as emergency, exigency, or consent." *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 533 (9th Cir. 2010). The deputies entered the home without a warrant. But the deputies assert that these exceptions to the warrant requirement —the consent, emergency aid, and exigent circumstances exceptions—excuse their warrantless entry.

> a.    Consent Exception

Valid consent provides an exception to the Fourth Amendment's warrant requirement. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006); *Bonivert v. City of Clarkston*, 883 F.3d 865, 874 (9th Cir. 2018). The deputies contend that they received either express or implied consent from Ms. Duncan to enter the home. Dkt. # 86 at 6–8.

The Court rejects this argument. Nothing in the transcript between Ms. Duncan and the 911 operator amounts to an express statement that she wished for the deputies to come into her home. Nor did Ms. Duncan communicate such a desire while the deputies stood at the doorstep of the home. And of course, Mr. Dold did not provide express consent; to the contrary, Mr. Dold's behavior indicated that he did not consent to the entry of the officers.

The deputies contend in the alternative that Ms. Duncan's 911 call—during which she requested police assistance to manage Mr. Dold—provided implied consent to enter the home. Dkt. # 86 at 7–8.  But they cite no federal case law suggesting that the mere act of calling 911 and requesting assistance authorizes any subsequent intrusion into the home, no matter what the officers observe when they arrive at the scene.  The 911 transcript suggests only that Ms. Duncan wanted the police to come to her home, perhaps to chat with Mr. Dold at the door or evaluate the situation further.  There is no sign that Ms. Duncan impliedly granted the deputies an unconditional license to *enter* her home even if—as Plaintiffs suggest—the deputies arrived at a quiet home with no signs of distress.

But even assuming the 911 call provided consent, Supreme Court precedent forecloses the deputies' argument.  In *Georgia v. Randolph*, one tenant of a home consented to a police entry and search while a co-tenant—who was also physically present at the home—objected. The Court held that "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him."  547 U.S. at 106; *see also id.* at 122–23 ("[A] physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant.").  Applying *Randolph* in a similar domestic violence context, the Ninth Circuit has held that "[e]ven though the officers secured [one party's] consent, [Plaintiff] was physically present inside and expressly refused to permit the officers to enter on two different occasions," meaning that "the consent exception to the warrant requirement did not justify the officers' entry into [Plaintiff's] home."  *Bonivert*, 883 F.3d at 875.

Accordingly, even if Ms. Duncan somehow consented to the warrantless entry, Mr. Dold's objection to the warrantless entry—as shown by his words and actions while standing at

MEMORANDUM OPINION RE: CROSS
MOTIONS FOR SUMMARY JUDGMENT - 14

1    the door of the home—renders the entry unreasonable as to him.[3]  The consent exception does

2    not apply.

3                b.      State Law

4            The deputies point to Washington state law to justify their warrantless entry.  Dkt. # 88 at

5    9–11.  They point to statutes that stress the importance of protecting victims in domestic violence

6    situations.  *See* Revised Code of Washington (RCW) 99.030(5) ("The primary duty of peace

7    officers, when responding to a domestic violence situation, is to enforce the laws allegedly

8    violated and protect the complaining party.").  They also point to a state statute requiring an

9    officer to arrest any individual who the officer believes assaulted a family or household member

10   in the previous four hours.  *See* RCW 10.31.100(2)(d).

11           But any state statute or police policy cannot require conduct that violates the United

12   States constitution.  Such a statute would itself be unconstitutional and must yield to federal law.

13   *Cf. Garner v. Tennessee*, 471 U.S. 1, 11 (1985) (state statute which authorized the use of deadly

14   force to arrest a fleeing felon regardless of the circumstances was unconstitutional as applied

15   when the fleeing felon did not pose a danger to anyone).  The deputies seem to recognize this

16   point.  Dkt. # 86 at 9 ("Defendant Deputies acknowledge that Washington Law does not control

17   the Court's interpretation of the Fourth Amendment.").  Accordingly, state law cannot justify a

18   warrantless entry that otherwise violates the Fourth Amendment.

19               c.      Exigency and Emergency Aid Exceptions

20

21

22   ─────────────────

23        [3] *Randolph* emphasizes that its holding does not prevent the police from entering a dwelling over
     the objection of a physically present co-tenant to investigate domestic violence.  547 U.S. at 118.  But this
     language suggests not that consent would exist in such circumstances, but that some other justification—

24   say, exigent or emergency circumstances—might permit entry.  The Court discusses those exceptions to
     the warrant requirement below.

MEMORANDUM OPINION RE: CROSS
MOTIONS FOR SUMMARY JUDGMENT - 15

"There are two general exceptions to the warrant requirement for home searches: exigency and emergency." *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009) (quoting *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir.2005)).

"The emergency aid exception permits law enforcement officers to 'enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Bonivert*, 883 F.3d at 876 (quoting *Brigham City*, 547 U.S. at 403). "An entry pursuant to the emergency aid exception is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action." *Id.* (internal quotation marks and citation omitted). Courts assess whether the emergency aid exception applies based on the totality of the circumstances. *Hopkins*, 573 F.3d at 764.

The exigent circumstances exception "applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Missouri v. McNeely*, 569 U.S. 141, 148–49 (2013) (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)). "[W]hen the government relies on the exigent circumstances exception, it . . . must satisfy two requirements: first, the government must prove that the officer had probable cause to search the house; and second, the government must prove that exigent circumstances justified the warrantless intrusion." *United States v. Johnson*, 256 F.3d 895, 905 (9th Cir. 2001) (en banc). "As a general rule, we define exigent circumstances as those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Id.* (citation omitted).

The Ninth Circuit has described the difference between the two exceptions as follows:

The "emergency" exception stems from the police officers' "community caretaking function" and allows them "to respond to emergency situations" that threaten life or limb; this exception does "*not* [derive from] police officers' function as criminal investigators."  By contrast, the "exigency" exception does derive from the police officers' investigatory function; it allows them to enter a home without a warrant if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is "necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts."

*Hopkins*, 573 F.3d at 763 (citations and quotation marks omitted); *see also Espinosa*, 598 F.3d at 534.

But the distinction between the two exceptions largely fades away (or at the very least becomes typologically confusing) when the primary exigency or emergency justifying warrantless entry is, as here, the risk of physical harm to another person following an alleged assault.  An imminent threat to another fits within the emergency aid exception; this is the core purpose of the exception.  But it is less clear that risk of harm to another falls under the exigency label as well.  The Ninth Circuit sometimes lists "harm to others" as an exigency, *see United States v. Struckman*, 603 F.3d 731, 743 (9th Cir. 2010), while at other times omits this example from its list of exigencies, *see Bonivert*, 883 F.3d at 878.  In domestic violence cases, the Ninth Circuit has sometimes focused on the exigent circumstances exception, *see United States v. Black*, 482 F.3d 1035, 1039 (9th Cir. 2007), sometimes focused on the emergency aid exception, *see United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005) (holding that the exigent circumstances exception did not justify entry but that the emergency aid exception did), and sometimes applied both, *see Bonivert*, 883 F.3d at 876–79.  Further adding to the doctrinal confusion, the Supreme Court has described law enforcement's obligation to provide emergency aid as a *type* of exigency justifying warrantless entry.  *See, e.g.*, *Lange v. California*, 141 S. Ct. 2011, 2017 (2021) (describing "emergency assistance" as a type of "exigenc[y]").

1        But regardless of the framework applied, the inquiry is essentially the same in

2   circumstances like these.  *Cf. Black*, 482 F.3d at 1041 n.1 (noting that the "'objective

3   reasonableness' test [of the emergency aid exception] is essentially the same as the one courts

4   use to determine whether police action is justified under the 'exigent circumstances' exception,"

5   and so applying either test would yield the same result).  Where, as likely here, there was

6   probable cause to believe that a crime had been committed (satisfying prong one of the exigent

7   circumstances test),[4] the inquiry boils down to whether there was an objectively reasonable

8   exigency or emergency (like a threat to Ms. Duncan) that would lead a reasonable officer to enter

9   the home without a warrant.  If so, then the deputies' warrantless entry did not violate the Fourth

10  Amendment.  But if there was no such exigency or emergency, then the Fourth Amendment

11  would prohibit the entry.

12       Whether an exigency or emergency justified the deputies' entry presents a close question.

13  The Ninth Circuit has explained that domestic violence cases do not "create a per se exigent need

14  for warrantless entry."  *United States v. Brooks*, 367 F.3d 1128, 1136 (9th Cir. 2004).  At the

15  same time, "the exigencies of domestic abuse cases present dangers that, in an appropriate case,

16  may override considerations of privacy."  *Id.*  "Courts have recognized the combustible nature of

17  domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry

18  was justified by exigent circumstances when the officer had substantial reason to believe that one

19  of the parties to the dispute was in danger."  *Id.* (quoting *Tierney v. Davidson*, 133 F.3d 189, 197

20  (2d Cir. 1998)).

21

22

23      [4] The deputies likely had probable cause to conclude that Mr. Dold committed some form of
assault or battery under Washington law.  The dispatcher told the deputies that there had been a physical

24  dispute, and Mr. Dold admitted to the deputies that he had shoved his mother.

MEMORANDUM OPINION RE: CROSS
MOTIONS FOR SUMMARY JUDGMENT - 18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Here, facts cut in both directions.  On the one hand, the deputies were dispatched to respond to a "verbal and physical" domestic abuse situation.  Dkt. # 76 at 29.  Mr. Dold also told the deputies that he had shoved his mother earlier, confirming that there had been some form of a physical dispute that might require intervention.  Dkt. # 63 at 7.  In light of the combustible nature of domestic violence disputes, *see Brooks*, 367 F.3d at 1136, the deputies could have believed that entry was necessary to prevent future violence.  *See Michigan v. Fischer*, 558 U.S. 45, 49 (2009) ("Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." (citation and quotation marks omitted)); *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995) ("We do not think that the police must stand outside an apartment, despite legitimate concerns about the welfare of the occupant, unless they can hear screams.").  And the deputies knew that the victim remained in the home but could not make meaningful contact with her.  *Martinez*, 406 F.3d at 1164 ("When the domestic violence victim is still in the home, circumstances may justify an entry pursuant to the exigency doctrine."); *Brooks*, 367 F.3d at 1135.  This fact distinguishes the case from those in which the Ninth Circuit held that exigent circumstances did not justify entry after reports of domestic violence.  *See, e.g.*, *Bonivert*, 883 F.3d at 877–88 (finding a Fourth Amendment violation when the alleged victim was already outside the house, meaning there was no objectively reasonable risk of bodily harm to another person).  And even if the deputies observed a relatively calm home when they arrived on the scene, officers need not "witness ongoing violence before responding to an emergency." *United States v. Snipe*, 515 F.3d 947, 952 n.6 (9th Cir. 2008).  Such a requirement would be inconsistent "not only with the purposes underlying the emergency doctrine but also with *Brigham City*'s express statement that police officers do not have to wait for violence before acting."  *Id.* (citing *Brigham City*, 126 S. Ct. at 1949).

1

On the other hand, viewing the facts in the light most favorable to Plaintiffs, the home

2 was quiet and calm when the deputies arrived.  There was no yelling, and there were no signs of

3 a violent struggle.  While the deputies contend that Ms. Duncan "sounded scared" when she said,

4 "I'm here" from within the residence, Dkt. # 67 at 2, a reasonable jury could disbelieve the

5 deputies' account.  And the mere fact that Mr. Dold closed the door on the deputies to end the

6 encounter does not justify warrantless entry.  An "occupant has no obligation to open the door or

7 to speak." *King*, 563 U.S. 452 at 469–70.  And "even if an occupant chooses to open the door

8 and speak with the officers," "the occupant need not allow the officers to enter the premises and

9 may refuse to answer any questions at any time." *Id.* at 470.  The deputies also point to several

10 statements made by Ms. Duncan during her 911 call.  Ms. Duncan told the 911 dispatcher that

11 Mr. Dold gave her a "fat lip," "hit [her]," and that she was "afraid to have [Dold] with me." Dkt.

12 # 86 at 14; Dkt. # 76 at 19–20, 25, 27.  But there is no indication that these details were ever

13 conveyed to the deputies by the 911 dispatcher.  Because the reasonableness of the deputies'

14 actions "is to be judged by the circumstances known to them," *Black*, 482 F.3d at 1038, such

15 facts cannot support the lawfulness of the deputies' conduct.

16 But the Court need not resolve this question.  Even if the deputies violated the Fourth

17 Amendment when they entered the home without a warrant, they are entitled to qualified

18 immunity, as described below.  No case law "clearly establishes" that under similar

19 circumstances, entry into the house to protect a potential victim of domestic violence would

20 violate the Fourth Amendment.

21 3.       "Clearly Established" Prong

22 The second prong of the qualified immunity analysis asks whether the constitutional right

23 was "clearly established" at the time of the alleged constitutional violation. *Peck*, 51 F.4th at

24 887.  A right is "clearly established" if a court can "identify a case where an officer acting under

MEMORANDUM OPINION RE: CROSS
MOTIONS FOR SUMMARY JUDGMENT - 20

similar circumstances . . . was held to have violated" the Constitution. *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 552 (2017) (per curiam).  An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it." *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014)).  While there need not be "a case directly on point for a right to be clearly established, existing precedent must have *placed the statutory or constitutional question beyond debate*." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) (per curiam) (emphasis added) (quoting *White v. Pauly*, 137 S. Ct. at 551); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).  The Supreme Court has described the "clearly established" test as creating an "exacting standard" that "gives government officials breathing room to make reasonable but mistaken judgments." *Sheehan*, 575 U.S. at 611 (internal quotation marks and citation omitted).  To that end, qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Supreme Court has also "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *al-Kidd*, 563 U.S. at 742).  "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 742).  This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.*  (citation and internal quotation marks omitted).  "[S]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer

confronts." *Rivas-Villegas*, 142 S. Ct. at 8 (quoting *Mullenix*, 577 U.S. at 12) (first two alterations in original).

Here, Plaintiffs do not point to case law that "clearly establishes" that the deputies' entry was unconstitutional under similar circumstances to those present in this case.  As the discussion above illustrates, it is a close question whether the deputies' warrantless entry violated the Fourth Amendment.  In these scenarios—where reasonable minds could come to different conclusions about the lawfulness of the deputies' conduct—qualified immunity shields officers from liability. *See Mitchell v. Forsyth*, 472 U.S. 511, 535 n.12 (1985) ("[I]n cases where there is a legitimate question whether an exception to the warrant requirement exists, it cannot be said that a warrantless search violates clearly established law."); *al-Kidd*, 563 U.S. at 743 (qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." (citation and quotation marks omitted)).

Even viewing the facts in the light most favorable to the Plaintiffs (as the Court must for purposes of the deputies' motion for summary judgment based on qualified immunity), a reasonable jury could find these facts: (1) the deputies were dispatched to respond to a 911 call reporting a "physical domestic" dispute; (2) the deputies arrived to a calm home without yelling or overt indication of an immediate emergency or distress; (3) the victim was still in the home; (4) the deputies were unable to meaningfully interact with the victim due to the suspect's actions; and (5) the suspect admitted to shoving the victim earlier.  There does not appear to be any case law that would put "*any* reasonable officer" on notice that warrantless entry here would violate the Fourth Amendment.  *Sheehan*, 575 U.S. at 611 (emphasis added) (citation omitted).

Plaintiffs point to a number of cases which stand for the general proposition that domestic violence does not create exigent circumstances per se. *See, e.g.*, *Black*, 482 F.3d at 1040 ("[W]e have stopped short of holding that 'domestic abuse cases create a per se exigent need for

warrantless entry'"); *Brooks*, 367 F.3d at 1136 ("We do not suggest that domestic abuse cases create a per se exigent need for warrantless entry").  Plaintiffs also cite cases that state that a search of the home absent a warrant or exigent circumstances is presumptively unreasonable. *See, e.g.*, *Brigham City*, 547 U.S. at 403.  But these statements describe the right at too high a level of generality: They provide little guidance to officers about what conduct violates the Fourth Amendment.  While these cases suggest that officers may not enter a home upon the mere mention of the words "domestic violence," they do describe the factual circumstances that might justify or preclude such an entry.

Plaintiffs rely heavily on *Bonivert v. City of Clarkson*.  883 F.3d 865.  But that case is readily distinguishable and does not clearly establish the contours of the right at issue.  In *Bonivert,* the victim of the reported domestic abuse was already *outside* the home when the officers arrived.  *See id.* at 875 ("[I]t is important to underscore that neither [the alleged victim] nor the baby were in danger because they were safely outside the house when police entered."). There was no objectively reasonable justification to enter the home because there could be no imminent threat to the victim; the victim was safely separated from the alleged attacker.  By contrast, Ms. Duncan was still in the home, and the deputies could not meaningfully communicate with her because Mr. Dold actively prevented the deputies from speaking to Ms. Duncan.  Plaintiffs also rely on *Cuervas v. De Roco*. 531 F.3d 726 (9th Cir. 2008).  But that case involves warrantless entry in an attempt to locate a parolee.  Unlike here, there is no suggestion that the officers in that case entered the home to protect a person who had recently reported domestic abuse.

In short, Plaintiffs identify no case in which a court has held unconstitutional a warrantless entry when a potential victim of domestic violence is still in the house, the responding officers cannot meaningfully communicate with the victim, and the suspect actively

prevents access to the victim.  To the contrary, Ninth Circuit cases can be read to imply that when a victim of domestic violence is still inside the home and there remains a credible risk of violence, warrantless entry may be appropriate.  In *Brooks*, for example, the court stated that "[w]hen the domestic violence victim is still in the home, circumstances may justify an entry pursuant to the exigency doctrine." 367 F.3d at 1135.  And in *Black*, the court found the emergency aid exception justified the warrantless entry because—as here—the deputies did not know the extent of the emergency or the scope of the risk posed to the victim.  482 F.3d at 1035, 1039; *see also United States v. Wilder*, 187 F.3d 650 (9th Cir. 1999) (unpublished) ("We have little doubt that the 911 call reporting the 'physical domestic' dispute, the substance of which Officer Link verified upon arrival, was sufficient to create exigent circumstances.").

To be sure, Plaintiffs are no doubt correct that the facts in those cases are somewhat distinguishable from those here.  In *Brooks*, for example, the court upheld a warrantless entry in part because the officers observed a room in disarray, and in *Black*, the court did the same because the officers could not locate the alleged victim.[5]  At most, however, these cases might help clarify the type of conduct that *is* permissible; they shed little light on the line at which an officer's conduct crosses from lawful to unlawful.  They do not put every reasonable officer on notice that a warrantless entry under these circumstances—when a domestic violence victim is in the house and the officers cannot meaningfully communicate with the victim—violates the Constitution.

Moreover, case law tends to emphasize that officers are given significant leeway when responding to domestic violence disputes.  "Courts have recognized the combustible nature of

---

[5] During the 911 call in *Black*, however, the victim indicated that she would wait for the officers *outside* the home.   482 F.3d at 1039–40.  Even so, the court held that the warrantless entry was permissible, even though it was very likely—based on the 911 call—that the victim was *not* inside the home. *Id.*

domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger." *Brooks*, 367 F.3d at 1136 (quoting *Tierney*, 133 F.3d at 197). When officers respond to a report of domestic violence, "violence may be lurking and explode with little warning." *Martinez*, 406 F.3d at 1164 (citation omitted). And in *Georgia v. Randolph*, the Supreme Court stated: "No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering." 547 U.S. at 118. In fact, the Ninth Circuit has observed that "[t]wo other circuits have even held that a 911 call reporting a domestic emergency, without more, may be enough to support a warrantless search of a home." *Brooks*, 367 F.3d at 1136 (citing *United States v. Richardson*, 208 F.3d 626, 630 (7th Cir. 2000) and *United States v. Cunningham*, 133 F.3d 1070, 1072–73 (8th Cir.1998)); *Martinez*, 406 F.3d at 1164–65. ("[O]ther circuits have recognized the need for law enforcement officers to enter a home without a warrant when it appears that the occupant may injure himself or others."). An officer reading these cases could reasonably—if erroneously—conclude that warrantless entry is permissible so long as the alleged victim remains in the home and the officers cannot speak with him or her.

Ultimately, the "clearly established" inquiry creates an "exacting standard." *Sheehan*, 575 U.S. at 611 (internal quotation marks and citation omitted). While many have criticized the doctrine, the Supreme Court has made clear in recent years that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743 (citation omitted). Unless the law puts the constitutionality of the deputies' conduct "beyond debate," an officer is entitled to qualified immunity. *Rivas-Villegas*, 142 S. Ct. at 7–8 (citation

omitted).  In an edge case like this one, qualified immunity shields the deputies from liability.  If the deputies' warrantless entry violated the Fourth Amendment, they are still entitled to qualified immunity.

D.     Failure to Train Claims

The County moves for summary judgment as to Plaintiffs' "failure to train" claims.  *See* Dkt. # 75 at 9–18 (County's motion for summary judgment).  Plaintiffs assert two causes of action against the County based on a failure to train theory.  First, Plaintiffs assert a direct claim against the County for its alleged failure to train the deputies.  Dkt. # 50 at 12.  This is a type of *Monell* claim, named after the Supreme Court case, *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).  Second, Ms. Duncan asserts a due process claim against the County, arguing that the County's failure to train deprived her of her right to companionship with her son.  Dkt. # 50 at 13.  The Court grants the County's motion for summary judgment as to both claims.

1.     *Monell* Claim for Failure to Train

The County moves for summary judgment on Plaintiffs' *Monell* claim for failure to adequately train the deputies.  Dkt. # 75 at 9–18.  In its motion, the County focuses on its training program on the use of tasers.  But in Plaintiffs' response brief, they state that their *Monell* claim has nothing to do with tasers.  *See* Dkt. # 110 at 1 ("[T]he failure to train claim is not based on any contention that the County's Taser training was inadequate."); *id.* at 2 ("The *Monell* claim has nothing to do with the training the County provided on Taser use.").  Instead, they state that the "*Monell* claim is based on failure to adequately train [the County's] deputies on the use of a carotid chokehold (generally referred to as a Lateral Vascular Neck Restraint or 'LVNR')."  *Id.* at 2; *see also id.* at 10 (same).  In its reply brief, the County argues that this new chokehold theory of liability does not appear in the complaint and was not disclosed to the

County; that the theory relies entirely on inadmissible expert opinions; that there is no evidence that the chokehold training was inadequate; and that there is no evidence that the County was deliberately indifferent to any deficiency in training.  Dkt. # 119 at 1.

In order to hold a local government liable under § 1983, a plaintiff must prove that "action pursuant to official municipal policy" caused their injury.  *Monell*, 436 U.S. at 691.  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  While a local government's failure to adequately train its employees can amount to official government policy for purposes of § 1983 "in limited circumstances," "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id*.  Proof of inadequate training "does not render the city liable [under §1983] per se." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  Rather, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick*, 563 U.S. at 61 (quoting *City of Canton*, 489 U.S. at 388).  "Only then can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* (citation and quotation marks omitted).  But "'[d]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (citation omitted).

Plaintiffs fail to satisfy this "stringent standard," and the Court grants the County's motion for summary judgment as to the *Monell* claim.  Plaintiffs rely heavily on a 2007 Canadian study to show the inherent danger of the chokehold used by the deputies.  That study states:

> In cases of prolonged or extremely violent struggle, it could be possible for the subject to get out of the correct position for application of an appropriate VNR. In these cases, the intended VNR could become an arm bar or tracheal hold which

> achieves loss of consciousness through asphyxia. For this reason, officers must
> be taught and subsequently utilize the concept that if a subject is not rendered
> unconscious within 30 seconds of application of the VNR, it is not working and is
> either ineffective or not a VNR. In this case officers must consider tactically
> repositioning or engaging in another sort of restraint/force option if the situation
> allows.

Dkt. # 96-6 at 17. Construing all facts in the light most favorable to Plaintiffs, the deputies applied

a LVNR for longer than 30 seconds, the durational limit suggested by the study. Plaintiffs thus

contend that because the County was aware of this study, the County failed to adequately train its

deputies to limit the duration of LVNRs in accordance with the study's findings. But the study is

equivocal at best. Elsewhere, the study states:

> [V]ascular neck restraint in North America has been heavily criticized for its
> hypothesized immediate and devastating cardiopulmonary and neurological effects.
> *None of those claims have been supported by known physiological effects of
> transient carotid occlusion or by case reports, case studies, medical anecdote or
> more formal medical research.*

Dkt. # 120-2 at 31 (emphasis added); *see also id.* (citing another study which "determined that

the effects of complete carotid occlusion were completely reversible even following 100 seconds

of complete vascular neck occlusion").

But even if the Court were to accept that the study stands for the proposition that use of

the LVNR for longer than 30 seconds would be unreasonably dangerous, Plaintiffs' own expert,

Dr. Harmening, appears to have conceded that he did not take issue with the County's training

about LVNRs. The following back-and-forth took place during Dr. Harmening's deposition:

> Q. So do you know whether or not the Snohomish County Sheriff's Department utilized
> the standardized training?
>
> A. Yes.
>
> Q. And they did; correct?
>
> A. They did, yes.

1
2
3
4
5
6
7
8

Q. So Officer McGee would have been trained in the standard policy which everybody uses, which is in fact the industry standard for training; correct?

A. I absolutely agree with that. They provided the module. It is the standardized module.

Q. So the County didn't do anything wrong in training him according to industry standards, did they?

A. No. I've never alleged that.

Q. *So what did the County do wrong with regard to his training on lateral vascular neck restraint?*

A. You're asking me something I have not opined on. *I'm saying it was Deputy McGee who did something wrong with the neck restraint, not the County.*

9

Dkt. # 120-1 at 3–4 (emphasis added).  Looking to Dr. Harmening's expert report leads to the

10

same conclusion.  Dr. Harmening opined that the deputies' application of the LVNR for

11

(according to his calculations) three to four minutes was unreasonable given the medical

12

evidence.  Dkt. # 98-2 at 18.  But nowhere in the report does he opine about the County's lack of

13

*training* around the proper duration of an LVNR.  To the contrary, in the only portion of the

14

report that discusses the training provided to the deputies about the use of LVNRs, Dr.

15

Harmening seems to suggest that the deputies *did* receive LVNR training, but that the deputies

16

disregarded that training.  *See* Dkt. # 98-2 at 17–18 ("McGee has completed training in the use of

17

the LVNR," but deputy McGee misapplied the LVNR); *id.* at 23 (stating his opinion that "the use

18

of the lateral vascular neck restraint by McGee for an excessive duration and at a time when he

19

was unable to properly position himself *pursuant to his training* was inappropriate and reckless."

20

(emphasis added)); *cf. City of Canton*, 489 U.S. at 386 (noting that Section 1983 does not permit

21

respondeat superior liability or vicarious liability for municipal governments).  In the portion of

22
23
24

the report that discusses the duration of the LVNR,[6] Dr. Harmering said nothing about the County's training about LVNR duration, only that deputy McGee applied the LVNR for an unreasonably dangerous duration. *See generally id.* at 18–19, 23.  Plaintiffs have thus provided no evidence that the County's training program was, in fact, deficient.

But even if Plaintiffs could rely on the study to show that the LVNR duration was unreasonable, and even if the Plaintiffs could establish that the County's LVNR training could be improved in some way, Plaintiffs' claim would still fail.  This is because Plaintiffs have not shown that the County exhibited "deliberate[] indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388.  Plaintiffs have not pointed to a "pattern" of constitutional violations, which is "ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (citation and quotation marks omitted).  They have not shown, for example, that any shortcoming in the County's training about LVNRs routinely led to constitutional violations, or that deputy sheriffs of Snohomish County regularly use such tactics.  Nor have they shown that any purported deficiencies in the County's training program were so "patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64.  Ultimately, establishing municipal liability—particularly on a failure to train theory—poses a very high bar. *See Connick*, 563 U.S. at 61 (noting that the deliberate indifference standard creates a "stringent standard").  Plaintiffs have not cleared that high bar here.[7]

---

[6] In their brief, Plaintiffs clarify that they challenge only the adequacy of the County's training about the proper duration of an LVNR.  They do not challenge the County's training about the appropriateness of the LVNR generally and "whether it was properly applied throughout the encounter." Dkt. # 110 at 3.  With respect to those issues, Plaintiffs state that Dr. Harmening opined only "that McGee's conduct was inconsistent with his training on when and how to administer an LVNR," *id.*, not that the training itself was inadequate.

[7] The County also asks the Court for judgment in its favor on the failure-to-train claims because the deputies' use of force was reasonable under the circumstances, and thus there was no constitutional

As a final note, the County observes in its reply brief that the LVNR-based theory put forward by Plaintiffs in their response to the motion for summary judgment departs from the theory outlined in the complaint, which focuses exclusively on the County's alleged failure to train the deputies about proper use of their tasers. *See* Dkt. # 50 at 11–12 (discussing the County's alleged failure to train the deputies about tasers). If a plaintiff wishes to rely on an unpled theory at summary judgment, a plaintiff must either amend their complaint to include the theory or "make known during discovery their intention to pursue" this new theory. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000). Plaintiffs do not appear to have provided such notice of their intent to pursue a new theory. But because Plaintiffs have not had an opportunity to respond to this argument. And because the Court has resolved the *Monell* claim on the merits, the Court declines to evaluate this argument.[8]

2.   Deprivation of Ms. Duncan's Right to Companionship through the County's Alleged Failure to Train

Ms. Duncan asserts a claim for violation of her "right to companionship of her son through failure to train." Dkt. # 50 at 13. Based on the due process clause, the Ninth Circuit recognizes that "a parent has a fundamental liberty interest in the companionship and society of his or her child and that [t]he state's interference with that liberty interest without due process of law is remediable under [42 U.S.C. §] 1983." *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) (citation and quotation marks omitted) (alterations in original).

---

violation. Dkt. # 75 at 14–17. *See Long v. City & Cnty. of Honolulu*, 511 F.3d 901, 907 (9th Cir. 2007) ("If no constitutional violation occurred, the municipality cannot be held liable."). But there are countless factual disputes that preclude such a conclusion. Most importantly, the parties vigorously dispute the seriousness of the amount of force used and the extent to which Mr. Dold resisted arrest. This, in turn, bears on the reasonableness of the force used by the deputies in response. Thus, the Court declines to grant summary judgment on this basis.

[8] In its reply brief, the County seems to request that the Court strike Dr. Harmening's report as inadmissible because it was submitted after the expert report deadline. Dkt. # 119 at 4–5. Plaintiffs have not had an opportunity to respond to the County's admissibility argument. Because the Court has addressed the *Monell* claim on the merits, it makes no decision about the admissibility of the report. And

1

2

3

4

This claim is derivative of Plaintiffs' broader failure to train claim against the County. As discussed above, the County is entitled to summary judgment on that claim. Accordingly, the Court grants the County's motion for summary judgment as to Ms. Duncan's "right to companionship" claim based on the County's alleged failure to train.

5

E.      Negligent Retention Claim

6

7

8

9

10

11

Plaintiffs assert a state-law claim against the County for its negligent retention of deputy McGee. The parties have cross-moved for partial summary judgment as to the negligent retention claim. Dkt. # 58 (Plaintiffs' motion); Dkt. # 75 (County's motion). The Court previously dismissed Ms. Dold's negligent retention claim because she failed to file a claim form as required under Washington law. *See* Dkt. # 39 at 9. But Ms. Duncan's negligent retention claim is still in play.[9]

12

13

The Court denies both motions for summary judgment. There are numerous disputes of fact remaining, and the public duty doctrine does not bar the claim.

14

1.      Negligent Retention Standard

15

16

17

18

The Washington state legislature abolished state sovereign immunity in 1961 and did the same for its political subdivisions in 1967. *Cummins v. Lewis Cnty.*, 156 Wash. 2d 844, 862, 133 P.3d 458 (2006) (Chambers, J., concurring). Under Washington law, a local government is liable in tort "to the same extent as if [it] were a private person or corporation." RCW 4.96.010(1).

19

20

21

22

A negligent retention claim holds an employer liable when the employer negligently elects to retain an employee and the employee then commits a wrongful act. To succeed on a negligent retention claim, "a plaintiff must show that the employer had knowledge of the employee's unfitness or failed to exercise reasonable care to discover unfitness before

23

24

---

[9] No party meaningfully addresses this claim specifically in reference to Ms. Duncan, instead briefing the claim as to "Plaintiffs," collectively.

1    . . . retaining the employee." *Anderson v. Soap Lake Sch. Dist.*, 191 Wash. 2d 343, 356, 423

2    P.3d 197 (2018) (citation omitted). The plaintiff must also show the employer's retention of the

3    employee was a proximate cause of the plaintiff's injuries. *Carlsen v. Wackenhut Corp.*, 73

4    Wash. App. 247, 252–53, 868 P.2d 882 (1994).

5          2.     Disputes of Material Fact

6          Plaintiffs argue that the County was negligent in retaining deputy McGee.  Dkt. # 58.

7    According to Plaintiffs, deputy McGee has a history of conduct showing that he was unfit to

8    serve as a deputy.  First, Plaintiffs allege that deputy McGee failed to create a report after an

9    individual reported the potential rape of a child.  *Id.* at 3–4.  Second, Plaintiffs allege that deputy

10   McGee was involved in a 2010 encounter that resulted in the death of an individual, Adam

11   Colliers; deputy McGee repeatedly deployed his taser and applied other forms of force in an

12   attempt to control Mr. Collier, ultimately leading to his death.  *Id.* 5–10.  Plaintiffs also identify

13   several other incidents involving deputy McGee, along with evidence that the County took

14   efforts to protect deputy McGee from the consequences of his actions.  *See generally id.*

15   Plaintiffs argue that no reasonable law enforcement agency would have retained deputy McGee

16   after these incidents.  *Id.* at 18.  And if Snohomish County had fired McGee after any of these

17   incidents, Plaintiffs say, Mr. Dold may not have died.  *Id.*

18         The County counters that deputy McGee's alleged failure to submit a report for the child

19   rape incident is not "sufficient to establish Deputy McGee was unfit."  Dkt. # 97 at 13.

20   Similarly, the County argues that the only evidence introduced regarding the Adam Colliers

21   incident is that "the event occurred."  *Id.* at 14.  The evidence does not, the County says,

22   establish that deputy McGee acted improperly, or that "the County had knowledge McGee was

23   unfit to be an officer."  *Id.*  The County makes similar arguments about the other evidence

24   identified by Plaintiffs.

The descriptions of the facts relied on by each party illustrate the numerous disputes of material fact that must be resolved by a jury.  For example, a jury must resolve whether a reasonable law enforcement agency would have retained deputy McGee after the Colliers incident, the failure-to-report incident, and the other events cited by Plaintiffs.  While breach of a legal duty (that is, whether a defendant was negligent) can be resolved on summary judgment when "reasonable minds could not differ" as to whether the defendant's conduct was negligent, "breach . . . [is] generally [a] question[] of fact for the jury."  *Briggs v. Pacificorp*, 120 Wash. App. 319, 322–23, 85 P.3d 369 (2003).  Here, a reasonable jury could arrive at different conclusions about whether the County's retention of deputy McGee was negligent.  Disputes of material fact preclude summary judgment for either party.

3.      Public Duty Doctrine

The County argues that the negligent retention claim is barred by the "public duty doctrine."  Dkt. ## 75 at 19–21; 119 at 9–12.  The Court disagrees.

 "The public duty doctrine stands for a basic tenet of common law: 'A cause of action for negligence will not lie unless the defendant owes a duty of care to [the] plaintiff.'"  *Ehrhart v. King Cnty.*, 195 Wash. 2d 388, 398, 460 P.3d 612, 618 (2020) (quoting *Chambers-Castanes v. King Cnty*, 100 Wash.2d 275, 284, 669 P.2d 451 (1983)).  "To establish a duty in tort against a governmental entity, a plaintiff must show that the duty breached was owed to an individual and was not merely a general obligation owed to the public."  *Beltran-Serrano v. City of Tacoma*, 193 Wash. 2d 537, 549, 442 P.3d 608 (2019).  The doctrine "recognizes that governments, unlike private persons, are tasked with duties that are not actionable duties within the meaning of tort law."  *Id*.  "The public duty doctrine guides a court's analysis of whether a duty exists that can sustain a claim against the government in tort."  *Ehrhart*, 195 Wash. 2d at 398.

The public duty doctrine has spawned confusion in both federal courts and the lower courts of Washington. *See Cummins*, 156 Wash. 2d. at 861 ("[T]he public duty doctrine is now regularly misunderstood and misapplied.") (Chambers, J., concurring). But as Justice Chambers explained in his concurrence in *Munich v. Skagit Emergency Communications Center*,[10] the doctrine typically does *not* eliminate a government actor's duty if that duty is based in common law: "[T]he only governmental duties we have limited by application of the public duty doctrine are duties imposed by a *statute, ordinance, or regulation*. This court has never held that a government did not have a *common law* duty solely because of the public duty doctrine." 175 Wash.2d 871, 886–87, 288 P.3d 328 (2012) (Chambers, J., concurring) (emphasis added). "Because the legislature ha[s] declared that governments [are] to be liable for their tortious conduct just like private persons or corporations, the public duty doctrine [is] not applied to duties that governments ha[ve] in common with private persons." *Munich*, 175 Wash. 2d at 888 (Chambers, J., concurring). Instead, the Washington Supreme Court has "recognized that the public duty doctrine comes into play when special governmental obligations are imposed by *statute or ordinance*." *Beltran-Serrano*, 193 Wash. 2d at 549–50 (emphasis added); *see also GRB v. City of Spokane*, No. 2:18-CV-264-RMP, 2019 WL 289812, at *4 (E.D. Wash. Jan. 22, 2019) ("[T]he public duty doctrine does not apply to common law negligence claims; it only applies to duties arising from statutes.").

This makes sense. When a statute or ordinance imposes a duty on government actors, the public does not generally share that duty. In such circumstances, the public duty doctrine steps in to ensure that a government is liable in tort "to the *same* extent as if [it] were a private person or corporation," RCW 4.96.010(1) (emphasis added), but no *more* than a private person or

---

[10] "Justice Chambers's concurring opinion [in *Munich*] is precedential because it received five votes from justices who also signed the majority opinion." *Beltran-Serrano*, 193 Wash. 2d at 550 n.8.

corporation.  Indeed, "[t]he central purpose behind the public duty doctrine is to ensure that governments do not bear greater tort liability than private actors."  *Beltran-Serrano*, 193 Wash. 2d at 549.  Applying the public duty doctrine to cover all common law duties "would inappropriately lead to a partial restoration of immunity by carving out an exception to ordinary tort liability for governmental entities."  *Id.* at 550.

Here, Plaintiffs assert a common law claim based on the County's negligent retention of one of its employees, deputy McGee.  The tort imposes a duty on an employer for negligently deciding to retain an employee who then commits a wrongful act.  This is not a duty imposed by statute or ordinance; nor is it one imposed exclusively on government actors.  It is a general, common law duty shared by every employer: Like other employers, the County has a common law duty to ensure that it reasonably selects its employees.  *See, e.g.*, *Betty Y. v. Al-Hellou*, 988 P.2d 1031, 1032–33 (Wash. Ct. App. 1999) (evaluating a negligent retention claim brought against a private employer); *GRB*, 2019 WL 289812, at *5 ("The determination of whether the public duty doctrine bars a negligence claim turns on whether the duty which the plaintiff claims the government defendant breached is one that a non-government person or entity could be liable for as well."); *Mita v. Guardsmark*, LLC, 182 Wash. App. 76, 84, 328 P.3d 962, 966 (2014) ("[T]he public duty doctrine does not apply where, as here, a plaintiff alleges the public entity breached a common law duty it shares in common with private entities.").  And like private employers, the County can be held liable when its negligent workforce management leads to harm.  Because Plaintiffs assert a common law negligent retention claim that includes a duty imposed on the government and the public alike, the claim is not barred by the public duty doctrine.  *See GRB*, 2019 WL 289812, at *6 ("Because negligent hiring and training are two

duties that private persons and entities hold to other members of the public, the City of Spokane is held to that duty as well.").[11]

The Washington Supreme Court's recent decision in *Beltran-Serrano v. City of Tacoma* is instructive.  In that case, the court held that the public duty doctrine did not bar a negligence claim against law enforcement officers based on their handling of an interaction that led to the use lethal force.  The court reasoned that this presented a common law claim based on a common law duty: "At common law, every individual owes a duty of reasonable care to refrain from causing foreseeable harm in interactions with others."  *Id.* at 551.  In light of the nature of the claim and the fact that the officer had an "affirmative interaction" with the plaintiff, the court held that "[t]he City therefore owed Beltran-Serrano a duty in tort to exercise reasonable care." *Id.* at 551–52.

The County correctly notes that the court in *Beltran-Serrano* declined to address the application of the public duty doctrine to the plaintiff's "negligence theory based on the City's training and supervision of its employees," instead leaving that question for the superior court on remand.  *Id.* at 543 n.3.  But it declined to address that question only because of the "the separate certification order framing the issue for review does not reference th[ese] negligence claims."  *Id.* To the extent that these other claims also arise out of a general common law duty applicable to the public, the Court believes that the logic of *Beltran-Serrano* would similarly apply to other

---

[11] The County cites several federal district court cases applying the public duty doctrine to bar negligent retention claims.  *See, e.g.*, *Shope v. City of Lynnwood*, 2011 WL 1154447, at *6 (W.D. Wash. Mar. 28, 2011); *Dowell v. City of Lynnwood*, No. C06-1240-JCC, 2007 WL 4365793, at *7 (W.D. Wash. Dec. 11, 2007); Dkt. # 119 at 10–12.  But most of these decisions predate the Washington Supreme Court's more recent public duty case law (including *Beltran-Serrano* and Justice Chambers's concurrence in *Munich*), in which the court has emphasized that common law duties shared by all members of the public are generally not barred by the public duty doctrine.  In any event, these decisions are not binding on this Court's interpretation of Washington state law.

theories of negligence based on a local government's supervision of its employees and workforce.

Accordingly, the Court holds that the public duty doctrine does not bar the negligent retention claim. And because there are numerous disputes of material fact about whether the County negligently retained deputy McGee, the Court denies both Plaintiffs' and the County's motions for summary judgment on this claim.

F.      Wrongful Death Claim

The deputies' motion for summary judgment seeks summary judgment for the wrongful claims. Dkt. # 67 at 18–24. They argue, among other things, that Plaintiffs' expert witness failed to provide a factual basis for his opinion that the Deputies caused Mr. Dold's death, and that Washington law provides immunity (i.e., state law qualified immunity) for officers who respond in good faith to a domestic violence incident. *Id.*

The Court has already dismissed these claims. The Court previously held that Ms. Dold's wrongful death claim is barred because she did not file a claim form, a statutory prerequisite to a wrongful death claim against a government or government employee under Washington law. *See* Dkt. # 39 (dismissing the claims as to the County); Dkt. # 132 (dismissing the claims as to the individual deputies). The Court also concluded that Ms. Duncan's wrongful death claim is barred because she lacks standing. *See* Dkt. # 39.

Therefore, the deputies' motion as to the wrongful death claim is moot.

**IV**

**CONCLUSION**

For the reasons above, and as set forth in the Court's previous order (Dkt. # 134), the Court rules as follows:

(1)  Plaintiffs' Motion for Partial Summary Judgment on the Negligent Retention Claim, Dkt. # 58, is DENIED.

(2)  Plaintiffs' Motion for Partial Summary Judgment on Causation and Color of Law Elements of the Excessive Force Claim, Dkt. # 61, is GRANTED in part and DENIED in part.

(3)  Plaintiffs' Motion for Partial Summary Judgment on the Warrantless Entry Claim, Dkt. # 63, is DENIED.

(4)  The deputies' Motion for Summary Judgment, Dkt. # 67, is GRANTED in part and DENIED in part as moot.

(5)  The County's Motion for Summary Judgment, Dkt. # 75, is GRANTED in part and DENIED in part.

   Dated this 29th day of December, 2022.

John H. Chun
United States District Judge