1
2
3
4
5
6                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
7                            AT SEATTLE

8   JENNIFER DOLD, ET AL.,                    CASE NO. 2:20-cv-00383-JHC

9                      Plaintiffs,            ORDER RE: MOTIONS FOR
                                              RECONSIDERATION AND MOTION TO
10            v.                              BIFURCATE

11  SNOHOMISH COUNTY, ET AL.,

12                     Defendants.

13

14
                                   I
15
                             INTRODUCTION
16
           Pending before the Court are three motions: (1) Snohomish County's motion for
17
    reconsideration on the negligent retention claim (Dkt. # 137), and (2) Plaintiffs' motion for
18
    reconsideration on their warrantless entry claim (Dkt. # 141), and (3) Defendants' motion to
19
    bifurcate (Dkt. # 139).  The motions for reconsideration ask the Court to reconsider its
20
    conclusions in its previous order (Dkt. # 134) and accompanying memorandum opinion (Dkt.
21
    # 135).[1]
22

23          [1] Motions for reconsideration are "disfavored," and the Court "will ordinarily deny such motions
    in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal
24

ORDER RE: MOTIONS FOR RECONSIDERATION AND MOTION TO BIFURCATE - 1

1    For the reasons below, the Court DENIES the three motions.

2                                          II

3                                     DISCUSSION

4    A.    Motion for Reconsideration of the Negligent Retention Claim

5           The County asks the Court to reconsider its earlier ruling denying its summary judgment

6    motion on the negligent retention claim.  Dkt. # 137.  The County's motion for reconsideration

7    makes two arguments.  First, the County argues that the Court failed to recognize that a negligent

8    retention claim requires that the employee's wrongful conduct occur "outside the scope of

9    employment."  Second, the County challenges the admissibility of the evidence relied on by

10   Plaintiffs to create a genuine dispute of material fact.

11          1.      "Scope of Employment" Issue

12          The County primarily contends that the Court ignored a mandatory element of a negligent

13   retention claim.  The County argues that under Washington law, a plaintiff asserting a negligent

14   retention claim must show that the employee was acting "outside the scope of his employment"

15   when they committed the wrongful act that harmed the plaintiff.  The Court rejects this

16   argument.

17          As a federal court considering a question of state law, "we are bound to follow the

18   decisions of the state's highest court."  *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th

19   885, 889 (9th Cir. 2021) (quoting *Diaz v. Kubler Corp.*, 785 F.3d 1326, 1329 (9th Cir. 2015)).

20   "[W]hen the state supreme court has not spoken on an issue, we must determine what result the

21   court would reach based on state appellate court opinions, statutes and treatises."  *Id.* (quoting

22

23   ───────────────────────
     authority which could not have been brought to its attention earlier with reasonable diligence."  LCR

24   7(h)(1).

ORDER RE: MOTIONS FOR RECONSIDERATION AND MOTION TO BIFURCATE - 2

*Diaz*, 785 F.3d at 1329).  While "we look to intermediate appellate courts for guidance, . . . we are not bound by them if we believe that the state supreme court would decide otherwise." *Radcliffe v. Hernandez*, 818 F.3d 537, 543 (9th Cir. 2016); *see also Miller v. County of Santa Cruz,* 39 F.3d 1030, 1036 n.5 (9th Cir. 1994) ("A state appellate court's announcement of a rule of law is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and quotation marks omitted)).

As described in the Court's prior order, a negligent retention claim holds an employer liable when the employer negligently elects to retain an employee and the employee then commits a wrongful act.  To succeed on a negligent retention claim, "a plaintiff must show that the employer had knowledge of the employee's unfitness or failed to exercise reasonable care to discover unfitness before . . . retaining the employee." *Anderson v. Soap Lake Sch. Dist.*, 191 Wash. 2d 343, 356, 423 P.3d 197 (2018) (citation omitted).  The plaintiff must also show the employer's retention of the employee was a proximate cause of the plaintiff's injuries.  *Carlsen v. Wackenhut Corp.*, 73 Wash. App. 247, 252–53, 868 P.2d 882 (1994).  "The difference between negligent hiring and negligent retention is timing.  Negligent hiring occurs at the time of hiring, while negligent retention occurs during the course of employment." *Anderson*, 191 Wash. 2d at 356 (citations omitted).  These causes of actions "are based on the concept that the employer's *own* negligence is a wrong to the injured party, independent from the employer's liability for its employee's negligence imputed by the doctrine of respondeat superior." *Evans v. Tacoma Sch. Dist. No. 10*, 195 Wash. App. 25, 47, 380 P.3d 553 (2016).

The County directs the Court's attention to a recent Washington Court of Appeals decision, *Hicks v. Klickitat County Sheriff's Off.*, 23 Wash. App. 2d 236, 515 P.3d 556 (2022).  There, a plaintiff sued the Department of Social and Health Services for its negligent retention of

a social worker, Shirley DeArmond.  *Id.* at 238. The plaintiff alleged that DeArmond negligently investigated a child abuse report.  *Id.*  On appeal, the Court of Appeals dismissed the negligent retention claim.  The court observed that "[n]egligent retention claims generally arise when an employee is acting outside the scope of their employment."  *Id.* at 248 (citing *Evans*, 195 Wash. App. at 47).  And "[b]ecause Hicks has failed to allege facts that show DeArmond acted outside the scope of employment, Hicks' negligent retention claim fails as a matter of law."  *Id.*

The Court acknowledges that some intermediate appellate courts in Washington (like the *Hicks* court) have imposed an "outside the scope of employment" requirement in negligent retention cases.  But this Court must determine how the Washington Supreme Court would decide the question.  And while "we look to intermediate appellate courts for guidance, . . . we are not bound by them if we believe that the state supreme court would decide otherwise." *Radcliffe*, 818 F.3d at 543.  The Court believes that *Hicks* answered a different question than the one presented here.  Unlike in *Hicks*, there is no direct negligence claim that could give rise to vicarious liability against the County.  Under such circumstances, the Court believes that the Washington Supreme Court would not adopt a "scope of employment" requirement for negligent retention claims, at least in cases where there is no remaining claim for vicarious liability.

First, the Washington Supreme Court has never mentioned a "scope of employment" requirement for negligent retention claims.  In 2018, the Washington Supreme Court decided *Anderson v. Soap Lake School District*.  191 Wash. 2d 343.  In *Anderson*, the Court noted that "[t]his court has not yet adopted a test for negligent hiring and/or retention of an employee."  *Id.* at 356.  It then "adopt[ed] the test used by the Courts of Appeals: to hold an employer liable for negligently hiring or retaining an employee who is incompetent or unfit, a plaintiff must show that the employer had knowledge of the employee's unfitness or failed to exercise reasonable care to discover unfitness before hiring or retaining the employee."  *Id.*

Notably, the test adopted in *Anderson does not* require that the employee's conduct occur outside the scope of employment.  Nor is this omission attributable to oversight.  In the next section of the decision, the court considered claims for "negligent training and supervision."  *Id.* at 360–63.  And for those claims, the Court carefully analyzed whether negligent training and supervision claims require that the employee acted outside the scope of employment when committing the wrongful act.  *Id.*  Reading *Anderson* as a whole, the most reasonable inference is that the Washington Supreme Court would not adopt an "outside the scope of employment" requirement for negligent retention claims.

Second, the Washington Supreme Court in *Anderson* favorably cited the Second Restatement of Torts when discussing the standard for negligent hiring and retention: "It is negligence to use an instrumentality, whether a human being or a thing, which the actor knows or should know to be so incompetent, inappropriate, or defective, that its use involves an unreasonable risk of harm to others."  Restatement (Second) of Torts § 307 (1965); *see also Anderson*, 191 Wash. 2d at 356.  The Restatement then provides the following illustration:

> A, the proprietor of an apartment house, employs as janitor B, a man whom A knows to be of an exceedingly fiery and violent temper.  C, one of A's tenants, complains to B in regard to lack of heat.  B becomes violently angry and attacks and harms C.  *Irrespective of whether B's act is within the course of his employment as janitor*, A is negligent toward C.

Restatement (Second) of Torts § 307 cmt. a, illus. 1 (1965) (emphasis added).  If *Anderson* is read to endorse the rule found in the Second Restatement of Torts, then it is unlikely that the Washington Supreme Court would adopt a "scope of employment" requirement, at least in this case.  *See Mudpie*, 15 F.4th at 889 (looking to treatises to determine how a state's highest court would resolve a legal question).

Third, the *Hicks* court turned a descriptive statement into mandatory rule.  The *Hicks* court stated that "[n]egligent retention claims *generally* arise when an employee is acting outside

the scope of their employment." 23 Wash. App. 2d at 248 (emphasis added).  In dismissing the negligent retention claim because the employee was acting outside the scope of employment, the *Hicks* court appears to have transformed this qualified statement into an exceptionless rule.

Fourth, and perhaps most importantly, the apparent justification for a "scope of employment" requirement does not apply here.  The *Hicks* court explained that when an employee commits tortious conduct *within* the scope of employment, an employer can be held liable under a different theory: vicarious liability or respondeat superior liability.  23 Wash. App. 2d at 248 n.9.  The court explained that "[u]nder the doctrine of respondeat superior, an employer can be vicariously liable for its employee's torts committed *within* the scope of employment. . . . An injured party generally cannot assert negligent retention claims when the employer is vicariously liable for the employee's conduct."  *Id*.  The *Hicks* court apparently believed that a negligent retention claim is unnecessary when an employee's tortious conduct occurs within the scope of employment because the plaintiff would always have another path to recovery (and a less onerous one, at that) under the doctrine of respondeat superior.

Courts have explained that any "scope of employment" requirement is justified by concerns about "redundant" causes of action: If a defendant is vicariously liable under a respondeat superior theory for acts within the scope of employment, there is no need to separately impose liability on a negligent retention theory.  In *LaPlant v. Snohomish County*, 162 Wash. App. 476, 271 P.3d 254 (2011), the Court of Appeals concluded that any recovery based on a negligent retention theory would be "superfluous" because "the County agreed that it would be vicariously liable for any negligence on the part of the deputies."  *Id.* at 257 (emphasis added). In *Schiro v. Boyne USA, Inc.*, 21 Wash. App. 2d 1024, 2022 WL 782372 (2022), the Court noted in dicta that it "question[s] the purpose of allowing a negligent hiring or retention claim to go forward when the employer concedes any alleged act was within the scope of the employment

because this creates essentially duplicative claims." *Id.* at *6 n.2; *see also id.* (rejecting plaintiff's argument because she "failed . . . to provide an example of when an employer might be liable under a negligent hiring or retention claim but not a vicarious liability claim, even when the employer has admitted the employee was acting within the scope of employment").  In *Gilliam v. Department of Social & Health Services, Child Protective Services*, 89 Wash. App. 569, 950 P.2d 20 (1998), the court concluded that "a cause of action for negligent supervision is redundant" because "the State acknowledged Morrow was acting within the scope of her employment, and that the State would be vicariously liable for her conduct." *Id.* at 585.  And in *Tubar v. Clift*, No. C05-1154-JCC, 2008 WL 5142932 (W.D. Wash. Dec. 5, 2008), a court in this District permitted a negligent retention claim to proceed against an employer for conduct within the scope of employment.  The court concluded that there would be "no such redundancy [of causes of action] because Plaintiff has not asserted a negligence claim against Officer Clift for which the City would be vicariously liable by admission." *Id.* at *7.

Here, there is no direct negligence claim against the deputies that could give rise to the County's vicarious liability.  The Court previously dismissed Ms. Duncan's direct negligence/wrongful death claim for lack of standing.[2]  Dkt. # 39 at 8–9.[3]  And the Estate's state-law claims were dismissed for failure to file a claim form as required by Washington law.  *See id.* at 3–7.  The only remaining cause of action against the County, then, is for negligent retention.  There is no risk of "redundant" or "superfluous" causes of action.  When, as here, for one reason or another, vicarious liability is unavailable and the only remaining cause of action against an employer is based on negligent retention, the Court believes that the Washington

---

[2] No party has challenged Ms. Duncan's standing to bring a negligent retention claim.
[3] This case was previously assigned to the Honorable Richard A. Jones before reassignment to the undersigned judge in April 2022.

Supreme Court would not foreclose a negligent retention claim based on a "scope of employment" requirement.

    2.    Evidentiary Objections

    The County argues that various documents used to support Plaintiffs' negligent retention claim should be stricken or disregarded.  These objections fall into two categories: (1) objections to Dr. Harmening's opinions based on his purported failure to comply with the expert report rules found in Federal Rule of Civil Procedure 26, and (2) objections to the admissibility of various other documents, primarily based on concerns of hearsay.

        a.    Dr. Harmening's Report

    The County argues (Dkt. # 97 at 6–9) that Dr. Harmening's "supplemental" declaration— attached to Plaintiffs' motion for summary judgment (Dkt. # 60)—should be stricken. According to the County, the declaration seeks to incorporate new opinions that were not disclosed in Dr. Harmening's initial expert report.  *See* Dkt. # 98-2 (Dr. Harmening's original expert report); Fed. R. Civ. P. 26(a)(2) (requiring that the expert report contain "a complete statement of all opinions the witness will express and the basis and reasons for them").  The County argues that this declaration is not a "supplement" to the original expert report under Rule 26(e), and the expert report deadline passed before Dr. Harmening's more recent declaration. Thus, the County says, the new opinions should be excluded under Rule 37(c)(1).  *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed.").

    The Court agrees in part with the County.  Dr. Harmening's initial expert report did not mention the Biondi "child rape" incident in any form.  The first time that Dr. Harmening opined about the Biondi incident (and its bearing on the County's alleged negligence for retaining

deputy McGee) was in his declaration attached to Plaintiffs' summary judgment motion, submitted after the expert report deadline.  Plaintiffs do not plausibly assert that the omission was "substantially justified" or "harmless."  Fed. R. Civ. P. 37(c)(1); *Yeti by Molly, Ltd.*, 259 F.3d at 1106.  Nor can Plaintiffs characterize this declaration as a "supplement" to circumvent the requirements of Rule 26.  *See Luke v. Family Care & Urgent Med. Clinic*, 323 F. App'x 496, 500 (9th Cir. 2009).  Accordingly, the Court does not consider Dr. Harmening's statements about the Biondi incident.

Similarly, Dr. Harmening's initial report did not opine that the County was negligent in retaining deputy McGee.  The report says nothing about negligent retention or the County's employment practices.  This omission was not substantially justified or harmless.  Accordingly, the Court does not consider any opinion by Dr. Harmening about whether the County negligently retained deputy McGee.

But Dr. Harmening's initial report *did* discuss the Colliers incident.  *See* Dkt. # 98-2 at 22.  Dr. Harmening summarized the Colliers incident and noted that deputy McGee's conduct toward Mr. Dold was "similar" to his conduct in the Colliers incident.  *Id.*  Dr. Harmening noted concern that after "reviewing McGee's personnel file, [he] was able to find no evidence of McGee being disciplined or ordered to undergo remedial training."  *Id.*  He also noted that the "District Attorney" requested that deputy McGee receive additional taser training, and that "[i]t is highly unusual for a prosecutor to request specific training," perhaps indicating "concern" about deputy McGee's handling of the Colliers incident.  *Id.*  And during the deposition of Dr. Harmening, the County questioned Dr. Harmening extensively about his conclusions from the Colliers incident.  *See, e.g.*, Dkt. # 76 at 151–64.  The County should not be surprised that Dr. Harmening would opine about the Colliers incident and any similarities to this case.  Construing this evidence and reasonable inferences therefrom in the light most favorable to Plaintiffs, a

reasonable jury could rely on this information (along with other evidence) to conclude that the County was on notice of deputy McGee's unfitness and that the Colliers incident rendered deputy McGee unfit.

            b.         Other Documents

In their response to Plaintiffs' motion for partial summary judgment, Snohomish County argued that the Court should "strike or disregard" the materials contained in Appendices A-K and N of the Lobsenz Declaration. Dkt. # 97 at 9–10. Snohomish County gave two reasons for this request. First, Snohomish County said that Plaintiffs "never produced or identified these materials, despite the County's [] discovery requests." *Id.* at 9. Second, Snohomish County said that "even if the documents had been properly disclosed, they contain multiple levels of inadmissible hearsay." *Id.* at 10.

The County's first objection is baseless. The documents attached to the Lobsenz Declaration were themselves produced by Snohomish County *to Plaintiffs* during discovery. *See* Dkt. # 102 at 7–8. Snohomish County was on notice of the existence of the documents and could have expected that Plaintiffs might rely on them during litigation.

The County's hearsay objections require more careful consideration. At summary judgment, a court may consider evidence only if it is "admissible at trial." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). For purposes of summary judgment, admissibility at trial depends not on the evidence's *form*, but on its *content. See id.* ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."); *Block v. City of L.A.*, 253 F.3d 410, 418–19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."). So long as the evidence "could be presented in an admissible form at

ORDER RE: MOTIONS FOR RECONSIDERATION AND MOTION TO BIFURCATE - 10

trial," a court can consider the evidence, even if there are hearsay or best-evidence-rule objections. *Fraser*, 342 F.3d at 1036.

The Court first addresses the "Bales Memorandum," in which Captain David Bales requested that Undersheriff Tom Davis investigate deputy McGee. *See* Dkt. # 59 at 7. The memorandum states that Captain Bales received a complaint from Nicola Biondi alleging that deputy McGee failed to "take a report" after Ms. Biondi submitted an allegation that her daughter had been raped. *Id.* And while deputy McGee initially told a detective that he took a statement but was not sure that he had written a report, McGee later told the detective that he was not sure if he had taken a statement and did not take a report because the incident happened in another County. *Id.* Captain Bales concluded that "[t]he issue of not filing a report is only one concern. Another is the appearance of 'changing his story' and the apparent loss of the written statement." *Id.*

The Court concludes that it may consider this evidence at summary judgment. First, Plaintiffs suggest that the memorandum is not hearsay because it is being used not to prove the truth of the matter asserted, but to show the effect on the listener: that Snohomish County knew about allegations of wrongdoing long before the incident with Mr. Dold. *See L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935 (9th Cir. 2002) ("Out-of-court declarations introduced to show the effect on the listener are not hearsay."); Dkt. # 145 at 11 n.14. But even if the document itself is inadmissible hearsay, the Court focuses on the admissibility of the document's contents, not its form. *Fraser*, 342 F.3d at 1036. This information could be presented in an admissible form at trial through the testimony of Captain Bales (or the detective tasked with investigation). The memorandum contains conclusions within the personal knowledge of Captain Bales (e.g., that deputy McGee apparently submitted different versions of his story). *See id.* ("The contents of the diary are mere recitations of events within Fraser's personal knowledge

and, depending on the circumstances, could be admitted into evidence at trial in a variety of ways.  Fraser could testify to all the relevant portions of the diary from her personal knowledge."); *see also id.* (listing other ways a diary could be admitted at trial).  To be sure, the Bales memorandum only requests an investigation and does not make a final determination of wrongdoing.  But Captain Bales preliminarily concluded, based on the evidence presented to him, that deputy McGee erred by failing to file a report and by changing his story.  Viewing the evidence and reasonable inferences therefrom in the light most favorable to Plaintiffs, a reasonable jury could draw from this that, absent a subsequent report clearing deputy McGee of wrongdoing, it would have been negligent to retain deputy McGee.

Similarly, some of the content of the memorandum issued by Jeffrey L. Miller may be presented in an admissible form at trial.  Dkt. # 59 at 9.  Even if the memorandum itself is inadmissible, and even if the memorandum's statements about what Jeffrey Miller heard would be hearsay, Jeffrey Miller made several conclusions within his personal knowledge (e.g., that deputy McGee's "failure to report a rape of a child" "led to complications for prosecution who had to drop charges against the suspect," and that there were "questions about Deputy McGee's honesty").  *Id.*  He could testify directly to those conclusions.  *Fraser*, 342 F.3d at 1036.  Again, a reasonable jury could conclude that, given the seriousness of the allegations, the County was negligent in retaining McGee absent a subsequent report clearing deputy McGee of wrongdoing.

The County did not raise any specific evidentiary objection to documents establishing facts about the Adam Colliers incident.  *See* Dkt. # 97 at 14–15.  In any event, deputy McGee confirmed many of the critical facts about what happened during that incident, and those statements are admissible as statements of a party-opponent.  Fed. R. Evid. 801(d)(2).  And Dr. Harmening could rely on evidence that "experts in the particular field would reasonably rely on . . . in forming an opinion on the subject," even if that evidence is not otherwise admissible.  Fed.

R. Evid. 703.  The Colliers incident bears many similarities to the incident at issue here.  If a jury concludes that the deputies used excessive force against Mr. Dold, a reasonable jury could also conclude that deputy McGee used excessive force or behaved inappropriately in the Colliers incident.  And from this, a reasonable jury could conclude that the County was negligent in retaining deputy McGee.

B.     Motion for Reconsideration of the Warrantless Entry Claim

Plaintiffs ask the Court to reconsider its decision on the warrantless entry claim.  Dkt. # 141.  The Court previously concluded that the deputies were entitled to qualified immunity: Even if the deputies' conduct violated the Fourth Amendment, it was not clearly established that warrantless entry under these circumstances would be unconstitutional.  Dkt. # 135 at 11–26.  The Court denies Plaintiffs' motion for reconsideration.

Plaintiffs' motion primarily contends that the Court's previous decision ignored the "imminence" requirement embedded in the exigent circumstances and emergency aid exceptions to the warrant requirement.  *See, e.g.*, *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from *imminent* injury." (emphasis added)); *Bonivert v. City of Clarkston*, 883 F.3d 865, 877 (9th Cir. 2018) ("[A]ll of our decisions involving a police response to reports of domestic violence have required an objectively reasonable basis for believing that an actual or imminent injury was unfolding in the place to be entered.").

The Court agrees with Plaintiffs that warrantless entry is justified by the exigent circumstances and emergency aid exceptions only when there is an imminent or immediate threat to a person's safety or wellbeing.  The Court also agrees that this requirement was clearly established in law when the deputies entered the home on March 21, 2017.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

But as the Court understands Supreme Court and Ninth Circuit case law, this is not enough.  The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'"  *Id.* (quoting *al-Kidd*, 563 U.S. at 742).  This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Id.* (citation and quotation marks omitted).  And "[s]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."  *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam) (quoting *Mullenix*, 577 U.S. at 12) (second alteration in original).  Accordingly, Plaintiffs "must identify a case that put [the deputies] on notice that [their] *specific* conduct was unlawful."  *Id.* (emphasis added).

The Ninth Circuit has confirmed that "[i]n recent years, the Court has tightened the inquiry to focus closely on an analysis of existing precedent."  *Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017).  While the law "'do[es] not require a case directly on point . . . existing precedent must have placed the statutory or constitutional question *beyond debate*,' such that 'every' reasonable official—not just 'a' reasonable official—would have understood that he was violating a clearly established right."  *Id.* (quoting *al-Kidd*, 563 U.S. at 741).

In light of this case law, the Court believes that the proper inquiry is not whether an imminence requirement was clearly established as of March 2017.  Rather, the Court believes that the proper inquiry is whether—as of March 21, 2017—it was clearly established that the *particular circumstances* confronted by the officers would not constitute a sufficiently imminent threat to justify warrantless entry.  This is because the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition," *Mullenix*, 577 U.S. at 12

1    (citation omitted), so as to provide an officer with guidance about "how the relevant legal

2    doctrine . . . will apply to the factual situation the officer confronts," *Rivas-Villegas*, 142 S. Ct. at

3    8 (citation omitted).

4         The Court reluctantly concludes that no case decided before the incident at issue put "*any*

5    reasonable official*" on notice that warrantless entry under these circumstances would violate the

6    Fourth Amendment. *City & Cnty. Of San Francisco, Calif. V. Sheehan*, 575 U.S. 600, 611

7    (2015) (emphasis added) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014)).  The

8    deputies were dispatched to handle a "physical domestic" dispute.  Dkt. ## 64 at 32; 76 at 29.

9    When they arrived, Mr. Dold apparently confirmed to the deputies that there had been a physical

10   altercation with Ms. Duncan.  The victim, Ms. Duncan, was still in the house.  Neither deputy

11   meaningfully communicated with Ms. Duncan.[4]  Deputy McGee—the deputy who ultimately

12   breached the threshold of the home—could not see Ms. Duncan.  Dkt. # 63 at 7.  In recognition

13   of the "combustible nature of domestic disputes," courts have "accorded great latitude to an

14

---

15       [4] Plaintiffs suggest that the deputies could have called Ms. Duncan on her cell phone if they
     wanted to talk to her.  Dkt. # 141 at 8–9.  But the Ninth Circuit rejected a similar argument in *United*
16   *States v. Brooks*, 367 F.3d 1128 (9th Cir. 2004):

17            Brooks argues that Perez, rather than enter the hotel room without consent, could have
          asked Bengis to join him in the hallway so that he might there assess the safety risks
18        involved.  Brooks contends that such a course of action would have minimized the need
          for the additional intrusion of the warrantless entry.  We reject this argument.  The
          Supreme Court has "repeatedly refused to declare that only the 'least intrusive' search
19        practicable can be reasonable under the Fourth Amendment."  *Vernonia Sch. Dist. 47J v.*
          *Acton*, 515 U.S. 646, 663 (1995) (citing *Skinner v. Railway Labor Executives' Assn.*, 489
20        U.S. 602, 629 n.9 (1989) (collecting cases for this proposition)).  As for Brooks's
          argument that police should have been satisfied by interviewing Bengis in the hallway,
21        such a method might have been attempted, but was not constitutionally required.  A
          hallway interview would not necessarily have been effective to protect Bengis in this
22        context because it would not have addressed sufficiently the exigency with which Perez
          was confronted.  Considering the tendency of victims of domestic abuse to be less than
          forthcoming about the harms to which they were or will likely be exposed at the hands of
23        an aggressor who remains on the scene, Perez was entitled to search inside the hotel
          room, which in the total circumstances was an objectively reasonable way to address the
          exigency.
24   367 F.3d at 1135–36.

officer's belief that warrantless entry was justified by exigent circumstances when the officer had

substantial reason to believe that one of the parties to the dispute was in danger." *United States*

*v. Brooks*, 367 F.3d 1128, 1136 (9th Cir. 2004) (quoting *Tierney v. Davidson*, 133 F.3d 189, 197

(2d Cir. 1998)).  Under these circumstances, the Court cannot say that "any reasonable official"

would understand warrantless entry to be unconstitutional.  *Sheehan*, 575 U.S. at 611 (citation

omitted).

To be sure, Plaintiffs correctly note that, viewing the facts in the light most favorable to

them, the deputies encountered a calm scene without signs of a recent struggle.  This cuts against

the deputies' argument that there was an imminent need to enter the home.  But even so, an

officer could (erroneously) conclude that the situation confronted—in which a domestic violence

victim was still in the home and the deputes could not directly confirm that she was safe—

qualified as an imminent threat under existing case law that would justify warrantless entry under

the exigency or emergency aid exceptions.

In their motion, Plaintiffs cite a number of cases to support their "clearly established"

analysis, but the Court finds each distinguishable in some way.  For example, in *United States v.*

*Harris*, 642 F. App'x 713 (9th Cir. 2016),[5] the alleged victim "answered the door and was within

the sight of the police" and was "unharmed and displayed no signs of being in distress."  *Id.* at

715.  By contrast, while deputy McCoy apparently saw Ms. Duncan through the window, deputy

---

[5] Some of the cases cited by Plaintiffs are unpublished.  The Ninth Circuit has stated that, when considering whether law has been clearly established, courts "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent. *Jessop v. City of Fresno*, 936 F.3d 937, 941 (9th Cir. 2019) (quoting *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005)); *Bahrampour v. Lampert*, 356 F.3d 969, 977 (9th Cir. 2004) (ODC argues before this Court that unpublished decisions can be considered in determining whether the law was clearly established. We agree.").  But the Ninth Circuit has also cautioned that "it will be a rare instance in which, absent any published opinions on point or overwhelming obviousness of illegality, we can conclude that the law was clearly established on the basis of unpublished decisions only."  *Hines v. Youseff*, 914 F.3d 1218, 1230 (9th Cir. 2019) (quoting *Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002)).

ORDER RE: MOTIONS FOR RECONSIDERATION AND MOTION TO BIFURCATE - 16

McGee—who was the first deputy to breach the threshold of the house—could not.  *See* Dkt. # 63 at 7 (Plaintiffs stating that "[a]t that point, McGee could not see Ms. Duncan").  Even ignoring this distinction, a majority of the *Harris* panel stated (in Judge Wallace's dissent) or assumed (in Judge Berzon's concurrence) that the "warrantless initial entry and first protective sweep of the apartment were justified under the exigency or emergency exception."  *See id.* at 718 (Berzon, J., concurring); *id.* at 719 (Wallace, J., dissenting) ("Judge Berzon assumes and I would hold that the initial entry and protective sweep of the apartment met the requirements of the exigency exception to the Fourth Amendment.").  And in *United States v. Struckman*, 603 F.3d 731 (9th Cir. 2010), another case cited by Plaintiffs, there was no report of domestic violence or any mention of a potential victim close by.

Plaintiffs' strongest case is *Maric v. Alvarado*, 748 F. App'x 747 (9th Cir. 2018).  In *Maric*, as here, officers responded to a potential domestic violence call, but the alleged victims remained in the house.  But in *Maric*, it was "apparent to the officers that Mary and the children were unharmed" because the officers could see them.  *Id.* at 748.  And more importantly, *Maric* was decided in 2018, after the deputies' warrantless entry here.  *See, e.g.*, *Nicholson v. City of Los Angeles*, 935 F.3d 685, 690 (9th Cir. 2019) (requiring "that the right was clearly established *at the time of the alleged* misconduct" (emphasis added) (citation omitted)); *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004) (per curiam) ("The parties point us to a number of other cases in this vein that postdate the conduct in question. . . . These decisions, of course, could not have given fair notice to Brosseau and are of no use in the clearly established inquiry.").  Nor can *Maric*'s "clearly established" conclusion apply retroactively to cover the conduct here.  *See Sampson v. Cnty. Of Los Angeles by & through Los Angeles Cnty. Dep't of Child. & Fam. Servs.*, 974 F.3d 1012, 1028 (9th Cir. 2020) (Hurwitz, J., concurring in part and dissenting in part) ("The

'clearly established' inquiry focuses on the judicial opinions extant at the time of the conduct at issue, not on how subsequent cases characterize pre-existing law.").

In recent years, qualified immunity has been roundly criticized.  *See, e.g.*, *id.* at 1025 (Hurwitz, J., concurring in part and dissenting in part) (calling qualified immunity a "judge-made doctrine . . . found nowhere in the text of § 1983"); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1872 (2017) (Thomas, J., concurring) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence."); *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (arguing that the Supreme Court's qualified immunity decision "tells officers that they can shoot first and think later, and it tells the public that palpably unreasonable conduct will go unpunished"); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797 (2018); William Baude*, Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45 (2018). Still, this Court is bound to apply binding precedent as it understands it.  And whatever the wisdom of qualified immunity may be, the Supreme Court has made clear that the doctrine creates an "exacting standard," *Sheehan*, 575 U.S. at 611 (internal quotation marks and citation omitted), designed to "protect[] 'all but the plainly incompetent or those who knowingly violate the law.'"  *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Under these rules, and in light of case law emphasizing the "great latitude" afforded to officers responding to domestic violence, *Brooks*, 367 F.3d at 1136, the Court reluctantly concludes that as of March 2017, the law was not clearly established that the deputies' entry would be unconstitutional in these circumstances.

C.     Motion to Bifurcate

Defendants submitted a "Renewed Motion to Bifurcate Claims Against Defendants Bryson McGee and Cody McCoy."  Dkt. # 139.  The Court denies the motion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### III

### CONCLUSION

For the reasons above, the Court rules as follows:

(1) Snohomish County's motion for reconsideration on the negligent retention claim (Dkt. # 137) is DENIED.[6]

(2) Plaintiffs' motion for reconsideration on their warrantless entry claim (Dkt. # 141) is DENIED.

(3) Defendants' motion to bifurcate (Dkt. # 139) is DENIED.

Dated this 7th day of February, 2023.

John H. Chun
United States District Judge

---

[6] As stated above, however, the County's request to strike Dr. Harmening's supplemental declaration is granted in part and denied in part.

ORDER RE: MOTIONS FOR RECONSIDERATION AND MOTION TO BIFURCATE - 19