1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

JENNIFER DOLD, personal representative
of the estate of Alexander Dold; and KATHY
DUNCAN,

                    Plaintiffs,

        v.

SNOHOMISH COUNTY, a political
subdivision of the State of Washington;
BRYSON McGEE; and CODY McCOY,

                    Defendants.

NO. 2:20-cv-00383-JHC

PLAINTIFFS' MOTIONS IN LIMINE

**NOTE ON MOTION CALENDAR:
February 24, 2023**

Plaintiffs, Jennifer Dold and Kathy Duncan, make the following motions in limine seeking orders precluding defendants from presenting evidence or making argument on the following subjects.

## 1. Evidence of what Duncan said to the operator in her 911 call, which was never passed on to either of the deputies.

As this Court has already recognized, information in factual statements made by Duncan to the 911 dispatcher are relevant only if the dispatcher passed this information on to the deputies. Since "there is no indication that these details were ever conveyed to the deputies by the 911 dispatcher[,] [b]ecause the reasonableness of the deputies' actions 'is to be judged by the circumstances known to them,'" such facts cannot support the lawfulness of the deputies' conduct." Dkt. #135, at 20:12-15, citing *United States v. Black*, 482 F.3d 1035, 1038 (9th Cir. 2007). The determination of whether the force used was objectively reasonable must be made

PLAINTIFFS' MOTIONS IN LIMINE – 1
(2:20-cv-00383-JHC)

DOL013-0001 7142718

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

by considering "what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015), *citing Graham v. Connor*, 490 U.S. 386, 396 (1989). *Accord Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (limited testimony about officers' prior contacts with Ruvalcaba "was relevant to establish the facts and circumstances known to the officers during their confrontation with Ruvalcaba."); *Simmonds v. Genesee County*, 682 F.3d 438, 445 (6th Cir. 2012)(although after the incident officers learned suspect was unarmed, "all of the information available to the officers at the time they used force" supported reasonable belief that he was armed and dangerous), *citing Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

Since the deputies never heard Duncan's 911 call, the recording of that call should be excluded. Since the only relevant information is information that was passed on to the deputies by police radio, the Court should prohibit anyone from testifying to anything else.

It is undisputed that the information that was relayed to the deputies was extremely limited. It is easy to determine exactly what facts were passed on to deputies McGee and McCoy because we have the recording of all the police radio communications with the deputies. Between 9:18 p.m. when they were dispatched and their arrival at the Duncan residence at 9:47 p.m., these are the *only* facts passed onto the deputies: MALE VERBAL AND PHYSICAL (9:18:36); SUS IS MENTAL AND OFF MEDS, RP REQ. SILENT APPROACH (9:19:28); SUS IS IN HOUSE, RP LEFT THE HOUSE IN ORDER TO CALL; RP THINKS HE WILL TAKE OFF IF CALLED (9:21:28); RP IS GOING BACK TO THE HOUSE (9:23:07); RP WANTS HIM TAKEN IN FOR PSYCH EVAL, SUS WMA TALL, SHAVED HEAD, TEE, SWEATS (9:25:33).[1]

Thus, the Court should preclude all witnesses from testifying to anything else that Duncan said to the 911 operator because nothing else has any relevance to the issue of the

---

[1] See CAD Radio communication detail Report. (Appendix A to *Declaration of James E. Lobsenz*).

PLAINTIFFS' MOTIONS IN LIMINE – 2
(2:20-cv-00383-JHC)

DOL013-0001 7142718

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

objective reasonableness of the use of force which must be assessed solely on the basis of facts known to the deputies at the time they used force against Dold.

### 2. Evidence of what she told Detectives Bilyieu and Fontenot, or any other law enforcement officer, in post death interview.

Similarly, for substantive purposes, defendants should be precluded from offering any evidence as to what Duncan told Detectives Bilyieu and Fontenot when they interviewed her after Dold had died and his body had been removed from the scene. Of course defendants may use portions of Duncan's statements for *impeachment* purposes *if* the portion referenced contradicts testimony which Duncan gives on direct.

### 3. Criminal history: convictions.

At the time of his death, Alexander Dold had the following criminal history. He had a juvenile conviction for Minor in Possession (of alcohol) and he also had a DUI conviction that was more than eight years old. Since he is dead, he won't be testifying and thus no criminal conviction could ever be admissible for impeachment purposes under ER 609.

### 4. Alexander Dold's school disciplinary problems.

When he was a high school student Alexander Dold was suspended from school for drinking alcohol. He stopped attending Monroe High School, switched to Shorewood High School, and eventually graduated from Shorewood. The incident has no relevance to any issue in this case. Defendants should be precluded from presenting any evidence regarding any school behavior or school disciplinary matters.

### 5. Alexander Dold's use of alcohol or illegal drugs.

Defendants should be precluded from presenting any evidence or asking any witness any questions regarding Alexander Dold's alleged use or abuse of alcohol. Aside from the incidents mentioned above (his suspension from high school for underage drinking, his juvenile offense of Minor in Possession, and his DUI conviction in the year 2009, Plaintiffs are unaware

PLAINTIFFS' MOTIONS IN LIMINE – 3
(2:20-cv-00383-JHC)

DOL013-0001 7142718

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

of any other instances of alcohol abuse or illegal alcohol use.  There is no contention that Alexander Dold was consuming alcohol on the night of his death.

Defendants should be precluded from presenting any evidence or asking any witness any questions regarding Alexander Dold's alleged use or abuse of illegal drugs.  At times during discovery depositions, Defendants have intimated that Alexander Dold may have made admissions to someone regarding his use of cocaine or marijuana.  Defendants have not indicated when these admissions were supposedly made.  Alexander's family members are not aware of his ever having used any illegal drugs.  There is no contention that he was using or under the influence of any drugs on the night of his death.  As a part of the autopsy conducted in this case, blood samples were sent to the Washington State Patrol Toxicology Laboratory and tested for the presence of many substances.  None were found.[2]

Plaintiffs do not mean to suggest that there can be no testimony regarding the medications that were prescribed for him and that were used to control his delusional thoughts and cognitive impairments associated with his chronic schizophrenia.  Obviously, there will be testimony regarding his behavior when he was "not taking his meds" and the use of such medication to control his mental illness.

### 6.  Presence of any weapons in the house, and speculative argument that Dold "might" have had a gun, or access to one.

Defendants should be precluded from presenting any evidence regarding the presence of any weapons in the Dold house.  This prohibition should extend both to evidence regarding a gun which belonged to Duncan, and to a baseball bat and a set of golf clubs owned by Alexander.

---

[2] The Toxicology Test Report states that his blood was tested for acetone, ethanol, isopropanol, methanol, amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine metabolites and opiates and the results were "None detected."  See Appendix B to *Decl. Lobsenz*.

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

## A. Kathy Duncan's gun was locked up where Dold could not access it.

In her 911 call, Kathy Duncan informed the operator that although she had a gun, her son had no access to it. She stated that she had "a fat lip" because her adult son "yanked the lanyard off her neck and he was trying to get my phone and I think that's when he hit me and he had his arm cocked." *Trans.* 911 Call, at 2. This discussion regarding guns then ensued:

> SNOPAC: Any weapons involved?
>
> DUNCAN: Um, no. I … I have a gun but it's with me and uh …
>
> SNOPAC: Is it secured?
>
> DUNCAN: Pardon?
>
> SNOPAC: Is it secured?
>
> DUNCAN: ***Yes, it's zipped up and it will be locked in … in the car.*** He won't be violent with them. He's afraid of police because when he … a friend of his in high school was killed by a policeman so he was . . .

*Trans*, at 2-3 (emphasis added).

Since Deputies McGee and McCoy were never told anything about Duncan's gun they had no factual basis for believing that *either* Duncan or Dold had access to a gun. Even if the police radio operator had told them what Duncan had said, they would *still* have had no basis for believing that there was a gun in the house or that Dold had access to one. When Duncan was interviewed shortly after Alexander died and his body was taken away, she again stated: "***I told 911 he's not armed.***" He will be afraid of police."[3] Indeed, as both deputies admit, neither one of them ever saw Alexander holding anything in his hands, so they never had any reason to believe that he was armed.

Consequently, there can be no relevance to evidence that Duncan had a gun which was locked up in her car. Under ER 401, any evidence related to Duncan's possession of a gun

---

[3] Appendix C to *Decl. Lobsenz* (emphasis added). Similarly, at her deposition Duncan said Alex had only seen her gun once, that he got upset when he saw it and questioned why she had a gun in the first place, that he had never touched it, and that he did not know where she kept it. *Deposition Duncan*, at 32 (Appendix D, *Decl. Lobsenz*).

PLAINTIFFS' MOTIONS IN LIMINE – 5
(2:20-cv-00383-JHC)

DOL013-0001 7142718

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1   should be excluded. Even if it had some minimal relevance, it would be excludable under ER

2   403 since its prejudicial value would far outweigh whatever minimal relevance it could possibly

3   have. It would make no sense to admit evidence that Duncan possessed a gun along with

4   evidence that it was locked up in a place outside the house where Dold could not access it.

5   **B.      Speculation that Dold "might" have a gun is inadmissible because such speculation**
        **cannot even justify a frisk, much less the repeated use of tasers, blows, kicks, and**
6       **the application of a chokehold.**

7           The Ninth Circuit has twice "held in the context of an excessive force challenge that

8   mere suspicion of domestic violence did 'not reveal any basis' for believing a suspect was

9   armed." *Thomas v. Dillard*, 818 F.3d 864, 882 (9th Cir. 2016), citing *Smith v. City of Hemet*,

10  394 F.3d 689, 702 (9th Cir. 2005) (en banc). In *Thomas* the Court considered "whether domestic

11  violence is the type of crime that is likely to involve weapons, such that the nature of the crime

12  itself may provide suspicion that a person is armed." *Id.* at 878. "We address that issue now

13  and hold domestic violence is not a crime such as bank robbery or trafficking in large quantities

14  of drugs that is, as a general matter, likely to involve the use of weapons." *Id.*

15          The Court rejected the contention "that the mere fact an officer is responding to a

16  perceived domestic violence call establishes reasonable suspicion a suspect is armed and

17  dangerous" because that contention "ignores the broad scope of conduct encompassed by the

18  term domestic violence . . ." *Id.* at 879. "Domestic violence comes in widely varying degrees

19  of dangerousness," and is a term of art encompassing acts that one might not characterize as

20  violent. . . . It can involve conduct as minor as squeezing another's arm to create a bruise . . . ."

21  *Id.* The present case illustrates the soundness of the *Thomas* Court's observation. In this case,

22  the only specific act that the deputies were aware of at the time they tased and beat him was

23  that Alexander Dold admitted that he "pushed" his mother. Knowledge that Dold pushed his

24  mother does not provide any basis for believing that he was armed with any kind of weapon.

25  Moreover, they could see that he had nothing in his hands when he was lying on his back in his

26

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

bedroom.  Nevertheless, they continued to tase and beat him on the porch steps allegedly because he "might" have a gun hidden somewhere under the porch stairs.

In addition to prohibiting any evidence regarding Kathy Duncan's gun, Plaintiff asks the Court to also prohibit Defendants from making any argument that the deputies' use of force was objectively reasonable because they believed that Alexander "might" have a gun.  As *Gravelet-Blondin v. Shelton*, 728 F.3d 1086 (9th Cir. 2013) shows, any such argument is impermissible.  In *Shelton*, police were dispatched in response to a call that Jack, an elderly man, was trying to kill himself.  Police contacted Jack outside his home and while attempting to handcuff Jack the police tased him twice. The Donald Gravelet-Blondins, Jack's neighbors, witnessed the police holding Jack down on the ground, heard Jack crying out in pain, and called out, "what are you doing to Jack?"  Blondin was roughly thirty feet away from the officers. Sgt. Shelton pointed a taser at him and told him to "get back."  Blondin took two steps back and then froze.  Shelton then "tased Blondin in dart mode, knocking him down and causing excruciating pain, paralysis, and loss of muscle control." *Id.* at 1090. "Shelton asked Blondin if he "want[ed] it again" before turning to Ms. Blondin and warning, "You're next." *Id.*  Blondin was arrested and charged with obstructing, but that charge was ultimately dropped.  *Id.*

Shelton argued that his use of force was not excessive because he thought Blondin might be armed with a gun and thus posed a danger to him.  The Ninth Circuit agreed with the district court that this belief was unsupported speculation and thus the use of the taser was objectively unreasonable:

> Defendants also urge us to consider Jack's then-unlocated gun as a basis for the officers' belief that Blondin posed a threat. As the district court observed, ***the officers' purported fear that Blondin might have a gun was "based on nothing more than the reality that any civilian could be armed, speculation that fails to distinguish [Blondin] from any bystander at a crime scene."***

728 F.3d at 1091 (emphasis added), citing *Deorle v. Rutherford,* 272 F.3d 1272, 1281 (9th Cir. 2001).  Similarly, in the present case, neither McGee nor McCoy has any objective basis for believing that Dold was armed or had access to any weapon.  Consequently, defendants should

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

be precluded from arguing that *any* use of force was justified on the ground that Dold "might" have been armed.

**C.** **When Alexander was afraid he kept his golf clubs and a baseball bat close to him while he slept.**

Because he suffered from paranoid schizophrenia, Alexander sometimes had delusions that people were hiding nearby and intended to attack or hurt him. His family first began to suspect he was mentally ill when he started talking about "people hiding in the rhododendrons" who were watching him, people in the bushes who had bows and arrows, or serial killers living in the woods near his house.[4] These paranoid fears surfaced most often when he was not taking his medication. During these periods, because he was afraid to go to sleep, he sometimes kept a baseball bat and a golf club in his bedroom so that he could protect himself in case these people attacked him in the night.[5] On the night of his death, the deputies did not see a bat, a golf club, or any other item that could be employed as a weapon, and Alexander never touched any such item. Since the deputies did not know anything about this behavior or about a bat or a golf club, they are not relevant to the determination of the issue of the use of excessive force. *Black*, 482 F.3d at 1038.

**7. Kathy Duncan's prior husbands.**

Kathy Duncan was married to Alexander's father Zoltan Dold. In depositions, defendants asked questions concerning Zoltan Dold's alcoholism and about his verbal abuse of Alexander Dold when Alexander was a minor. Some treatment records suggest that Zoltan Dold called Alexander names when he was drunk.

Defendants also inquired about Kathy Duncan's second husband Allen who committed suicide. They asked whether his stepfather's suicide had any effect on Alexander.

Neither of these subjects is relevant. Indeed, the conduct of either of Kathy Duncan's prior husbands has no relevance to any issue in this case.

---

[4] Dep. Duncan, at 22-23 (Appendix D); Dep. Jen Dold, 51 (Appendix E, *Decl. Lobsenz*).

[5] Dep. Jen Dold, at 51 (Appendix E).

PLAINTIFFS' MOTIONS IN LIMINE – 8
(2:20-cv-00383-JHC)

DOL013-0001 7142718

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

### 8. Alexander allegedly punched a cousin.

During discovery defense counsel inquired about an allegation that at some unspecified prior date, apparently during Alexander's childhood, he punched one of his cousins.  The cousin was allegedly drunk at the time.  Apparently, Alexander was charged with some kind of offense and a hearing was set in juvenile court, but the charge was eventually dropped.[6]  The incident, whenever it may have occurred, has no relevance to any issue in this case.  Any reference to it or questioning about it should be precluded.

### 9. Living arrangements in prior years.

After his parents divorced Alexander had various living arrangements.  For some years he lived with his father and his grandmother.  At other times he lived with Kathy Duncan and her mother.  In his adulthood he lived briefly in a motel; he lived for about two months in a mental illness treatment house run by Compass Health; and he also lived independently in his own apartment for a short period of time.  There was a very brief period of time – three days – when he was living in his car.  Evidence of his living arrangements prior to March of 2017 simply has no relevance to any issue in this case and should be precluded pursuant to ER 701 and/or ER 703.

### 10. Disagreements about his money – his disability payments, how much he spent, what he spent it on, how much they would give him each day.

Over the years, Alexander would have disagreements with his mother and his sister about the amounts of money that they distributed to him from his disability benefits and about what he bought with the money (such as cigarettes and energy drinks).  So that he would not spend all of his monthly benefits at the beginning of the month, Kathy Duncan and Jen Dold would dole out a small amount to him (generally $30) each day. This subject is not relevant to any issue in this lawsuit and evidence on this subject should be precluded.

---

[6] Deposition Jen Dold, at 56 (Appendix E, Decl. Lobsenz).

PLAINTIFFS' MOTIONS IN LIMINE – 9
(2:20-cv-00383-JHC)

DOL013-0001 7142718

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

**11. Alexander's online contact with "girls" and his viewing of pornography.**

During the deposition of Kathy Duncan, counsel for the County questioned her about Alexander's contact with "girls" over the internet and asked what he looked at when he was online. Although Duncan answered this questions, Plaintiffs' counsel objected that this line of questioning was way "beyond the pale of anything relevant" and noted that it seemed counsel was simply trying to embarrass Duncan by asking her if her son looked at on-line pornography.[7] The Court should prohibit defense counsel from presenting evidence or asking questions about this subject.

**12. Alexander Dold's heart problem.**

Under Fed. R. Evid. 401, evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. For several reasons, evidence pertaining to Mr. Dold's heart condition does not meet the relatively low threshold of what is considered relevant evidence. First, no defense expert can or will testify on a more probable than not basis that Mr. Dold's enlarged heart caused his death on March 21, 2017, or that if Mr. Dold did not have an enlarged heart, he would have survived his encounter with deputies McCoy and McGee. To the contrary, all expert testimony relating to this issue is generally the same: that the prolonged physical struggle between Dold and deputies McGee and McCoy led to metabolic acidosis, which was a significant cause of Mr. Dold's death.[8] For this reason, even if such evidence were minimally probative of a fact of consequence in determining a disputed issue in this case (which it is not), such would be substantially outweighed by the danger of confusing the issues and misleading the jury. *See* Fed. R. Evid. 403.

---

[7] Deposition Duncan, at 121-23 ("Q. Was Alex into anything online? A. Yeah, he talked to girls and stuff online, and pictures and junk like that. 2 Q. What girls did he talk to? A. Just not the kind you want to take home to mom. Just girls, you know. Q. On what kind of websites? A. I don't know. 7 Q. How do you know he did that? A. I think accidentally I saw something on his phone once. Q. And what did you see? . . . MR. LOBSENZ: . . . Go ahead and answer. THE WITNESS: Just girly pictures, and girls would call and text and stuff. . . . Q. BY MR. GROSS: Do you know if he was spending any money on these interactions with girls online? A. He didn't have money to spend. He got $30.00 a day."). (Appendix D, Decl. Lobsenz).

[8] See Dkt. #61, at pp. 4-8, discussing and quoting the deposition testimony of Drs. Dawes, Chan and Adams.

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Moreover, even if the Defendants planned to offer evidence that Dold's heart condition was *a* cause of his death, there is no factual basis upon which the Defendants can or will argue that an enlarged heart was the *only* cause of death. As the Court has already recognized with respect to the Defendants' arguments that Mr. Dold's purported resistance was a cause in fact of his death:

> Defendants' arguments inaccurately suggest that if Mr. Dold's resistance was a cause-in-fact of Mr. Dold's death, then the deputies' conduct cannot also be a cause-in-fact of his death. But an injury can have multiple but-for-causes and multiple proximate causes. *See Bostock v. Clayton County,* 140 S.Ct. 1731, 1739 (2020) ("[O]ften events have multiple but-for causes"); Dan B. Dobbs et al., *The Law of Torts,* §196, p. 625 (2d ed. 2011) ("It is by no means true that the but-for test reduces everything to a single cause. In fact, there are always many causes that meet the but-for test."); *Staub v. Proctor Hosp.*, 462 U.S. 411, 420 (2011) ("[I]t is common for injuries to have multiple proximate causes."). If appropriate the Court will instruct the jury as such….

*Dkt*. #135, at 10:10-23. In other words, whether or not Dold had an enlarged heart is irrelevant to the question of whether the Defendants' excessive force caused Alexander Dold's death. This is especially true where the Court has also noted that the "eggshell skull doctrine" (i.e., the defendant takes his victim as he finds him), is a recognized theory in section 1983 cases. *Id*. 20-23 (citing *Richman v. Sheehan*, 512 F.3d 876, 884 (7th Cir. 2008)). Since Alexander Dold's "eggshell" enlarged heart is irrelevant to any causation issue (or to any other issue), there would be no point in allowing evidence of his heart condition only to then instruct the jury that this evidence was irrelevant and must be ignored.

### 13. Evidence that the electrical shock delivered by a taser does not directly cause heart attacks.

Plaintiffs anticipate the Defendants will attempt to introduce expert testimony that attempts to establish the shock delivered by conducted electrical weapons (i.e., "tasers") does not alone cause cardiac arrest and death. This, however, is a strawman argument in the most classic sense. Allowing the Defendants to "rebut" an argument that the Plaintiffs do not intend to raise serves no purpose other than to confuse and/or mislead the jury. Fed. R. Evid. 401 and

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

403.  To be very clear, Plaintiffs have never made any argument that the shock or voltage of the deputies' tasers immediately killed Dold, or by itself caused his death.

Rather, Plaintiffs contend the lengthy physical struggle between Dold and the deputies, which included the deputies' repeated use of tasers on Dold—which caused painful shocks and increased and further prolonged the physical struggle between them—caused metabolic acidosis in Dold, a condition that eventually led to cardiac arrest and death.  See *Dkt*. 61 at 4:1-9:20 (outlining the testimony of defendants' experts who all generally agree that the prolonged physical struggle between Alexander Dold and deputies McGee and McCoy was a contributory cause of Dold's death).  Given this theory of causation, any argument or reference to the fact that the shocks from tasers do not "directly" cause cardiac arrest is simply a red herring designed to confuse the issues.  For this reason alone, such evidence and testimony should be excluded as irrelevant under Fed. R. Evid. 401.

### 14. Argument that the deputies were legally obligated to enter the house because of Washington's mandatory four hour arrest law.

Since the Court dismissed Plaintiffs' warrantless entry claim, there is no reason why there should be any testimony regarding the deputies' belief that they did not need to have a warrant because there were exigent circumstances.  Deputy McGee has asserted that he felt that Washington's statute that mandates an arrest of the report of domestic violence was made in the preceding four hours was applicable.  Therefore he asserts that he had to enter the house in order to arrest Dold.  But there is no evidence that the reported DV incident had occurred within the past four hours.  On the contrary, the only evidence regarding the time of the DV incident comes from Duncan because she is the only living witness to it.  She has attested to the fact that the incident occurred *more* than four hours before the deputies arrived at her house.  Therefore, the four hour arrest statute has no relevance to this case and no witness should be permitted to refer to it or testify about it.

PLAINTIFFS' MOTIONS IN LIMINE – 12
(2:20-cv-00383-JHC)

DOL013-0001 7142718

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

## 15. Scope of expert testimony from police practices experts.

### A. Impermissible credibility opinions and invasion of the jury's province.

The Court recently issued an order making rulings on the Plaintiffs' Motion to Exclude Defense Experts Ovens and Spurling and to Limit the testimony of Expert Hicks. *Dkt*. #136. In that order the court reserved ruling on one issue involving expert opinions based upon credibility determinations which accept the deputies' testimony as to what happened as true and fail to acknowledge that there are disputes of fact about what happened on the night of Mr. Dold's death. The Court's order states: "[T]he Court is not comfortable ruling on this issue without additional briefing. In particular, the Court would like to know how courts handle expert testimony when, as here, there are numerous facts in dispute that affect the expert's testimony." *Dkt*. #136 at 10:12-14. What follows is Plaintiffs' response to the court's invitation.

The rule that expert opinion as to a witness' credibility is improper and invades the province of the jury is well-settled. As this court has already noted, "[e]xpert testimony is not appropriate to determine how this incident unfolded. This determination in the present case depends on witness credibility. Judging the credibility of witnesses is the jury's function." Dkt. #136, at 10, quoting *Jimenez v. Sambrano,* 2009 WL 2382622, at *2 (S.D. Cal. July 31, 2009).

This Court has also recognized that the rule that an expert witness may not opine that a police officer's use of force was "reasonable" (or "unreasonable"); or that the officer's use of force "did" (or did not) violate the Fourth Amendment; is also well-settled. Dkt. #136, at 4:8-5:7.

Finally, it is also well-settled that to be admissible, an expert's opinion must be helpful to the jury because it informs the jury of something beyond the ken of the layman. (That requirement is explicitly incorporated into the text of Evidence Rule 702(a)). When this third rule of law is applied to a case where a defendant proposes to ask an expert "hypothetical" questions regarding the defendant's use of force, courts hold that such questioning is improper

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

because it is *not* helpful to the jury and instead constitutes a poorly disguised opinion on the issue which is solely for the jury to determine. One of the lead cases which applies these rules is *McCloughan v. City of Springfield*, 208 F.R.D. 236 (2002).

There the district court considered police officer Patterson's motion in limine asking the court to preclude the Plaintiff from calling Ken Katsaris as an expert witness at trial. Plaintiff McCloughan sued Officer Patterson for excessive use of force. McCloughan said that after he backed his vehicle into Patterson's personal vehicle, that Patterson, who was off-duty, pulled McCloughan out of his car, threw him to the ground, and kicked him in the head twice. But Patterson strenuously denied kicking McCloughan in the head. This fact was sharply in dispute. McCloughan maintained that Katsaris was going to give admissible expert testimony about the standards of conduct that police departments used to govern the conduct of their officers while they were off-duty and their officers' use of force. Patterson argued that Katsaris should be precluded from testifying because he was really going to give an opinion that Patterson used excessive force. The district court (1) permitted expert testimony regarding the existence and content of internal police department policies regulating the conduct of its officers and (2) prohibited and excluded expert testimony as to whether Patterson *followed* the department's policies:

> McCloughan argues that Katsaris is qualified to render expert testimony in this case and that the court should allow him to offer his opinion regarding the appropriate standard of conduct of off-duty police officers and the use of force. McCloughan asserts that expert testimony on accepted police practices is admissible in §1983 excess force cases and in any other case in which the reasonableness of police conduct is at issue. ***McCloughan contends*** that Katsaris will offer testimony on the reasonableness of Patterson's conduct under the accepted standard of care for police officers and ***that Katsaris is not, contrary to Patterson's assertions otherwise, offering any opinion(s) on the credibility of the witness.***

*McCloughan*, 208 F.R.D. 236, 238 (C.D. Ill. 2002) (emphasis added).

The district court allowed Katsaris to testify regarding the existence of the Springfield Police Department's internal standards for the conduct of off-duty police officers, and their

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

standards for how to restrain an arrestee who is resisting arrest. But the court prohibited Katsaris from opining as to whether officer Patterson followed those procedures in this case because that *would* amount to a forbidden opinion on credibility and *would* invade the province of the jury by opining on what actually happened:

> [T]he Court will allow Katsaris to offer testimony regarding the proper procedures to be used by law enforcement officials when retraining arrestees who resist arrest, how and when an officer should decide to go from off-duty to an on-duty officer, and the propriety of the Springfield Police Department's Rules of Conduct (specifically Rule 10). Basically, the Court believes that Katsaris can provide *a general framework* regarding proper police conduct *which the jury can utilize to determine the specific facts of this case*.

> *However, the court will not allow Katsaris to offer any specific opinions regarding the specific facts of this case.* As the Court understands it, *most of the crucial facts are in dispute*. In fact, it is the Court's understanding that, . . . *if it were to allow Katsaris to offer his opinion in this case as to whether Patterson … followed proper police procedures, the Court, in essence, would be allowing Katsaris to, as an expert, make and relay credibility findings to the jury regarding the witnesses' testimony. Such testimony is improper and is not helpful to the jury.*

> \*   \*   \*

> Furthermore, *the Court does not believe that a jury needs an expert witness to tell them that it is improper* – under proper police procedure or even common decency – to kick someone in the head when he is being restrained on the ground. If the jury were to find that Patterson did this, the Court is confident that it would also find this conduct to be reprehensible and would render a verdict accordingly without the necessity of hearing from an expert to tell them that this conduct was improper.

*McCloughan,* 208 F.R.D. at 239-40 (emphasis added), citing *Lundy,* 809 F.2d 392, 395 (7th Cir. 1987) ("[c]ourts agree that it is improper to permit an expert to testify regarding facts that people of common understanding can easily comprehend.").

> Accordingly, Patterson's motion is allowed in part and denied in part. Katsaris may testify as to proper police procedures, but he *may not* offer his opinion(s) as to whether those procedures were properly *followed* in this case.

*McCloughan*, at 240 (emphasis added).

PLAINTIFFS' MOTIONS IN LIMINE – 15
(2:20-cv-00383-JHC)

DOL013-0001 7142718

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

The same principle applies here. Deputy McGee contends that Alexander Dold punched him in face without warning, verbally threatened McGee by stating "I will kill you," and tried to grab McGee's gun and take it away from McGee. Plaintiffs maintain McGee is lying and that none of these things ever happened. They contend that Duncan and the Padvoracs are telling the truth: that Dold never punched McGee; never verbally threatened him; and never tried to take away his gun. In fact, as the Padvoracs stated when interviewed, it was one of the deputies who said "I could shoot you" to Dold. (They said they heard a male voice which was not Alexander's voice.)

It would *not* assist the jurors to ask one of the Defendants' experts to "hypothetically" assume that the deputies are telling the truth about everything, and then, based on that assumption, to ask the expert for his opinion as to whether the deputies' conduct was "reasonable," or "consistent with standard police practices," or "proper." Similarly, it would not assist the jurors to ask the Plaintiffs' expert to "hypothetically" assume that the deputies are lying – that Alexander never hit or threatened them, and that he was frightened and struggling simply because he was unable to breathe while being choked, tased, and punched – and then, based on that assumption, to elicit the expert's opinion that the deputies' use of force was objectively "unreasonable," "inconsistent with the department's standards," "improper," or "excessive."

No expert has any special, scientific, or technical expertise in determining when a witness is lying. Moreover, that determination is reserved exclusively for the jury. The defense experts should be allowed to testify (if they know) what Snohomish County's policies and rules state. But whether the defendant deputies followed them is not a proper subject for them to opine on.

**B. Ovens' Failure to identify any specific police practice standards.**

However, while expert testimony on the existence of police department standards is generally admissible, *those standards must be identified with specificity.* "The expert must refer

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

to commonly used police procedures, identifying specific standards by which the jury could measure the defendant's actions." *Butera v. District of Columbia,* 235 F.3d 637, 659 (D.C. Cir. 2011), citing *Scott v. District of Columbia,* 101 F.3d 748, 754 (D.C. Cir. 1996). But defendants' expert Thomas Ovens never identified any "specific" police standards. He simply asserts that he knows what generally accepted police practices or the "current" practices are. This is not sufficient. A police expert must do more than simply rely on his own experience or "simply … declare that the [police department] violated the national standard of care." *United States v. Jojola,* 499 F.Supp.3d 1007, 1012 (D.N.M. 2020), quoting *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997). Thus, the defendants' experts should not be allowed to testify about police standards at all because they have not specifically identified any. *See Halcomb v. Washington Metropolitan Transit Authority,* 526 F.Supp.2d 24, 30 (D.D.C. 2007) (expert "may offer opinions with respect to the issues in this case *only to the extent* that these opinions are *tied to and based upon identifiable, objective standards of police practice such as* those set forth in publications of *the International Association of Chiefs of Police . . .*").

### 16. The Court should exclude evidence regarding Kris Sperry's timesheet entries while employed by the State of Georgia.

Plaintiffs anticipate Defendants will attempt to cross-examine Plaintiffs' expert Kris Sperry, M.D., with respect to purportedly inaccurate time entries he made while employed by the State of Georgia in an effort to impeach Dr. Sperry's credibility as a witness. During Dr. Sperry's deposition, Defendants questioned him at length about articles published in the Atlanta Journal-Constitution which suggested that Dr. Sperry had at various times between the years of 2010 and 2015, reported working full days as a state employee when he had actually been out of the office testifying for private clients. Dr. Sperry acknowledged that he made mistakes when reporting his time as a state employee, but he disputed the accuracy of the articles with respect to the frequency with which such mistakes were made. Dr. Sperry also testified that such mistakes were not purposeful, and that any purported over-reporting did not result in any

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

significant benefit to him. Moreover, there is no evidence that Dr. Sperry was ever disciplined by the State or that any formal proceedings resulted in findings that Dr. Sperry committed any act of impropriety.

Under Fed. R. Evid. 608(b), specific instances of conduct may be inquired into "**if** they are probative of the character or truthfulness or untruthfulness" of Dr. Sperry. In this case, the anticipated evidence should be excluded as it is irrelevant to Dr. Sperry's truthfulness and, even if minimally probative, it would be unduly prejudicial under Fed. R. Evid. 403. *See Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1464 (11th Cir. 1994) (accusation of forgery not relevant to expert's character for truthfulness given absence of sanctions resulting therefrom and thus improperly admitted). There is no evidence that the inaccurate timesheets Dr. Sperry submitted as a state employee were purposeful or deliberate misrepresentations. Moreover, such mistakes over a career of over 18 years can occur without any intent of deception or misrepresentation—a fact that further calls the probative value of such evidence into question. Finally, the probative value of such evidence is further weakened given the relatively remote time period when these acts were purportedly committed (between 2010 and 2015). For these reasons, any argument or reference to inaccuracies in Dr. Sperry's time entries while employed by the State of Georgia should be excluded.

I certify that this memorandum contains 6,296 words, in compliance with the Local Civil Rules.

PLAINTIFFS' MOTIONS IN LIMINE – 18
(2:20-cv-00383-JHC)

DOL013-0001 7142718

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

DATED this 9th day of February, 2023.

       *s/ James E. Lobsenz*
James E. Lobsenz WSBA #8787
Randy J. Johnson WSBA #50129
Attorneys for Plaintiffs
CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104
Phone: (206) 622-8020
lobsenz@carneylaw.com

PLAINTIFFS' MOTIONS IN LIMINE – 19
(2:20-cv-00383-JHC)

DOL013-0001 7142718

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

## RULE 7(d) CERTIFICATION

I certify that the parties have conferred in an attempt to come to an agreement on these motions and reached the following conclusions regarding which motions were in dispute and which were not:

| Motion | In dispute | Stipulated |
|---|---|---|
| **1. What Duncan said to the 911 operator** | X | |
| **2. What Duncan said to law enforcement when interviewed after Alexander's death** | X | |
| **3. Alexander Dold's criminal history** | | Agreed* |
| **4. Alexander Dold's school disciplinary problems** | | Agreed* |
| **5. Alexander Dold's use of alcohol or illegal drugs** | | Agreed* |
| **6. Presence of weapons in the house.**<br>**a. Kathy Duncan's gun**<br>**b. Speculation that Dold might have access to a gun**<br>**c. Baseball bat and/or golf club** | X | |
| **7. Duncan's prior husbands** | X | |
| **8. Allegedly punching a cousin** | | Agreed* |

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

| | | | |
|---|---|---|---|
| **9.** | **Living Arrangements** | X | |
| **10.** | **Disagreements about money/SSI disability benefits** | X | |
| **11.** | **Internet contact with girls and/or pornography** | | Agreed* |
| **12.** | **Enlarged heart** | X | |
| **13.** | **Electrical shock from taser as direct cause of death** | X | |
| **14.** | **Four hour arrest statute** | X | |
| **15.** | **Scope of Expert Testimony re police practices**<br>**a. Impermissible credibility opinions**<br>**b. Testimony regarding unidentified police standards** | X | |
| **16.** | **Dr. Kris Sperry's timesheet entries** | X | |

    **\* However, defendants reserve the right to present such evidence if the Plaintiffs' present evidence which opens the door to it.**

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of February, 2023, I electronically filed the foregoing **PLAINTIFFS' MOTIONS IN LIMINE** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

**Attorneys for Defendant Snohomish County**
Ted Buck
Evan Bariault
Nick Gross
Delaney M. DiGiovanni,
FREY BUCK P.S.
1200 5th Avenue, Suite 1900
Seattle, WA 98101
tbuck@freybuck.com
ngross@freybuck.com
ebariault@freybuck.com
ddigiovanni@freybuck.com;

**Attorneys for Defendants Bryson McGee and Cody McCoy**
Shannon M. Ragonesi
Richard B. Jolley
Sean M. Dwyer
KEATING, BUCKLIN & MCCORMACK, INC., P.S.
801 Second Avenue Suite 1210
Seattle, WA  98104
sragonesi@kbmlawyers.com
RJolley@kbmlawyers.com
sdwyer@kbmlawyers.com

DATED this 9th day of February, 2023.

_s/ Deborah A. Groth_
Legal Assistant

PLAINTIFFS' MOTIONS IN LIMINE – 22
(2:20-cv-00383-JHC)

DOL013-0001 7142718

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020